**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

PATRICK NATHANIEL REED,
c/o 22 Philbrook Way
Woodlands, TX, 77382

                                        **AMENDED COMPLAINT**

                    Plaintiff,          **Case No: 3:22-cv-01181-TJC-PDB**

v.

SHANE RYAN,
2706 Ellen St #3R
Durham, NC, 27705

And

HACHETTE BOOK GROUP, INC
1290 6th Ave
New York, NY 10104

And

DOUG FERGUSON
c/o 1 Riverside Avenue
Jacksonville, FL, 32202

And

THE ASSOCIATED PRESS
200 Liberty Street
New York, NY 10281

And

FOX SPORTS, INC.
12181 Bluff Creed Dr.
Playa Vista, CA, 90094

And

NYP HOLDINGS, INC.

d/b/a The New York Post
1211 Avenue of the Americas
New York, NY 10036

And

GAVIN NEWSHAM
c/o 1211 Avenue of the Americas
New York, NY 10036

And

BLOOMBERG L.P.
731 Lexington Avenue
New York, NY 10022

And

ERIK LARSON
218 Myrtle Avenue
Apartment 6A
Brooklyn, NY 11201

Defendants.

## I.    INTRODUCTION

Plaintiff PATRICK NATHANIEL REED ("Mr. Reed") or ("Plaintiff") brings this action

against Defendants SHANE RYAN ("Ryan"), HACHETTE BOOK GROUP, INC ("Hachette"),

DOUG FERGUSON ("Ferguson"), THE ASSOCIATED PRESS ("AP"), FOX SPORTS, INC.

("Fox Sports"), NYP HOLDINGS, INC ("New York Post"), GAVIN NEWSHAM ("Newsham"),

BLOOMBERG L.P. ("Bloomberg") and ERIK LARSON ("Larson") acting in concert as joint

tortfeasors, jointly and severally, in this civil action for general defamation, defamation per se,

defamation by implication, and tortious interference as a result of Defendants' causing actual

damages, compensatory damages, and giving rise to punitive damages, including continuing and

aggravated harm to Mr. Reed's professional, business and personal reputation and livelihood. In

crafting this Amended Complaint, Mr. Reed has endeavored to comply with the Court's order of

December 13, 2022, as well as precedent set by this Court in its prior rulings in *Berenato v. Tankel,* No. 3 :10-cv-979-J-32MCR (M.D. Fla. July 15, 2011) and *Bassler v . George Weston Bakeries Distribution, Inc.*, No. 3:08-cv-595-J-32JRK (M.D. Fla. Oct. 24, 2008). As grounds therefore, Mr. Reed alleges as follows:

## II.   JURISDICTION AND VENUE

1.     This Court has diversity jurisdiction over this case pursuant to 28 U.S.C. § 1332, as the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000.

2.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(3) in that this is a district in which a substantial part of the events or omissions giving rise to Plaintiff's claim occurred, as this case is related to *Reed v. Chamblee et al*, 3:22-cv-01059 (M.D. Fl.) (the "*Chamblee* Case") filed in this Court, and Defendant PGA Tour is located in this judicial district.

3.     The Court may exercise personal jurisdiction over the Defendants pursuant to Fla. Stat.§48.193(1)(a)(2) because they committed the tortious act of defamation and tortious interference within the state of Florida. Further, because Defendants all conduct substantial business and reap substantial profit regularly in Florida, they have more than sufficient minimum contacts with the state so as to satisfy the due process requirements of the Constitution and Florida law.

4.     Defendant AP is registered with the Florida Secretary of State to do business in Florida.

5.     Defendant New York Post, as per their website[1], lists "most of Florida" as one of the only six geographic areas in the United States where they provide home delivery service, in

---

[1] https://nypost.com/subscription-help/

addition to Boston, Philadelphia, Washington DC, Los Angeles, and Las Vegas. Thus, they conduct substantial business regularly in Florida.

6.     Defendant Fox Sports also has a permanent presence in Florida, with an office in Fort Lauderdale, as well as a Florida specific Twitter handle, @FoxSportsFL.

7.     Defendant Bloomberg is registered with the Florida Secretary of State to do business in Florida.

### III.   PARTIES

8.     Mr. Reed is an individual, natural person who is a citizen of the state of Texas and a resident of both Texas and Florida. He has a residence in both The Woodlands, Texas and Kissimmee, Florida.

9.     Defendant Ryan is an individual, natural person who is  a citizen of the state of North Carolina.

10.     Defendant Hachette is incorporated under the laws of Delaware, with headquarters in New York.

11.     Defendant Ferguson is an individual, natural person who is a citizen of Florida, and specifically, this judicial circuit.

12.     Defendant AP is incorporated under the laws of New York with headquarters in New York.

13.     Defendant Fox Sports is incorporated under the laws of Delaware, with headquarters in California.

14.     Defendant New York Post is incorporated under the laws of Delaware, with headquarters in New York.

15.     Defendant Newsham is an individual, and on information and belief a citizen and resident of the United Kingdom. On information and belief, he is employed by Defendant New York Post and/or Fox Sports as a writer.

16.     Defendant Bloomberg is. Delaware limited partnership with headquarters and its principal place of business in New York. Defendant Bloomberg is a citizen of Delaware, New York, New Jersey, and New Mexico, but **not** a citizen of Florida for the purpose of diversity of citizenship jurisdiction because none of its partners are citizens of Florida or domiciled in Florida.

As revealed by Defendant Bloomberg in *Van Deeen v. Bloomberg L.*P., No. 20-cv-239 (S.D. Ala. Dec. 2, 2020), Defendant Bloomberg has two partners, Bloomberg Inc and BLP Acquisition L.P. Both are Delaware corporations with principal places of business in New York. Furthermore, BLP Acquisition L.P. has tow partners, Bloomberg Inc. and BLP Acquisition Holding LLC. BLP Acquisition Holding LLC is a Delaware limited liability company with its principal place of business in New York. The owners/members of BLP Acquisition Holding LLC are: (1) Michael Bloomberg, a U.S. citizen domiciled in New York; (2) Duncan Macmillan, a U.S. citizen domiciled in New Jersey; (3) Thomas Secunda, a U.S. citizen domiciled in New York; (4) Thomas Neff, a U.S. citizen domiciled in New Mexico; (5) Robert Ostrow, a U.S. citizen domiciled in New York; (6) Ross Macdonald Barnes, Jr., a U.S. citizen domiciled in New Jersey; and (7) Mark Purdy, a U.S. citizen domiciled in New York.

17.     Defendant Larson is an individual and a citizen and resident of New York

## IV.   STANDING

18.     Mr. Reed has standing to bring this action because he has been directly affected and victimized by the unlawful conduct complained herein. His injuries are proximately related to the

intentional, reckless, and malicious conduct of Defendants, each and every one of them acting in concert jointly and severally, as joint tortfeasors.

## V.    FACTS

### BACKGROUND FACTS

19.    Mr. Reed is a professional golfer who began his career after winning back-to-back NCAA Championships at Augusta State University. Since his first win, Mr. Reed has gone on to win a total of 9 PGA Tournaments, including his first major championship victory in 2018, at The Masters in Augusta, Georgia, at the age of 27. He was ranked as high as six (6) in the Official World Golf Ranking as late as 2020 and has remained a top player in the world since earning his PGA Tour card in December of 2012 and has continued to proudly represent the United States worldwide on team events and individually since 2014.

20.    Despite his exceptional world-class golfing achievements, in June of 2022, Mr. Reed was constructively terminated as a member of the PGA Tour, as a result of threats made and actions taken by its Commissioner Jay Monahan ("Monahan") and the PGA Tour and he later signed with LIV Golf.

21.    To compound matters, both before and in furtherance of the threats made and actions taken by the PGA Tour and Monahan to constructively terminate Mr. Reed,  each and every one of the Defendants have conspired as joint tortfeasors for and with the PGA Tour, its executives, Monahan and their agents to engage in a pattern and practice of defaming Mr. Reed, misreporting information with actual knowledge of falsity and/or reckless disregard of the truth, as set forth herein.

22.    These calculated, malicious, false and/or reckless attacks have had a direct effect on Mr. Reed's and his family's livelihood because he has suffered major damages through the loss

of multiple multi-million dollar sponsorship deals that were not or have not been renewed including, but not limited to Titleist, Nike, Ultimate Software, cbdMD, Callaway, Tax Slayer, Perry Ellis, NetJets, and ETS as well as numerous promising prospective sponsorship and business opportunities that did not come to fruition as a direct and proximate result including, but not limited to companies such as Quicken Loans, Draft Kings, Travelers, DOW, ARAMCO, CISCO, Porsche, Wells-Fargo, ROUSH, Zurich, Perry Ellis, Waste Management, Citibank, American Express, Michael Kors, Houston Tourism, Taylormade, Bettinardi, and SRIXON. The damages do not just stop there. Top Coaches in the world have denied to coach or work with him periodically throughout his career as a top-player in the world for fear of backlash they would receive from the Tour or the media, including, but not limited to Butch Harmon, and Sean Foley, two very prominent coaches in the golf world who took on lesser players at the time asked or thereafter.

23.     Mr. Reed received no corporate sponsorships via the PGA Tour's Corporate Partners, in which every single member of every Ryder Cup Team and/or President's Cup Team member that Mr. Reed has played with and/or against, has received. He was and is the only player from any  team competition, including International Team Members and European Ryder Cup Members, who has never had a single sponsor that is a corporate partner of the PGA Tour. Meanwhile Mr. Reed's peers from all sides have received multiple sponsorship deals through the PGA Tour and affiliates. Mr. Reed has far fewer sponsorships now than he had prior to the Defendants' concerted attack on his reputation, and far fewer sponsorships than other golfers who have reached his exceptional level of professional success

## FACTS PERTAINING TO DEFENDANTS' CONCERTED ACTION

24.     To understand why the Defendants have engaged in a pattern and practice of maliciously defaming Mr. Reed, it is important to set forth briefly facts pertaining to antitrust and

anti-competition allegations that are being litigated by the undersigned counsel in the Fifteenth Judicial Circuit in Florida as well as by others in the U.S. District Court for the Northern District of California. These facts show the Defendants' intent, and therefore actual as well as common-law malice, in maliciously defaming Mr. Reed. Lending credence to these antitrust allegations is the fact that in the case brought by the undersigned counsel, these antitrust allegations were sustained on a motion to dismiss, and the case is now in the discovery phase. *Klayman v. PGA Tour et al*, 50-2022-CA-006587, (15th Jud. Cir. Fl.)*. This case is centered around the same type of collusive conduct set forth herein.

25.     Defendants are acting in concert as joint tortfeasors with and as agents on behalf of the PGA Tour and DP World Tour – the PGA Tour's joint venture partner - which view LIV as its primary competitor. Thus, Defendants and the PGA Tour and its joint venture partner DP World Tour, have conspired and colluded to defame, smear, and harm anyone associated with LIV—including Mr. Reed, one of its most prominent athletes—in order to try to maintain their monopolistic hold on professional golf, and therefore continue to substantially profit, to the tune of an estimated $1.522 billion in revenue for the PGA Tour alone in 2021.[2]

26.     For example, Monahan and DP World Tour's CEO Keith Pelley ("Pelley") sit on the governing board of Official World Golf Ranking ("OWGR"), which awards points that determine whether golfers qualify Major Championships and World Golf Championships. It is therefore no surprise that LIV golfers such as Mr. Reed do not earn OWGR points, which severely

---

[2] *See* Mike Purkey, *The PGA Tour Is On a Spending Spree and We Know Who's Going to Get the Bill*, Sports Illustrated, Dec. 21, 2021, available at: https://www.si.com/golf/news/the-pga-tour-is-on-a-spending-spree-and-we-know-whos-gonna-get-the-bill

cripples their ability to advance professionally as golfers, thus, along with the continued malicious defamation, eliminates Mr. Reed and LIV golfers as competitors, as set forth below.

27.     With regard to the defamation at issue, Golf Channel is firmly ensconced as the PGA Tour's and the DP World Tour's co-conspiratorial agent and admitted "partner" in the words of PGA Tour Commissioner Monahan as recently at the 2022 President's Cup, to push its anticompetitive agenda and message to the public. Golf Channel systematically and prominently displays a chyron on its television screen which admits and boasts that it is the "Home of the PGA Tour."

28.     This was also admitted by Monahan in a recent appearance on none other than Golf Channel, where he referred to the "partnership" between the PGA Tour and Golf Channel, stating that he was "really proud of the partnership that we [the PGA Tour and the Golf Channel] share."[3]

29.     It has even recently been revealed in LIV's lawsuit against the PGA Tour for illegal, anticompetitive actions that the PGA Tour itself  has orchestrated a campaign to defame LIV and its players over LIV being financed by the Saudi PIF, and that the PGA Tour hired Clout Public Affairs to not only assist in orchestrating this, but also to bury the PGA Tour's involvement from public knowledge. This is shown in LIV's motion to compel Clout to comply with its subpoena. *See L IV Golf Inc. v. Clout Public Affairs, LLC,* 1:22-mc-00126, (N.D. CA.) Dkt. #1-1.

30.     It is clear that task of fomenting, orchestrating, and manufacturing defamatory outrage was directed to the Defendants named herein to serve as the PGA Tour's voice and agents, which explains why there has been such a clearly orchestrated attack by the Defendants as alleged herein on Mr. Reed and LIV.

---

[3] *Jay Monahan doesn't expect peace between PGA Tour, LIV*, Golf Channel, Sep. 21, 2022, YouTube, available at: https://www.youtube.com/watch?v=7wmZVDzlWRo

31.     The Defendants named herein, each and every one of them, have a lengthy, well-established, and highly publicized history of working very closely with, and at the direction of, the PGA Tour, DP World Tour – as well as the two golf leagues' partner and preferred media "mouthpiece," the Golf Channel – in order to push the PGA Tour and DP World Tour's agenda and promote their talking points.

32.     In return for serving and carrying-out the PGA Tour's, the DP World Tour's, and Golf Channel's agenda, the Defendants, on information and belief, receive direct financial benefit and perks such as free tickets to PGA Tour events and special access to its officials and players, as well the indirect benefit of having a boosted profile and fame due to their association with the PGA Tour, the DP World Tour and Golf Channel.

33.     As further evidence, the PGA Tour's defamatory pattern and practice previously gave rise to a related lawsuit before this Court, *Reed v. Chamblee et al*, 3:22-cv-01059 (M.D. Fl.) (the "*Chamblee* Case"), where the PGA Tour and Golf Channel's known "mouthpieces," including but not limited to Brandel Chamblee, Damon Hack, Shane Bacon, and Eamon Lynch were sued for publishing malicious and defamatory statements and other illegal acts of and concerning Mr. Reed due to his decision to sign with LIV.

34.     In the *Chamblee* Case, it is alleged that the Defendants there conspired to engage in a concerted plan of action to maliciously defame and commit other illegal acts concerning Mr. Reed at the direction of the PGA Tour and its foreign partner, the DP World Tour due to Mr. Reed's decision to sign with LIV Golf. It is alleged that this concerted defamatory attack was targeted at Mr. Reed because the media has portrayed him as a "villain" and used him as a "whipping boy," and the controversial face of LIV, so by attacking him, they are able to attack other golfers signed with LIV and LIV itself. This increases viewership, clicks, and profitability.

Regrettably, this is a common, albeit sinister, technique used by the media to create scandal, and manufactured controversies for money.

35.     Certain golf media is notorious for its penchant of manufacturing and creating scandal where none truly exists, as it is a quick and easy way to gain attention and viewership, and therefore profit. Regrettably, Mr. Reed has become golf media's preferred target due to Defendant Ryan and the other Defendants' continued, sustained attacks.

36.     This instant case is related to the *Chamblee* Case, as it involves further newly discovered false, malicious, and defamatory statements and other alleged illegal acts  of and concerning Mr. Reed made by the PGA Tour's "mouthpieces," at the direction of the PGA Tour.

37.     This continued course of conduct dates all the way back to January 30, 2015, when Defendant Ryan out of nowhere first posted an article on Tobacco Road Blues titled *The Villain: Patrick Reed*," where Defendant Ryan falsely and maliciously accused Mr. Reed of lying during his interview, stealing from his teammates at the University of Georgia, and cheating during a qualifying round at Augusta State University. This article was a "showcase" meant to promote his forthcoming book, <u>Slaying the Tiger: A Year Inside the Ropes on the New PGA Tour</u> ("<u>Slaying the Tiger</u>"), which ended up republishing many of the same malicious and defamatory statements.

38.     It was through this article and book that Defendant Ryan first created scandal using Mr. Reed's name, and the false, malicious, and defamatory publications of cheating, lying, and stealing manufactured by him which  have been republished countless times with reckless disregard by these golf media reporters in the years since, severely damaging Mr. Reed's reputation and the livelihood and well-being of himself, his colleagues, and his family.

39.     Prior to the release of <u>Slaying the Tiger</u>, the PGA Tour credentialed Defendant Ryan, despite him having no publisher or a real resume in order to give him complete access behind

11

the scenes for an entire year with access to PGA Tour players, including Mr. Reed, and their families' agents. Defendant Ryan communicated with Mr. Reed via email, portraying his upcoming book as documenting how the "young guns" of golf, including Mr. Reed, were chasing the legends of the game. Mr. Reed even sat for an interview with Defendant Ryan, where Mr. Reed was never once asked about the defamatory statements that came to be published in Slaying the Tiger. These defamatory statements in Slaying the Tiger by Defendant Ryan completely blindsided Mr. Reed.

40.     And now, Defendant Ryan has chosen to republish these same malicious, false, and defamatory statements of and concerning Mr. Reed in his new book—right when the LIV controversy is taking center stage. The timing here can only be explained by the fact that these new defamatory publications are being made and perpetrated in concert with the *Chamblee* Defendants, Defendant PGA, and DP World Tour in order to try to further smear, discredit, defame, falsely injure, tortiously interfere and severely damage  Mr. Reed and other LIV golfers who have signed with LIV.

41.     This is part and parcel to Defendant Ryan's fixation on Mr. Reed, and indicative of the fact that he takes every possible opportunity to maliciously defame Mr. Reed with his fabricated "cheating" publications. It is a calculated effort to try to destroy Mr. Reed's professional career to promote his publications for profit.

42.     Defendant Ryan himself is a longtime partner and collaborator with and in effect an agent of the PGA Tour and the Defendants in the *Chamblee Case*, including but not limited to Brandel Chamblee, Damon Hack, Shane Bacon, Eamon Lynch, and The Golf Channel.

43.     Defendant Ryan frequently appears on the Golf Channel, often at the same time as the above Defendants in the *Chamblee Case*.

44.     Defendant Ryan often travels to Ponte Vedra, Florida – the headquarters of the PGA Tour – to cover golf.

45.     As revealed in a January 7, 2020 interview with "Off the Ball Sports," Defendant Ryan' entire career was built off the back of his association with his benefactor, the PGA Tour.[4] Indeed, when the hosts of this show even mildly criticized the PGA Tour, Defendant Ryan rushed to its defense saying:

> The PGA Tour in a lot of ways is an unbelievably impressive organization…they're head and shoulders above any other governing bodies in golf and it puts me in an awkward position almost to criticize them because there are a ton of people who work for the PGA Tour who helped me out routinely any time that I am there and have been integral to the work I do…

46.     In that same show, Defendant Ryan openly exhibited his malicious intent to damage and destroy Mr. Reed with his fabricated cheating publications and other false publications:

> If he has to deal with this, as I think he will….that's going to take its toll. It's not going to be fun. You would think a normal human being would start to dread being out on the course…just because it's, uh, either you're taking abuse or, even worse, you're waiting to take abuse.

> So, I don't think [the players] like [Mr. Reed] to begin with, I think they're going to like him even less now… [Mr. Reed is] not going to be anybody's best friend and you'll start to see more and more criticism come out…from players.

> Nobody called him out and that's fine, but that's going to infuriate fans and other golfers more and it's just going to make matters worse for him.

47.     Similarly, Defendant Newsham is also a frequent partner and collaborator with the PGA Tour and Defendant Ryan and the Defendants in the *Chamblee Case*, including but not limited to Brandel Chamblee, Damon Hack, Shane Bacon, Eamon Lynch, and The Golf Channel.

48.     Defendant Newsham has at the direction of the PGA Tour and Ryan, republished at a minimum reckless disregard for the truth and thus with actual malice the false, malicious, and

---

[4] https://www.youtube.com/watch?v=ltuKVhcGIlY

defamatory statements contained in the Book to a much wider audience on Fox Sports and New York Post.

49.     Lastly, Defendant Ferguson – a resident of this judicial district and a citizen of Florida - has held a longstanding and continuous grudge and at all material times exhibited animus against Mr. Reed, having with actual malice, defamed and written highly skewed and negative stories of and concerning Mr. Reed numerous times over the years under the umbrella of the Associated Press. He also chooses to repeat and republish with actual malice the same highly false and defamatory attacks initially manufactured by Defendant Ryan.

50.     Similar to Defendants Ryan and Newsham, Defendant Ferguson is a longtime partner, collaborator and "mouthpiece" for the PGA Tour and writes for and is on the editorial staff of Golf Channel and the Associated Press.

## FACTS PERTAINING TO DEFENDANTS' DEFAMATION

51.     In retaliation for Mr. Reed's decision to sign with LIV, Defendants, conspiring and acting in concert as joint tortfeasors with the PGA Tour, DP World Tour, have engaged in a pattern and practice of maliciously defaming and tortious interfering with Mr. Reed, as well as LIV and other golfers who signed with LIV.

52.     It is clear that where the Defendants are making false and misleading statements regarding LIV and its players, it is reasonably understood by an objective viewer/listener that the Defendants are making these statements of and concerning Mr. Reed, as well as other golfers signed to LIV.

53.     Indeed, Mr. Reed has become, not by choice but due to media-driven narrative, a "whipping boy" and therefore a frequent target of the Defendants and others in the media in order to defame, disparage and harm LIV's other golfers and LIV as a whole.

54.     The Defendants know that if they can destroy the reputation of Mr. Reed, which they themselves have inserted as the face of the "controversy" surrounding LIV, they can destroy the reputations and financial and other well-being of each and every golfer signed with LIV, just as they have for Mr. Reed for years and therefore LIV itself. This will allow them to achieve their goal of removing LIV as a competitor so that they can continue to profit obscenely.

55.     Each and every one of the defamatory publications and tortious interference set forth below were intentionally published and perpetrated by the Defendants in the state of Florida, where the offending acts were accessed, read, opened, and viewed by numerous third-party Florida residents and citizens. Florida and this district are in effect the capitol of professional golf and golf in general for the United States. Its year-round warm climate, and the fact that Florida is the third largest state, with a huge media market in the golf industry make the Sunshine State a prime target for Defendants' defamatory and other illegal acts in their effort to destroy Mr. Reed, other LIV players and LIV in general. Indeed, the last LIV tournament for 2022 took place at Trump National in Doral, Florida, and a myriad of PGA Tour events also take place in this district and Florida in general. Thus, the PGA Tour and LIV are going head-to-head in the Sunshine State.

56.     In sum, each and every one the Defendants have engaged in "continuous and systematic" activities in Florida, as they are all members of golf media. Florida is considered to be the golf capital of the United States, if not the world. Furthermore, as this Amended Complaint alleges that Defendants were and are continuing to act in concert with and at the direction of the PGA Tour, their "continuous and systematic" contacts with Florida are even more evident given that the PGA Tour is headquartered in Ponte Vedra, Florida, in this judicial district.

57.     As set forth above, Defendants Ryan, Newsham, and Ferguson are regularly in Florida, and specifically this judicial district where the PGA Tour is headquartered, to provide media coverage for golf events being held in the Ponte Vedra area and elsewhere in Florida.

58.     Defendants Hachette, Fox Sports, New York Post, and AP heavily circulate their golf media and do substantial business and reap large profits in Florida, and specifically this judicial district. They have deliberately exploited this judicial district, since it is one of the golf capitals of the United States and the world, and where the PGA Tour headquarters is located.

59.     In sum, each of the Defendants do substantial business in Florida and derive significant revenues from their business in Florida, as it is the third largest media market in the United States and which may soon overtake other media markets giving Florida's rapid population growth and good economic and social conditions, including but not limited to a lack of a state personal income tax and other benefits for individuals and businesses that most other states do not offer.

60.     It is clearly established that in defamation cases, "a publication must be considered in its totality. 'The court must consider all the words used, not merely a particular phrase or sentence.'" *Byrd v. Hustler Magazine*, 433 So. 2d 593, 595 (Fla. Dist. Ct. App. 1983).

61.     **Thus, the defamatory statements set forth below are presented in context, but the actual portions that are alleged to be defamatory will be set forth in bold**.

62.     Furthermore, it is clear that statements of mixed opinion are actionable as defamation. "Mixed opinion is based upon facts regarding a person or his conduct that are neither stated in the publication nor assumed to exist by a party exposed to the communication. Rather, the communicator implies that a concealed or undisclosed set of defamatory facts would confirm his opinion." *Hay v. Indep. Newspapers, Inc.*, 450 So. 2d 293, 295 (Fla. Dist. Ct. App. 1984).

63. Florida law recognizes defamation, defamation *per se* and defamation by implication. Importantly, defamation by implication arises, not only from what is stated, but from what is implied when a defendant (1) juxtaposes a series of facts so as to imply a defamatory connection between them, or (2) creates a defamatory implication by omitting facts, such that he may be held responsible for the defamatory implication. *Readon v. WPLG, LLC*, 46 Fla. L. Weekly 836 (Dist. Ct. App. 2021).

64. Furthermore, defamatory statements can arise from persons not specifically named in the statements at issue so long as understood by the listener or reader that it is of and concerning the person being defamed. "It is not essential that the person defamed be named in the publication if, by intrinsic reference, the allusion is apparent, or if the publication contains matters of description or reference to facts and circumstances from which others may understand that he is the person referred to, or if he is pointed out by extraneous circumstances so that persons knowing him can and do understand that he is the person referred to; and it is sufficient if those who know the plaintiff can make out that he is the person meant." *Harwood v. Bush*, 223 So. 2d 359, 362 (Fla. Dist. Ct. App. 1969). As a recent real-world example, in the case of Johnny Depp against Amber Heard for defamation, *Depp v. Heard*, CL-2019-2911 (Fairfax VA), Mr. Depp was not specifically named in the defamatory publication, but because readers could discern that the statements were of and concerning him, he was able to obtain a large jury verdict in his favor. The jury returned a verdict for Mr. Depp of $15 million for defamation far less systematic and severe than what has been perpetrated against Mr. Reed.

65. And, while the statements below are unambiguously defamatory, even if they could be construed as ambiguous, this is an issue that would need to go to the trier of fact. *Perry v. Cosgrove*, 464 So.2d 664, (Fla. 2d DCA 1985).

66.     Lastly, it is textbook Florida black-letter law that constitutional and actual malice can be discerned and proved by circumstantial facts which show the intent of the speaker. *See* Manual Socias, *Showing Constitutional Malice in Media Defamation*, Fla. Bar. J., Sept. 2018, available at https://www.floridabar.org/the-florida-bar-journal/showing-constitutional-malice-in-media-defamation/. This is why Mr. Reed has set forth these circumstantial facts in this Amended Complaint in order to provide notice to the Defendants and the Court of his claims.

### *Ryan and Hachette*

67.     Defendant Ryan has recently published, The Cup They Couldn't Lose: America, The Ryder Cup, and The Long Road to Whistling Straits, (hereinafter the "Book"), where he republishes with actual malice many of the same false, malicious, and defamatory statements set forth in Slaying the Tiger: A Year Inside the Ropes on the New PGA Tour of and concerning Mr. Reed.

68.     In the Book, Ryan makes numerous malicious, false, and defamatory statements of and concerning Mr. Reed.

69.     Ryan  and Hachette acted with, at a minimum, a reckless disregard for the truth, since they consciously and willfully chose not to speak with any witnesses who could have and would have refuted the false, malicious, and defamatory statements below, including but not limited to Mr. Reed's college coaches, his college teammates, and PGA Tour officials involved in the "incidents" set forth below.

70.     The defamation maliciously commences with the title of Chapter 1 itself, which reads "December 2019, Melbourne, Australia, Fires Down Under … The Greatest Escape…**The End of the Legend of Patrick Reed**." It is telling and of great legal significance that the first

chapter of the book takes aim at Mr. Reed, who then becomes the focus of more smears, lies and innuendo.

71.    This chapter—taken as a whole, including the plainly defamatory title—is defamatory, and at a bare minimum, defamatory by implication.

72.    *First*, Ryan publishes, "**[Mr. Reed had] been kicked out of Georgia after a year for two alcohol violations, the second of which he tried to hide from his coach, and before that he'd been accused by his teammates of cheating during a qualifying event. Then he went to Augusta State, where he turned the entire team against him almost immediately, and once again he was accused of cheating, this time by shaving strikes in two straight qualifying events. His teammates held a meeting and voted to kick him off the team, but Augusta State coach Josh Gregory reduced it to a two-match suspension**."

73.    This statement is false, malicious, and defamatory on its face because it falsely states that Mr. Reed cheated during his NCAA playing career. Mr. Reed has provided public statements by his coaches – who would have been privy to any cheating accusations – that they were unaware of any cheating accusations against Mr. Reed and importantly that he did not cheat.

74.    *Second*, Ryan publishes, "**When the ugly details came out, Reed set to work blundering his way into deeper trouble**, which was the start of a PR strategy that he's doggedly stuck to ever since**.** He went on Golf Channel, **produced a couple of vague statements from his coaches**, and generally took the path of full denial**.** The end result was that Reed's teammates, who had previously been silent **came out of the woodwork to crucify him further, confirming old details and adding new ones.**

75.    This statement is false, malicious, and defamatory because it once again published the falsity that Mr. Reed cheated during his NCAA playing career. Mr. Reed has provided public

statements by his coaches – who would have been privy to any cheating accusations – that they were unaware of any cheating accusations against Mr. Reed.

76.     It is significant and most telling that Mr. Reed - as a young freshman in college was taking the place of All-American juniors and seniors in qualifying events every single week on the University of Georgia Golf Team- which was the best in the country at that time. Those players didn't like a freshman taking their spots - it embarrassed them, angered them, and in the end - Patrick ended beating all of them in his second team triumph to go back-to-back NCAA Championships, so these group of guys had every reason to get rid of Patrick on the team, and that is what they did.

77.     *Third*, Ryan published "Reed found himself in a waste area that looked indistinguishable from a sand trap. The rules, though, are different: in the waste area, a player is allowed to ground his club. Which is exactly what Reed did, but then he proceeded to drag the club backward, sweeping away the sand in front of his ball. Then he resettled the club and did it again**. This is blatantly illegal, and nothing about it was ambiguous. Reed had improved his lie by clearing the path to his ball, and when the first effort wasn't satisfactory, he did it again. The TV camera caught him red-handed**, and Golf.com's Dylan Dethier, on the scene, heard Rickie Fowler say, I don't even know what you have to review."

78.     This statement is false, malicious, and defamatory because it baselessly accuses Mr. Reed of intentionally cheating during the 2019 Hero World Challenge in the Bahamas. What the purported taped video of this matter – which on information and belief was doctored - showed, at worst, was an unintentional error by Mr. Reed and he was not even in a sand trap but a waste area instead, which the PGA Tour also believed to be the case as evidenced by the fact the Mr. Reed

was only assessed a two-stroke penalty and not disqualified from the tournament. Thus, there was never any finding of misconduct or cheating!

79.     Furthermore, even the statement that the waste area looked indistinguishable from a sand trap is highly misleading to the public. It implies that Mr. Reed committed a rules infraction in a waste bunker that was "indistinguishable" from a bunker. Professional players know the difference, especially at that specific course- in the Bahamas - the waste areas and bunkers are well known  The players all know difference between a waste bunker (which is a penalty area) and a normal bunker.

80.     *Fourth,* Ryan published "Reed was assessed a two-stroke penalty when the round was over**, but the bigger problem was the hit to his reputation. Before long, someone dug up a clip of him doing the same exact thing at a 2015 tournament, and for a guy whose credibility was already in the mud, who had been accused of cheating in the past, it was like throwing gas on the flames. He was skewered**."

81.     This statement is false, malicious, and defamatory because it baselessly accuses Mr. Reed of intentionally cheating. This is completely false. It is telling that Mr. Ryan provides his readers with absolutely no specifics as to this manufactured cheating incident, and therefore tries to hide the fact that this is just a false, malicious, and defamatory targeted attack on Mr. Reed's reputation, both professional and personal.

82.     *Fifth*, Ryan published, "**Chamblee went so far as to say that when Tiger added Reed to the team, he "made a deal with the devil." By forcing the Americans to defend him. Reed put them in an impossible situation and forced them to greet an obvious violation – one that would have horrified most of them to commit, in a sport where players frequently call**

penalties on themselves even when the camera aren't running – with silence, putting their own integrity on the line."

83.     This statement is false, malicious, and defamatory because it baselessly accuses Mr. Reed of intentionally cheating during the 2019 Hero World Challenge in the Bahamas. This is completely false. It further questions the integrity of Mr. Reed, and falsely publishes that Mr. Reed forced his teammates to put their own integrity on the line, which is a false exaggeration if not implication. Mr. Reed never forced his teammates to say anything, nor could he. They are all adults capable of making their own decisions and saying what they want to say.

84.     *Sixth*, Ryan published, "**It figured that the first time anyone on Reed's team had been honest and open with the media, it would be a caddie admitting he'd shoved a fan."**

85.     This statement is false, malicious,  and defamatory because it published the falsity that Mr. Reed had lied to the media in the past. This is false, malicious, and defamatory. It also creates the false and misleading implication that Mr. Reed's wife, agents, lawyers, coaches, and anyone associated with Mr. Reed also tells lies and is dishonest.

86.     Each and every one of published statements were made with actual malice since they were false and/or made with a reckless disregard for the truth. And, given Ryan's and his publisher's demonstrable animus toward and against Mr. Reed, the falsities set forth above also amount to both constitutional and common law malice, as Ryan clearly has a pathological and sick fixation to lie and publish false defamatory statements in his quest to try to destroy Mr. Reed, his wife, his children and family, in order to sell books for profit.

### *New York Post, Fox Sports, and Gavin Newsham*

87.     Gavin Newsham published in this judicial district an article that contained false, malicious, and defamatory statements of and concerning Mr. Reed using Ryan and Hachette's

defamatory Book as a credited source (the "Newsham Article"). On September 18, 2022, the Newsham Article was published by Fox Sports under the title, "***'Don't know they'd p\*\*\* [piss] on him if he was on fire': The scandalous truth of golf's biggest villain***[5]" and on September 17, 2022, this same article was published by the New York Post under the title, "***The scandalous truth about Patrick Reed, the bad boy of golf***".[6] These articles are identical except for the titles, and these titles are highly defamatory as a matter of false fact.

88.    Ryan and Hachette are conspiring and working in concert together with Newsham, Fox Sports, and New York Post as joint tortfeasors in order to further and republish the lies contained in the Book, in order to try to drive sales of the Book.

89.    Newsham, New York Post, and Fox Sports acted with, at a minimum, a reckless disregard for the truth, since he consciously and willfully chose not to speak with any witnesses who could have and would have refuted the false, malicious, and defamatory statements below, including but not limited to Mr. Reed's college coaches, his college teammates, and PGA Tour officials involved in the "incidents" set forth below.

90.    Indeed, the two titles given to the Newsham Article defeat any possible assertion that they are "opinion," as both purport to offer the "truth" about Mr. Reed, and therefore are unequivocally making statements of fact –albeit false – of and concerning Mr. Reed.

91.    First, Newsham publishes, "Detailing the long history of the Ryder Cup, Ryan explains how 2020 US captain Steve Stricker managed to galvanise a team so often incapable of

---

[5] Gavin Newsham, *'Don't know they'd p\*\*\* [piss] on him if he was on fire': The scandalous truth of golf's biggest villain,* Sep. 18, 2022, Fox Sports, available at: https://www.foxsports.com.au/golf/dont-know-they-p-on-him-if-he-was-on-fire-the-scandalous-truth-of-golfs-biggest-villain/news-story/e7c3b7dd1a5b3d0bbdb0758ccc3960f9
[6] Gavin Newsham, *The scandalous truth about Patrick Reed, the bad boy of golf,* Sep. 17, 2022, New York Post, available at: https://nypost.com/2022/09/17/the-scandalous-truth-about-patrick-reed-the-bad-boy-of-golf/

beating their European counterparts — **and how he solved the perennial problem of Patrick Reed**."

92.     This statement is false, malicious, and defamatory because it accuses Mr. Reed of being a "problem" as part of the U.S. Ryder Cup team. Nothing can be farther from the truth. Mr. Reed simply showed up and played with his teammates and never caused any issues.

93.     Second, Newsham publishes, "**When items including a watch, a putter and $400 went missing from the locker room, teammates suspected it was Reed who had taken them, especially as he turned up the following day with a large wad of cash**."

94.     This statement is false, malicious and defamatory because it falsely accuses Mr. Reed and/or implies that Mr. Reed stole from his teammates. This has never been any accusation that this occurred and Mr. Reed never stole from his teammates.

95.     Third, Newsham publishes, "**During one qualifying round, Reed hit his ball into the rough but when they found it, it was, miraculously, closer to the fairway. Convinced he was cheating, Reed was challenged by his teammates but denied any wrongdoing. It was a similar story when Reed attended Augusta State. This time, he stood accused of shaving strokes off his scorecards and while his teammates voted to kick him off the team**, his coach reduced the sanction to a two-match suspension**.**"

96.     This statement is false, malicious, and defamatory because it once again published the falsity that Mr. Reed cheated during his NCAA playing career. Mr. Reed has provided public statements by his coaches – who would have been privy to any cheating accusations – that they were unaware of any cheating accusations against Mr. Reed.

97.     It is also significant and telling that Mr. Reed - as a young freshman in college was taking the place of All-American juniors and seniors in qualifying events every single week on the

24

University of Georgia Golf Team- which was the best in the country at that time. Those players didn't like a freshman taking their spots - it embarrassed them, angered them, and in the end – Mr. Reed ended up beating all of them in his second team triumph to go back-to-back in winning NCAA Championships, so these group of guys had every reason to get rid of Mr. Reed on the team, and that is what they did.

98.    *Fourth*, Newsham publishes "Golf analyst Brandel Chamblee, meanwhile, suggested that in picking Reed, **Woods had 'made a deal with the devil.' He was right**."

99.    This statement is false, malicious, and defamatory because it accuses Mr. Reed of being "the devil," and specifically, Newsham, lends credence to this assertion by saying, "he was right." Mr. Reed simply plays golf. Tiger Woods selecting Mr. Reed for the 2019 Presidents Cup match was not making a "deal with the devil." This creates and reinforces the false implication that Mr. Reed is evil, a terrible human being, a cheater, and a thief. All of this is entirely untrue and highly defamatory.

100.    *Fifth* Newsham publishes, "**At the Hero World Classic in the Bahamas prior to the Presidents Cup, Reed was spotted trying to improve the lie of his ball, not once but twice.** Reed blamed it on the angle of the TV cameras making it look worse than it was but he was still penalised two strokes. As Ryan writes: '**Making a deal with the devil is useful only if the devil can give you something important in exchange….'**"

101.    This statement is false, malicious, and defamatory because it accuses Mr. Reed of intentionally cheating at the Hero World Classic, which simply did not happen. It was a simple alleged error at worst, and Mr. Reed was only penalized two strokes and not disqualified, which is obviously what would have happened if he had been found to have intentionally cheated. With reckless disregard for the truth at a minimum, Newsham also republishes Ryan's defamatory

statements about Mr. Reed being "the devil," which is completely "out of pocket" and defamatory as set forth above.

102.    *Sixth*, Newsham publishes "**Free from the trouble that followed Reed around like a puppy, the US team jelled like never before, coasting to a record win over Europe, winning 19-9. Petty feuds were forgotten, egos left at the locker room door and any chance of disruption had been eradicated. Finally, the US players were a team, not just a dozen millionaire golfers thrown together. And, as Ryan writes, it showed 'what happens when American power is no longer stifled by mismanagement, but elevated and ultimately unleashed by a superb captaincy**.'"

103.    This statement is false, malicious, and defamatory because it creates the false and misleading implication that Mr. Reed was solely responsible for causing the U.S. team to not gel, creating petty feuds and egos, and overall being a locker room disruption. This is completely false and misleading and highly damaging to Mr. Reed's trade and profession as a professional golfer.

104.    For all of the defamatory publications set forth above, Defendant Newsham acted at a minimum with a reckless disregard for the truth as he failed to do his due diligence before, with actual malice, publishing defamatory statements of and concerning Mr. Reed.

### *Defendant Ferguson and AP*

105.    On or about February 2, 2021, Defendant Ferguson published an article on AP titled Column: Reed's reputation from Bahamas the ultimate penalty.[7] (the "Ferguson Article").

106.    The  Ferguson Article taken as a whole is completely defamatory, and at a bare minimum defamatory by implication. The entire purpose of the Article is to plant in the reader's mind that, despite there being absolutely no evidence of cheating, that Mr. Reed is a habitual

---

[7] Doug Ferguson, *Column: Reed's reputation from Bahamas the ultimate penalty,* Feb. 2, 2021, AP, available at: https://apnews.com/article/sports-bahamas-patrick-reed-golf-rickie-fowler-8d0fa7ed6f764ddf3195e23e005c53a4

cheater who has earned a reputation for cheating and who has gotten away with cheating. Specifically, the false, malicious, and defamatory statements include but are hardly limited to:

107.   *First*, Defendant Ferguson published:

The violation was so egregious that Rickie Fowler, glancing at the replay on television, quickly raised his eyebrows and said: "Whoa! What was THAT?"

It was Patrick Reed**.**

**This was just over a year ago in the Bahamas, the day Reed infamously used the back of his wedge to scoop away sand — twice — from behind his golf ball in a waste bunker, improving his line of play.** Only when he was shown video evidence did Reed accept the two-shot penalty, but not before suggesting the camera angle made it look worse than it was**.**

**The penalty, as it turns out, was worth more than two shots.**

**There is no greater punishment in golf than being stuck with a reputation for cheating**.

108.   This statement is false, malicious, and defamatory because it falsely accuses Mr. Reed of being a cheater and having earned a reputation for cheating through his actions. This is completely untrue and baseless. Mr. Reed has never been found to have cheated by anyone.

109.   *Second*, Defendant Ferguson published: "**[m]oving past this one will be almost impossible."**

110.   This statement is false, malicious, and defamatory because, similar to the above statement, falsely accuses Mr. Reed of being a cheater and having earned a reputation for cheating through his actions, and particularly that his reputation for cheating will always follow Mr. Reed. This is completely untrue and baseless. Mr. Reed has never been found to have cheated by anyone.

111.   *Third*, Defendant Ferguson published:

**He pulled his approach from a fairway bunker into thick grass left of the 10th green. Approaching where a volunteer had marked the spot with a tiny flag, Reed asked if the ball bounced. "No, I didn't see it bounce," the volunteered replied.**

> He turned to his playing partners, PGA Tour rookie Will Gordon and second-year player Robby Shelton, and told them, "They said it didn't bounce," and that he would check for an embedded lie. Crouching over, he marked the spot with a tee, put the ball in the palm of his hand and kept probing the turf for about 5 seconds when he called for an official. And then he poked around for another five seconds.
>
> "I believe it broke ground, but I'm going to let you make that call," Reed told Brad Fabel, the rules official.
>
> Fabel didn't immediately know what he was talking about because Reed had placed the ball about 8 feet away.
>
> Reed showed him where the ball was, Fabel poked around and agreed there was a "lip," meaning the ball had broken the plane of the soil.
>
> Free drop.

112.    This statement is false, malicious, and defamatory because it creates the false implication that Mr. Reed had somehow gotten away with cheating, despite the fact that Mr. Reed had been completely cleared of any wrongdoing by the PGA. It is included tactically by Ferguson to lend phony support to the baseless published statements of cheating above.

### Defendants Larson and Bloomberg

113.    On or about January 4, 2023, Defendant Larson published on Bloomberg an article titled "***Saudi-Backed LIV Golf is Using PGA Suit to Get Data on 9/11 Families Court Told***."[8] (the "Larson Article").

114.    First and foremost, Mr. Reed's picture is prominently featured in the Larson Article, a clear editorial decision made by Defendants Larson and Bloomberg to create the false and

---

[8] Erik Larson, *Saudi-Backed LIV Golf is Using PGA Suit to Get Data on 9/11 Families Court Told*, Bloomberg, Jan. 4, 2023, available at: https://www.bloomberg.com/news/articles/2023-01-04/saudi-backed-liv-golf-using-pga-suit-to-get-data-on-9-11-families-court-told#:~:text=LIV%2C%20backed%20by%20the%20%24676,its%20new%20professional%20golf%20circuit.

misleading implication that Mr. Reed is somehow involved in using the PGA lawsuit to get data on 9/11 families. This could not be further from the truth and Mr. Reed is not a Plaintiff in the PGA lawsuit or a party to any lawsuit against the PGA Tour. Defendants Larson and Bloomberg could have simply done their minimal due diligence and seen that Mr. Reed has no involvement in these lawsuits, as it is a matter of public record.

115.    In fact, it is certain Defendants Larson and Bloomberg <u>did</u> in fact check the court record and see that Mr. Reed had no involvement, but still willfully disregarded this fact to include his picture to malicious create the false and misleading implication that Mr. Reed is somehow involved.

116.    Mr. Reed simply plays golf and is completely uninvolved in the lawsuit between LIV and the PGA Tour or its companion case between LIV and Clout.

117.    The inclusion of Mr. Reed's photo links him to the entirely false, malicious, and defamatory statements contained in the Larson Article.

118.    Furthermore, Defendants Larson and Bloomberg publish that "**It's (meaning the issue of 9/11 family victims) has taken a more sinister turn**."

119.    This statement is completely false, malicious, and defamatory, as it creates the false and misleading implication that Mr. Reed is personally involved in "sinister" activities, when in actuality, the sinister aspect of this story is not legitimate discovery in pending court cases of which Mr. Reed is not even a party, but the overt transparent effort by the PGA Tour and its agents, such as Clout, to use the horrible tragedy of 9/11 to whip up hatred against LIV Golf and its players, in an anticompetitive scheme to destroy the new golf league.

120.    As a direct proximate result of the defamation set forth above,  Defendants, have maliciously caused a hostile workplace environment for Mr. Reed, spilling over to his family. This

hostile workplace, which has been made to occur in the tournaments and events which Mr. Reed attends and participates in to earn a living for himself and his family, has been manifested, only in part, by induced personal attacks on him and his family by persons attending these tournaments and events. These induced personal attacks have in turn harmed his performance at tournaments and events and deprived him of lucrative sponsorships and other financial awards, despite his excellent record, which record would be even much greater without the disruption and emotional distress caused by these personal attacks.

121.     These induced and continuing personal attacks include, but are not limited to: "Now on the tee the excavator!," "You suck!," "You f….. ing suck!," "You jackass!," "You coward!," "Shovel!," Why don't you dig a grave and bury yourself in it!," "You piece of shit!," "No one likes you!," Everyone hates you Reed!," "Good luck digging yourself out of this one!," "Where are your parents coward?!," "You cheater!," "Cheat!," "Everyone hates you cheater!," "You're going to miss this you cheater!," "You cheat in college and on tour and you're a piece of shit!," "Beat the cheater's ass!," "Sorry Webb for having to play with the cheat! Who did you piss off?!," "Why don't you introduce your children to their grandparents you ungrateful bitch?!"  This is just a sampling of what Defendants maliciously and intentionally caused and furthered with actual malice. These personal attacks occur frequently while Mr. Reed is actively preparing to make his golf shot, or during the golf shot, much less thereafter as he is walking to his next golf shot, as well as lining up and making putts on the green, which putts require a high degree of concentration. Defendant Ryan admits the damage that he and those who have republished his false and misleading defamatory statements have caused:

> If he has to deal with this, as I think he will….that's going to take its toll. It's not going to be fun. You would think a normal human being would start to dread being out on the course…just because it's, uh, either you're taking abuse or, even worse, you're waiting to take abuse.

So, I don't think [the players] like [Mr. Reed] to begin with, I think they're going to like him even less now… [Mr. Reed is] not going to be anybody's best friend and you'll start to see more and more criticism come out…from players.

Nobody called him out and that's fine, but that's going to infuriate fans and other golfers more and it's just going to make matters worse for him.

122.   Pursuant to Fla. Stat. § 770.01, the undersigned counsel has demanded correction or retraction from the Defendants at least five (5) days to the filing of this Complaint, and Defendants have refused to do so, further ratifying and condoning the defamatory statements set forth herein.

## VI.   CAUSES OF ACTION

### FIRST CAUSE OF ACTION
*Defamation*
*Defendant Ryan*

123.   Defendant Ryan, acting together with his co-Defendants, acting in concert as joint tortfeasors, jointly and severally, and individually, has defamed Mr. Reed by knowingly, intentionally, willfully, recklessly, grossly negligently, and/or negligently publishing statements of and concerning the Plaintiff which he knew or should have known to be false and misleading.

124.   These statements, published in the Book, include but are not limited to:

**He'd been kicked out of Georgia after a year for two alcohol violations, the second of which he tried to hide from his coach, and before that he'd been accused by his teammates of cheating during a qualifying event. Then he went to Augusta State, where he turned the entire team against him almost immediately, and once again he was accused of cheating, this time by shaving strikes in two straight qualifying events. His teammates held a meeting and voted to kick him off the team, but Augusta State coach Josh Gregory reduced it to a two-match suspension.**

**When the ugly details came out, Reed set to work blundering his way into deeper trouble**, which was the start of a PR strategy that he's doggedly stuck to ever since. He went on Golf Channel, **produced a couple of vague statements from his coaches**, and generally took the path of full denial. The end result was

that Reed's teammates, who had previously been silent **came out of the woodwork to crucify him further, confirming old details and adding new ones.**

Reed found himself in a waste area that looked indistinguishable from a sand trap. The rules, though, are different: in the waste area, a player is allowed to ground his club. Which is exactly what Reed did, but then he proceeded to drag the club backward, sweeping away the sand in front of his ball. Then he resettled the club and did it again**. This is blatantly illegal, and nothing about it was ambiguous. Reed had improved his lie by clearing the path to his ball, and when the first effort wasn't satisfactory, he did it again. The TV camera caught him red-handed**, and Golf.com's Dylan Dethier, on the scene, heard Rickie Fowler say, I don't even know what you have to review."

Reed was assessed a two-stroke penalty when the round was over, **but the bigger problem was the hit to his reputation. Before long, someone dug up a clip of him doing the same exact thing at a 2015 tournament, and for a guy whose credibility was already in the mud, who had been accused of cheating in the past, it was like throwing gas on the flames. He was skewered.**

**Chamblee went so far as to say that when Tiger added Reed to the team, he "made a deal with the devil." By forcing the Americans to defend him. Reed put them in an impossible situation and forced them to greet an obvious violation – one that would have horrified most of them to commit, in a sport where players frequently call penalties on themselves even when the camera aren't running – with silence, putting their own integrity on the line.**

**It figured that the first time anyone on Reed's team had been honest and open with the media, it would be a caddie admitting he'd shoved a fan.**

December 2019, Melbourne, Australia, Fires Down Under … The Greatest Escape…**The End of the Legend of Patrick Reed**.

125.    Defendant Ryan's defamatory publications are not privileged in any way or manner.

126.    The false, defamatory and misleading publications of and concerning Mr. Reed were widely published and the falsity of the statements caused injury to Mr. Reed.

127.    Defendant Ryan acted with actual malice because he knew or had reason to know that the publications were false and misleading, and/or at a minimum acted with a reckless disregard for the truth.

128.    These false, malicious, and defamatory statements have caused irreparable harm to Mr. Reed, his goodwill and reputation and financially in his trade and profession as a professional golfer, as a businessman, and personally.

129.    While these statements in particular are clearly defamatory, the publications in general and as a whole are defamatory as well, since "a publication must be considered in its totality. 'The court must consider all the words used, not merely a particular phrase or sentence.'" *Byrd v. Hustler Magazine*, 433 So. 2d 593, 595 (Fla. Dist. Ct. App. 1983).

<u>SECOND CAUSE OF ACTION</u>
*Defamation by Implication*
*Defendant Ryan*

130.    Defendant Ryan, acting together with his co-Defendants, acting in concert as joint tortfeasors, jointly and severally, and individually, has defamed Mr. Reed by knowingly, intentionally, willfully, recklessly, grossly negligently, and/or negligently publishing statements of and concerning Mr. Reed which he knew or should have known to be false and misleading.

131.    These statements, published in the Book include, but are not limited to:

**He'd been kicked out of Georgia after a year for two alcohol violations, the second of which he tried to hide from his coach, and before that he'd been accused by his teammates of cheating during a qualifying event. Then he went to Augusta State, where he turned the entire team against him almost immediately, and once again he was accused of cheating, this time by shaving strikes in two straight qualifying events. His teammates held a meeting and voted to kick him off the team, but Augusta State coach Josh Gregory reduced it to a two-match suspension.**

**When the ugly details came out, Reed set to work blundering his way into deeper trouble**, which was the start of a PR strategy that he's doggedly stuck to ever since. He went on Golf Channel, **produced a couple of vague statements from his coaches**, and generally took the path of full denial. The end result was that Reed's teammates, who had previously been silent **came out of the woodwork to crucify him further, confirming old details and adding new ones.**

Reed found himself in a waste area that looked indistinguishable from a sand trap. The rules, though, are different: in the waste area, a player is allowed to ground his

club. Which is exactly what Reed did, but then he proceeded to drag the club backward, sweeping away the sand in front of his ball. Then he resettled the club and did it again**. This is blatantly illegal, and nothing about it was ambiguous. Reed had improved his lie by clearing the path to his ball, and when the first effort wasn't satisfactory, he did it again. The TV camera caught him red-handed**, and Golf.com's Dylan Dethier, on the scene, heard Rickie Fowler say, I don't even know what you have to review."

Reed was assessed a two-stroke penalty when the round was over, **but the bigger problem was the hit to his reputation. Before long, someone dug up a clip of him doing the same exact thing at a 2015 tournament, and for a guy whose credibility was already in the mud, who had been accused of cheating in the past, it was like throwing gas on the flames. He was skewered.**

**Chamblee went so far as to say that when Tiger added Reed to the team, he "made a deal with the devil." By forcing the Americans to defend him. Reed put them in an impossible situation and forced them to greet an obvious violation – one that would have horrified most of them to commit, in a sport where players frequently call penalties on themselves even when the camera aren't running – with silence, putting their own integrity on the line.**

**It figured that the first time anyone on Reed's team had been honest and open with the media, it would be a caddie admitting he'd shoved a fan.**

December 2019, Melbourne, Australia, Fires Down Under … The Greatest Escape…**The End of the Legend of Patrick Reed.**

132.    Defendant Ryan's defamatory publications of and concerning Mr. Reed are not privileged in any way or manner.

133.    Defendant Ryan, acting together with his co-Defendants, acting in concert as joint tortfeasors, jointly and severally, and individually, published false statements of and concerning Mr. Reed and these statements were defamatory in that they created a false impression of Mr. Reed.

134.    Defendant Ryan, acting together with his co-Defendants, acting in concert as joint tortfeasors, jointly and severally, and individually, juxtaposed a series of facts so as to imply a defamatory connection between them or, in the alternative, created a defamatory implication by omitting facts when describing the nature and sequence of events.

135.    A reasonable person would understand Defendant Ryan's statements to impart the false innuendo, which would be highly offensive to a reasonable person.

136.    Defendant Ryan, acting together with his co-Defendants, acting in concert as joint tortfeasors, jointly and severally, and individually, intended or endorsed the defamatory inferences that the published statements created, and these false, defamatory and misleading statements were made with actual malice.

137.    Defendant Ryan acted with actual malice because he knew or had reason to know that the publications were false and misleading, and/or at a minimum acted with a reckless disregard for the truth.

138.    These false, malicious, and defamatory statements have caused irreparable harm to Mr. Reed, his goodwill and reputation and financially in his trade and profession as a professional golfer, as a businessman, and personally.

139.    While these statements in particular are clearly defamatory, the publications in general and as a whole are defamatory as well, since "a publication must be considered in its totality. 'The court must consider all the words used, not merely a particular phrase or sentence.'" *Byrd v. Hustler Magazine*, 433 So. 2d 593, 595 (Fla. Dist. Ct. App. 1983).

### THIRD CAUSE OF ACTION
### *Defamation Per Se*
### *Defendant Ryan*

140.    Defendant Ryan, acting together with his co-Defendants, acting in concert as joint tortfeasors, jointly and severally, and individually, has defamed Mr. Reed by knowingly, intentionally, willfully, recklessly, grossly negligently, and/or negligently publishing statements of and concerning Mr. Reed which he knew or should have known to be false and misleading

141.    These statements published in the Book include, but are not limited to:

**He'd been kicked out of Georgia after a year for two alcohol violations, the second of which he tried to hide from his coach, and before that he'd been accused by his teammates of cheating during a qualifying event. Then he went to Augusta State, where he turned the entire team against him almost immediately, and once again he was accused of cheating, this time by shaving strikes in two straight qualifying events. His teammates held a meeting and voted to kick him off the team, but Augusta State coach Josh Gregory reduced it to a two-match suspension.**

**When the ugly details came out, Reed set to work blundering his way into deeper trouble**, which was the start of a PR strategy that he's doggedly stuck to ever since. He went on Golf Channel, **produced a couple of vague statements from his coaches**, and generally took the path of full denial. The end result was that Reed's teammates, who had previously been silent **came out of the woodwork to crucify him further, confirming old details and adding new ones.**

Reed found himself in a waste area that looked indistinguishable from a sand trap. The rules, though, are different: in the waste area, a player is allowed to ground his club. Which is exactly what Reed did, but then he proceeded to drag the club backward, sweeping away the sand in front of his ball. Then he resettled the club and did it again**. This is blatantly illegal, and nothing about it was ambiguous. Reed had improved his lie by clearing the path to his ball, and when the first effort wasn't satisfactory, he did it again. The TV camera caught him red-handed**, and Golf.com's Dylan Dethier, on the scene, heard Rickie Fowler say, I don't even know what you have to review."

Reed was assessed a two-stroke penalty when the round was over, **but the bigger problem was the hit to his reputation. Before long, someone dug up a clip of him doing the same exact thing at a 2015 tournament, and for a guy whose credibility was already in the mud, who had been accused of cheating in the past, it was like throwing gas on the flames. He was skewered.**

**Chamblee went so far as to say that when Tiger added Reed to the team, he "made a deal with the devil." By forcing the Americans to defend him. Reed put them in an impossible situation and forced them to greet an obvious violation – one that would have horrified most of them to commit, in a sport where players frequently call penalties on themselves even when the camera aren't running – with silence, putting their own integrity on the line.**

**It figured that the first time anyone on Reed's team had been honest and open with the media, it would be a caddie admitting he'd shoved a fan.**

December 2019, Melbourne, Australia, Fires Down Under … The Greatest Escape…**The End of the Legend of Patrick Reed**.

142.   Defendant Ryan's defamatory publications are not privileged in any way or manner.

143.   The false, defamatory and misleading nature of Defendant Ryan's publications of and concerning Plaintiff caused Mr. Reed ridicule, hatred, disgust and contempt in his trade and profession as a professional golfer.

144.   The false, defamatory and misleading publications were made with actual malice.

145.   Defendant Ryan acted with actual malice because he knew or had reason to know that the publications were false and misleading, and/or at a minimum acted with a reckless disregard for the truth.

146.   These false, malicious, and defamatory statements have caused irreparable harm to Mr. Reed, his goodwill and reputation and financially in his trade and profession as a professional golfer, as a businessman, and personally.

147.   While these statements in particular are clearly defamatory, the publications in general and as a whole are defamatory as well, since "a publication must be considered in its totality. 'The court must consider all the words used, not merely a particular phrase or sentence.'" *Byrd v. Hustler Magazine*, 433 So. 2d 593, 595 (Fla. Dist. Ct. App. 1983).

## FOURTH CAUSE OF ACTION
### *Defamation*
### *Defendant Hachette*

148.   Defendant Hachette, acting together with its co-Defendants, acting in concert as joint tortfeasors, jointly and severally, and individually, has defamed Mr. Reed by knowingly, intentionally, willfully, recklessly, grossly negligently, and/or negligently publishing statements of and concerning the Plaintiff which it knew or should have known to be false and misleading.

149.   These statements, published in the Book, include but are not limited to:

**He'd been kicked out of Georgia after a year for two alcohol violations, the second of which he tried to hide from his coach, and before that he'd been accused by his teammates of cheating during a qualifying event. Then he went to Augusta State, where he turned the entire team against him almost immediately, and once again he was accused of cheating, this time by shaving strikes in two straight qualifying events. His teammates held a meeting and voted to kick him off the team, but** Augusta State coach Josh Gregory reduced it to a two-match suspension.

**When the ugly details came out, Reed set to work blundering his way into deeper trouble,** which was the start of a PR strategy that he's doggedly stuck to ever since. He went on Golf Channel, **produced a couple of vague statements from his coaches,** and generally took the path of full denial. The end result was that Reed's teammates, who had previously been silent **came out of the woodwork to crucify him further, confirming old details and adding new ones.**

Reed found himself in a waste area that looked indistinguishable from a sand trap. The rules, though, are different: in the waste area, a player is allowed to ground his club. Which is exactly what Reed did, but then he proceeded to drag the club backward, sweeping away the sand in front of his ball. Then he resettled the club and did it again**. This is blatantly illegal, and nothing about it was ambiguous. Reed had improved his lie by clearing the path to his ball, and when the first effort wasn't satisfactory, he did it again. The TV camera caught him red-handed,** and Golf.com's Dylan Dethier, on the scene, heard Rickie Fowler say, I don't even know what you have to review."

Reed was assessed a two-stroke penalty when the round was over, **but the bigger problem was the hit to his reputation. Before long, someone dug up a clip of him doing the same exact thing at a 2015 tournament, and for a guy whose credibility was already in the mud, who had been accused of cheating in the past, it was like throwing gas on the flames. He was skewered.**

**Chamblee went so far as to say that when Tiger added Reed to the team, he "made a deal with the devil." By forcing the Americans to defend him. Reed put them in an impossible situation and forced them to greet an obvious violation – one that would have horrified most of them to commit, in a sport where players frequently call penalties on themselves even when the camera aren't running – with silence, putting their own integrity on the line.**

**It figured that the first time anyone on Reed's team had been honest and open with the media, it would be a caddie admitting he'd shoved a fan.**

December 2019, Melbourne, Australia, Fires Down Under … The Greatest Escape…**The End of the Legend of Patrick Reed**.

150.    Defendant Hachette's defamatory publications are not privileged in any way or manner.

151.    The false, defamatory and misleading publications of and concerning Mr. Reed were widely published and the falsity of the statements caused injury to Mr. Reed.

152.    Defendant Hachette acted with actual malice because it knew or had reason to know that the publications were false and misleading, and/or at a minimum acted with a reckless disregard for the truth.

153.    These false, malicious, and defamatory statements have caused irreparable harm to Mr. Reed, his goodwill and reputation and financially in his trade and profession as a professional golfer, as a businessman, and personally.

154.    While these statements in particular are clearly defamatory, the publications in general and as a whole are defamatory as well, since "a publication must be considered in its totality. 'The court must consider all the words used, not merely a particular phrase or sentence.'" *Byrd v. Hustler Magazine*, 433 So. 2d 593, 595 (Fla. Dist. Ct. App. 1983).

**FIFTH CAUSE OF ACTION**
***Defamation by Implication***
***Defendant Hachette***

155.    Defendant Hachette, acting together with its co-Defendants, acting in concert as joint tortfeasors, jointly and severally, and individually, has defamed Mr. Reed by knowingly, intentionally, willfully, recklessly, grossly negligently, and/or negligently publishing statements of and concerning Mr. Reed which it knew or should have known to be false and misleading.

156.    These statements, published in the Book include, but are not limited to:

**He'd been kicked out of Georgia after a year for two alcohol violations, the second of which he tried to hide from his coach, and before that he'd been accused by his teammates of cheating during a qualifying event. Then he went to Augusta State, where he turned the entire team against him almost**

**immediately, and once again he was accused of cheating, this time by shaving strikes in two straight qualifying events. His teammates held a meeting and voted to kick him off the team, but Augusta State coach Josh Gregory reduced it to a two-match suspension.**

**When the ugly details came out, Reed set to work blundering his way into deeper trouble**, which was the start of a PR strategy that he's doggedly stuck to ever since. He went on Golf Channel, **produced a couple of vague statements from his coaches**, and generally took the path of full denial. The end result was that Reed's teammates, who had previously been silent **came out of the woodwork to crucify him further, confirming old details and adding new ones.**

Reed found himself in a waste area that looked indistinguishable from a sand trap. The rules, though, are different: in the waste area, a player is allowed to ground his club. Which is exactly what Reed did, but then he proceeded to drag the club backward, sweeping away the sand in front of his ball. Then he resettled the club and did it again**. This is blatantly illegal, and nothing about it was ambiguous. Reed had improved his lie by clearing the path to his ball, and when the first effort wasn't satisfactory, he did it again. The TV camera caught him red-handed**, and Golf.com's Dylan Dethier, on the scene, heard Rickie Fowler say, I don't even know what you have to review."

Reed was assessed a two-stroke penalty when the round was over, **but the bigger problem was the hit to his reputation. Before long, someone dug up a clip of him doing the same exact thing at a 2015 tournament, and for a guy whose credibility was already in the mud, who had been accused of cheating in the past, it was like throwing gas on the flames. He was skewered.**

**Chamblee went so far as to say that when Tiger added Reed to the team, he "made a deal with the devil." By forcing the Americans to defend him. Reed put them in an impossible situation and forced them to greet an obvious violation – one that would have horrified most of them to commit, in a sport where players frequently call penalties on themselves even when the camera aren't running – with silence, putting their own integrity on the line.**

**It figured that the first time anyone on Reed's team had been honest and open with the media, it would be a caddie admitting he'd shoved a fan.**

December 2019, Melbourne, Australia, Fires Down Under … The Greatest Escape…**The End of the Legend of Patrick Reed.**

157.     Defendant Hachette's defamatory publications of and concerning Mr. Reed are not privileged in any way or manner.

158.    Defendant Hachette, acting together with its co-Defendants, acting in concert as joint tortfeasors, jointly and severally, and individually, published false statements of and concerning Mr. Reed and these statements were defamatory in that they created a false impression of Mr. Reed.

159.    Defendant Hachette, acting together with its co-Defendants, acting in concert as joint tortfeasors, jointly and severally, and individually, juxtaposed a series of facts so as to imply a defamatory connection between them or, in the alternative, created a defamatory implication by omitting facts when describing the nature and sequence of events.

160.    A reasonable person would understand Defendant Hachette's statements to impart the false innuendo, which would be highly offensive to a reasonable person.

161.    Defendant Hachette, acting together with its co-Defendants, acting in concert as joint tortfeasors, jointly and severally, and individually, intended or endorsed the defamatory inferences that the published statements created, and these false, defamatory and misleading statements were made with actual malice.

162.    Defendant Hachette acted with actual malice because it knew or had reason to know that the publications were false and misleading, and/or at a minimum acted with a reckless disregard for the truth.

163.    These false, malicious, and defamatory statements have caused irreparable harm to Mr. Reed, his goodwill and reputation and financially in his trade and profession as a professional golfer, as a businessman, and personally.

164.    While these statements in particular are clearly defamatory, the publications in general and as a whole are defamatory as well, since "a publication must be considered in its

totality. 'The court must consider all the words used, not merely a particular phrase or sentence.'"

*Byrd v. Hustler Magazine*, 433 So. 2d 593, 595 (Fla. Dist. Ct. App. 1983).

<u>SIXTH CAUSE OF ACTION</u>
*Defamation Per Se*
*Defendant Hachette*

165.    Defendant Hachette, acting together with its co-Defendants, acting in concert as joint tortfeasors, jointly and severally, and individually, has defamed Mr. Reed by knowingly, intentionally, willfully, recklessly, grossly negligently, and/or negligently publishing statements of and concerning Mr. Reed which it knew or should have known to be false and misleading

166.    These statements published in the Book include, but are not limited to:

**He'd been kicked out of Georgia after a year for two alcohol violations, the second of which he tried to hide from his coach, and before that he'd been accused by his teammates of cheating during a qualifying event. Then he went to Augusta State, where he turned the entire team against him almost immediately, and once again he was accused of cheating, this time by shaving strikes in two straight qualifying events. His teammates held a meeting and voted to kick him off the team, but Augusta State coach Josh Gregory reduced it to a two-match suspension.**

**When the ugly details came out, Reed set to work blundering his way into deeper trouble**, which was the start of a PR strategy that he's doggedly stuck to ever since. He went on Golf Channel, **produced a couple of vague statements from his coaches**, and generally took the path of full denial. The end result was that Reed's teammates, who had previously been silent **came out of the woodwork to crucify him further, confirming old details and adding new ones.**

Reed found himself in a waste area that looked indistinguishable from a sand trap. The rules, though, are different: in the waste area, a player is allowed to ground his club. Which is exactly what Reed did, but then he proceeded to drag the club backward, sweeping away the sand in front of his ball. Then he resettled the club and did it again**. This is blatantly illegal, and nothing about it was ambiguous. Reed had improved his lie by clearing the path to his ball, and when the first effort wasn't satisfactory, he did it again. The TV camera caught him red-handed**, and Golf.com's Dylan Dethier, on the scene, heard Rickie Fowler say, I don't even know what you have to review."

Reed was assessed a two-stroke penalty when the round was over, **but the bigger problem was the hit to his reputation. Before long, someone dug up a clip of**

him doing the same exact thing at a 2015 tournament, and for a guy whose credibility was already in the mud, who had been accused of cheating in the past, it was like throwing gas on the flames. He was skewered.

Chamblee went so far as to say that when Tiger added Reed to the team, he "made a deal with the devil." By forcing the Americans to defend him. Reed put them in an impossible situation and forced them to greet an obvious violation – one that would have horrified most of them to commit, in a sport where players frequently call penalties on themselves even when the camera aren't running – with silence, putting their own integrity on the line.

It figured that the first time anyone on Reed's team had been honest and open with the media, it would be a caddie admitting he'd shoved a fan.

December 2019, Melbourne, Australia, Fires Down Under … The Greatest Escape…**The End of the Legend of Patrick Reed**.

167.    Defendant Hachette's defamatory publications are not privileged in any way or manner.

168.    The false, defamatory and misleading nature of Defendant Hachette's publications of and concerning Plaintiff caused Mr. Reed ridicule, hatred, disgust and contempt in his trade and profession as a professional golfer.

169.    The false, defamatory and misleading publications were made with actual malice.

170.    Defendant Hachette acted with actual malice because it knew or had reason to know that the publications were false and misleading, and/or at a minimum acted with a reckless disregard for the truth.

171.    These false, malicious, and defamatory statements have caused irreparable harm to Mr. Reed, his goodwill and reputation and financially in his trade and profession as a professional golfer, as a businessman, and personally.

172.    While these statements in particular are clearly defamatory, the publications in general and as a whole are defamatory as well, since "a publication must be considered in its

totality. 'The court must consider all the words used, not merely a particular phrase or sentence.'"

*Byrd v. Hustler Magazine*, 433 So. 2d 593, 595 (Fla. Dist. Ct. App. 1983).

**SEVENTH CAUSE OF ACTION**
*Defamation*
***Defendant Fox Sports***

173.　Defendant Fox Sports, acting together with its co-Defendants, acting in concert as joint tortfeasors, jointly and severally, and individually, has defamed Mr. Reed by knowingly, intentionally, willfully, recklessly, grossly negligently, and/or negligently publishing statements of and concerning the Plaintiff which it knew or should have known to be false and misleading.

174.　These statements include, but are not limited to:

Detailing the long history of the Ryder Cup, Ryan explains how 2020 US captain Steve Stricker managed to galvanise a team so often incapable of beating their European counterparts — **and how he solved the perennial problem of Patrick Reed.**

**When items including a watch, a putter and $400 went missing from the locker room, teammates suspected it was Reed who had taken them, especially as he turned up the following day with a large wad of cash.**

**During one qualifying round, Reed hit his ball into the rough but when they found it, it was, miraculously, closer to the fairway. Convinced he was cheating, Reed was challenged by his teammates but denied any wrongdoing. It was a similar story when Reed attended Augusta State. This time, he stood accused of shaving strokes off his scorecards and while his teammates voted to kick him off the team,** his coach reduced the sanction to a two-match suspension.

Golf analyst Brandel Chamblee, meanwhile, suggested that in picking Reed, **Woods had 'made a deal with the devil.' He was right.**

**At the Hero World Classic in the Bahamas prior to the Presidents Cup, Reed was spotted trying to improve the lie of his ball, not once but twice.** Reed blamed it on the angle of the TV cameras making it look worse than it was but he was still penalised two strokes. As Ryan writes: **"Making a deal with the devil is useful only if the devil can give you something important in exchange…."**

**Free from the trouble that followed Reed around like a puppy, the US team jelled like never before, coasting to a record win over Europe, winning 19-9. Petty feuds were forgotten, egos left at the locker room door and any chance**

44

of disruption had been eradicated. **Finally, the US players were a team, not just a dozen millionaire golfers thrown together. And, as Ryan writes, it showed "what happens when American power is no longer stifled by mismanagement, but elevated and ultimately unleashed by a superb captaincy."**

**Don't know they'd p*** [piss] on him if he was on fire': The scandalous truth of golf's biggest villain.**

175.    Defendant Fox Sports' defamatory publications are not privileged in any way or manner.

176.    The false, defamatory and misleading publications of and concerning Mr. Reed were widely published and the falsity of the statements caused injury to Mr. Reed.

177.    Defendant Fox Sports acted with actual malice because it knew or had reason to know that the publications were false and misleading, and/or at a minimum acted with a reckless disregard for the truth.

178.    These false, malicious, and defamatory statements have caused irreparable harm to Mr. Reed, his goodwill and reputation and financially in his trade and profession as a professional golfer, as a businessman, and personally.

179.    While these statements in particular are clearly defamatory, the publications in general and as a whole are defamatory as well, since "a publication must be considered in its totality. 'The court must consider all the words used, not merely a particular phrase or sentence.'" *Byrd v. Hustler Magazine*, 433 So. 2d 593, 595 (Fla. Dist. Ct. App. 1983).

## EIGHTH CAUSE OF ACTION
### *Defamation by Implication*
### *Defendant Fox Sports*

180.    Defendant Fox Sports, acting together with its co-Defendants, acting in concert as joint tortfeasors, jointly and severally, and individually, has defamed Mr. Reed by knowingly,

intentionally, willfully, recklessly, grossly negligently, and/or negligently publishing statements

of and concerning Mr. Reed which it knew or should have known to be false and misleading.

181.    These statements include, but are not limited to:

Detailing the long history of the Ryder Cup, Ryan explains how 2020 US captain Steve Stricker managed to galvanise a team so often incapable of beating their European counterparts — **and how he solved the perennial problem of Patrick Reed.**

**When items including a watch, a putter and $400 went missing from the locker room, teammates suspected it was Reed who had taken them, especially as he turned up the following day with a large wad of cash.**

**During one qualifying round, Reed hit his ball into the rough but when they found it, it was, miraculously, closer to the fairway. Convinced he was cheating, Reed was challenged by his teammates but denied any wrongdoing. It was a similar story when Reed attended Augusta State. This time, he stood accused of shaving strokes off his scorecards and while his teammates voted to kick him off the team,** his coach reduced the sanction to a two-match suspension.

Golf analyst Brandel Chamblee, meanwhile, suggested that in picking Reed, **Woods had 'made a deal with the devil.' He was right.**

**At the Hero World Classic in the Bahamas prior to the Presidents Cup, Reed was spotted trying to improve the lie of his ball, not once but twice.** Reed blamed it on the angle of the TV cameras making it look worse than it was but he was still penalised two strokes. As Ryan writes: **"Making a deal with the devil is useful only if the devil can give you something important in exchange…."**

**Free from the trouble that followed Reed around like a puppy, the US team jelled like never before, coasting to a record win over Europe, winning 19-9. Petty feuds were forgotten, egos left at the locker room door and any chance of disruption had been eradicated. Finally, the US players were a team, not just a dozen millionaire golfers thrown together. And, as Ryan writes, it showed "what happens when American power is no longer stifled by mismanagement, but elevated and ultimately unleashed by a superb captaincy."**

**Don't know they'd p\*\*\* [piss] on him if he was on fire': The scandalous truth of golf's biggest villain**.

182.    Defendant Fox Sports' defamatory publications of and concerning Mr. Reed are

not privileged in any way or manner.

183.     Defendant Fox Sports, acting together with its co-Defendants, acting in concert as joint tortfeasors, jointly and severally, and individually, published false statements of and concerning Mr. Reed and these statements were defamatory in that they created a false impression of Mr. Reed.

184.     Defendant Fox Sports, acting together with its co-Defendants, acting in concert as joint tortfeasors, jointly and severally, and individually, juxtaposed a series of facts so as to imply a defamatory connection between them or, in the alternative, created a defamatory implication by omitting facts when describing the nature and sequence of events.

185.     A reasonable person would understand Defendant Fox Sports' statements to impart the false innuendo, which would be highly offensive to a reasonable person.

186.     Defendant Fox Sports, acting together with its co-Defendants, acting in concert as joint tortfeasors, jointly and severally, and individually, intended or endorsed the defamatory inferences that the published statements created, and these false, defamatory and misleading statements were made with actual malice.

187.     Defendant Fox Sports acted with actual malice because it knew or had reason to know that the publications were false and misleading, and/or at a minimum acted with a reckless disregard for the truth.

188.     These false, malicious, and defamatory statements have caused irreparable harm to Mr. Reed, his goodwill and reputation and financially in his trade and profession as a professional golfer, as a businessman, and personally.

189.     While these statements in particular are clearly defamatory, the publications in general and as a whole are defamatory as well, since "a publication must be considered in its

totality. 'The court must consider all the words used, not merely a particular phrase or sentence.'"

*Byrd v. Hustler Magazine*, 433 So. 2d 593, 595 (Fla. Dist. Ct. App. 1983).

## NINTH CAUSE OF ACTION
### *Defamation Per Se*
### *Defendant Fox Sports*

190.     Defendant Fox Sports, acting together with its co-Defendants, acting in concert as joint tortfeasors, jointly and severally, and individually, has defamed Mr. Reed by knowingly, intentionally, willfully, recklessly, grossly negligently, and/or negligently publishing statements of and concerning Mr. Reed which it knew or should have known to be false and misleading

191.     These statements include, but are not limited to:

Detailing the long history of the Ryder Cup, Ryan explains how 2020 US captain Steve Stricker managed to galvanise a team so often incapable of beating their European counterparts — **and how he solved the perennial problem of Patrick Reed.**

**When items including a watch, a putter and $400 went missing from the locker room, teammates suspected it was Reed who had taken them, especially as he turned up the following day with a large wad of cash.**

**During one qualifying round, Reed hit his ball into the rough but when they found it, it was, miraculously, closer to the fairway. Convinced he was cheating, Reed was challenged by his teammates but denied any wrongdoing. It was a similar story when Reed attended Augusta State. This time, he stood accused of shaving strokes off his scorecards and while his teammates voted to kick him off the team,** his coach reduced the sanction to a two-match suspension.

Golf analyst Brandel Chamblee, meanwhile, suggested that in picking Reed, **Woods had 'made a deal with the devil.' He was right.**

**At the Hero World Classic in the Bahamas prior to the Presidents Cup, Reed was spotted trying to improve the lie of his ball, not once but twice.** Reed blamed it on the angle of the TV cameras making it look worse than it was but he was still penalised two strokes. As Ryan writes: **"Making a deal with the devil is useful only if the devil can give you something important in exchange…."**

**Free from the trouble that followed Reed around like a puppy, the US team jelled like never before, coasting to a record win over Europe, winning 19-9. Petty feuds were forgotten, egos left at the locker room door and any chance**

**of disruption had been eradicated. Finally, the US players were a team, not just a dozen millionaire golfers thrown together. And, as Ryan writes, it showed "what happens when American power is no longer stifled by mismanagement, but elevated and ultimately unleashed by a superb captaincy."**

**Don't know they'd p\*\*\* [piss] on him if he was on fire': The scandalous truth of golf's biggest villain**.

192.     Defendant Fox Sports' defamatory publications are not privileged in any way or manner.

193.     The false, defamatory and misleading nature of Defendant Fox Sports' publications of and concerning Plaintiff caused Mr. Reed ridicule, hatred, disgust and contempt in his trade and profession as a professional golfer.

194.     The false, defamatory and misleading publications were made with actual malice.

195.     Defendant Fox Sports acted with actual malice because it knew or had reason to know that the publications were false and misleading, and/or at a minimum acted with a reckless disregard for the truth.

196.     These false, malicious, and defamatory statements have caused irreparable harm to Mr. Reed, his goodwill and reputation and financially in his trade and profession as a professional golfer, as a businessman, and personally.

197.     While these statements in particular are clearly defamatory, the publications in general and as a whole are defamatory as well, since "a publication must be considered in its totality. 'The court must consider all the words used, not merely a particular phrase or sentence.'" *Byrd v. Hustler Magazine*, 433 So. 2d 593, 595 (Fla. Dist. Ct. App. 1983).

**TENTH CAUSE OF ACTION**
***Defamation***
***Defendant New York Post***

198.     Defendant New York Post, acting together with its co-Defendants, acting in concert as joint tortfeasors, jointly and severally, and individually, has defamed Mr. Reed by knowingly, intentionally, willfully, recklessly, grossly negligently, and/or negligently publishing statements of and concerning the Plaintiff which it knew or should have known to be false and misleading

199.     These statements include, but are not limited to:

Detailing the long history of the Ryder Cup, Ryan explains how 2020 US captain Steve Stricker managed to galvanise a team so often incapable of beating their European counterparts — **and how he solved the perennial problem of Patrick Reed.**

**When items including a watch, a putter and $400 went missing from the locker room, teammates suspected it was Reed who had taken them, especially as he turned up the following day with a large wad of cash.**

**During one qualifying round, Reed hit his ball into the rough but when they found it, it was, miraculously, closer to the fairway. Convinced he was cheating, Reed was challenged by his teammates but denied any wrongdoing. It was a similar story when Reed attended Augusta State. This time, he stood accused of shaving strokes off his scorecards and while his teammates voted to kick him off the team,** his coach reduced the sanction to a two-match suspension.

Golf analyst Brandel Chamblee, meanwhile, suggested that in picking Reed, **Woods had 'made a deal with the devil.' He was right.**

**At the Hero World Classic in the Bahamas prior to the Presidents Cup, Reed was spotted trying to improve the lie of his ball, not once but twice.** Reed blamed it on the angle of the TV cameras making it look worse than it was but he was still penalised two strokes. As Ryan writes: **"Making a deal with the devil is useful only if the devil can give you something important in exchange…."**

**Free from the trouble that followed Reed around like a puppy, the US team jelled like never before, coasting to a record win over Europe, winning 19-9. Petty feuds were forgotten, egos left at the locker room door and any chance of disruption had been eradicated. Finally, the US players were a team, not just a dozen millionaire golfers thrown together. And, as Ryan writes, it showed "what happens when American power is no longer stifled by mismanagement, but elevated and ultimately unleashed by a superb captaincy."**

**The scandalous truth about Patrick Reed, the bad boy of golf**.

200.    Defendant New York Post's defamatory publications are not privileged in any way or manner.

201.    The false, defamatory and misleading publications of and concerning Mr. Reed were widely published and the falsity of the statements caused injury to Mr. Reed.

202.    Defendant New York Post acted with actual malice because it knew or had reason to know that the publications were false and misleading, and/or at a minimum acted with a reckless disregard for the truth.

203.    These false, malicious, and defamatory statements have caused irreparable harm to Mr. Reed, his goodwill and reputation and financially in his trade and profession as a professional golfer, as a businessman, and personally.

204.    While these statements in particular are clearly defamatory, the publications in general and as a whole are defamatory as well, since "a publication must be considered in its totality. 'The court must consider all the words used, not merely a particular phrase or sentence.'" *Byrd v. Hustler Magazine*, 433 So. 2d 593, 595 (Fla. Dist. Ct. App. 1983).

## ELEVENTH CAUSE OF ACTION
### *Defamation by Implication*
### *Defendant New York Post*

205.    Defendant New York Post, acting together with its co-Defendants, acting in concert as joint tortfeasors, jointly and severally, and individually, has defamed Mr. Reed by knowingly, intentionally, willfully, recklessly, grossly negligently, and/or negligently publishing statements of and concerning Mr. Reed which it knew or should have known to be false and misleading.

206.    These statements include, but are not limited to:

Detailing the long history of the Ryder Cup, Ryan explains how 2020 US captain Steve Stricker managed to galvanise a team so often incapable of beating their European counterparts — **and how he solved the perennial problem of Patrick Reed.**

**When items including a watch, a putter and $400 went missing from the locker room, teammates suspected it was Reed who had taken them, especially as he turned up the following day with a large wad of cash.**

**During one qualifying round, Reed hit his ball into the rough but when they found it, it was, miraculously, closer to the fairway. Convinced he was cheating, Reed was challenged by his teammates but denied any wrongdoing. It was a similar story when Reed attended Augusta State. This time, he stood accused of shaving strokes off his scorecards and while his teammates voted to kick him off the team,** his coach reduced the sanction to a two-match suspension.

Golf analyst Brandel Chamblee, meanwhile, suggested that in picking Reed, **Woods had 'made a deal with the devil.' He was right.**

**At the Hero World Classic in the Bahamas prior to the Presidents Cup, Reed was spotted trying to improve the lie of his ball, not once but twice.** Reed blamed it on the angle of the TV cameras making it look worse than it was but he was still penalised two strokes. As Ryan writes: **"Making a deal with the devil is useful only if the devil can give you something important in exchange…."**

**Free from the trouble that followed Reed around like a puppy, the US team jelled like never before, coasting to a record win over Europe, winning 19-9. Petty feuds were forgotten, egos left at the locker room door and any chance of disruption had been eradicated. Finally, the US players were a team, not just a dozen millionaire golfers thrown together. And, as Ryan writes, it showed "what happens when American power is no longer stifled by mismanagement, but elevated and ultimately unleashed by a superb captaincy."**

**The scandalous truth about Patrick Reed, the bad boy of golf**.

207.    Defendant New York Post's defamatory publications of and concerning Mr. Reed are not privileged in any way or manner.

208.    Defendant New York Post, acting together with its co-Defendants, acting in concert as joint tortfeasors, jointly and severally, and individually, published false statements of and concerning Mr. Reed and these statements were defamatory in that they created a false impression of Mr. Reed.

209.   Defendant New York Post, acting together with its co-Defendants, acting in concert as joint tortfeasors, jointly and severally, and individually, juxtaposed a series of facts so as to imply a defamatory connection between them or, in the alternative, created a defamatory implication by omitting facts when describing the nature and sequence of events.

210.   A reasonable person would understand Defendant New York Post's statements to impart the false innuendo, which would be highly offensive to a reasonable person.

211.   Defendant New York Post, acting together with its co-Defendants, acting in concert as joint tortfeasors, jointly and severally, and individually, intended or endorsed the defamatory inferences that the published statements created, and these false, defamatory and misleading statements were made with actual malice.

212.   Defendant New York Post acted with actual malice because it knew or had reason to know that the publications were false and misleading, and/or at a minimum acted with a reckless disregard for the truth.

213.   These false, malicious, and defamatory statements have caused irreparable harm to Mr. Reed, his goodwill and reputation and financially in his trade and profession as a professional golfer, as a businessman, and personally.

214.   While these statements in particular are clearly defamatory, the publications in general and as a whole are defamatory as well, since "a publication must be considered in its totality. 'The court must consider all the words used, not merely a particular phrase or sentence.'" *Byrd v. Hustler Magazine*, 433 So. 2d 593, 595 (Fla. Dist. Ct. App. 1983).

## TWELFTH CAUSE OF ACTION
### *Defamation Per Se*
### *Defendant New York Post*

215.     Defendant New York Post, acting together with its co-Defendants, acting in concert as joint tortfeasors, jointly and severally, and individually, has defamed Mr. Reed by knowingly, intentionally, willfully, recklessly, grossly negligently, and/or negligently publishing statements of and concerning Mr. Reed which it knew or should have known to be false and misleading.

216.     These statements include, but are not limited to:

Detailing the long history of the Ryder Cup, Ryan explains how 2020 US captain Steve Stricker managed to galvanise a team so often incapable of beating their European counterparts — **and how he solved the perennial problem of Patrick Reed.**

**When items including a watch, a putter and $400 went missing from the locker room, teammates suspected it was Reed who had taken them, especially as he turned up the following day with a large wad of cash.**

**During one qualifying round, Reed hit his ball into the rough but when they found it, it was, miraculously, closer to the fairway. Convinced he was cheating, Reed was challenged by his teammates but denied any wrongdoing. It was a similar story when Reed attended Augusta State. This time, he stood accused of shaving strokes off his scorecards and while his teammates voted to kick him off the team,** his coach reduced the sanction to a two-match suspension.

Golf analyst Brandel Chamblee, meanwhile, suggested that in picking Reed, **Woods had 'made a deal with the devil.' He was right.**

**At the Hero World Classic in the Bahamas prior to the Presidents Cup, Reed was spotted trying to improve the lie of his ball, not once but twice.** Reed blamed it on the angle of the TV cameras making it look worse than it was but he was still penalised two strokes. As Ryan writes: **"Making a deal with the devil is useful only if the devil can give you something important in exchange…."**

**Free from the trouble that followed Reed around like a puppy, the US team jelled like never before, coasting to a record win over Europe, winning 19-9. Petty feuds were forgotten, egos left at the locker room door and any chance of disruption had been eradicated. Finally, the US players were a team, not just a dozen millionaire golfers thrown together. And, as Ryan writes, it showed "what happens when American power is no longer stifled by mismanagement, but elevated and ultimately unleashed by a superb captaincy."**

**The scandalous truth about Patrick Reed, the bad boy of golf**.

217.    Defendant New York Post's defamatory publications are not privileged in any way or manner.

218.    The false, defamatory and misleading nature of Defendant New York Post's publications of and concerning Plaintiff caused Mr. Reed ridicule, hatred, disgust and contempt in his trade and profession as a professional golfer.

219.    The false, defamatory and misleading publications were made with actual malice.

220.    Defendant New York Post acted with actual malice because it knew or had reason to know that the publications were false and misleading, and/or at a minimum acted with a reckless disregard for the truth.

221.    These false, malicious, and defamatory statements have caused irreparable harm to Mr. Reed, his goodwill and reputation and financially in his trade and profession as a professional golfer, as a businessman, and personally.

222.    While these statements in particular are clearly defamatory, the publications in general and as a whole are defamatory as well, since "a publication must be considered in its totality. 'The court must consider all the words used, not merely a particular phrase or sentence.'" *Byrd v. Hustler Magazine*, 433 So. 2d 593, 595 (Fla. Dist. Ct. App. 1983).

### THIRTEENTH CAUSE OF ACTION
#### *Defamation*
#### *Defendant Newsham*

223.    Defendant Newsham, acting together with his co-Defendants, acting in concert as joint tortfeasors, jointly and severally, and individually, has defamed Mr. Reed by knowingly, intentionally, willfully, recklessly, grossly negligently, and/or negligently publishing statements of and concerning the Plaintiff which he knew or should have known to be false and misleading.

224.    These statements include, but are not limited to:

Detailing the long history of the Ryder Cup, Ryan explains how 2020 US captain Steve Stricker managed to galvanise a team so often incapable of beating their European counterparts — **and how he solved the perennial problem of Patrick Reed.**

**When items including a watch, a putter and $400 went missing from the locker room, teammates suspected it was Reed who had taken them, especially as he turned up the following day with a large wad of cash.**

**During one qualifying round, Reed hit his ball into the rough but when they found it, it was, miraculously, closer to the fairway. Convinced he was cheating, Reed was challenged by his teammates but denied any wrongdoing. It was a similar story when Reed attended Augusta State. This time, he stood accused of shaving strokes off his scorecards and while his teammates voted to kick him off the team,** his coach reduced the sanction to a two-match suspension.

Golf analyst Brandel Chamblee, meanwhile, suggested that in picking Reed, **Woods had 'made a deal with the devil.' He was right.**

**At the Hero World Classic in the Bahamas prior to the Presidents Cup, Reed was spotted trying to improve the lie of his ball, not once but twice.** Reed blamed it on the angle of the TV cameras making it look worse than it was but he was still penalised two strokes. As Ryan writes: **"Making a deal with the devil is useful only if the devil can give you something important in exchange…."**

**Free from the trouble that followed Reed around like a puppy, the US team jelled like never before, coasting to a record win over Europe, winning 19-9. Petty feuds were forgotten, egos left at the locker room door and any chance of disruption had been eradicated. Finally, the US players were a team, not just a dozen millionaire golfers thrown together. And, as Ryan writes, it showed "what happens when American power is no longer stifled by mismanagement, but elevated and ultimately unleashed by a superb captaincy."**

**The scandalous truth about Patrick Reed, the bad boy of golf**

**Don't know they'd p\*\*\* [piss] on him if he was on fire': The scandalous truth of golf's biggest villain.**

225.   Defendant Newsham's defamatory publications are not privileged in any way or manner.

226.   The false, defamatory and misleading publications of and concerning Mr. Reed were widely published and the falsity of the statements caused injury to Mr. Reed.

227.    Defendant Newsham acted with actual malice because he knew or had reason to know that the publications were false and misleading, and/or at a minimum acted with a reckless disregard for the truth.

228.    These false, malicious, and defamatory statements have caused irreparable harm to Mr. Reed, his goodwill and reputation and financially in his trade and profession as a professional golfer, as a businessman, and personally.

229.    While these statements in particular are clearly defamatory, the publications in general and as a whole are defamatory as well, since "a publication must be considered in its totality. 'The court must consider all the words used, not merely a particular phrase or sentence.'" *Byrd v. Hustler Magazine*, 433 So. 2d 593, 595 (Fla. Dist. Ct. App. 1983).

### FOURTEENTH CAUSE OF ACTION
*Defamation by Implication*
*Defendant Newsham*

230.    Defendant Newsham, acting together with his co-Defendants, acting in concert as joint tortfeasors, jointly and severally, and individually, has defamed Mr. Reed by knowingly, intentionally, willfully, recklessly, grossly negligently, and/or negligently publishing statements of and concerning Mr. Reed which he knew or should have known to be false and misleading.

231.    These statements include, but are not limited to:

Detailing the long history of the Ryder Cup, Ryan explains how 2020 US captain Steve Stricker managed to galvanise a team so often incapable of beating their European counterparts — **and how he solved the perennial problem of Patrick Reed.**

**When items including a watch, a putter and $400 went missing from the locker room, teammates suspected it was Reed who had taken them, especially as he turned up the following day with a large wad of cash.**

**During one qualifying round, Reed hit his ball into the rough but when they found it, it was, miraculously, closer to the fairway. Convinced he was cheating, Reed was challenged by his teammates but denied any wrongdoing.**

**It was a similar story when Reed attended Augusta State. This time, he stood accused of shaving strokes off his scorecards and while his teammates voted to kick him off the team,** his coach reduced the sanction to a two-match suspension.

Golf analyst Brandel Chamblee, meanwhile, suggested that in picking Reed, **Woods had 'made a deal with the devil.' He was right.**

**At the Hero World Classic in the Bahamas prior to the Presidents Cup, Reed was spotted trying to improve the lie of his ball, not once but twice.** Reed blamed it on the angle of the TV cameras making it look worse than it was but he was still penalised two strokes. As Ryan writes: **"Making a deal with the devil is useful only if the devil can give you something important in exchange…."**

**Free from the trouble that followed Reed around like a puppy, the US team jelled like never before, coasting to a record win over Europe, winning 19-9. Petty feuds were forgotten, egos left at the locker room door and any chance of disruption had been eradicated. Finally, the US players were a team, not just a dozen millionaire golfers thrown together. And, as Ryan writes, it showed "what happens when American power is no longer stifled by mismanagement, but elevated and ultimately unleashed by a superb captaincy."**

**The scandalous truth about Patrick Reed, the bad boy of golf**

**Don't know they'd p\*\*\* [piss] on him if he was on fire': The scandalous truth of golf's biggest villain.**

232.    Defendant Newsham's defamatory publications of and concerning Mr. Reed are not privileged in any way or manner.

233.    Defendant Newsham, acting together with his co-Defendants, acting in concert as joint tortfeasors, jointly and severally, and individually, published false statements of and concerning Mr. Reed and these statements were defamatory in that they created a false impression of Mr. Reed.

234.    Defendant Newsham, acting together with his co-Defendants, acting in concert as joint tortfeasors, jointly and severally, and individually, juxtaposed a series of facts so as to imply a defamatory connection between them or, in the alternative, created a defamatory implication by omitting facts when describing the nature and sequence of events.

235.   A reasonable person would understand Defendant Newsham's statements to impart the false innuendo, which would be highly offensive to a reasonable person.

236.   Defendant Newsham, acting together with his co-Defendants, acting in concert as joint tortfeasors, jointly and severally, and individually, intended or endorsed the defamatory inferences that the published statements created, and these false, defamatory and misleading statements were made with actual malice.

237.   Defendant Newsham acted with actual malice because he knew or had reason to know that the publications were false and misleading, and/or at a minimum acted with a reckless disregard for the truth.

238.   These false, malicious, and defamatory statements have caused irreparable harm to Mr. Reed, his goodwill and reputation and financially in his trade and profession as a professional golfer, as a businessman, and personally.

239.   While these statements in particular are clearly defamatory, the publications in general and as a whole are defamatory as well, since "a publication must be considered in its totality. 'The court must consider all the words used, not merely a particular phrase or sentence.'" *Byrd v. Hustler Magazine*, 433 So. 2d 593, 595 (Fla. Dist. Ct. App. 1983).

### FIFTEENTH CAUSE OF ACTION
#### *Defamation Per Se*
#### *Defendant Newsham*

240.   Defendant Newsham, acting together with his co-Defendants, acting in concert as joint tortfeasors, jointly and severally, and individually, has defamed Mr. Reed by knowingly, intentionally, willfully, recklessly, grossly negligently, and/or negligently publishing statements of and concerning Mr. Reed which he knew or should have known to be false and misleading.

241.   These statements include, but are not limited to:

Detailing the long history of the Ryder Cup, Ryan explains how 2020 US captain Steve Stricker managed to galvanise a team so often incapable of beating their European counterparts — **and how he solved the perennial problem of Patrick Reed.**

**When items including a watch, a putter and $400 went missing from the locker room, teammates suspected it was Reed who had taken them, especially as he turned up the following day with a large wad of cash.**

**During one qualifying round, Reed hit his ball into the rough but when they found it, it was, miraculously, closer to the fairway. Convinced he was cheating, Reed was challenged by his teammates but denied any wrongdoing. It was a similar story when Reed attended Augusta State. This time, he stood accused of shaving strokes off his scorecards and while his teammates voted to kick him off the team,** his coach reduced the sanction to a two-match suspension.

Golf analyst Brandel Chamblee, meanwhile, suggested that in picking Reed, **Woods had 'made a deal with the devil.' He was right.**

**At the Hero World Classic in the Bahamas prior to the Presidents Cup, Reed was spotted trying to improve the lie of his ball, not once but twice.** Reed blamed it on the angle of the TV cameras making it look worse than it was but he was still penalised two strokes. As Ryan writes: **"Making a deal with the devil is useful only if the devil can give you something important in exchange...."**

**Free from the trouble that followed Reed around like a puppy, the US team jelled like never before, coasting to a record win over Europe, winning 19-9. Petty feuds were forgotten, egos left at the locker room door and any chance of disruption had been eradicated. Finally, the US players were a team, not just a dozen millionaire golfers thrown together. And, as Ryan writes, it showed "what happens when American power is no longer stifled by mismanagement, but elevated and ultimately unleashed by a superb captaincy."**

**The scandalous truth about Patrick Reed, the bad boy of golf**

**Don't know they'd p\*\*\* [piss] on him if he was on fire': The scandalous truth of golf's biggest villain.**

242.    Defendant Newsham's defamatory publications are not privileged in any way or

manner.

243.   The false, defamatory and misleading nature of Defendant Newsham's publications of and concerning Plaintiff caused Mr. Reed ridicule, hatred, disgust and contempt in his trade and profession as a professional golfer.

244.   The false, defamatory and misleading publications were made with actual malice.

245.   Defendant Newsham acted with actual malice because he knew or had reason to know that the publications were false and misleading, and/or at a minimum acted with a reckless disregard for the truth.

246.   These false, malicious, and defamatory statements have caused irreparable harm to Mr. Reed, his goodwill and reputation and financially in his trade and profession as a professional golfer, as a businessman, and personally.

247.   While these statements in particular are clearly defamatory, the publications in general and as a whole are defamatory as well, since "a publication must be considered in its totality. 'The court must consider all the words used, not merely a particular phrase or sentence.'" *Byrd v. Hustler Magazine*, 433 So. 2d 593, 595 (Fla. Dist. Ct. App. 1983.

### SIXTEENTH CAUSE OF ACTION
*Tortious Interference*
*Defendant Ryan*

248.   Mr. Reed had ongoing contractual relationships with sponsors whereby Mr. Reed was to promote his sponsor's goods in exchange for financial benefit, as well as prospective contractual relationships with sponsors.

249.   As a result of Defendant Ryan's intentional and unjustified interference, Mr. Reed experienced the loss of multiple multi-million dollar sponsorship deals that were not or have not been renewed including, but not limited to Titleist, Nike, Ultimate Software, cbdMD, Callaway, Tax Slayer, Perry Ellis, NetJets, and ETS as well as numerous promising prospective sponsorship

and business opportunities that did not come to fruition as a direct and proximate result including, but not limited to companies such as Quicken Loans, Draft Kings, Travelers, DOW, ARAMCO, CISCO, Porsche, Wells-Fargo, ROUSH, Zurich, Perry Ellis, Waste Management, Citi Bank, Houston Tourism, Taylormade, Bettinardi, and SRIXON.

250.    Defendant Ryan knew of the ongoing business relationships between Mr. Reed and his sponsors as well as the prospective contractual relationships between Mr. Reed and sponsors.

251.    Defendant Ryan willfully and intentionally and vindictively interfered with these ongoing business relationships and prospective business relationships and/or contracts by spreading lies of and concerning Mr. Reed in order to destroy his reputation, and to induce sponsors to break their contractual relationships with Mr. Reed.

252.    As a direct and proximate result of Defendant Ryan's  actions, Mr. Reed has suffered severe financial damages and had his ongoing contractual relationships with his sponsors terminated, and his prospective contractual relationships with sponsors never came to fruition, and ongoing and prospective contractual relationships terminated due to this intentional and unjustifiable interference by Defendant Ryan.

### SEVENTEENTH CAUSE OF ACTION
*Tortious Interference*
*Defendant Hachette*

253.    Mr. Reed had ongoing contractual relationships with sponsors whereby Mr. Reed was to promote his sponsor's goods in exchange for financial benefit, as well as prospective contractual relationships with sponsors.

254.    As a result of Defendant Hachette's intentional and unjustified interference, Mr. Reed experienced the loss of multiple multi-million dollar sponsorship deals that were not or have not been renewed including, but not limited to Titleist, Nike, Ultimate Software, cbdMD,

Callaway, Tax Slayer, Perry Ellis, NetJets, and ETS as well as numerous promising prospective sponsorship and business opportunities that did not come to fruition as a direct and proximate result including, but not limited to companies such as Quicken Loans, Draft Kings, Travelers, DOW, ARAMCO, CISCO, Porsche, Wells-Fargo, ROUSH, Zurich, Perry Ellis, Waste Management, Citi Bank, Houston Tourism, Taylormade, Bettinardi, and SRIXON.

255.    Defendant Hachette knew of the ongoing business relationships between Mr. Reed and his sponsors as well as the prospective contractual relationships between Mr. Reed and sponsors.

256.    Defendant Hachette willfully and intentionally and vindictively interfered with these ongoing business relationships and prospective business relationships and/or contracts by spreading lies of and concerning Mr. Reed in order to destroy his reputation, and to induce sponsors to break their contractual relationships with Mr. Reed.

257.    As a direct and proximate result of Defendant Hachette's  actions, Mr. Reed has suffered severe financial damages and had his ongoing contractual relationships with his sponsors terminated, and his prospective contractual relationships with sponsors never came to fruition, and ongoing and prospective contractual relationships terminated due to this intentional and unjustifiable interference by Defendant Hachette.

**EIGHTEENTH CAUSE OF ACTION**
*Tortious Interference*
*Defendant Fox Sports*

258.    Mr. Reed had ongoing contractual relationships with sponsors whereby Mr. Reed was to promote his sponsor's goods in exchange for financial benefit, as well as prospective contractual relationships with sponsors.

259.    As a result of Defendant Fox Sports' intentional and unjustified interference, Mr. Reed experienced the loss of multiple multi-million dollar sponsorship deals that were not or have not been renewed including, but not limited to Titleist, Nike, Ultimate Software, cbdMD, Callaway, Tax Slayer, Perry Ellis, NetJets, and ETS as well as numerous promising prospective sponsorship and business opportunities that did not come to fruition as a direct and proximate result including, but not limited to companies such as Quicken Loans, Draft Kings, Travelers, DOW, ARAMCO, CISCO, Porsche, Wells-Fargo, ROUSH, Zurich, Perry Ellis, Waste Management, Citi Bank, Houston Tourism, Taylormade, Bettinardi, and SRIXON.

260.    Defendant Fox Sports knew of the ongoing business relationships between Mr. Reed and his sponsors as well as the prospective contractual relationships between Mr. Reed and sponsors.

261.    Defendant Fox Sports willfully and intentionally and vindictively interfered with these ongoing business relationships and prospective business relationships and/or contracts by spreading lies of and concerning Mr. Reed in order to destroy his reputation, and to induce sponsors to break their contractual relationships with Mr. Reed.

262.    As a direct and proximate result of Defendant Fox Sports' actions, Mr. Reed has suffered severe financial damages and had his ongoing contractual relationships with his sponsors terminated, and his prospective contractual relationships with sponsors never came to fruition, and ongoing and prospective contractual relationships terminated due to this intentional and unjustifiable interference by Defendant Fox Sports.

### NINETEENTH CAUSE OF ACTION
***Tortious Interference***
***Defendant New York Post***

263.     Mr. Reed had ongoing contractual relationships with sponsors whereby Mr. Reed was to promote his sponsor's goods in exchange for financial benefit, as well as prospective contractual relationships with sponsors.

264.     As a result of Defendant New York Post's intentional and unjustified interference, Mr. Reed experienced the loss of multiple multi-million dollar sponsorship deals that were not or have not been renewed including, but not limited to Titleist, Nike, Ultimate Software, cbdMD, Callaway, Tax Slayer, Perry Ellis, NetJets, and ETS as well as numerous promising prospective sponsorship and business opportunities that did not come to fruition as a direct and proximate result including, but not limited to companies such as Quicken Loans, Draft Kings, Travelers, DOW, ARAMCO, CISCO, Porsche, Wells-Fargo, ROUSH, Zurich, Perry Ellis, Waste Management, Citi Bank, Houston Tourism, Taylormade, Bettinardi, and SRIXON.

265.     Defendant New York Post knew of the ongoing business relationships between Mr. Reed and his sponsors as well as the prospective contractual relationships between Mr. Reed and sponsors.

266.     Defendant New York Post willfully and intentionally and vindictively interfered with these ongoing business relationships and prospective business relationships and/or contracts by spreading lies of and concerning Mr. Reed in order to destroy his reputation, and to induce sponsors to break their contractual relationships with Mr. Reed.

267.     As a direct and proximate result of Defendant New York Post's  actions, Mr. Reed has suffered severe financial damages and had his ongoing contractual relationships with his sponsors terminated, and his prospective contractual relationships with sponsors never came to fruition, and ongoing and prospective contractual relationships terminated due to this intentional and unjustifiable interference by Defendant New York Post.

## TWENTIETH CAUSE OF ACTION
### *Tortious Interference*
### *Defendant Newsham*

268.    Mr. Reed had ongoing contractual relationships with sponsors whereby Mr. Reed was to promote his sponsor's goods in exchange for financial benefit, as well as prospective contractual relationships with sponsors.

269.    As a result of Defendant Newsham's intentional and unjustified interference, Mr. Reed experienced the loss of multiple multi-million dollar sponsorship deals that were not or have not been renewed including, but not limited to Titleist, Nike, Ultimate Software, cbdMD, Callaway, Tax Slayer, Perry Ellis, NetJets, and ETS as well as numerous promising prospective sponsorship and business opportunities that did not come to fruition as a direct and proximate result including, but not limited to companies such as Quicken Loans, Draft Kings, Travelers, DOW, ARAMCO, CISCO, Porsche, Wells-Fargo, ROUSH, Zurich, Perry Ellis, Waste Management, Citi Bank, Houston Tourism, Taylormade, Bettinardi, and SRIXON.

270.    Defendant Newsham knew of the ongoing business relationships between Mr. Reed and his sponsors as well as the prospective contractual relationships between Mr. Reed and sponsors.

271.    Defendant Newsham willfully and intentionally and vindictively interfered with these ongoing business relationships and prospective business relationships and/or contracts by spreading lies of and concerning Mr. Reed in order to destroy his reputation, and to induce sponsors to break their contractual relationships with Mr. Reed.

272.    As a direct and proximate result of Defendant Newsham's  actions, Mr. Reed has suffered severe financial damages and had his ongoing contractual relationships with his sponsors terminated, and his prospective contractual relationships with sponsors never came to fruition, and

ongoing and prospective contractual relationships terminated due to this intentional and unjustifiable interference by Defendant Newsham.

**TWENTY-FIRST CAUSE OF ACTION**
*Defamation*
***Defendant Ferguson***

273.    Defendant Ferguson, acting together with his co-Defendants, acting in concert as joint tortfeasors, jointly and severally, and individually, has defamed Mr. Reed by knowingly, intentionally, willfully, recklessly, grossly negligently, and/or negligently publishing statements of and concerning the Plaintiff which he knew or should have known to be false and misleading.

274.    These statements include but are not limited to:

The violation was so egregious that Rickie Fowler, glancing at the replay on television, quickly raised his eyebrows and said: "Whoa! What was THAT?"

It was Patrick Reed.

**This was just over a year ago in the Bahamas, the day Reed infamously used the back of his wedge to scoop away sand — twice — from behind his golf ball in a waste bunker, improving his line of play.** Only when he was shown video evidence did Reed accept the two-shot penalty, but not before suggesting the camera angle made it look worse than it was.

**The penalty, as it turns out, was worth more than two shots.**

**There is no greater punishment in golf than being stuck with a reputation for cheating.**

**"[m]oving past this one will be almost impossible."**

**He pulled his approach from a fairway bunker into thick grass left of the 10th green. Approaching where a volunteer had marked the spot with a tiny flag, Reed asked if the ball bounced. "No, I didn't see it bounce," the volunteered replied.**

**He turned to his playing partners, PGA Tour rookie Will Gordon and second-year player Robby Shelton, and told them, "They said it didn't bounce," and that he would check for an embedded lie. Crouching over, he marked the spot with a tee, put the ball in the palm of his hand and kept probing the turf for**

67

**about 5 seconds when he called for an official. And then he poked around for another five seconds.**
**"I believe it broke ground, but I'm going to let you make that call," Reed told Brad Fabel, the rules official.**

**Fabel didn't immediately know what he was talking about because Reed had placed the ball about 8 feet away.**

**Reed showed him where the ball was, Fabel poked around and agreed there was a "lip," meaning the ball had broken the plane of the soil.**

**Free drop.**

275.     Defendant Ferguson's defamatory publications are not privileged in any way or manner.

276.     The false, defamatory and misleading publications of and concerning Mr. Reed were widely published and the falsity of the statements caused injury to Mr. Reed.

277.     Defendant Ferguson acted with actual malice because he knew or had reason to know that the publications were false and misleading, and/or at a minimum acted with a reckless disregard for the truth.

278.     These false, malicious, and defamatory statements have caused irreparable harm to Mr. Reed, his goodwill and reputation and financially in his trade and profession as a professional golfer, as a businessman, and personally.

279.     While these statements in particular are clearly defamatory, the publications in general and as a whole are defamatory as well, since "a publication must be considered in its totality. 'The court must consider all the words used, not merely a particular phrase or sentence.'" *Byrd v. Hustler Magazine*, 433 So. 2d 593, 595 (Fla. Dist. Ct. App. 1983).

<u>**TWENTY- SECOND CAUSE OF ACTION**</u>
*Defamation by Implication*
*Defendant Ferguson*

280.    Defendant Ferguson, acting together with his co-Defendants, acting in concert as joint tortfeasors, jointly and severally, and individually, has defamed Mr. Reed by knowingly, intentionally, willfully, recklessly, grossly negligently, and/or negligently publishing statements of and concerning Mr. Reed which he knew or should have known to be false and misleading.

281.    These statements include, but are not limited to:

The violation was so egregious that Rickie Fowler, glancing at the replay on television, quickly raised his eyebrows and said: "Whoa! What was THAT?"

It was Patrick Reed.

**This was just over a year ago in the Bahamas, the day Reed infamously used the back of his wedge to scoop away sand — twice — from behind his golf ball in a waste bunker, improving his line of play.** Only when he was shown video evidence did Reed accept the two-shot penalty, but not before suggesting the camera angle made it look worse than it was.

**The penalty, as it turns out, was worth more than two shots.**

**There is no greater punishment in golf than being stuck with a reputation for cheating.**

**"[m]oving past this one will be almost impossible."**

**He pulled his approach from a fairway bunker into thick grass left of the 10th green. Approaching where a volunteer had marked the spot with a tiny flag, Reed asked if the ball bounced. "No, I didn't see it bounce," the volunteered replied.**

**He turned to his playing partners, PGA Tour rookie Will Gordon and second-year player Robby Shelton, and told them, "They said it didn't bounce," and that he would check for an embedded lie. Crouching over, he marked the spot with a tee, put the ball in the palm of his hand and kept probing the turf for about 5 seconds when he called for an official. And then he poked around for another five seconds.**
**"I believe it broke ground, but I'm going to let you make that call," Reed told Brad Fabel, the rules official.**

**Fabel didn't immediately know what he was talking about because Reed had placed the ball about 8 feet away.**

**Reed showed him where the ball was, Fabel poked around and agreed there was a "lip," meaning the ball had broken the plane of the soil.**

**Free drop**

282.    Defendant Ferguson's defamatory publications of and concerning Mr. Reed are not privileged in any way or manner.

283.    Defendant Ferguson, acting together with his co-Defendants, acting in concert as joint tortfeasors, jointly and severally, and individually, published false statements of and concerning Mr. Reed and these statements were defamatory in that they created a false impression of Mr. Reed.

284.    Defendant Ferguson, acting together with his co-Defendants, acting in concert as joint tortfeasors, jointly and severally, and individually, juxtaposed a series of facts so as to imply a defamatory connection between them or, in the alternative, created a defamatory implication by omitting facts when describing the nature and sequence of events.

285.    A reasonable person would understand Defendant Ferguson's statements to impart the false innuendo, which would be highly offensive to a reasonable person.

286.    Defendant Ferguson, acting together with his co-Defendants, acting in concert as joint tortfeasors, jointly and severally, and individually, intended or endorsed the defamatory inferences that the published statements created, and these false, defamatory and misleading statements were made with actual malice.

287.    Defendant Ferguson acted with actual malice because he knew or had reason to know that the publications were false and misleading, and/or at a minimum acted with a reckless disregard for the truth.

288.    These false, malicious, and defamatory statements have caused irreparable harm to Mr. Reed, his goodwill and reputation and financially in his trade and profession as a professional golfer, as a businessman, and personally.

289.    While these statements in particular are clearly defamatory, the publications in general and as a whole are defamatory as well, since "a publication must be considered in its totality. 'The court must consider all the words used, not merely a particular phrase or sentence.'" *Byrd v. Hustler Magazine*, 433 So. 2d 593, 595 (Fla. Dist. Ct. App. 1983).

**TWENTY-THIRD CAUSE OF ACTION**
***Defamation Per Se***
***Defendant Ferguson***

290.    Defendant Ferguson, acting together with his co-Defendants, acting in concert as joint tortfeasors, jointly and severally, and individually, has defamed Mr. Reed by knowingly, intentionally, willfully, recklessly, grossly negligently, and/or negligently publishing statements of and concerning Mr. Reed which he knew or should have known to be false and misleading.

291.    These statements include, but are not limited to:

The violation was so egregious that Rickie Fowler, glancing at the replay on television, quickly raised his eyebrows and said: "Whoa! What was THAT?"

It was Patrick Reed.

**This was just over a year ago in the Bahamas, the day Reed infamously used the back of his wedge to scoop away sand — twice — from behind his golf ball in a waste bunker, improving his line of play.** Only when he was shown video evidence did Reed accept the two-shot penalty, but not before suggesting the camera angle made it look worse than it was.

**The penalty, as it turns out, was worth more than two shots.**

**There is no greater punishment in golf than being stuck with a reputation for cheating.**

**"[m]oving past this one will be almost impossible."**

**He pulled his approach from a fairway bunker into thick grass left of the 10th green. Approaching where a volunteer had marked the spot with a tiny flag, Reed asked if the ball bounced. "No, I didn't see it bounce," the volunteered replied.**

**He turned to his playing partners, PGA Tour rookie Will Gordon and second-year player Robby Shelton, and told them, "They said it didn't bounce," and that he would check for an embedded lie. Crouching over, he marked the spot with a tee, put the ball in the palm of his hand and kept probing the turf for about 5 seconds when he called for an official. And then he poked around for another five seconds.**
**"I believe it broke ground, but I'm going to let you make that call," Reed told Brad Fabel, the rules official.**

**Fabel didn't immediately know what he was talking about because Reed had placed the ball about 8 feet away.**

**Reed showed him where the ball was, Fabel poked around and agreed there was a "lip," meaning the ball had broken the plane of the soil.**

**Free drop**.

292.    Defendant Ferguson's defamatory publications are not privileged in any way or manner.

293.    The false, defamatory and misleading nature of Defendant Ferguson's publications of and concerning Plaintiff caused Mr. Reed ridicule, hatred, disgust and contempt in his trade and profession as a professional golfer.

294.    The false, defamatory and misleading publications were made with actual malice.

295.    Defendant Ferguson acted with actual malice because he knew or had reason to know that the publications were false and misleading, and/or at a minimum acted with a reckless disregard for the truth.

296.    These false, malicious, and defamatory statements have caused irreparable harm to Mr. Reed, his goodwill and reputation and financially in his trade and profession as a professional golfer, as a businessman, and personally.

297.    While these statements in particular are clearly defamatory, the publications in general and as a whole are defamatory as well, since "a publication must be considered in its totality. 'The court must consider all the words used, not merely a particular phrase or sentence.'" *Byrd v. Hustler Magazine*, 433 So. 2d 593, 595 (Fla. Dist. Ct. App. 1983).

**TWENTH- FOURTH CAUSE OF ACTION**
***Tortious Interference***
***Defendant Ferguson***

298.    Mr. Reed had ongoing contractual relationships with sponsors whereby Mr. Reed was to promote his sponsor's goods in exchange for financial benefit, as well as prospective contractual relationships with sponsors.

299.    As a result of Defendant Ferguson's intentional and unjustified interference, Mr. Reed experienced the loss of multiple multi-million dollar sponsorship deals that were not or have not been renewed including, but not limited to Titleist, Nike, Ultimate Software, cbdMD, Callaway, Tax Slayer, Perry Ellis, NetJets, and ETS as well as numerous promising prospective sponsorship and business opportunities that did not come to fruition as a direct and proximate result including, but not limited to companies such as Quicken Loans, Draft Kings, Travelers, DOW, ARAMCO, CISCO, Porsche, Wells-Fargo, ROUSH, Zurich, Perry Ellis, Waste Management, Citi Bank, Houston Tourism, Taylormade, Bettinardi, and SRIXON.

300.    Defendant Ferguson knew of the ongoing business relationships between Mr. Reed and his sponsors as well as the prospective contractual relationships between Mr. Reed and sponsors.

301.    Defendant Ferguson willfully and intentionally and vindictively interfered with these ongoing business relationships and prospective business relationships and/or contracts by

spreading lies of and concerning Mr. Reed in order to destroy his reputation, and to induce sponsors to break their contractual relationships with Mr. Reed.

302.    As a direct and proximate result of Defendant Ferguson's  actions, Mr. Reed has suffered severe financial damages and had his ongoing contractual relationships with his sponsors terminated, and his prospective contractual relationships with sponsors never came to fruition, and ongoing and prospective contractual relationships terminated due to this intentional and unjustifiable interference by Defendant Ferguson.

**TWENTY-FIFTH CAUSE OF ACTION**
*Defamation*
*Defendant AP*

303.    Defendant AP, acting together with its co-Defendants, acting in concert as joint tortfeasors, jointly and severally, and individually, has defamed Mr. Reed by knowingly, intentionally, willfully, recklessly, grossly negligently, and/or negligently publishing statements of and concerning the Plaintiff which it knew or should have known to be false and misleading.

304.    These statements include but are not limited to:

The violation was so egregious that Rickie Fowler, glancing at the replay on television, quickly raised his eyebrows and said: "Whoa! What was THAT?"

It was Patrick Reed.

**This was just over a year ago in the Bahamas, the day Reed infamously used the back of his wedge to scoop away sand — twice — from behind his golf ball in a waste bunker, improving his line of play.** Only when he was shown video evidence did Reed accept the two-shot penalty, but not before suggesting the camera angle made it look worse than it was.

**The penalty, as it turns out, was worth more than two shots.**

**There is no greater punishment in golf than being stuck with a reputation for cheating.**

**"[m]oving past this one will be almost impossible."**

**He pulled his approach from a fairway bunker into thick grass left of the 10th green. Approaching where a volunteer had marked the spot with a tiny flag, Reed asked if the ball bounced. "No, I didn't see it bounce," the volunteer replied.**

**He turned to his playing partners, PGA Tour rookie Will Gordon and second-year player Robby Shelton, and told them, "They said it didn't bounce," and that he would check for an embedded lie. Crouching over, he marked the spot with a tee, put the ball in the palm of his hand and kept probing the turf for about 5 seconds when he called for an official. And then he poked around for another five seconds.**
**"I believe it broke ground, but I'm going to let you make that call," Reed told Brad Fabel, the rules official.**

**Fabel didn't immediately know what he was talking about because Reed had placed the ball about 8 feet away.**

**Reed showed him where the ball was, Fabel poked around and agreed there was a "lip," meaning the ball had broken the plane of the soil.**

**Free drop**.

305.     Defendant AP's defamatory publications are not privileged in any way or manner.

306.     The false, defamatory and misleading publications of and concerning Mr. Reed were widely published and the falsity of the statements caused injury to Mr. Reed.

307.     Defendant AP acted with actual malice because it knew or had reason to know that the publications were false and misleading, and/or at a minimum acted with a reckless disregard for the truth.

308.     These false, malicious, and defamatory statements have caused irreparable harm to Mr. Reed, his goodwill and reputation and financially in his trade and profession as a professional golfer, as a businessman, and personally.

309.     While these statements in particular are clearly defamatory, the publications in general and as a whole are defamatory as well, since "a publication must be considered in its

totality. 'The court must consider all the words used, not merely a particular phrase or sentence.'"

*Byrd v. Hustler Magazine*, 433 So. 2d 593, 595 (Fla. Dist. Ct. App. 1983).

<u>**TWENTY-SIXTH CAUSE OF ACTION**</u>
***Defamation by Implication***
***Defendant AP***

310.    Defendant AP, acting together with its co-Defendants, acting in concert as joint tortfeasors, jointly and severally, and individually, has defamed Mr. Reed by knowingly, intentionally, willfully, recklessly, grossly negligently, and/or negligently publishing statements of and concerning Mr. Reed which it knew or should have known to be false and misleading.

311.    These statements include, but are not limited to:

The violation was so egregious that Rickie Fowler, glancing at the replay on television, quickly raised his eyebrows and said: "Whoa! What was THAT?"

It was Patrick Reed.

**This was just over a year ago in the Bahamas, the day Reed infamously used the back of his wedge to scoop away sand — twice — from behind his golf ball in a waste bunker, improving his line of play.** Only when he was shown video evidence did Reed accept the two-shot penalty, but not before suggesting the camera angle made it look worse than it was.

**The penalty, as it turns out, was worth more than two shots.**

**There is no greater punishment in golf than being stuck with a reputation for cheating.**

**"[m]oving past this one will be almost impossible."**

**He pulled his approach from a fairway bunker into thick grass left of the 10th green. Approaching where a volunteer had marked the spot with a tiny flag, Reed asked if the ball bounced. "No, I didn't see it bounce," the volunteered replied.**

**He turned to his playing partners, PGA Tour rookie Will Gordon and second-year player Robby Shelton, and told them, "They said it didn't bounce," and that he would check for an embedded lie. Crouching over, he marked the spot with a tee, put the ball in the palm of his hand and kept probing the turf for**

**about 5 seconds when he called for an official. And then he poked around for another five seconds.**
**"I believe it broke ground, but I'm going to let you make that call," Reed told Brad Fabel, the rules official.**

**Fabel didn't immediately know what he was talking about because Reed had placed the ball about 8 feet away.**

**Reed showed him where the ball was, Fabel poked around and agreed there was a "lip," meaning the ball had broken the plane of the soil.**

**Free drop**.

312.    Defendant AP's defamatory publications of and concerning Mr. Reed are not privileged in any way or manner.

313.    Defendant AP, acting together with its co-Defendants, acting in concert as joint tortfeasors, jointly and severally, and individually, published false statements of and concerning Mr. Reed and these statements were defamatory in that they created a false impression of Mr. Reed.

314.    Defendant AP, acting together with its co-Defendants, acting in concert as joint tortfeasors, jointly and severally, and individually, juxtaposed a series of facts so as to imply a defamatory connection between them or, in the alternative, created a defamatory implication by omitting facts when describing the nature and sequence of events.

315.    A reasonable person would understand Defendant AP's statements to impart the false innuendo, which would be highly offensive to a reasonable person.

316.    Defendant AP, acting together with its co-Defendants, acting in concert as joint tortfeasors, jointly and severally, and individually, intended or endorsed the defamatory inferences that the published statements created, and these false, defamatory and misleading statements were made with actual malice.

317.     Defendant AP acted with actual malice because it knew or had reason to know that the publications were false and misleading, and/or at a minimum acted with a reckless disregard for the truth.

318.     These false, malicious, and defamatory statements have caused irreparable harm to Mr. Reed, his goodwill and reputation and financially in his trade and profession as a professional golfer, as a businessman, and personally.

319.     While these statements in particular are clearly defamatory, the publications in general and as a whole are defamatory as well, since "a publication must be considered in its totality. 'The court must consider all the words used, not merely a particular phrase or sentence.'" *Byrd v. Hustler Magazine*, 433 So. 2d 593, 595 (Fla. Dist. Ct. App. 1983).

## TWENTY-SEVENTH CAUSE OF ACTION
### *Defamation Per Se*
### *Defendant AP*

320.     Defendant AP, acting together with its co-Defendants, acting in concert as joint tortfeasors, jointly and severally, and individually, has defamed Mr. Reed by knowingly, intentionally, willfully, recklessly, grossly negligently, and/or negligently publishing statements of and concerning Mr. Reed which it knew or should have known to be false and misleading.

321.     These statements include, but are not limited to:

The violation was so egregious that Rickie Fowler, glancing at the replay on television, quickly raised his eyebrows and said: "Whoa! What was THAT?"

It was Patrick Reed.

**This was just over a year ago in the Bahamas, the day Reed infamously used the back of his wedge to scoop away sand — twice — from behind his golf ball in a waste bunker, improving his line of play.** Only when he was shown video evidence did Reed accept the two-shot penalty, but not before suggesting the camera angle made it look worse than it was.

**The penalty, as it turns out, was worth more than two shots.**

**There is no greater punishment in golf than being stuck with a reputation for cheating.**

**"[m]oving past this one will be almost impossible."**

**He pulled his approach from a fairway bunker into thick grass left of the 10th green. Approaching where a volunteer had marked the spot with a tiny flag, Reed asked if the ball bounced. "No, I didn't see it bounce," the volunteered replied.**

**He turned to his playing partners, PGA Tour rookie Will Gordon and second-year player Robby Shelton, and told them, "They said it didn't bounce," and that he would check for an embedded lie. Crouching over, he marked the spot with a tee, put the ball in the palm of his hand and kept probing the turf for about 5 seconds when he called for an official. And then he poked around for another five seconds.**
**"I believe it broke ground, but I'm going to let you make that call," Reed told Brad Fabel, the rules official.**

**Fabel didn't immediately know what he was talking about because Reed had placed the ball about 8 feet away.**

**Reed showed him where the ball was, Fabel poked around and agreed there was a "lip," meaning the ball had broken the plane of the soil.**

**Free drop**.

322.    Defendant APs defamatory publications are not privileged in any way or manner.

323.    The false, defamatory and misleading nature of Defendant AP's publications of and concerning Plaintiff caused Mr. Reed ridicule, hatred, disgust and contempt in his trade and profession as a professional golfer.

324.    The false, defamatory and misleading publications were made with actual malice.

325.    Defendant AP acted with actual malice because it knew or had reason to know that the publications were false and misleading, and/or at a minimum acted with a reckless disregard for the truth.

326.     These false, malicious, and defamatory statements have caused irreparable harm to Mr. Reed, his goodwill and reputation and financially in his trade and profession as a professional golfer, as a businessman, and personally.

327.     While these statements in particular are clearly defamatory, the publications in general and as a whole are defamatory as well, since "a publication must be considered in its totality. 'The court must consider all the words used, not merely a particular phrase or sentence.'" *Byrd v. Hustler Magazine*, 433 So. 2d 593, 595 (Fla. Dist. Ct. App. 1983).

**TWENTY-EIGHTH CAUSE OF ACTION**
*Tortious Interference*
*Defendant AP*

328.     Mr. Reed had ongoing contractual relationships with sponsors whereby Mr. Reed was to promote his sponsor's goods in exchange for financial benefit, as well as prospective contractual relationships with sponsors.

329.     As a result of Defendant AP's intentional and unjustified interference, Mr. Reed experienced the loss of multiple multi-million dollar sponsorship deals that were not or have not been renewed including, but not limited to Titleist, Nike, Ultimate Software, cbdMD, Callaway, Tax Slayer, Perry Ellis, NetJets, and ETS as well as numerous promising prospective sponsorship and business opportunities that did not come to fruition as a direct and proximate result including, but not limited to companies such as Quicken Loans, Draft Kings, Travelers, DOW, ARAMCO, CISCO, Porsche, Wells-Fargo, ROUSH, Zurich, Perry Ellis, Waste Management, Citi Bank, Houston Tourism, Taylormade, Bettinardi, and SRIXON.

330.     Defendant AP knew of the ongoing business relationships between Mr. Reed and his sponsors as well as the prospective contractual relationships between Mr. Reed and sponsors.

331.    Defendant AP willfully and intentionally and vindictively interfered with these ongoing business relationships and prospective business relationships and/or contracts by spreading lies of and concerning Mr. Reed in order to destroy his reputation, and to induce sponsors to break their contractual relationships with Mr. Reed.

332.    As a direct and proximate result of Defendant AP's actions, Mr. Reed has suffered severe financial damages and had his ongoing contractual relationships with his sponsors terminated, and his prospective contractual relationships with sponsors never came to fruition, and ongoing and prospective contractual relationships terminated due to this intentional and unjustifiable interference by Defendant AP.

**TWENTY-NINTH CAUSE OF ACTION**
*Defamation*
*Defendant Larson*

333.    Defendant Larson, acting together with his co-Defendants, acting in concert as joint tortfeasors, jointly and severally, and individually, has defamed Mr. Reed by knowingly, intentionally, willfully, recklessly, grossly negligently, and/or negligently publishing statements of and concerning the Plaintiff which he knew or should have known to be false and misleading.

334.    These statements, which are tied to Mr. Reed due to the inclusion of his picture prominently in the article, include but are not limited to:

**Saudi-Backed LIV Golf Is Using PGA Suit to Get Data on 9/11 Families, Court Told**

**It's (meaning the issue of 9/11 family victims) has taken a more sinister turn**.

335.    Defendant Larson's defamatory publications are not privileged in any way or manner.

336.    The false, defamatory and misleading publications of and concerning Mr. Reed were widely published and the falsity of the statements caused injury to Mr. Reed.

337.   Defendant Larson acted with actual malice because he knew or had reason to know that the publications were false and misleading, and/or at a minimum acted with a reckless disregard for the truth.

338.   Defendant Larson's article could not be further from the truth and Mr. Reed is not a Plaintiff in the PGA lawsuit or a party to any lawsuit against the PGA Tour. Defendant Larson could have simply done minimal due diligence and seen that Mr. Reed has no involvement in these lawsuits, as it is a matter of public record. Indeed, Defendant Larson <u>must have</u> checked the court record and see that Mr. Reed had no involvement, but still willfully disregarded this fact to include his picture to malicious create the false and misleading implication that Mr. Reed is somehow involved.

339.   These false, malicious, and defamatory statements have caused irreparable harm to Mr. Reed, his goodwill and reputation and financially in his trade and profession as a professional golfer, as a businessman, and personally.

340.   While these statements in particular are clearly defamatory, the publications in general and as a whole are defamatory as well, since "a publication must be considered in its totality. 'The court must consider all the words used, not merely a particular phrase or sentence.'" *Byrd v. Hustler Magazine*, 433 So. 2d 593, 595 (Fla. Dist. Ct. App. 1983).

**<u>THIRTIETH CAUSE OF ACTION</u>**
***Defamation by Implication***
***Defendant Larson***

341.   Defendant Larson, acting together with his co-Defendants, acting in concert as joint tortfeasors, jointly and severally, and individually, has defamed Mr. Reed by knowingly, intentionally, willfully, recklessly, grossly negligently, and/or negligently publishing statements of and concerning Mr. Reed which he knew or should have known to be false and misleading.

342.    These statements, which are tied to Mr. Reed due to the inclusion of his picture prominently in the article, include but are not limited to:

**Saudi-Backed LIV Golf Is Using PGA Suit to Get Data on 9/11 Families, Court Told**

**It's (meaning the issue of 9/11 family victims) has taken a more sinister turn**

343.    Defendant Larson's defamatory publications of and concerning Mr. Reed are not privileged in any way or manner.

344.    Defendant Larson, acting together with his co-Defendants, acting in concert as joint tortfeasors, jointly and severally, and individually, published false statements of and concerning Mr. Reed and these statements were defamatory in that they created a false impression of Mr. Reed.

345.    Defendant Larson's article could not be further from the truth and Mr. Reed is not a Plaintiff in the PGA lawsuit or a party to any lawsuit against the PGA Tour. Defendant Larson could have simply done minimal due diligence and seen that Mr. Reed has no involvement in these lawsuits, as it is a matter of public record. Indeed, Defendant Larson <u>must have</u> checked the court record and see that Mr. Reed had no involvement, but still willfully disregarded this fact to include his picture to malicious create the false and misleading implication that Mr. Reed is somehow involved.

346.    Defendant Larson, acting together with his co-Defendants, acting in concert as joint tortfeasors, jointly and severally, and individually, juxtaposed a series of facts so as to imply a defamatory connection between them or, in the alternative, created a defamatory implication by omitting facts when describing the nature and sequence of events.

347.    A reasonable person would understand Defendant Larson's statements to impart the false innuendo, which would be highly offensive to a reasonable person.

348.     Defendant Larson, acting together with his co-Defendants, acting in concert as joint tortfeasors, jointly and severally, and individually, intended or endorsed the defamatory inferences that the published statements created, and these false, defamatory and misleading statements were made with actual malice.

349.     Defendant Larson acted with actual malice because he knew or had reason to know that the publications were false and misleading, and/or at a minimum acted with a reckless disregard for the truth.

350.     These false, malicious, and defamatory statements have caused irreparable harm to Mr. Reed, his goodwill and reputation and financially in his trade and profession as a professional golfer, as a businessman, and personally.

351.     While these statements in particular are clearly defamatory, the publications in general and as a whole are defamatory as well, since "a publication must be considered in its totality. 'The court must consider all the words used, not merely a particular phrase or sentence.'" *Byrd v. Hustler Magazine*, 433 So. 2d 593, 595 (Fla. Dist. Ct. App. 1983).

## THIRTY-FIRST CAUSE OF ACTION
### *Defamation Per Se*
### *Defendant Larson*

352.     Defendant Larson, acting together with his co-Defendants, acting in concert as joint tortfeasors, jointly and severally, and individually, has defamed Mr. Reed by knowingly, intentionally, willfully, recklessly, grossly negligently, and/or negligently publishing statements of and concerning Mr. Reed which he knew or should have known to be false and misleading.

353.     These statements, which are tied to Mr. Reed due to the inclusion of his picture prominently in the article, include but are not limited to:

**Saudi-Backed LIV Golf Is Using PGA Suit to Get Data on 9/11 Families, Court Told**

**It's (meaning the issue of 9/11 family victims) has taken a more sinister turn**

354. Defendant Larson's defamatory publications are not privileged in any way or manner.

355. The false, defamatory and misleading nature of Defendant Larson's publications of and concerning Plaintiff caused Mr. Reed ridicule, hatred, disgust and contempt in his trade and profession as a professional golfer.

356. The false, defamatory and misleading publications were made with actual malice.

357. Defendant Larson acted with actual malice because he knew or had reason to know that the publications were false and misleading, and/or at a minimum acted with a reckless disregard for the truth.

358. Defendant Larson's article could not be further from the truth and Mr. Reed is not a Plaintiff in the PGA lawsuit or a party to any lawsuit against the PGA Tour. Defendant Larson could have simply done minimal due diligence and seen that Mr. Reed has no involvement in these lawsuits, as it is a matter of public record. Indeed, Defendant Larson <u>must have</u> checked the court record and see that Mr. Reed had no involvement, but still willfully disregarded this fact to include his picture to malicious create the false and misleading implication that Mr. Reed is somehow involved.

359. These false, malicious, and defamatory statements have caused irreparable harm to Mr. Reed, his goodwill and reputation and financially in his trade and profession as a professional golfer, as a businessman, and personally.

360. While these statements in particular are clearly defamatory, the publications in general and as a whole are defamatory as well, since "a publication must be considered in its

totality. 'The court must consider all the words used, not merely a particular phrase or sentence.'"

*Byrd v. Hustler Magazine*, 433 So. 2d 593, 595 (Fla. Dist. Ct. App. 1983).

**THIRTY-SECOND CAUSE OF ACTION**
*Tortious Interference*
*Defendant Larson*

361.    Mr. Reed had ongoing contractual relationships with sponsors whereby Mr. Reed was to promote his sponsor's goods in exchange for financial benefit, as well as prospective contractual relationships with sponsors.

362.    As a result of Defendant Larson's intentional and unjustified interference, Mr. Reed experienced the loss of multiple multi-million dollar sponsorship deals that were not or have not been renewed including, but not limited to Titleist, Nike, Ultimate Software, cbdMD, Callaway, Tax Slayer, Perry Ellis, NetJets, and ETS as well as numerous promising prospective sponsorship and business opportunities that did not come to fruition as a direct and proximate result including, but not limited to companies such as Quicken Loans, Draft Kings, Travelers, DOW, ARAMCO, CISCO, Porsche, Wells-Fargo, ROUSH, Zurich, Perry Ellis, Waste Management, Citi Bank, Houston Tourism, Taylormade, Bettinardi, and SRIXON.

363.    Defendant Larson knew of the ongoing business relationships between Mr. Reed and his sponsors as well as the prospective contractual relationships between Mr. Reed and sponsors.

364.    Defendant Larson willfully and intentionally and vindictively interfered with these ongoing business relationships and prospective business relationships and/or contracts by spreading lies of and concerning Mr. Reed in order to destroy his reputation, and to induce sponsors to break their contractual relationships with Mr. Reed.

365.    As a direct and proximate result of Defendant Larson's  actions, Mr. Reed has suffered severe financial damages and had his ongoing contractual relationships with his sponsors terminated, and his prospective contractual relationships with sponsors never came to fruition, and ongoing and prospective contractual relationships terminated due to this intentional and unjustifiable interference by Defendant Larson.

### THIRTY-THIRD CAUSE OF ACTION
*Defamation*
*Defendant Bloomberg*

366.    Defendant Bloomberg, acting together with its co-Defendants, acting in concert as joint tortfeasors, jointly and severally, and individually, has defamed Mr. Reed by knowingly, intentionally, willfully, recklessly, grossly negligently, and/or negligently publishing statements of and concerning the Plaintiff which it knew or should have known to be false and misleading.

367.    These statements, which are tied to Mr. Reed due to the inclusion of his picture prominently in the article, include but are not limited to:

**Saudi-Backed LIV Golf Is Using PGA Suit to Get Data on 9/11 Families, Court Told**

**It's (meaning the issue of 9/11 family victims) has taken a more sinister turn**

368.    Defendant Bloomberg's defamatory publications are not privileged in any way or manner.

369.    The false, defamatory and misleading publications of and concerning Mr. Reed were widely published and the falsity of the statements caused injury to Mr. Reed.

370.    Defendant Bloomberg acted with actual malice because it knew or had reason to know that the publications were false and misleading, and/or at a minimum acted with a reckless disregard for the truth.

371.    Defendant Bloomberg's  article could not be further from the truth and Mr. Reed is not a Plaintiff in the PGA lawsuit or a party to any lawsuit against the PGA Tour. Defendant Bloomberg could have simply done minimal due diligence and seen that Mr. Reed has no involvement in these lawsuits, as it is a matter of public record. Indeed, Defendant Bloomberg must have checked the court record and see that Mr. Reed had no involvement, but still willfully disregarded this fact to include his picture to malicious create the false and misleading implication that Mr. Reed is somehow involved.

372.    These false, malicious, and defamatory statements have caused irreparable harm to Mr. Reed, his goodwill and reputation and financially in his trade and profession as a professional golfer, as a businessman, and personally.

373.    While these statements in particular are clearly defamatory, the publications in general and as a whole are defamatory as well, since "a publication must be considered in its totality. 'The court must consider all the words used, not merely a particular phrase or sentence.'" *Byrd v. Hustler Magazine*, 433 So. 2d 593, 595 (Fla. Dist. Ct. App. 1983).

**THIRTY-FOURTH CAUSE OF ACTION**
*Defamation by Implication*
*Defendant Bloomberg*

374.    Defendant Bloomberg, acting together with its co-Defendants, acting in concert as joint tortfeasors, jointly and severally, and individually, has defamed Mr. Reed by knowingly, intentionally, willfully, recklessly, grossly negligently, and/or negligently publishing statements of and concerning Mr. Reed which it knew or should have known to be false and misleading.

375.    These statements, which are tied to Mr. Reed due to the inclusion of his picture prominently in the article, include but are not limited to:

**Saudi-Backed LIV Golf Is Using PGA Suit to Get Data on 9/11 Families, Court Told**

**It's (meaning the issue of 9/11 family victims) has taken a more sinister turn**.

376.    Defendant Bloomberg's defamatory publications of and concerning Mr. Reed are not privileged in any way or manner.

377.    Defendant Bloomberg, acting together with its co-Defendants, acting in concert as joint tortfeasors, jointly and severally, and individually, published false statements of and concerning Mr. Reed and these statements were defamatory in that they created a false impression of Mr. Reed.

378.    Defendant Bloomberg's  article could not be further from the truth and Mr. Reed is not a Plaintiff in the PGA lawsuit or a party to any lawsuit against the PGA Tour. Defendant Bloomberg could have simply done minimal due diligence and seen that Mr. Reed has no involvement in these lawsuits, as it is a matter of public record. Indeed, Defendant Bloomberg must have checked the court record and see that Mr. Reed had no involvement, but still willfully disregarded this fact to include his picture to malicious create the false and misleading implication that Mr. Reed is somehow involved.

379.    Defendant Bloomberg, acting together with its co-Defendants, acting in concert as joint tortfeasors, jointly and severally, and individually, juxtaposed a series of facts so as to imply a defamatory connection between them or, in the alternative, created a defamatory implication by omitting facts when describing the nature and sequence of events.

380.    A reasonable person would understand Defendant Bloomberg's statements to impart the false innuendo, which would be highly offensive to a reasonable person.

381.    Defendant Bloomberg, acting together with its co-Defendants, acting in concert as joint tortfeasors, jointly and severally, and individually, intended or endorsed the defamatory

inferences that the published statements created, and these false, defamatory and misleading statements were made with actual malice.

382.    Defendant Bloomberg acted with actual malice because it knew or had reason to know that the publications were false and misleading, and/or at a minimum acted with a reckless disregard for the truth.

383.    These false, malicious, and defamatory statements have caused irreparable harm to Mr. Reed, his goodwill and reputation and financially in his trade and profession as a professional golfer, as a businessman, and personally.

384.    While these statements in particular are clearly defamatory, the publications in general and as a whole are defamatory as well, since "a publication must be considered in its totality. 'The court must consider all the words used, not merely a particular phrase or sentence.'" *Byrd v. Hustler Magazine*, 433 So. 2d 593, 595 (Fla. Dist. Ct. App. 1983).

<u>**THIRTY-FIFTH CAUSE OF ACTION**</u>
*Defamation Per Se*
*Defendant Bloomberg*

385.    Defendant Bloomberg, acting together with its co-Defendants, acting in concert as joint tortfeasors, jointly and severally, and individually, has defamed Mr. Reed by knowingly, intentionally, willfully, recklessly, grossly negligently, and/or negligently publishing statements of and concerning Mr. Reed which it knew or should have known to be false and misleading.

386.    These statements, which are tied to Mr. Reed due to the inclusion of his picture prominently in the article, include but are not limited to:

**Saudi-Backed LIV Golf Is Using PGA Suit to Get Data on 9/11 Families, Court Told**

**It's (meaning the issue of 9/11 family victims) has taken a more sinister turn**.

387.    Defendant Bloomberg's defamatory publications are not privileged in any way or manner.

388.    The false, defamatory and misleading nature of Defendant Bloomberg's publications of and concerning Plaintiff caused Mr. Reed ridicule, hatred, disgust and contempt in his trade and profession as a professional golfer.

389.    The false, defamatory and misleading publications were made with actual malice.

390.    Defendant Bloomberg acted with actual malice because it knew or had reason to know that the publications were false and misleading, and/or at a minimum acted with a reckless disregard for the truth.

391.    Defendant Bloomberg's  article could not be further from the truth and Mr. Reed is not a Plaintiff in the PGA lawsuit or a party to any lawsuit against the PGA Tour. Defendant Bloomberg could have simply done minimal due diligence and seen that Mr. Reed has no involvement in these lawsuits, as it is a matter of public record. Indeed, Defendant Bloomberg must have checked the court record and see that Mr. Reed had no involvement, but still willfully disregarded this fact to include his picture to malicious create the false and misleading implication that Mr. Reed is somehow involved.

392.    These false, malicious, and defamatory statements have caused irreparable harm to Mr. Reed, his goodwill and reputation and financially in his trade and profession as a professional golfer, as a businessman, and personally.

393.    While these statements in particular are clearly defamatory, the publications in general and as a whole are defamatory as well, since "a publication must be considered in its totality. 'The court must consider all the words used, not merely a particular phrase or sentence.'" *Byrd v. Hustler Magazine*, 433 So. 2d 593, 595 (Fla. Dist. Ct. App. 1983).

## THIRTY-SIXTH CAUSE OF ACTION
### *Tortious Interference*
### *Defendant Bloomberg*

394.     Mr. Reed had ongoing contractual relationships with sponsors whereby Mr. Reed was to promote his sponsor's goods in exchange for financial benefit, as well as prospective contractual relationships with sponsors.

395.     As a result of Defendant Bloomberg's intentional and unjustified interference, Mr. Reed experienced the loss of multiple multi-million dollar sponsorship deals that were not or have not been renewed including, but not limited to Titleist, Nike, Ultimate Software, cbdMD, Callaway, Tax Slayer, Perry Ellis, NetJets, and ETS as well as numerous promising prospective sponsorship and business opportunities that did not come to fruition as a direct and proximate result including, but not limited to companies such as Quicken Loans, Draft Kings, Travelers, DOW, ARAMCO, CISCO, Porsche, Wells-Fargo, ROUSH, Zurich, Perry Ellis, Waste Management, Citi Bank, Houston Tourism, Taylormade, Bettinardi, and SRIXON.

396.     Defendant Bloomberg knew of the ongoing business relationships between Mr. Reed and his sponsors as well as the prospective contractual relationships between Mr. Reed and sponsors.

397.     Defendant Bloomberg willfully and intentionally and vindictively interfered with these ongoing business relationships and prospective business relationships and/or contracts by spreading lies of and concerning Mr. Reed in order to destroy his reputation, and to induce sponsors to break their contractual relationships with Mr. Reed.

398.     As a direct and proximate result of Defendant Bloomberg's  actions, Mr. Reed has suffered severe financial damages and had his ongoing contractual relationships with his sponsors terminated, and his prospective contractual relationships with sponsors never came to fruition, and

ongoing and prospective contractual relationships terminated due to this intentional and unjustifiable interference by Defendant Bloomberg.

## VII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment against each Defendant, jointly and severally, as joint tortfeasors as follows:

(a)    For general (non-economic), special (economic), actual and compensatory damages in an amount to be determined by the jury in an amount in excess of $320,000,000.00 U.S. dollars, as well as injunctive relief;

(b)     For consequential damages in a sum reasonable to a jury;

(c)    For punitive damages in an amount to be determined by the jury to punish and impress upon Defendants the seriousness of their conduct and to deter similar conduct in the future;

(d)    For attorneys' fees, expenses and costs of this action, and;

(e)    For such further relief as this Court deems necessary, just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff Patrick Nathaniel Reed demands a trial by jury on all counts as to all issues so triable.

**Dated**: January 13, 2023                                     Respectfully submitted,

*/s/ Larry Klayman, Esq.*
Larry Klayman, Esq.
Klayman Law Group, P.A.
7050 W. Palmetto Park Rd
Boca Raton, FL, 33433
Tel: 561-558-5336
Email: leklayman@gmail.com

*Counsel for Plaintiff*