**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

| | |
|---|---|
| **PATRICK NATHANIEL REED,** | **Case No. 3:22-cv-01181-TJC-PDB** |
| **PLAINTIFF,** | |
| **v.** | **DEFENDANTS HACHETTE BOOK GROUP, INC.'S, SHANE RYAN'S, AND NYP HOLDINGS, INC.'S MOTION TO DISMISS THE FIRST AMENDED COMPLAINT** |
| **SHANE RYAN, ET AL.,** | |
| **DEFENDANTS.** | |
| _____/ | |

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendants Hachette Book Group, Inc. ("Hachette"), Shane Ryan ("Ryan") (together, the "Hachette Defendants"), and Defendant NYP Holdings, Inc. ("NYP") (collectively, the "Defendants") move to dismiss with prejudice Plaintiff Patrick Reed's First Amended Complaint ("FAC") (Dkt. 27) for failure to state a claim.

## MEMORANDUM OF LAW

## INTRODUCTION

This defamation lawsuit arises out of a book and corresponding news article reporting on, among other things, the cloud of controversy that has followed one of professional golf's most infamous and well-covered figures, Patrick Reed, and how his checkered history played into his being left off the 2021 U.S. Ryder Cup team. The book and article address several well-publicized controversies that have followed Reed through much of his collegiate and professional golf career, whether justified or not. Following his defection from the PGA Tour to the Saudi-backed LIV Golf in June 2022, Reed filed this and a "very similar" companion lawsuit in an obvious attempt to

silence news reporting on him and his new financial backers.

This Amended Complaint (the "FAC") comes after the Court dismissed Reed's original complaint without prejudice as "a shotgun pleading." Dkt. 25 at 1-3. Despite eliminating six causes of action from his original pleading (including his bizarre conspiracy claims that journalists and news media conspired with the PGA Tour to defame him), the FAC has somehow grown in length but still contains the very same deficiencies identified in the Court's order (and allegations underlying his conspiracy claims). While Reed alleges 36 separate claims (including 12 claims against the Defendants), the thrust of the FAC is that seven statements published by the Hachette Defendants and seven statements published by NYP are defamatory. Setting aside that Defendants are forced to respond to another rambling shotgun pleading, this lawsuit must be dismissed as a matter of law for several independent reasons.

*First*, many of the statements at issue are not actionable under defamation law because they are not false statements of fact, a fundamental requirement to state a defamation claim. *Second*, Reed fails to plausibly allege facts that, if true, could establish that Defendants published the statements at issue with actual malice. *Third*, the claims against NYP are subject to the wire service defense. *Fourth*, Reed has failed to plausibly allege any Defendant's statements caused him to suffer special damages. *Fifth*, Reed's tag-along claims for defamation-by-implication, defamation per se, and tortious interference are duplicative of his primary defamation claim, and each fails to state a claim on its own terms. Accordingly, Reed's claims fail as a matter of law, and the Court should dismiss this action in its entirety with prejudice.

## STATEMENT OF FACTS[1]

### A.   The Parties

Reed is a professional golfer who joined the PGA Tour in 2012 and left the PGA Tour in mid-2022 to join LIV Golf, a professional golf tour financed by Saudi Arabia's sovereign wealth fund.  FAC ¶¶ 19, 29.  Defendant Shane Ryan is a sports writer who authored *The Cup They Couldn't Lose: America, the Ryder Cup, and the Long Road to Whistling Straits* (the "Book"), the book at issue in this action, as well as *Slaying the Tiger: A Year Inside the Ropes on the New PGA Tour*, a book he authored in 2015 (the "2015 Book"), also referenced in the FAC.  *Id.* ¶ 67.  Hachette Books (an imprint of Defendant Hachette) is the publisher of the Book.  *Id.*  Defendant NYP is the publisher of the NEW YORK POST, which published an article by Gavin Newsham in September 2022 titled *The scandalous truth about Patrick Reed, the bad boy of golf* (the "Article").  *Id.* ¶ 87.  Newsham is an independent journalist based in the United Kingdom.  *Id.* ¶ 15.[2]

### B.   The Book

On May 10, 2022, Hachette Books published the Book.  *See* Declaration of Jeremy A. Chase, Ex. 1.[3]  The Book chronicles the lead-up to the 2021 Ryder Cup, a golf tournament that pits a team of the best U.S. golfers against the best of Europe.

---

[1] All facts are taken from the FAC, and sources incorporated by reference or otherwise subject to judicial notice.  *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1280 (11th Cir. 1999).

[2] Newsham is named as a defendant, but the docket does not reflect that he has been served in this action.  Reed also alleges that on September 18, 2022, Fox Sports published an article with the title "'*Don't know they'd p\*\*\* [piss] on him if he was on fire': The scandalous truth of golf's biggest villain,"* which, besides the title, is identical to the Article published by NYP.  FAC ¶ 87.  Like Newsham, the docket does not reflect that Fox Sports has been served.  More than 90 days have passed since the filing of this action on November 1, 2022.  *See* Fed. R. Civ. P. 4(m).

[3] All references to "Ex. [x]" are references to exhibits to the Chase Declaration.

Chapter 1 of the Book, titled "December 2019, Melbourne, Australia—Fires down under … the great escape … the end of the legend of Patrick Reed" (the "Book Chapter"), reports on Reed's participation in the 2019 Presidents Cup Tournament, a tournament similar to the Ryder Cup that pits the U.S. team against a team of non-European international golfers.  The Book Chapter describes how events occurring at the 2019 Presidents Cup and other controversies, including at an event just one week earlier, all but sealed Reed's fate of being left off the 2021 U.S. Ryder Cup team.

The Book Chapter recounts that Reed and Ryan were "old friends, dating back to 2015," when Ryan wrote his 2015 Book (*see* Ex. 2), which devoted a chapter to Reed's prowess on the golf course and his reputation as something of a villain on the Tour.  Ex. 1 at 4.  Recounting reporting from Ryan's 2015 Book, the Book Chapter explains Reed had:

> been kicked out of [the University of] Georgia after a year for two alcohol violations, the second of which he tried to hide from his coach, and before that he'd been accused by his teammates of cheating during a qualifying event. Then he went to Augusta State, where he turned the entire team against him almost immediately, and once again he was accused of cheating, this time by shaving strokes in two straight qualifying events.  His teammates held a meeting and voted to kick him off the team, but Augusta State coach Josh Gregory reduced it to a two-match suspension.  (*Id.*)

Although Reed ultimately led his Augusta State team "to two national titles," the Book states that following the 2015 Book's revelations:

> Reed set to work blundering his way into deeper trouble, which was the start of a PR strategy that he's doggedly stuck to ever since.  He went on the Golf Channel, produced a couple of vague statements from his coaches, and generally took the path of full denial.  The end result was that Reed's teammates who had previously been silent came out of the woodwork to crucify him further, confirming old details and adding new ones.  *Deadspin* summed it up in a headline: "Patrick Reed Takes a Swing at Defending Himself, Slices into

the Woods." And life moved on. (*Id.* at 5.)

Moving on from his earlier reporting, the Book Chapter then tells of Tiger Woods' surprising decision to name Reed to the 2019 Presidents Cup Team in Australia, in light of his earlier issues with teammates, and his criticism of 2018 Ryder Cup Captain Jim Furyk for not pairing Reed with his 2016 Ryder Cup partner, Jordan Spieth (at Spieth's request), at the 2018 tournament. *Id.* at 6.

One week prior to the 2019 Presidents Cup, a not-so-pleasant spotlight was shone on Reed yet again while playing at Tiger Woods' Hero World Classic tournament in the Bahamas. According to the Book – and as caught on camera – Reed

> found himself in a waste area that looked indistinguishable from a sand trap. The rules, though, are different: in the waste area, a player is allowed to ground his club. Which is exactly what Reed did, but then he proceeded to drag the club backward, sweeping away the sand in front of his ball. Then he resettled the club and did it again. This is blatantly illegal, and nothing about it was ambiguous. Reed had improved his lie by clearing the path to his ball, and when the first effort wasn't satisfactory, he did it again. The TV cameras caught him red-handed, and Golf.com's Dylan Dethier, on the scene, heard Rickie Fowler say, 'I don't even know what you have to review.' (*Id.* at 7.)

The Book then noted that Paul Azinger, one of the announcers on the telecast, opined "If that's not improving your lie, I don't know what is" and that "He" – Reed – "knows better." *Id.* at 7. The Book then explains:

> Reed was assessed a two-stroke penalty when the round was over, but the bigger problem was the hit to his reputation. Before long, someone dug up a clip of him doing the same exact thing at a 2015 tournament, and for a guy whose credibility was already in the mud, who had been accused of cheating in the past, it was like throwing gas on the flames. He was skewered. (*Id.* at 7.)

The response to Reed's conduct at the Bahamas tournament was harsh and swift. Golf Channel analyst Brandel Chamblee, according to the Book, "came out firing" at Reed

by stating that "[d]eep down in the marrow of this team, they will be affected by this controversy" and that "[t]here's just no two ways about it.  To defend what Patrick Reed did is to defend cheating."  *Id.* at 7.  The Book continues:

> Chamblee went so far as to say that when Tiger added Reed to the team, he 'made a deal with the devil.'  By forcing the Americans to defend him.  Reed put them in an impossible situation and forced them to greet an obvious violation–one that would have horrified most of them to commit, in a sport where players frequently call penalties on themselves even when the camera aren't running–with silence, putting their own integrity on the line.  (*Id.* at 7-8.)

Australian golfer Cameron Smith told the press, referring to Reed's justification for his conduct at the Bahamas tournament, "[t]o give a bit of a bullshit response like the camera angle," "that's pretty up there ... I don't have any sympathy for anyone that cheats.  I hope the crowd absolutely gives it to not only him, but everyone [on the U.S. team] next week."  *Id.* at 8.

After the Bahamas incident, the Book discusses the abuse fans hurled at Reed during the initial rounds of the 2019 Presidents Cup the next week as well as his generally poor performance.  According to the Book, after Reed and his Presidents Cup partner "suffered another loss, an incredible bit of news began to circulate in the media center:  Kessler Karain, Reed's caddie, had apparently fought a fan."  *Id.* at 11. Per the Book, Karain admitted that he "shoved" a fan who shouted an expletive at Reed and criticized his play at the tournament.  *Id.*  Ryan then opined, "[i]t figured that the first time anyone on Reed's team had been honest and open with the media, it would be a caddie admitting he'd shoved a fan."  *Id.*  The Book Chapter concludes with Reed's victory at a later part of the Presidents Cup, and the Americans' come-

from-behind victory over the International team.  *Id.* at 11-13.

The later chapters in the Book report on the American team's victory at the 2021 Ryder Cup, and Captain Steve Stricker's decision to leave Reed off the team after Reed contracted severe pneumonia just before the roster was publicly announced.  *See* Ex. 1 at 210-275.  But Ryan's interview with Stricker for the Book revealed "that even if Reed had been perfectly healthy, it's unlikely that Stricker would have selected him, a fact [Stricker] made clear while discussing [the selection of Scottie] Scheffler [for the team] a month after the Ryder Cup":

> "We thought he'd be great in the team room," Stricker said.  "He gets along well with everybody… We just thought it was a really good pick to make a team.  There were … there could be … yeah, I guess that's all I'm going to say, is that we just thought it rounded out our team really well.  And I mean *team*, you know?  You know what I'm trying to say?  And everybody at that level, whoever we would have picked, are very talented, so you're splitting hairs when it comes down to those picks." (*Id.* at 234.)

## C.    The Article

On September 17, 2022, the *New York Post* published the Article, which reported on portions of the 2015 Book and the Book.  *See* Ex. 3.  Drawing from the Books, the Article reports on many of the same anecdotes from Reed's collegiate and professional golf career, and addresses several controversies Reed has endured during that time.  These included Reed's being accused of stealing and cheating while at the University of Georgia and Augusta State, along with Reed's denial of these accusations; Tiger Woods' asking Reed to join the 2019 Presidents Cup team after Jordan Spieth asked to not be paired with Reed again at the 2018 Ryder Cup; Reed's being penalized two strokes for improving his lie at the 2019 Hero World Classic tournament in the

7

Bahamas, and professional golfers and commentators' harsh criticism of Reed after watching the video; the crowd heckling Reed at the 2019 Presidents Cup following the Bahamas tournament, culminating with his caddy admitting to shoving a fan who screamed an expletive at Reed; and the 2021 U.S. Ryder Cup team's jelling and winning the event without Reed.  When describing Stricker's decision to omit Reed from the 2021 Ryder Cup team, the Article states that Stricker had "solved the perennial problem of Patrick Reed" – quoting that language from the Book.  *Id.*

### D.    The First Amended Complaint

On November 1, 2022, Reed filed this action.  After this Court dismissed the original complaint as a shotgun pleading, Reed filed the FAC on January 13, 2023, asserting virtually identical claims for defamation, defamation per se, defamation by implication, and tortious interference against several defendants, including NYP and the Hachette Defendants.  While the statements that Reed alleges are defamatory (the "Statements") are repeated several times throughout Reed's nearly 400-paragraph pleading, for the Court's convenience, Defendants have prepared Exhibit 4 to the Chase Declaration listing each Statement, including text immediately before or after the Statements that the FAC omitted.[4]

Reed's claims against the Hachette Defendants are based on seven statements from the Book that Reed alleges are false and defamatory.  *See* FAC ¶¶ 123-172, 248-

---

[4] Reed lists each of the Statements in the FAC by including several paragraphs from the Book and Article but, adds bold typeface presumably to the words Reed alleges are defamatory.  Defendants address the Statements here by focusing on the words presented in bold typeface.  To the extent Reed claims in his Opposition that the non-bold portions of these paragraphs are defamatory, Defendants request the opportunity to file a short reply to address those statements.

257 (the "Hachette/Ryan Statements").  The FAC also alleges Ryan himself has engaged in "continued, sustained attacks" on Reed's reputation, beginning on January 30, 2015, when Ryan posted an article on Tobacco Road Blues titled *The Villain: Patrick Reed*, that addressed the swirling allegations that Reed's teammates accused him of stealing and cheating during a qualifying round in college.  *Id.* ¶¶ 35, 37.  Reed alleges Ryan "republished" these statements in his new book because Reed left the PGA Tour and joined the LIV Golf league.  *Id.* ¶ 40.  Reed's claims against NYP are based on seven statements from the Article that Reed claims are false and defamatory.  *See* FAC ¶¶ 198-222; 263-267 (the "NYP Statements").

## **ARGUMENT**

Reed's Complaint must be dismissed for failure to state a claim.  To survive a dismissal motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  While the Court must accept all factual allegations as true and draw all reasonable inferences in the plaintiff's favor, *Burban v. City of Neptune Beach*, 920 F.3d 1274, 1278 (11th Cir. 2019), the Court need not accept as true legal conclusions couched as factual allegations.  *Diverse Power, Inc. v. City of LaGrange*, 934 F.3d 1270, 1273 (11th Cir. 2019); *Iqbal*, 556 U.S. at 678.  Unless a plaintiff's well-pleaded allegations have "nudged [his] claims across the line from conceivable to plausible, [plaintiff's] complaint must be

dismissed." *Twombly*, 550 U.S. at 570; *Iqbal*, 556 U.S. at 680.[5]

Because meritless defamation lawsuits like this one risk chilling protected speech by forcing media defendants to incur unnecessary litigation costs, courts routinely dismiss libel and related claims at the pleading stage on the same grounds as set forth in this motion. *See, e.g., Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 702 (11th Cir. 2016) (recognizing "[t]he costs and efforts required to defend a lawsuit through [later] stage[s] of litigation could chill free speech nearly as effectively as the absence of the actual malice standard altogether" and applying the stringent requirements of *Iqbal* and *Twombly* to the actual malice standard in granting a pre-answer dismissal motion); *Stewart v. Sun Sentinel Co.*, 695 So. 2d 360, 363 (Fla. 4th DCA 1997) ("[I]n

---

[5] Although a court's review of a Rule 12(b)(6) dismissal motion is generally limited to the complaint, a court may consider documents integral to the complaint's allegations – which are deemed incorporated by reference – without the motion being converted into one for summary judgment. Courts may also "take judicial notice of ... newspaper articles ... for the limited purpose of determining which statements the documents contain." *United States ex rel. Osheroff v. Humana Inc.*, 776 F.3d 805, 811 n.4 (11th Cir. 2015). Here, the FAC expressly references – or Reed's claims otherwise rely on – several extraneous documents, but Reed does not attach them as exhibits to his pleading. These documents include: (1) the Article and the Book at issue in this case, Exs. 1, 3 (*Parekh v. CBS Corp.*, 820 F. App'x 827, 830 n.1 (11th Cir. 2020) (considering allegedly defamatory news broadcast and accompanying online article as exhibits to the dismissal motion because broadcast and article incorporated by reference to complaint, which provided the web address)); (2) materials referenced in the FAC including the 2015 Book, sworn statements from Reed's two college coaches, and the *Tobacco Road Blues* article, Exs. 2, 5-7 (FAC ¶¶ 37, 73-75); *Maletta v. Woodle*, 2021 WL 1894023, at *1 n.1 (M.D. Fla. May 11, 2021) (document referenced in amended complaint incorporated by reference and appropriate to consider in motion to dismiss defamation claim)); (3) materials, including online news articles, referenced in the Book or hyperlinked in the Article such as a 2015 *Deadspin* article referenced in the Book that included statements from Reed's teammates substantiating claims about his college career, Ex. 8 (FAC ¶¶ 74, 80); *Miller v. Gizmodo Media Grp., LLC*, 2019 WL 1790248, at *2 n.1 (S.D. Fla. Apr. 24, 2019) (considering on Rule 12(b)(6) motion a document "link[ed] to" in challenged article); and (4) documents evidencing the widespread reporting on Reed's college career and his conduct at the 2019 and 2015 Hero World Challenge tournaments. Exs. 9-13; *Osheroff*, 776 F.3d at 812 n.4; *Lil' Joe Wein Music, Inc. v. Jackson*, 245 F. App'x 873, 879 (11th Cir. 2007) ("[T]he Court takes judicial notice, on the basis of several newspaper articles discussing the film, that Who's the Man? received wide commercial distribution.").

defamation cases ... pretrial dispositions are 'especially appropriate' because of the chilling effect these cases have on freedom of speech.") (citation omitted).

## I.    REED FAILS TO STATE A CLAIM FOR DEFAMATION

The FAC fails to state a plausible defamation claim.  "In Florida, defamation is composed of the following elements: (1) publication, (2) a defamatory statement, (3) falsity, and (4) actual damages."  *Klayman v. City Pages*, 650 F. App'x 744, 749 (11th Cir. 2016).[6]  Likewise, as a matter of constitutional law, where a public figure like Reed sues for defamation, he must plead and ultimately prove "the publication of a knowing or reckless falsehood (the 'actual malice' standard) to recover."  *Michel*, 816 F.3d at 695.  The FAC fails to state a plausible defamation claim for the reasons that follow. Accordingly, the FAC must be dismissed.

### A.    The Statements Are Not Actionable Because They Do Not Contain False Statements of Fact

"Under the First Amendment there is no such thing as a false idea.  However pernicious an opinion may seem, we depend for its correction not on the conscience

---

[6] This motion cites to Florida law, however, New York law is equally, and perhaps more applicable here, given that the two publishers, Hachette and the New York Post, are headquartered in New York (*see* FAC ¶¶ 10, 14), and the Statements concern Reed's conduct in various locales around the world *other than* Florida.  Indeed, courts in this District routinely apply New York law to assess defamation claims analogous to Reed's claims here where the defendants are New York publishers even where the plaintiff – unlike here – is a Florida resident.  *See, e.g., Michel*, 816 F.3d at 694-95; *Nix*, 772 F. App'x at 812.  Should the Court apply New York law, which is largely similar to Florida defamation law, dismissal of the FAC with prejudice is be the proper result.  *See, e.g., Biro v. Conde Nast*, 807 F.3d 541, 547 (2d Cir. 2015) (affirming dismissal of defamation claim under Rule 12(b)(6) for failure to plausibly allege actual malice); *Kerik v. Tacopina*, 64 F. Supp. 3d 542, 569 (S.D.N.Y. 2014) (dismissing defamation claim under Rule 12(b)(6) and holding that the plaintiff "failed to allege any special damages as a result of the defendant's statements"); *Tannerite Sports, LLC v. NBCUniversal News Grp.*, 864 F.3d 236, 242 (2d Cir. 2017) (holding that "'[s]ubstantial truth' is the standard by which New York law, and the law of most other jurisdictions, determines an allegedly defamatory statement to be true or false" and affirming dismissal of defamation claim for lack of substantial truth).

of judges and juries but on the competition of other ideas." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339-40 (1974). Thus, "[a] false statement of fact is the *sine qua non* for recovery in a defamation action." *Byrd v. Hustler Magazine, Inc.*, 433 So. 2d 593, 595 (Fla. 4th DCA 1983); *see also Hallmark Builders Inc. v. Gaylord Broad. Co.*, 733 F.2d 1461, 1464 (11th Cir. 1984). Whether a statement is one of opinion or fact is a question of law for the court to decide. *Turner v. Wells*, 879 F.3d 1254, 1262-63 (11th Cir. 2018).

A statement must be objectively verifiable or falsifiable to be defamatory. *Turner v. Wells*, 198 F. Supp. 3d 1355, 1369-70 (S.D. Fla. 2016), *aff'd*, 879 F.3d 1254. And the key question is not what a plaintiff alleges but "how a reasonable and common mind would understand the statements," not "a tortured interpretation." *Schiller v. Viacom, Inc.*, 2016 WL 9280239, at *8 (S.D. Fla. Apr. 4, 2016). This principle "provides assurance that public debate will not suffer for lack of 'imaginative expression' or the 'rhetorical hyperbole' [that] has traditionally added much to the discourse of our Nation." *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 (1990) (citation omitted); *see also Horsley v. Rivera*, 292 F.3d 695, 702 (11th Cir. 2002) ("loose, figurative language that no reasonable person would believe present[s] facts" are protected as opinion).

Further, "statements of pure opinion are protected from defamation actions by the First Amendment." *Turner*, 879 F. 3d at 1262. "Under Florida law, a defendant publishes a 'pure opinion' when the defendant makes a comment or opinion based on facts which are set forth in the publication or which are otherwise known or available to the reader or listener as a member of the public." *Id.*; *see also Rasmussen v. Collier Cty.*

*Publ'g Co.*, 946 So. 2d 567, 571 (Fla. 2d DCA 2006) (observing that opinions and commentary "are not the stuff of libel"). And "[w]here the speaker or writer presents the facts at the same time he or she offers independent commentary, a finding of pure opinion will usually result." *Zambrano v. Devanesan*, 484 So. 2d 603, 606 (Fla. 4th DCA 1986). "Alternatively, even if the speaker or writer does not present the facts, or does not present all of them, like comments may still justify a finding of pure opinion where the facts are already known to the audience." *Id.*

Finally, where a statement is capable of being proven true or false, defamation law "overlooks minor inaccuracies and concentrates upon substantial truth." *Masson v. New Yorker Mag., Inc.*, 501 U.S. 496, 516 (1991); *Phila. Newspapers, Inc. v. Hepps*, 475 U.S. 767, 777 (1986); Hon. Robert D. Sack, SACK ON DEFAMATION § 2.1.1, at 2-7 (5th ed. 2017) (falsity is a "prerequisite for recovery ... in virtually all cases"). "Under the substantial truth doctrine, a statement does not have to be perfectly accurate if the 'gist' or the 'sting' of the statement is true." *Klayman v. Judicial Watch, Inc.*, 22 F. Supp. 3d 1240, 1253 (S.D. Fla. 2014) (citation omitted), *aff'd,* No. 14-13855 (11th Cir. Feb. 17, 2015). A statement is only actionable if it is "substantially and materially false, not just if it is technically false.'" *Id.* at 1253-54. Here, the Statements cannot form the basis of a defamation action because they do not contain false statements of fact.

1.  **The Statements Reporting on Cheating Accusations Against Reed Are Not False Statements of Fact (Hachette/Ryan Statements 1-5; NYP Statements 3, 5)**

The Statements discussing accusations of cheating against Reed are either substantially true, non-actionable opinion, or not alleged to be false by Reed. Initially,

accusations of "cheating" are not the type of allegations that are susceptible to a precise meaning, particularly in the context of athletic events.  And where, as here, the word "cheating" is used to characterize disclosed facts, it is clearly one of opinion.  *See Palm Beach Newspapers, Inc. v. Early*, 334 So. 2d 50, 52 (Fla. 4th DCA 1976) (charge of "cheating" the public leveled against superintendent was non-actionable opinion); *El Paso Times, Inc. v. Kerr*, 706 S.W.2d 797, 799 (Tex. App. 1986) (statement that prosecutor "cheated" in criminal trial was opinion based on disclosed facts as it "constituted the reporter's perception of the federal judicial system," and was incapable of being proven true or false).  Indeed, "[e]veryone is free to speculate about someone's motivations based on disclosed facts about that person's behavior." *McCafferty v. Newsweek Media Grp., Ltd.*, 955 F.3d 352, 359 (3d Cir. 2020).  Here, the statements pertaining to cheating fall into one of two categories: (1) reports that Reed's teammates "accused" him of cheating (which Reed does not deny) (Hachette/Ryan Statement 1; NYP Statement 3), and (2) statements based on fully disclosed – indeed, nationally televised – facts that he improperly improved his lie (ball position) during the 2019 Hero World Classic (Hachette/Ryan Statements 3-5; NYP Statement 5).

*First,* Reed's entire claim as to accusations of cheating during college amounts to contesting an allegation never made in the Book or Article.  The publications report only that Reed was "accused by his teammates" at both Georgia and Augusta State of cheating during qualifying events.  Hachette/Ryan Statement 1; NYP Statements 3. But nowhere in Reed's nearly 400-paragraph FAC does he allege it is false that he was "accused by his teammates" of cheating.  Rather, Reed denies that he *in fact* "cheated

during his NCAA playing career" a statement made nowhere in either the Book or the Article.  FAC ¶¶ 73, 75, 96.  To support his non-denial, he points to statements his college coaches gave "that they were *unaware* of any cheating accusations against Mr. Reed," (*id.* (emphasis added); *see also* Exs. 5-6), not that no such accusations were made.  *Id.*; *see Abbas v. Foreign Policy Grp., LLC*, 975 F. Supp. 2d 1, 19 (D.D.C. 2013) (contention that an accusation was made "is not defamatory because it is not an assertion of false fact, or indeed, of *any* fact.  [The journalist] is reporting on what people in the region have said to him, and does not otherwise take any position on what he has heard."), *aff'd*, 783 F.3d 1328 (D.C. Cir. 2015); *cf. Jones v. BuzzFeed, Inc.*, 591 F. Supp. 3d 1127, 1142 (N.D. Ala. 2022) (headline in online news article "How Accusing a Powerful Man of Rape Drove A College Student To Suicide" not actionable because "the facts in the headline are true: Rondini accused T.J. Bunn of rape").  Ironically, Reed all but admits that his Georgia teammates accused him of cheating when he twice alleges in the FAC in regard to the reports of cheating accusations that his teammates "had every reason to get rid of Mr. Reed on the team, and that is what they did."  FAC ¶¶ 76, 97.[7]

Further, the FAC conveniently ignores that the statement from Josh Gregory, Reed's Augusta State coach, confirms Reed *did* commit a violation during the NCAA qualifying event in question.  *See* Ex. 5 ("Gregory Statement") ¶ 2(a) ("In a qualifying

---

[7] The statement that Reed "went to Augusta State, where he turned the entire team against him almost immediately," is substantially true, as his Coach's statement makes clear that "Reed was not well liked by his teammates, who repeatedly challenged Reed.  The relationship between Reed and the team was very strained during this time."  Ex. 5 ¶ 2(b); Hachette/Ryan Statement 1.

round for the NCAA Preview Tournament, Reed reported a score to me in a text message that was incorrect by one shot. For qualifying[.]").  The Gregory Statement noted that when confronted with the scoring error, Reed "acknowledged that the score was incorrect by one shot and that it was an honest, unintentional mistake," and that Reed agreed to a suspension as punishment for the error "in order to keep the team together."  *Id.* ¶¶ 2(b-d).  Thus, the Gregory Statement confirms Reed was indeed accused of shaving strokes off his scorecard and admitted to the infraction as the Book and Article report, rendering those statements substantially true.  Regardless of whether characterized as "cheating" or "an honest mistake resulting in suspension," it only confirms that different people can draw different conclusions as to a person's intent from fully disclosed facts.  *See McCafferty*, 955 F.3d at 359.[8]

Finally, the Book's explanation that Reed's "PR strategy" that included the disclosure of "vague statements from his coaches" led "Reed's teammates, who had previously been silent" to come "out of the woodwork to crucify him further, confirming old details and adding new ones" (Hachette/Ryan Statement 2) is also substantially true.[9]  The FAC presents this Statement standing alone (*see*, *e.g.*, FAC ¶

---

[8] Although Reed puts in bold the statement from the Book that "[h]e'd been kicked out of Georgia after a year for two alcohol violations, the second of which he tried to hide from his coach" (Hachette/Ryan Statement 1), suggesting that he claims the statement is false and defamatory, nowhere in the FAC does Reed actually allege this statement is false.  Indeed, Reed does not challenge a substantially similar statement from the Article.  *See* Ex. 3 ("In 2008, Reed enrolled at the University of Georgia in Athens, but was kicked off the golf team for two alcohol violations.  He was also arrested for underage drinking and possessing a fake ID, given community service and put on probation.").  As such, this statement cannot form the basis of a defamation claim.

[9] To the extent Reed challenges the statement that he responded to cheating allegations by "produc[ing] a couple of vague statements from his coaches" (Hachette/Ryan Statement 2), this statement is an opinion as the term "vague" is a subjective judgment incapable of being proven true

16

74), but the very next sentence in the Book refers to a 2015 *Deadspin* article titled "Patrick Reed Takes a Swing at Defending Himself, Slices into the Woods" (the "*Deadspin* Article"), which, according to the Book, "summed [] up" the controversy over Reed's response to the cheating allegations.  Ex. 1 at 5.  Indeed, the *Deadspin* Article reported that Reed's former teammates contacted journalists to express their displeasure at Reed's response to the allegations, and pointed to several Tweets by Reed's Augusta State teammates corroborating that cheating allegations were made against Reed.  It also included a statement from another of Reed's Augusta State teammates who anonymously told another journalist "that Reed was caught falsifying his score in two consecutive qualifying rounds."  Ex. 8 at 7.  The *Deadspin* Article explained that, in light of the statements from Reed's former college teammates and the less than definitive statements from his college coaches, "Reed's claims" denying misconduct allegations during his college career "don't stand up to scrutiny."  *Id.* at 5.  The *Deadspin* Article makes clear that irrespective of the underlying truth of their claims, Reed's former teammates did in fact "c[o]me out of the woodwork to crucify him further" and that the teammates provided information that purported to "confirm old detail and add new ones" – rendering this Statement substantially true as well.

**Second**, Reed challenges all or portions of three statements Defendants published reporting on how he improved his lie at the 2019 Hero World Classic Tournament, describing his conduct as "blatantly illegal," not "ambiguous," an

---

or false.  *See Coles v. Washington Free Weekly, Inc.*, 881 F. Supp. 26, 31 (D.D.C. 1995) (statement that attorney's trial presentation was "vague" was protected opinion), *aff'd*, 88 F.3d 1278 (D.C. Cir. 1996).

"obvious violation," and that "the TV camera caught him red-handed." Initially, each of these statements are substantially true. The incident was caught on camera and shows Reed twice brushing sand away from behind his ball.[10] Reed also admits that he was "assessed a two-stroke penalty" for his conduct depicted in the video. FAC ¶ 78. There is no question Reed committed a clear violation of the rules on camera, and was penalized accordingly. As such, it is substantially true.

Next, Reed challenges the statement that, "[b]efore long, someone dug up a clip of him doing the same exact thing at a 2015 tournament," describing it as a "manufactured cheating incident." FAC ¶¶ 80-81; Hachette/Ryan Statement 4. However, in the same article for which Ryan quotes Golf.com reporter Dylan Dethier in the Book, Dethier reported on Reed making a "similar waste bunker practice swing" at the Hero World Classic in 2015, embedding his own Tweet with a video of it. *See* Hachette/Ryan Statement 3-4.[11] As such, it is substantially true that someone – Dethier – dug up a clip of Reed doing the same exact thing at a 2015 tournament.

Reed attempts to transform both of these statements from merely recounting

---

[10] *See* Ex. 13 (Brentley Romine, "Reed penalized at Hero for improving lie, blames camera angle," *Golf Channel* (Dec. 6, 2019), https://www.golfchannel.com/news/patrick-reed-penalized-two-shots-improving-lie-sand-hero-world-challenge). Reed's allegation "on information and belief" that the video was "doctored" is the height of implausibility. FAC ¶ 78. The incident was captured live on the Golf Channel, and though Reed blamed a "camera angle," he admitted on the day of the event that "after seeing the club go back and brush some sand, [the referees] thought that that's a breach in the rules of golf." *See* Ex. 11 ("Reed won't 'stew' over 2-stroke penalty at Hero," *Golf Channel* (Dec. 6, 2019), https://www.golfchannel.com/video/hero-world-challenge-2019-patrick-reed-rd-3-penalty).

[11] *See* Ex. 12 (Dylan Dethier, "The inside story behind Patrick Reed's controversial waste-area penalty," *Golf.com* (Dec. 7, 2019), https://golf.com/news/patrick-reed-waste-area-two-stroke-penalty/).

these indisputable facts, into asserting that it was an allegation that Reed was "intentionally cheating." FAC ¶ 78. But neither the Book nor the Article said such a thing. Rather, they merely reported on the facts that the public controversy at the 2019 Hero World Classic, coupled with the resurfaced video and earlier allegations of cheating from Reed's collegiate career, "was like throwing gas on the flames" and he was "skewered," *i.e.*, it created a media firestorm, led to intense fan heckling at the Presidents Cup the following week, and placed his team members in the difficult position of having to defend his actions thus putting their integrity on the line. Hachette/Ryan Statements 4-5. While Reed now claims that he didn't "force[] his teammates to put their own integrity on the line" as "[t]hey are all adults capable of making their own decisions and saying what they want to say" (FAC ¶ 83), he adopts a hyper-literal reading of the statement. No reasonable reader would believe that Reed literally forced his teammates to say anything: the only natural reading of this statement is that Ryan posits they were placed in a position of having to defend him out of team unity in the wake of the swirling narrative around Reed. This is plainly a subjective assessment of the disclosed facts, and is therefore non-actionable opinion. At bottom, none of the "cheating" allegations are actionable false statements of fact.

### 2.   Various Statements Pertaining To The Lead Up To The 2021 Ryder Cup Are Non-Actionable Rhetorical Hyperbole

Reed challenges a number of opinions from the Book and Article providing the author's hyperbolic and subjective judgments that are plainly statements of opinion. *See Donnelly v. McConnell*, 2012 WL 2402803, at *2 (M.D. Fla. June 26, 2012)

(dismissing defamation claim because challenged statement was merely the "[defendant]'s personal opinion").  For example, it is not possible to prove whether Reed's "legend" "ended" after he was excluded from the 2021 Ryder Cup (Hachette/Ryan Statement 7); whether Tiger Woods "made a deal with the devil" by adding Reed to the 2019 Presidents Cup Team (Hachette/Ryan Statement 5; NYP Statement 4), *Blomberg v. Cox Enter., Inc.*, 491 S.E.2d 430, 433 (Ga. Ct. App. 1997) (statement that former baseball player was "silver-tongued devil" was protected opinion because statement is "wholly subjective opinion not capable of proof"); whether Reed's credibility was "in the mud" or whether he was "skewered" following criticism of his actions at the Hero World Challenge tournament (Hachette/Ryan Statement 4); or whether Reed is the "bad boy of golf" (NYP Statement 7).  *K-Mart Corp. v. Washington*, 866 P.2d 274, 282 (Nev. 1993) (statement to plaintiff's girlfriend that she should stay away from him because "he seemed like a bad guy" was protected opinion).  As such, these statements cannot survive dismissal.

### 3. The Statements Reporting On The 2021 Ryder Cup Team Sans Reed Are Non-Actionable Opinion

Reed takes issue with the characterization that 2021 Ryder Cup Team Captain Steve Stricker "solved the perennial problem of Patrick Reed" and that the U.S. Team jelled and ultimately succeeded in part because they were "[f]ree from the trouble that followed Reed around like a puppy."  NYP Statements 1, 6.  Here, when viewed in the context of the entirety of the Article – as these statements must be – it is clear that "the speaker is expressing a subjective view, an interpretation, a theory, conjecture, or

surmise, rather than claiming to be in possession of objectively verifiable facts." *Marshall v. Planz*, 13 F. Supp. 2d 1246, 1257 (M.D. Ala. 1998) (citation omitted). Indeed, all of the facts underlying the contention that Reed was a "perennial problem" or that "trouble ... followed Reed around like a puppy" – the accusations of cheating and theft in college, his alienation from teammates, his clashes with other U.S. teammates including Jordan Spieth at previous tournaments, the controversy at the Hero World Classic, and the firestorm at the 2019 Presidents Cup – were fully set forth in the Article.[12]  Ex. 3.  Calling someone or something a "problem" and "trouble" constitutes non-actionable opinions.

## B.  Reed Fails To Plausibly Plead Actual Malice

The FAC should be dismissed in its entirety for the independent reason that Reed fails to plausibly plead actual malice.  In light of this country's "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open," *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964), the Supreme Court has held that the First Amendment provides heightened

---

[12] The Article's description of Reed as a "perennial problem" includes a hyperlink to a 2019 NYP article *Anonymous golfers had one word to describe Patrick Reed*, which reports on an anonymous survey of professional golfers, who described Reed as "arrogant" and explains that Reed had recently "been thrust into the spotlight for all the wrong reasons."  Ex. 9 (Jake Nisse, "Anonymous golfers had one word to describe Patrick Reed," *New York Post* (Jan. 16, 2019), https://nypost.com/2019/01/16/anonymous-golfers-had-one-word-to-describe-patrick-reed/).  *See Rehak Creative Servs., Inc. v. Witt*, 404 S.W.3d 716, 732 (Tex. App.-Houston [14th Dist.] 2013) (hyperlinks are "part of the context that must be taken into consideration when assessing what the website actually conveyed"); *Adelson v. Harris*, 973 F. Supp. 2d 467, 483-84 (S.D.N.Y. 2013) (criticizing those who discount hyperlinks due to external navigation required to access their content because it is "premised on a type of formalism that is misplaced in Internet defamation law"), *aff'd*, 876 F.3d 413 (2d Cir. 2017).  The Statement describing Reed as a "perennial problem" is clearly the author's opinion, based on the fully disclosed facts in the Article and hyperlinked article.  Ex. 3.

protection against libel suits brought by individuals "who, by reason of the notoriety of their achievements or the vigor and success with which they seek the public's attention, are properly classed as public figures." *Gertz*, 418 U.S. at 342. The First Amendment guarantees "a defendant may not be held liable for defaming a public figure about a matter of public concern unless he is shown to have 'acted with actual malice.'" *Berisha v. Lawson*, 973 F.3d 1304, 1310 (11th Cir. 2020) (citation omitted), *cert. denied*, 141 S. Ct. 2424 (2021).

"Determining whether an individual is a public figure—and thus subject to the actual malice analysis—is a question of law for the court to decide" and, in this case, "[t]here is no question that the plaintiff here is a public figure." *Michel*, 816 F.3d at 702. Reed pleads that he is a well-known professional golfer with a years-long career who has "remained a top player in the world" since making his PGA Tour debut in 2012 and is now "one of [LIV Golf]'s most prominent athletes." FAC ¶¶ 19, 25.

As Reed is a public figure, he must plead that each of the Defendants published the Statements with "actual malice," *i.e.*, "allege facts sufficient to give rise to a reasonable inference that the false statement was made 'with knowledge that it was false or with reckless disregard of whether it was false or not.'" *Michel*, 816 F.3d at 702 (quoting *N.Y. Times Co.*, 376 U.S. at 280). As the actual malice test is "not an objective [test]," *id.*, a defendant's conduct is "not measured by whether a reasonably prudent man would have published, or would have investigated before publishing," *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968), but whether each defendant "in fact entertained serious doubts as to the truth of his publication." *Id.* And following

22

*Twombly* and *Iqbal*, pleading actual malice has become a more rigorous burden.  Courts now frequently dismiss libel claims on upfront motions when a plaintiff's allegations of actual malice amount to little more than "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements."  *Michel*, 816 F.3d at 703-04 (quoting *Iqbal*, 556 U.S. at 678).[13]  Here, Reed fails to plead facts that could establish any of the Defendants published the Statements with actual malice.

### 1.    Reed Fails to Plausibly Allege Actual Malice

Reed haphazardly attempts to cobble together circumstantial allegations of actual malice, but when subjected to any scrutiny, they amount to just three facially insufficient allegations.  ***First***, Reed peppers his FAC with actual malice "buzzwords" that merely parrot the applicable legal standard and conclusorily allege Defendants were "reckless" and "malicious" without any corresponding facts.  *See*, *e.g.*, FAC ¶¶ 18, 86.  Because these allegations amount to "threadbare recitals of the elements of a cause of action" they do nothing to satisfy Reed's burden to plead actual malice.  *Michel*, 816 F.3d at 703-04; *see also*, *e.g.*, *Turner*, 879 F.3d at 1273.

***Second***, Reed alleges Defendants harbored "animus" against him.  *See*, *e.g.*, FAC ¶¶ 30, 86 (alleging Defendants engaged in "a clearly orchestrated attack" against Reed's reputation).  This type of "ill will" allegation falls far short of plausibly alleging

---

[13] *See also Turner*, 879 F.3d at 1273 (affirming dismissal for failure to plead actual malice; plaintiffs pled defendants "'knowingly and recklessly' ignored or deliberately avoided learning information" but not "facts demonstrating that [d]efendants acted in these ways"; *Coral Ridge Ministries Media, Inc. v. Amazon.com, Inc.*, 6 F.4th 1247, 1253 (11th Cir. 2021) ("[B]are-bone allegations … are insufficient to show that [the defendant Southern Poverty Law Center] doubted the truth of its designation."), *cert. denied sub nom.*, 142 S. Ct. 2453 (2022); *Jacoby v. Cable News Network, Inc.*, 2021 WL 5858569, at *5 (11th Cir. Dec. 10, 2021) (per curiam) ("[C]onclusory allegations" insufficient to plead actual malice).

actual malice.  *See, e.g.*, *Klayman*, 2015 WL 1546173, at *13-14 (dismissing defamation claim for lack of actual malice where "Plaintiff's argument mostly focuses on Defendants' ill will towards Plaintiff"); *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 665 (1989) ("[A defendant's] motive in publishing a story ... cannot provide a sufficient basis for finding actual malice.").

*Third*, Reed claims in wholly conclusory fashion that Defendants "chose not to speak with" his "college coaches, his college teammates, and PGA Tour officials" about the incidents described in the Book – an allegation that is, in essence, a charge that Ryan and Hachette failed to investigate.  FAC ¶¶ 69, 89; *see also id.* ¶ 104 (claiming Newsham "failed to do his due diligence").  Aside from being a blatant fabrication,[14] even assuming the truth of Reed's allegations, actual malice "requires more than a departure from reasonable standards of journalism."  *Levan v. Capital Cities/ABC, Inc.*, 190 F.3d 1230, 1239 (11th Cir. 1999); *Gertz*, 418 U.S. at 332 ("mere proof of failure to investigate, without more, cannot establish reckless disregard for the truth").

But the FAC is not merely a matter of inartful pleading:  the Complaint pleads, and the documents (of which this court may take judicial notice), negate any inference that Defendants published the Statements with actual malice.  For example, the Book

---

[14] At a minimum, the documents the Court may consider on this motion directly controvert Reed's allegations of failure to investigate.  As the Book notes, Ryan *had* received and reviewed the statements of Reed's former coaches (*see, e.g.*, FAC ¶¶ 73, 75), and neither statement contradicted Ryan's prior reporting.  Further, the *Deadspin* Article, which is directly referenced in the Book when discussing the response of Reed's teammates to his 2015 denials, explains that numerous of Reed's teammates contradicted Reed's denials and supported Ryan's prior reporting.  *See* Ex. 8.  Last, Ryan had no reason to speak with PGA Tour officials as Reed's conduct was captured on a national television broadcast, and Ryan reported the exact penalties Reed admits he received.  *See* Ex. 1 at 7; FAC ¶ 78.

and Article prominently incorporate Reed's denials or explanations in response to many of the Statements.  *See* Exs. 1, 3; *see* FAC ¶¶ 95, 100; *see generally*, *e.g.*, *BYD Co. v. VICE Media LLC*, 531 F. Supp. 3d 810, 824 (S.D.N.Y. 2021) (no actual malice based on "the manner in which the information was presented," including that it cited plaintiff's prior denials), *aff'd*, No. 21-1097, 2022 WL 598973 (2d Cir. Mar. 1, 2022), *cert. denied*, 143 S. Ct. 103 (2022); *Lohrenz v. Donnelly*, 350 F.2d 1272, 1286 (D.C. Cir. 2003) ("Reporting perspectives at odds with the publisher's own 'tends to rebut a claim of malice'") (citation omitted).

Likewise, the vast majority of the Statements are premised upon disclosed (and in the case of the Article, hyperlinked) reputable sources, which courts in this Circuit and around the country hold preclude a finding of actual malice.  *See*, *e.g.*, *Berisha*, 973 F.3d at 1313 (no actual malice because "[t]he law is clear that individuals are entitled to rely on 'previously published reports' from 'reputable sources'") (citation omitted); *Dongguk Univ. v. Yale Univ.*, 734 F.3d 113, 124 (2d Cir. 2013) ("[W]here reporters' false statements in an article were based on reliable sources, the defendants could hardly be accused of gross negligence, much less actual malice") (citation and internal quotation marks omitted); *Liberty Lobby, Inc. v. Dow Jones & Co.*, 838 F.2d 1287, 1297 (D.C. Cir. 1988) ("good faith reliance on previously published reports in reputable sources" precluded finding of actual malice as a matter of law).

With respect to the allegations of actual malice pertaining to the Statements about Reed's time in college, those allegations have gone unchallenged by the Reed for the last seven-plus years.  Indeed, Reed alleges that Ryan engaged in a "continued

25

course of conduct dates all the way back to January 30, 2015," when Ryan published the Tobacco Road Blues article *The Villain: Patrick Reed*, detailing the reporting pertaining to his troubled college career, and followed it up with his 2015 Book "republishing many of the same … statements" FAC ¶ 37.  Further, following Reed's denial of these statements, Ryan responded at the time with a Tweet stating that he "stood squarely behind his reporting," and Reed acknowledges that Ryan's reporting has been "republished countless times … in the years since," (FAC ¶ 38) and was even the subject of a 2018 NYP article that Reed did not and has not challenged.[15]  *Cf. Chaiken v. VV Publ'g Corp.*, 119 F.3d 1018, 1032 (2d Cir. 1997) (no actual malice where publisher "relies upon the integrity of a reputable author and has no serious reason to question the accuracy of the information provided by that author").  While, as reported in the *Deadspin* Article, Reed sent Ryan and his then-publisher "letters … demanding a retraction" in 2015, he never brought a defamation lawsuit against Ryan or his then-publisher.  *See Davis v. Costa-Gavras*, 654 F. Supp. 653, 656 (S.D.N.Y. 1987) (filmmakers' knowledge that no legal action taken challenging claims from source material book written four years earlier evidences *lack* of actual malice).  Reed waited more than seven years after the 2015 Book's publication to bring this lawsuit, which is based in part on Ryan's and NYP's restatement of those same unchallenged statements.  Reed has not pled and cannot plead actual malice.

---

[15] *See* Ex. 10 (Zach Braziller, "The cheating allegations that started the Patrick Reed backlash," *New York Post* (Apr. 9, 2018), https://nypost.com/2018/04/09/the-cheating-allegations-that-started-the-patrick-reed-backlash/) (reporting "accusations of cheating and stealing from [Reed's] teammates").

### 2.     The Article Is Also Protected By The Wire Service Defense

Finally, the defamation claim against NYP is independently subject to dismissal because NYP enjoys the protection of the wire service defense.  "Both Florida and New York courts recognize that a republisher may rely on the research of the original publisher, absent a showing that the republisher had, or should have had, substantial reasons to question the accuracy of the articles or the *bona fides* of the reporter."  *Nix v. ESPN, Inc.*, 2018 WL 8802885, at \*6 (S.D. Fla. Aug. 30, 2018) (citations and internal quotation marks omitted), *aff'd*, 772 F. App'x 807 (11th Cir. 2019).  All but one of the Statements in the Article are derived from the Book, and the one statement that is not drawn from the Book – the statement that he was accused of stealing from his teammates (NYP Statement 2) – is drawn from the 2015 Book.  Both books were published by major book publishers and written by a well-established author.  Because the Book was published by a reputable company and written by a reputable author, the Article – which accurately summarized the allegations against Reed from the Book and 2015 Book – is subject to the wire service defense.  *See*, *e.g.*, *Nix*, 772 F. App'x at 813 (affirming dismissal of defamation claims against outlets that republished allegedly defamatory portion of Associated Press report, holding that "Appellants did not assert facts to show, and there is nothing else to suggest, that ESPN or USA Today were negligent, reckless, or careless in relying on AP's content").  Accordingly, Reed's claims against NYP must be dismissed in their entirety on this additional ground.

### C.     Reed Fails To Plead Special Damages

Reed's defamation claims also fail because he fails to make any plausible

allegations that Defendants' publications caused him special damages. *See Edelstein v. WFTV, Inc.*, 798 So. 2d 797, 798 (Fla. 4th DCA 2001) (per curiam). Reed pleads nothing more than legal conclusions that the Defendants "caused irreparable harm to Mr. Reed" and sweeping generalities that the Defendants' publications caused Reed to lose "multiple multi-million dollar sponsorship deals" and have "caused Mr. Reed ridicule, hatred, disgust and contempt in his trade and profession as a professional golfer." *See* FAC ¶¶ 22, 143-146, 168-171, 218-221. But critically, Reed fails to allege any facts plausibly suggesting that his reputation has suffered or that he has incurred any financial losses that are directly attributable to the Statements from the Book and Article, as opposed to his own actions, including leaving the PGA Tour for LIV Golf. As such, his defamation claim must be dismissed.

## II.   REED'S ADDITIONAL CLAIMS MUST BE DISMISSED

Reed's additional claims for defamation-by-implication, defamation per se, and tortious interference each fail for the same reasons as his defamation claim, and on their own terms. ***First***, Reed's defamation-by-implication claim fails because he alleges that each of the Statements are false, even though the cause of action requires that "literally true statements [are] defamatory [by implication] where they create a false impression." *Jews For Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1106 (Fla. 2008); *Jacoby v. Cable News Network, Inc.*, 537 F. Supp. 3d 1303, 1312 (M.D. Fla. 2021), *aff'd,* No. 21-12030, 2021 WL 5858569 (11th Cir. Dec. 10, 2021). Because Reed alleges that each

Statement is false, his defamation-by-implication claim fails and must be dismissed.[16]

*Second*, Reed's defamation per se claim fails as a matter of law because Florida law does not provide a cause of action for "defamation per se" where damages are presumed in a libel suit against a media defendant; rather, "a plaintiff suing a media defendant must nevertheless plead and prove actual injury" like any other defamation claim. *Edelstein*, 798 So. 2d at 798.[17]

*Third*, Reed's throwaway claim for tortious interference is barred by Florida's single action rule because it is premised off of the same conduct and harm as his defective defamation claim. "In Florida, a single publication gives rise to a single cause of action" and "[t]he various injuries resulting from it are merely items of damage arising from the same wrong." *Callaway Land & Cattle Co. v. Banyon Lakes C. Corp.*, 831 So. 2d 204, 208 (Fla. 4th DCA 2002). "The rule is designed to prevent plaintiffs from circumventing a valid defense to defamation by recasting essentially the same facts into several causes of action all meant to compensate for the same harm" and courts routinely rely on the rule to "dismiss concurrent counts for related torts based on the same publication and underlying facts as the failed defamation count." *Klayman*, 22 F. Supp. 3d at 1256 (citations and internal quotation marks omitted).

---

[16] The claim is also subject to dismissal for two other reasons. *First*, it should be dismissed for the same reasons as Reed's defamation claims, because "[a]ll of the protections of defamation law that are afforded to the media and private defendants are therefore extended to the tort of defamation by implication." *Jews For Jesus*, 997 So. 2d at 1108. *Second*, Plaintiff fails to plead any non-conclusory facts that could support a plausible inference that Defendants intended or endorsed the alleged defamatory implications. *Klayman*, 650 F. App'x at 749; *see* FAC ¶¶ 136, 161, 211.

[17] *See also Blake v. Giustibelli*, 182 So. 3d 881, 884-85 (Fla. 4th DCA 2016) ("[I]n libel cases involving media defendants, fault and proof of damages must always be established.").

Here, Reed's tortious interference claims are grounded in the Statements published in the Book and Article. *See*, *e.g.*, FAC ¶¶ 249, 254, 264. Because Reed recasts his defamation claims as one for tortious interference, they must be dismissed under the single action rule. *See Klayman*, 22 F. Supp. 3d at 1255-57 (applying single action rule to dismiss tortious interference claim filed by Reed's counsel).

## **CONCLUSION**

For the foregoing reasons, Defendants respectfully request this Court dismiss the FAC with prejudice, and such other relief the Court deems just and proper.

## **Local Rule 3.01(g) Certification**

I have conferred with the opposing party by email and represent the opposing party opposes Defendants' motion.

THOMAS & LoCICERO PL

Carol Jean LoCicero (FBN 603030)
Linda R. Norbut (FBN 1011401)
601 South Boulevard
Tampa, FL  33606
Telephone: (813) 984-3060
Facsimile:  (813) 984-3070
clocicero@tlolawfirm.com
lnorbut@tlolawfirm.com

*Attorneys for Defendants Hachette Book
Group, Inc., Shane Ryan, and NYP
Holdings, Inc. D/B/A The New York Post*

DAVIS WRIGHT TREMAINE LLP

Jeremy A. Chase*
Jesse Feitel*
1251 Avenue of the Americas-21st Fl.
New York, NY  10020
Telephone: (212) 489-8230
Facsimile:  (212) 489-8340
jeremychase@dwt.com
jessefeitel@dwt.com

Laura R. Handman*
1301 K Street NW, Suite 500 East
Washington, D.C. 20005
Telephone: (202) 973-4200
Facsimile: (202) 973-4499
laurahandman@dwt.com
*admitted *pro hac vice*

## **CERTIFICATE OF SERVICE**

I hereby certify that on February 24, 2023, a true and correct copy of the foregoing was served via CM/ECF on all counsel of record.

*/s/ Carol Jean LoCicero*
Carol Jean LoCicero