IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

PATRICK NATHANIEL REED,

    PLAINTIFF,

v.                                                              CASE NO.  3:22-cv-1181-TJC-PDB

SHANE RYAN; et al.,

    DEFENDANTS.

_____/

**DEFENDANTS THE ASSOCIATED PRESS' AND DOUG FERGUSON'S
MOTION TO DISMISS AMENDED COMPLAINT AND FOR FEES
WITH SUPPORTING MEMORANDUM OF LAW**

    Pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendants The Associated Press ("AP") and Doug Ferguson (collectively, the "AP Defendants") move to dismiss all counts of the Amended Complaint against them. The 93-page complaint purports to state claims for defamation, defamation per se, defamation by implication, and tortious interference. In every instance, Plaintiff Patrick Nathaniel Reed ("Reed" or "Plaintiff") fails to plead a claim as a matter of law. Specific grounds for this motion are included in the Memorandum of Law. Most fundamentally, all claims are time barred. Moreover, the column at issue lacks defamatory meaning, is pure opinion, was published without knowing falsity or reckless disregard for the truth, and the tortious interference claims violate the single action rule prohibiting end runs around defamation defenses.

## MEMORANDUM OF LAW

### Introduction

Reed's baseless claims raised in the Amended Compliant[1] rest on a February 2021 piece, entitled *Column: Reed's reputation from Bahamas the ultimate penalty* (the "Column").  The Column explores the impact that Reed's reputation for cheating in the eyes of the public has had on his career. As a threshold matter, Reed's claims are time barred under the applicable one-year limitations period. Further, the Column, taken as a whole, does not convey the defamatory meaning alleged by Reed – i.e., that he is a "habitual cheater" – and is otherwise full of protected opinion for statements that cannot be proven true or false. Finally, Reed cannot plead the heightened standard of actual malice demanded of public figures.

His tortious interference claims are also barred because they are based on the same facts that give rise to the defamation claims. They, too, fail as a matter of law.

As the Eleventh Circuit has cautioned, courts must carefully examine legal claims that restrict First Amendment activity because "there is a powerful interest in

---

[1] On December 13, 2022, this Court *sua sponte* dismissed without prejudice Plaintiff's original complaint (D.E. 1) for being a shotgun pleading. (D.E. 25). The Court held that, at "[n]inety-two pages and forty-two counts . . . , Reed's Complaint is neither short nor plain." *Id.* Yet the excessive Amended Complaint – spanning 93 pages, 398 paragraphs, ten parties, and 36 claims – fares no better. For instance, the Court's dismissal Order instructed Reed "to incorporate into each count only the factual allegations that are relevant to the respective causes of action." (D.E. 25). The Amended Complaint not only fails to comply, but now also fails to incorporate *any* factual allegations into any count. Pleading deficiencies have repeatedly been an issue for opposing counsel. *See Klayman v. CNN*, No. 22-12480, 2023 WL 2027843 (11th Cir. Feb. 16, 2023) (affirming dismissal of opposing counsel's defamation claims against media defendant on the ground that the complaint was a shotgun pleading); *Reed v. Chamblee*, No. 3:22-cv-1059-TJC-PDB (M.D. Fla. Nov. 18, 2022) (order dismissing Reed's complaint against various media defendants for being a shotgun pleading that is "neither short nor plain").

ensuring that free speech is not unduly burdened by the necessity of defending against expensive yet groundless litigation." *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 702 (11th Cir. 2016); *see also* § 768.295, Fla. Stat. (Florida's "anti-SLAPP" statute, which similarly seeks to protect speech from meritless litigation). Accordingly, the AP Defendants request the Court dismiss the claims against them with prejudice.[2]

## BACKGROUND

Reed acknowledges his public figure status in describing himself as a "professional golfer" of "exceptional world-class golfing achievements." Am. Compl. ¶¶ 19-20.  Despite his accomplishments, however, Reed has long been plagued with accusations of cheating. *See, e.g.*, Am. Compl. ¶¶ 37-38 (describing accusations of cheating dating as far back as 2015). The Column explores the impact the public perception of Reed as a cheater has had on Reed's career, particularly after Reed's performance at a Bahamas tournament where he was penalized. The Column observes Reed would have a "hard time living down that incident," and "[m]oving past this [new] one will be almost impossible." *See* a true and correct copy of the Column attached as **Exhibit A.**[3] In short, the Column does what columns do; it delves into

---

[2] State substantive law applies in this diversity action. *See Davis v. McKenzie*, No. 16-62499-CIV-COHN/SELTZER, 2017 WL 8809359, at *11 (S.D. Fla. Nov. 3, 2017); *adopted in full by Davis v. McKenzie*, No 16-62499-CIV-COHN/SELTZER, 2018 WL 1813897 (S.D. Fla. Jan. 19, 2018).

[3] Although the Court's review of a motion to dismiss is generally limited to the "four corners" of the pleading, a court can consider documents integral to the complaint's allegations without the motion being converted into a summary judgment motion. *See Horsley v. Feldt*, 304 F.3d 1125, 1134-35 (11th Cir. 2002) (court could consider news article forming basis of defamation claim without converting the same to motion for summary judgment); *Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005) ("[A] document need not be physically attached to a pleading to be incorporated by reference into it…."); *Brooks v. Blue Cross & Blue Shield of Fla.*, 116 F.3d 1364, 1369 (11th Cir. 1997) ("where the plaintiff

possible impacts and explores effects.

The Column first describes a well-known incident that occurred at the 2019 Hero World Challenge in the Bahamas, where Reed was assessed a two-stroke penalty for "improving his line of play" by "us[ing] the back of his wedge to scoop away sand – twice – from behind his golf ball in a waste bunker." (the "Bahamas Event"). *See* Ex. A; *see also* Am. Compl. ¶¶ 78-79 (similarly describing the Bahamas Event). The Column posits that the real impact on Reed, however, was not the technical penalty but the reputational hit in the eyes of the public that came with it. The Column notes that Reed's behavior has haunted him ever since the Bahamas Event.

For example, in Hawaii, fans shouted, "CHEATER!" *See* Ex. A. In 2021, at the Farmers Insurance Open at Torrey Pines in San Diego, Reed claimed embedded ball relief (the "California Event"), and another fan firestorm ensued on social media. *See id.* Rather than take a side, however, the Column expressly notes that "[t]he procedure Reed followed wasn't illegal," and that PGA officials confirmed Reed did "nothing wrong." *Id.*

Ignoring the Column's actual content, Reed contends that "[t]he entire purpose of the [Column] is to plant in the reader's mind that . . . Mr. Reed is a habitual cheater." Am. Compl. ¶ 106. Here are the actual words from the Column, with the portions Reed complains about in bold (*see id.* at ¶ 61):

---

refers to certain documents in the complaint and those documents are central to the plaintiff's claim, then the Court may consider the documents part of the pleadings for purposes of motion to dismiss). The Court can consider the Column.

The violation was so egregious that Rickie Fowler, glancing at the replay on television, quickly raised his eyebrows and said: "Whoa! What was THAT?"

It was Patrick Reed**.**

**This was just over a year ago in the Bahamas, the day Reed infamously used the back of his wedge to scoop away sand — twice — from behind his golf ball in a waste bunker, improving his line of play.** Only when he was shown video evidence[4] did Reed accept the two-shot penalty, but not before suggesting the camera angle made it look worse than it was.

**The penalty, as it turns out, was worth more than two shots.**

**There is no greater punishment in golf than being stuck with a reputation for cheating**.

Reed was always going to have a hard time living down that incident.

It followed him to Australia, where the fans were so abusive his caddie got into it with a spectator and was replaced for the final day of the Presidents Cup. It stayed with him in the chill environment of Kapalua, where a spectator yelled "CHEATER!" after Reed hit a putt in a playoff. A few weeks later in San Diego, Reed asked police to remove hecklers.

The verbal abuse was silenced by golf not having fans because of the pandemic.

And then more outrage involving Reed, fueled mightily by social media, arrived during an otherwise idyllic Saturday afternoon at Torrey Pines.

**Moving past this one will be almost impossible.**

As far as the PGA Tour is concerned, Reed did nothing wrong on the 10th hole of the third round at the Farmers Insurance Open. And according to the Rules of Golf, which relies on facts over reputation, the tour was right.

"He operated the way the rules permit him to operate," said John Mutch, the tour's senior tournament director.

---

[4] The Column hyperlinks the words "video evidence" to a December 6, 2019 video titled "Patrick Reed's two-stroke penalty at Hero World Challenge 2019," posted on the PGA Tour's official YouTube channel at https://www.youtube.com/watch?v=sM7UJrsUr5g&ab_channel=PGA TOUR. *See* Ex. A. The video shows the Bahamas Event as well as subsequent commentary and interviews with Reed about the incident. The Court may again consider its contents. *See supra note* 3; *see also* Am. Compl. ¶ 78 (admitting that the video shows an "unintentional error by Mr. Reed").

This was about optics. Mostly, it was about Reed.

**He pulled his approach from a fairway bunker into thick grass left of the 10th green. Approaching where a volunteer had marked the spot with a tiny flag, Reed asked if the ball bounced. "No, I didn't see it bounce," the volunteered replied.**

**He turned to his playing partners, PGA Tour rookie Will Gordon and second-year player Robby Shelton, and told them, "They said it didn't bounce," and that he would check for an embedded lie. Crouching over, he marked the spot with a tee, put the ball in the palm of his hand and kept probing the turf for about 5 seconds when he called for an official. And then he poked around for another five seconds.**

**"I believe it broke ground, but I'm going to let you make that call," Reed told Brad Fabel, the rules official. Fabel didn't immediately know what he was talking about because Reed had placed the ball about 8 feet away. Reed showed him where the ball was, Fabel poked around and agreed there was a "lip," meaning the ball had broken the plane of the soil.**

**Free drop.**

The procedure[5] Reed followed wasn't illegal. It wasn't even necessary for him to call for an official. Rory McIlroy didn't ask for a ruling when the same thing happened on the 18th hole that day. And according to McIlroy, Rory Sabbatini also took relief from an embedded ball on the 15th hole Saturday.

The rule (16-3) allows players to proceed as if the ball is embedded provided it is "reasonable to conclude" based on the information at hand.

*Id.* at ¶¶ 109-112.

Reed brought a similar defamation suit against other defendants in the Southern District of Texas on August 16, 2022 (the "Texas Suit").[6] In that case, Reed

---

[5] The Column hyperlinks the word "procedure" to a January 31, 2021 video titled "McIlroy, Reed embedded golf ball rulings at Farmers Insurance Open," posted on the PGA Tour's official YouTube channel at https://www.youtube.com/watch?v=E9BoqR5rP_w&ab_channel=PGATOUR. *See* Ex. A. The video shows the California Event.

[6] *See* **Exhibit B**, which provides a true and correct copy of Reed's pleading in the Southern District of Texas, which may be considered by the Court without converting the motion into one for summary

complained about publications describing the same incidents from the Bahamas and California tournaments discussed in the Column. *See* Ex. B ¶¶ 52-60. This is important because Reed also claimed in the Texas Suit that "a substantial part of the[se] events . . . giving rise to [his] claim occurred" in the Southern District of Texas. *Id.* at ¶ 2. The operative complaint here admits Reed's Texas citizenship but also highlights the suit's connection to New York, noting that the four corporate defendants, including AP, are headquartered in New York. *See* Am. Compl. ¶¶ 8, 10, 12, 14, and 16. The alleged connections to Florida are anemic at best.

## The Counts

**Counts XXI-XXIII** against Defendant Ferguson and virtually identical **Counts XXV-XXVII** against AP (labeled "defamation," "defamation by implication," and "defamation per se") are based on the Column. *See* Am. Compl. ¶¶ 106, 273-297, 303-327.

**Counts XXIV** (Ferguson) and **XXVIII** (AP) are claims for tortious interference premised again on the Column. *Id.* at ¶¶ 298-302, 328-332. They similarly claim the AP Defendants damaged Reed's business relationships by "spreading lies of and concerning Mr. Reed in order to destroy his reputation." *Id.* at ¶¶ 301,331.

Each count must be dismissed as a matter of law.

---

judgment. The Texas Suit is central to the allegations here (and its authenticity is not in dispute). *See Nix v. ESPN, Inc.*, 1:18-CV-22208, 2018 WL 8802885, at *6 (S.D. Fla. Aug. 30, 2018). Reed voluntarily dismissed the Texas Suit and re-filed it in this Court – adding a few defendants and allegations on September 28, 2022. *See Reed v. Chamblee*, et al., Case No. 3-22-CV-01059-TJC-PDB (M.D. Fla.).

## LEGAL ARGUMENT

On a motion to dismiss a complaint for failure to state a claim, a court "must accept the allegations of the complaint as true and must construe the facts alleged in the light most favorable to the plaintiff." *Hunnings v. Texaco, Inc.*, 29 F.3d 1480, 1484 (11th Cir. 1994). "However, conclusory allegations, unwarranted factual deductions or legal conclusions masquerading as facts will not prevent dismissal." *Davila v. Delta Air Lines, Inc.*, 326 F.3d 1183, 1185 (11th Cir. 2003) (citation omitted).  Plaintiffs cannot simply regurgitate labels, conclusions, and "a formulaic recitation of the elements of a cause of action." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The touchstone is that "to survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

As the Eleventh Circuit has noted, testing a complaint against the plausibility standard is critical in public figure defamation suits, like this one:

> [T]here is a powerful interest in ensuring that free speech is not unduly burdened by the necessity of defending against expensive yet groundless litigation. Indeed, the actual malice standard was designed to allow publishers the "breathing space" needed to ensure robust reporting on public figures and events. [*New York Times v.*] *Sullivan*, 376 U.S. [254,] 271-72 [(1964)] . . . . Forcing publishers to defend inappropriate suits through expensive discovery proceedings in all cases would constrict that breathing space in exactly the manner the actual malice standard was intended to prevent. The costs and efforts required to defend a lawsuit through that stage of litigation could chill free speech nearly as effectively as the absence of the actual malice standard altogether.

*Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 702 (11th Cir. 2016).

The *Michel* warnings apply here. Plaintiff will undoubtedly seek substantial discovery in the empty hope of proving the wild allegations he and his counsel have concocted out of nothing more than the AP Defendants' publication of commentary about well-known controversies surrounding a professional golfer. *Michel* makes clear that this Court plays a critical gatekeeper role in blocking such assaults on free speech. Plaintiff's ridiculously speculative pleading should be dismissed now.

## I.   Florida's Borrowing Statute Bars All Defamation Claims

All of Plaintiff's claims against the AP Defendants should be dismissed because Florida's "borrowing statute" requires this Court to apply New York's or Texas's one-year statute of limitations for defamation claims. *See* N.Y. C.P.L.R. 215(3); TX CIV. PRAC. & REM. § 16.002(a).[7] As the Amended Complaint acknowledges, the Column was published on February 2, 2021. *See* Am. Compl. ¶ 105. Plaintiff had to sue by early February 2022, but he did not file until nine months later, on November 1, 2022 (D.E. 1). Plaintiff cannot use Florida's two-year limitation period to save his claims.

Florida's borrowing statute provides that "[w]hen the cause of action arose in another state or territory of the United States, or in a foreign country, and its laws forbid the maintenance of the action because of lapse of time, no action shall be maintained in the state." Fla. Stat. § 95.10. "[T]he statute bars actions brought in Florida which arise outside the State of Florida and which are time-barred in the jurisdiction in which the cause of action arose." *Bates v. Cook*, 509 So. 2d 1112, 1113

---

[7] In contrast, Florida has a two-year statute of limitations. *See* Fla. Stat. § 95.11(4)(g) (2022).

(Fla. 1987); *see also Digioia v. H. Koch & Sons, Div. of Wickes Mfg. Co.*, 944 F. 2d 809, 812 (11th Cir. 1991). "The purpose of the statute is to discourage 'forum shopping' and the filing of lawsuits in Florida that have already been barred in the jurisdiction where the cause of action arose." *Celotex Corp. v. Meehan*, 523 So. 2d 141, 143 (Fla. 1988); *see also Jaisinghani v. Capital Cities/ABC, Inc.*, 973 F. Supp. 1450, 1452 (S.D. Fla. 1997). The issue of where a cause of action arose is a question of law for the Court to decide. *See Jaisinghani*, 973 F. Supp. At 1452.

To decide where a tort cause of action arose, the Florida Supreme Court adopted the "significant relationship" test. *See Celotex*, 523 So. 2d at 144; *Bates*, 509 So. 2d at 1114-15 (finding test applies in analyzing statute of limitations periods for all torts). "Under this test, the cause of action arises in the state with the most significant relationship to the parties and the tortious act or occurrence." *Jaisinghani*, 973 F. Supp. at 1452. The test balances four factors: (1) the place where the injury occurred; (2) the place where the conduct causing the injury occurred; (3) the domicil[e], residence, nationality, place of incorporation, and place of business of the parties, and (4) the place where the relationship, if any, between the parties is centered. *See Celotex*, 523 So. 2d at 144 (citation omitted). No one factor dominates; instead, the test requires courts to "weigh the totality of the circumstances." *Jaisinghani*, 973 F. Supp. at 1454. As explained below, either New York's or Texas's limitations period governs Plaintiffs' defamation claims. Virtually nothing occurred in Florida. The complaint discusses events in in the Bahamas and California (*see* Ex. A), repeated by news organizations headquartered in New York (*see* Am. Compl. ¶¶ 10, 12, 14, 16) about a

Texas plaintiff (*see* Am. Compl. ¶ 8) – all jurisdictions with one-year defamation periods. N.Y. C.P.L.R. 215(3); TX CIV. PRAC. & REM. § 16.002(a); CAL. CIV. PROC. CODE § 340(c).

### A. The Alleged Injury Occurred in New York or Texas

First, the location of alleged injury is primarily in New York or Texas.  The Amended Complaint does not allege that the Column, published in February 2021, caused injury in Florida. The Column was not published from Florida, but rather by AP, which is headquartered in New York. Am Compl. ¶¶ 12, 105, n.7. Further, any alleged injury would have otherwise occurred in Texas, where Reed lives and is a citizen, and where he sued other defendants in similar litigation claiming injury in Texas. *See* Am. Compl. ¶ 8; Ex. B, ¶ 2. *See also Nix v. ESPN, Inc.,* 1:18-CV-22208, 2018 WL 8802885, at *4 (S.D. Fla. Aug. 30, 2018) (finding that the similar choice of law factor favored applying New York law rather than Florida law because the complaint cited to "no specific instances of harm within Florida," and any harm felt by the plaintiff would have been in New York); *Lamphier v. Knight–Ridder Newspapers,* 12 Med. L. Rep. 2154, 2156 (S.D. Fla. 1986) (applying former place of injury rule and finding Florida's borrowing statute barred plaintiff's libel action under California's one-year statute of limitations because alleged damages occurred in the location of "Plaintiff's place of residence and business").

### B. The Allegedly Defamatory Conduct Did Not Occur in Florida

The second factor, where the conduct allegedly causing the injury occurred, also favors New York or Texas. Although the Column is available worldwide, it was not

published from Florida, as it originated from AP headquarters in New York, where AP's ultimate publication decisions originate. *See Nix*, 2018 WL 8802885, at *4 (finding the similar choice of laws factor weighed in favor of applying New York law because "the decision to publish . . . was made by Defendant AP in New York"). The Column never mentions Florida. *See* Ex. A. Thus, none of the allegedly defamatory conduct centers on Florida.

In fact, in the Texas Suit, Reed alleged that other members of the media had "a long history of targeting Mr. Reed with their defamatory attacks," and used reporting on the Bahamas and California events as "prominent example[s]'" of this. *See* Ex. B. ¶¶ 52-60. He claimed that "a substantial part of the events or omissions giving rise to Plaintiff's claim" in that case, stemming from, *inter alia*, the Bahama and California events (also pled here), occurred in the Southern District of Texas. *See* Ex. B ¶¶ 2, 52-60.

## C.   The Parties are Located in Multiple States

The third factor, the domicile, residence, nationality, place of incorporation and place of business of the parties, also counsels against Florida. Even though Defendant Ferguson is a citizen of Florida, this alone does not end the inquiry. Neither AP nor any of the other publishing defendants in this matter are citizens of Florida. Am. Compl. ¶¶ 10 (Hachette, Delaware/New York), 12 (AP, New York), 13 (Fox Sports, Delaware/California), 14 (New York Post, Delaware/New York), and 16 (Bloomberg, Delaware/New York). And Reed is a citizen of Texas who alleges that he also owns a second house in Florida. *Id.* at ¶ 8. *See also Jaisinghani*, 973 F. Supp. at

1453–54 (finding, where the plaintiff had residences in both California and Florida, that the tort arose in California because the plaintiff's connections with California were stronger).

## D. The Parties' Relationship Was Not Centered in Florida

The final factor, the relationship between the parties, is not particularly instructive here as there is no relationship between Reed and the AP Defendants. The Column discusses events in the Bahamas, Australia, Hawaii, and California, but nothing about Florida. Plaintiff instead struggles to fabricate a connection centered in the state with his sweeping conclusion that Florida is "the golf capital of the United States, if not the world," (Am. Compl. ¶ 56) primarily because "Defendant PGA Tour is located in this judicial district." Am. Compl. ¶ 2. But, of course, PGA Tour is **not** a defendant in this case, and its presence in the state has no bearing on the actual parties' relationship.[8] *See Digioia*, 944 F. 2d at 813 (in applying Florida's borrowing statute, the location of a non-party "has little impact on the determination of which state . . . has an interest in the litigation").

Weighing the totality of circumstances, it is clear Florida's relationship with the Column is non-existent, and in any event not as significant as New York's or Texas's. Indeed, Florida does not bear *any* relationship—much less the most significant

---

[8] Plaintiff's baseless allegations that "Defendants have conspired . . . for and with the PGA Tour" (see Am. Compl. ¶21) are also disingenuous and superfluous. Indeed, Plaintiff dropped all his initial conspiracy claims after this Court instructed him "to bring only those claims that are supported in law." (D.E. 25); *compare* D.E. 1 *with* Am. Compl. As such, Plaintiff cannot use the PGA Tour's location as the crux of his argument that Reed's relationship with the AP Defendants was centered in Florida.

relationship—to the Column. The state bearing the most significant relationship to the alleged tort is New York, where AP's decision to publish the Column was made and most of the defendants are headquartered or, alternatively, Texas, where Reed is a citizen. Plaintiff seems to be engaged in the very thing Florida's borrowing statute prevents: forum shopping. *See Jaisinghani*, 973 F. Supp. at 1455; *Klayman*, 2008 WL 11333055, at *5 ("[Applying District of Columbia law] is consistent with Mr. Klayman's initial filing of his § 540.08 claim in the D.C. action and his allegation that such a claim was properly brought in that jurisdiction. Mr. Klayman appears to be engaged in the very thing that Florida's borrowing statute was designed to prevent: forum shopping") (citation omitted).

Pursuant to N.Y. C.P.L.R. 215(3) or TX CIV. PRAC. & REM. § 16.002(a), the last day Reed could sue for defamation about the Column was February 1, 2022. Because Reed did not file this case for another nine months, the claims as to the Column are time-barred and should be dismissed with prejudice.

## II.    The Defamation Claims Fail Under Substantive Defamation Law Too

### A. Elements of Defamation

While the defamation claims should be dismissed as time barred under New York or Texas law, the application of Florida substantive defamation law requires the same result.  *See Turner v. Wells*, 879 F.3d 1254, 1262-63 (11th Cir. 2018).  To state a defamation claim, Plaintiffs must set forth facts that would prove: (1) publication; (2) falsity;  (3) the  requisite  degree  of  fault;  (4) actual  damages;  and  (5) defamatory

meaning. *Turner*, 879 F.3d at 1262 (citation omitted). Under Florida law, the Amended Complaint is doomed.[9]

## B. Lack of Defamatory Meaning

To be actionable a statement must be defamatory. That is, it must be a statement that would expose one to hatred, ridicule, or disgust. *See Forston v. Colangelo*, 434 F. Supp. 2d 1369, 1378, n. 11 (S.D. Fla. 2006); *Seropian v. Forman*, 652 So. 2d 490, 495 (Fla. 4th DCA 1995). And it is for this Court in the first instance to decide whether a publication is even capable of a defamatory meaning. *See Rubin v. U.S. News & World Rep., Inc.*, 271 F.3d 1305, 1306–08 (11th Cir. 2001) (affirming dismissal of defamation by implication claim because no reasonable reader would have concluded that plaintiff, who owned a gold refining business, knowingly handled illegal gold or himself kept two sets of books simply because he was quoted as conceding that such activity happened in the industry). Plaintiffs cannot simply cherry pick; the alleged defamatory statements must be read in the context of the entire article. *See Turner*, 879 F.3d at 1270 ("Like the district court, we are 'hard-pressed to discern what arguably defamatory statement could reasonably flow from the facts about the [player] fine

---

[9] Reed purports to allege separate claims for defamation, defamation per se, and defamation by implication. With respect to defamation by implication, Plaintiff does not allege how any of the statements were actually true but convey a false and defamatory implication, dooming this theory. *See Jews for Jesus*, 997 So. 2d at 1106 (defamation by implication is based on true statements used to imply a defamatory meaning). Even had he alleged a proper implication claim, "all of the protections of defamation law" apply. *See id.* at 1108 & n.13. Reed's defamation per se claim also fails as a matter of law because Florida law does not provide such a cause of action where damages are presumed against a publisher; rather, "a plaintiff suing a media defendant must nevertheless plead and prove actual injury" like any other defamation claim. *Edelstein v. WFTV, Inc.*, 798 So. 2d 797, 798 (Fla. 4th DCA 2001).

system or the Judas concept' when considering the Report's actual text."); *Byrd v. Hustler Magazine, Inc.*, 433 So. 2d 593, 595 (Fla. 4th DCA 1983) (allegedly defamatory publication must be considered in total and isolated statements must be evaluated within the context of entire piece).  Where a plaintiff's reading is strained, a "court has a 'prominent function' in determining whether a statement is defamatory, and if a statement is not capable of a defamatory meaning, it should not be submitted to a jury." *Smith v. Cuban Am. Nat'l Found.*, 731 So. 2d 702, 704 (Fla. 3d DCA 1999) (citations omitted).

To decide whether a statement is capable of a defamatory meaning, courts must take an objective approach and "evaluate the publication, not by extremes, but as the common mind would naturally understand it." *Byrd*, 433 So. 2d at 595 (finding that re-touched photograph resulting in subject making obscene gesture could not, in light of caption making clear photograph was altered, be viewed as implying subject posed that way) (quotation omitted).  *See also Valentine v. C.B.S., Inc.*, 698 F.2d 430, 431–32 (11th Cir. 1983) (plaintiff's claim that song lyrics implied she was part of conspiracy to convict individual not reasonable as no lyrics mentioning her related to the conspiracy and noting "[a] review of the entire song makes it clear this interpretation is not reasonably possible . . . plaintiff's interpretation does not construe the words as the common mind would understand them but is tortured and extreme.").

Here, Plaintiff alleges that the Column "plant[s] in the reader's mind that . . . Mr. Reed is a habitual cheater . . . who has gotten away with cheating." Am. Compl. ¶ 106. But Plaintiff's assigned defamatory meaning is expressly refuted by the Column

itself. Indeed, with respect to the Bahamas Event, the Column accurately describes that Reed "accept[ed] the two-shot penalty" for "using the back of his wedge to scoop away sand – twice – from behind his golf ball in a waste bunker, improving his line of play" – a fact which the Amended Complaint concedes. *See* Ex. A; Am. Compl. ¶ 101. The Column also includes Reed's explanation that the "camera angle" of the "video evidence" of the incident "made it look worse than it was." Ex. A. Further, regarding the California Event where Reed sought embedded ball relief, the Column goes to great lengths to make it clear that "Reed did nothing wrong . . . at the Farmers Insurance Open." *Id.* The Column also describes how the PGA Tour confirmed "procedure Reed followed wasn't illegal," and notes "[i]t wasn't even necessary for him to call for an official." *Id.* This directly contradicts Reed's allegations that the statements in the Columns about these events make him out to be a "habitual cheater" who gets away with things. In other words, the defamation claim cannot survive because the alleged defamatory meaning is expressly contradicted by the actual text of the Column itself.

## C. Statements of Opinion are Not Actionable

Much of the Column is protected opinion. Statements of "pure opinion" cannot constitute libel or defamation. *Milkovich v. Lorain Journal, Co.*, 497 U.S. 1, 2 (1990); *Turner*, 879 F.3d at 1262; *Rasmussen v. Collier Cty. Publ'g Co.*, 946 So. 2d 567, 571 (Fla. 2d DCA 2006). Whether a statement is an actionable fact or a non-actionable opinion is a question of law and will turn on "the statement in its totality" in the context of the

entire publication, "accord[ing] weight to cautionary terms used by the person publishing the statement." *Rasmussen*, 946 So. 2d at 571.

"A false statement of fact is the *sine qua non* for recovery in a defamation action." *Byrd*, 433 So. 2d at 595; *see Turner*, 879 F.3d at 1262-63 ("True statements, statements that are not readily capable of being proven false, and statements of pure opinion are protected from defamation actions by the First Amendment.") "[S]tatements that cannot reasonably be interpreted as stating actual facts about an individual are protected." *Milkovich*, 497 U.S. at 2. The key here, under both Eleventh Circuit and Supreme Court precedent, is whether the words at issue are "readily capable of being proven false." *Turner*, 879 F.3d at 1262; *see also Milkovich*, 497 U.S. at 19 ("a statement on matters of public concern must be provable as false before there can be liability under state defamation law"). The answer is no.

Columns are particularly appropriate, protected places to discuss opinions and employ figurative language. *See Guilford Transp. Indus., Inc. v. Wilner*, 760 A.2d 580, 583 (D.D.C. 2000) ("The reasonable reader who peruses [a] column on the editorial or Op–Ed page is fully aware that the statements found there are not "hard" news . . . Readers expect that columnists will make strong statements, sometimes phrased in a polemical manner . . .") (quoting *Ollman v. Evans*, 750 F.2d 970, 986 (D.D.C. 1984)). Indeed, the context in which the alleged defamation was published "is of critical import." *Forston*, 434 F. Supp. 2d at 1381. In *Forston*, for instance, the court found that a basketball column that appeared regularly in the newspaper's sports section was "a vehicle through which basketball fans can read of [the author's] thoughts and opinions

on the NBA. Because the challenged statements were made through a medium that fosters debate on basketball issues," reasonable readers would understand them to be opinion. *Id.*

The Column at issue bears all the hallmarks of protected opinion on its face. Given its label as a "Column," "a reasonable reader is more likely to regard its content as opinion and/or rhetorical hyperbole." *See id.* The Column explores from all angles the controversies surrounding Reed, Reed's positions, and public reaction to the repeated controversies. It then focuses on what columns should do: exploration of potential affects – here, whether Reed can ever overcome fans' publicly (and often vehemently) expressed perception of Reed's behavior as cheating. The Column questions whether the Bahamas Event had tarnished Reed's reputation, casting a shadow of doubt on Reed's every move during subsequent tournaments, despite Reed's having paid for his actions (a two-stroke penalty). *See* Ex. A. The AP Defendants are entitled to the observation that "[t]he penalty, as it turns out, was worth more than two shots" because "[t]here is no greater punishment in golf than being stuck with a reputation for cheating." Am. Compl. ¶ 107. They are likewise entitled to the opinion that after the California Event, where spectators again found Reed's actions "questionable," "[m]oving past this one will be almost impossible." Ex. A. Simply put, the AP Defendants' comments cannot be proven true or false and involve subject assessments of worth and impossibility. They constitute classic opinion.

Moreover, accurately reporting on others' accusations and opinions about someone's reputation – here, the heckling public's – is not actionable. *See Abbas v.*

*Foreign Pol'y Grp., LLC*, 975 F. Supp. 2d 1, 19 (D.D.C. 2013), *aff'd*, 783 F.3d 1328 (D.C. Cir. 2015) (the contention that an accusation was made "is not defamatory because it is not an assertion of false fact, or indeed, of any fact. [The journalist] is reporting on what people in the region have said to him, and does not otherwise take any position on what he has heard."); *cf. Jones v. Buzzfeed*, 591 F. Supp. 3d 1127, 1142 (N.D. Ala. 2022) (headline in online news article "How Accusing a Powerful Man of Rape Drove A College Student To Suicide" not actionable because "the fact in the headline are true: Rondini accused T.J. Bunn of rape"). Florida has long recognized that "a person's general reputation is the opinion formed and expressed of him." *Hamilton v. State*, 129 Fla. 219, 231 (1937). In other words, whether someone is viewed as having a good or bad reputation is, itself, an opinion. *See Ralich v. U.S.*, 185 F.2d 784, 786 (8th Cir. 1950) (drawing the distinction that "[r]eputation is the opinion generally entertained of a man, while character is what he really is.") As such, the opinion that Reed's reputation has suffered – in the full context of the Column's discussion of Reed's behavior, the PGA's statements and fan reactions – is not actionable as a matter of law.

### D. Reed Cannot Plausibly Allege Actual Malice

Yet another independent ground for dismissal is Plaintiff's complete inability to allege facts plausibly suggesting that any of the AP Defendants acted with actual malice. That failure infects each claim.

The First Amendment guarantees "a defendant may not be held liable for defaming a public figure about a matter of public concern unless he is shown to have

'acted with actual malice.'" *Berisha v. Lawson*, 973 F.3d 1304, 1310 (11th Cir. 2020).

Actual malice means that:

> defendants published a defamatory statement either with actual knowledge of its falsity or with a high degree of awareness of its probable falsity. It is a subjective test, which asks whether the publisher in *fact* entertained serious doubts as to the truth of his publication. Even an extreme departure from professional [publishing] standards does not necessarily rise to the level of actual malice.

*Id.* at 1312; *see Turner*, 879 F.3d at 1273; *Michel*, 816 F.3d at 702-03.

There is no serious dispute that Reed is a public figure who must plead actual malice. He describes himself as a "professional golfer" of "exceptional world-class golfing achievements," who is one of LIV's "most prominent athletes." Am. Compl. ¶¶ 19, 20, 25. His position as a sports professional, alone, makes him a public figure. *See Curtis Publishing v. Butts*, 388 U.S. 130, 155 (1967). "This conclusion is consistent with a long line of cases, beginning with the Supreme Court's opinion in *Butts*, which have found professional and collegiate athletes . . . to be public figures." *Barry v. Time, Inc.*, 584 F. Supp. 1110, 1119 (N.D. Cal. 1984) (collecting cases). The common thread in these decisions is that "one's voluntary decision to pursue a career in sports, whether as an athlete or a coach, invites attention and comment regarding his job performance and thus constitutes an assumption of the risk of negative publicity." *Id.* (internal quotations omitted); *see also Turner*, 879 F.3d at 1272. A professional golfer of Reed's admitted stature is a public figure.

Reed has not – and cannot – plead the high standard of actual malice. Purely conclusory allegations of "recklessness" and the like, which amount to "threadbare

recitals of the elements of a cause of action," must be disregarded. *Michel*, 816 F.3d at 703-04; *see Turner*, 879 F.3d at 1273 (affirming dismissal with prejudice of complaint alleging defendants "knowingly and recklessly" ignored truth where "the complaint does not set forth facts demonstrating that the Defendants acted in these ways."). When a public figure "fails to allege facts sufficient to give rise to a reasonable inference that the defendants published the [allegedly defamatory statements] with actual malice," the complaint must be dismissed. *See Michel*, 816 F.3d at 706 (affirming dismissal with prejudice for failure to plead actual malice); *Turner*, 879 F.3d at 1274 (same).

For instance, in *Turner v. Wells*, the Eleventh Circuit affirmed dismissal with prejudice of a professional football coach's defamation claims because, *inter alia*, he had failed to properly allege actual malice. *Id.* Former Miami Dolphins coach James Turner was deemed a public figure because of his job. *Id.* at 1271. Despite having "allege[d] malice," the court found that "most of his allegations are set forth in a conclusory manner." *Id.* at 1273. Notwithstanding the coach's claims "that defendants were aware of certain information that would have portrayed him in a better light, but purposefully decided to omit it," the court explained the allegations fell short of actual malice:

> Ultimately, many of Coach Turner's allegations center on the Defendants' failure to properly analyze certain information. But these allegations also fail to allege malice, because they do not give rise to a reasonable inference that the Defendants knowingly or with reckless disregard published a false statement of fact. If anything, these allegations attack the <u>reliability</u> of the Defendants' <u>opinions</u>, and we have explained above why these types of claims fall outside the scope of a defamation suit.

*Id.* at 1274 (emphasis in original).

Reed similarly offers sweeping conclusory allegations that do not support a reasonable inference that the AP Defendants acted with actual malice. He imagines ill will: "Defendant Ferguson . . . exhibited animus against Mr. Reed, having with actual malice, defamed and written highly skewed and negative stories of and concerning Mr. Reed numerous times over the years under the umbrella of the Associated Press." Am. Compl. ¶ 49. This ill will allegation falls exceedingly short of plausibly pleading actual malice. *See Klayman v. City Pages*, No. 5:13–cv–143–Oc–22PRL, 2015 WL 1546173, at *13-14 (M.D. Fla. Apr. 3, 2015) (educating Reed's counsel on the differences between actual malice and "ill will"). Further, given that the statements lack any defamatory meaning, are protected opinion, or otherwise consist of undisputed and verified facts, the AP Defendants, like the *Turner* defendants, could not have published them with actual malice, as a matter of law.

## III.   THE FAILED TORTIOUS INTERFERENCE CLAIMS

Regardless of whether this Court applies New York, Texas, or Florida law, Plaintiff's twin claims for tortious interference are barred because they are based on the same alleged facts and injuries giving rise to the defamation claims. *See, e.g.*, *Tymar Distrib. LLC v. Mitchell Grp. USA, LLC*, 558 F. Supp. 3d 1275, 1286-88 (S.D. Fla. 2021). In Florida, "a single publication gives rise to a single cause of action." *Samara v. Juice Plus+ Co., LLC*, No. 6:20-cv-520-Orl-31EJK, 2020 WL 13389215, at *5 (M.D. Fla. Sept. 9, 2020) (quoting *Callaway Land & Cattle Co. v. Banyon Lakes C. Corp.*, 831 So. 2d

204, 208 (Fla. 4th DCA 2002)). The rule "prohibits defamation claims from being re-cast as additional, separate torts," if all the claims arise from the same publication. *Kinsman v. Winston*, No: 6:15-cv-696-Orl-22GJK, 2015 WL 12839267, at *5 (M.D. Fla. Sept. 15, 2015). As the Florida Supreme Court has explained, a plaintiff is not permitted to make an end-run around a valid defense to defamation by "renaming the cause of action and pleading the same facts" as those alleged in support of a defamation claim. *Fridovich v. Fridovich*, 598 So. 2d 65, 69 (Fla. 1992); *see also Orlando Sports Stadium, Inc. v. Sentinel Star Co.*, 316 So. 2d 607, 609 (Fla. 4th DCA 1975) (a plaintiff cannot skirt the strict requirements of defamation "by the simple expedient of redescribing the libel action to fit a different category of intentional wrong"). Rather than being guided by the label a plaintiff puts on his claims, Florida courts "look for the reality, and the essence of the action and not its mere name." *Orlando Sports Stadium, Inc.*, 316 So. 2d at 609 (quotations omitted).

Federal courts have also acknowledged that extraneous tort claims rooted in challenged statements are barred regardless of whether the defamation claim fails. *Tobinick v. Novella*, No. 9:14-CV-80781-ROSENBERG/BRAN, 2015 WL 328236, at *11 n.17 (S.D. Fla. Jan. 23, 2015) (citing *Klayman v. Judicial Watch, Inc.*, 22 F. Supp. 3d 1240, 1256 (S.D. Fla. 2014) (in case brought by Reed's counsel, court dismissed tortious interference and intentional infliction of emotional distress claims "based on analogous underlying facts. . . intended to compensate for the same alleged harm" as his defamation claims)); *see also Fridovich*, 598 So. 2d at 70 ("In short, regardless of privilege, a plaintiff cannot transform a defamation action into a claim for intentional

infliction of emotional distress simply by characterizing the allegedly defamatory statements as 'outrageous'"). In fact, the single action rule bars such claims even when no defamation claim has been asserted, if the wrong stems from allegedly defamatory statements. *Gilliard v. New York Times Co.*, No. GC-01-59, 2001 WL 1147256 (Fla. Cir. Ct. May 22, 2001) (interference, conspiracy, negligence, and extortion claims barred even though no defamation claim was alleged because the wrong complained of was based on the publication of allegedly defamatory statements), *aff'd*, 826 So. 2d 296 (Fla. 2d DCA 2002). If the claim is premised upon allegedly false and defamatory speech, it cannot masquerade as another tort. *Orlando Sports Stadium*, 316 So. 2d at 609.

New York and Texas law demand the same. *See Kesner v. Dow Jones & Co., Inc.*, 515 F. Supp. 3d 149, 189-90, n. 13 (S.D.N.Y. 2021) (noting that "New York and Florida law both yield the same result" because "under New York law, claims sounding in tort are construed as defamation claims, not only where those causes of action seek damages only for injury to reputation, but also where the entire injury complained of by plaintiff flows from the effect on his reputation.") (internal quotations omitted); *Hamad v. Ctr. for Jewish Cmty. Studies*, 265 Fed. Appx. 414, 417 (5th Cir. 2008) (under Texas law, plaintiff "cannot avoid the one-year statute of limitation applicable to defamation claims by simply alleging additional causes of action that are subject to a two-year statute of limitations," where "[t]he primary focus of [plaintiff's] claims is the damage to his personal reputation.").

Here, Plaintiff's tortious interference claims are grounded in the same publications underlying the six failed defamation counts. *See* Am. Compl. ¶¶ 301, 331 (alleging that Plaintiff's tortious interference claims against the AP Defendants are based on their alleged "spreading [of] lies of and concerning Mr. Reed in order to destroy his reputation"). Because the counts for tortious interference are nothing more than re-labeled defamation claims, they violate the single cause of action rule and must be dismissed. *See Klayman,* 22 F. Supp. 3d at 1256.

## CONCLUSION

Florida law recognizes that cases involving First Amendment rights are particularly suited for early-stage disposition. *See Stewart v. Sun Sentinel Co.*, 695 So. 2d 360, 363 (Fla. 4th DCA 1997) ("pretrial dispositions are 'especially appropriate' because of the chilling effect these cases have on freedom of speech") (quoting *Karp v. Miami Herald Publ'g Co.*, 359 So. 2d 580, 581 (Fla. 3d DCA 1978)). Dismissals are often granted in favor of publishers in cases like this one where the cause of action is time-barred and the publications otherwise involve matters of opinion that do not convey a defamatory meaning. *See*, *e.g.*, *Berenato v. Tankel*, No. 3:10–cv–979–J–32MCR, 2012 WL 473933, at *1-2 (M.D. Fla. Feb. 14, 2012) (dismissing slander claim because statements not defamatory).

The Amended Complaint fails to state a claim against the AP Defendants as a matter of law and should be dismissed with prejudice under Fed. R. Civ. P. 12(b)(6).

## **LOCAL RULE 3.01(g) CERTIFICATION**

Undersigned counsel has contacted Plaintiff's counsel by email with respect to the relief sought herein.  Plaintiff's counsel opposes the relief requested.

Dated: February 24, 2023.

Respectfully submitted,

THOMAS & LoCICERO PL

*/s/ Carol Jean LoCicero*
Carol Jean LoCicero (FBN 603030)
Linda R. Norbut (FBN 1011401)
601 South Boulevard
Tampa, FL  33606
Telephone: (813) 984-3060
Facsimile:  (813) 984-3070
clocicero@tlolawfirm.com
lnorbut@tlolawfirm.com

*Attorneys for the AP Defendants*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the **24th day of February**, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system.  I also certify that the foregoing document is being served this date on all counsel of record via transmission of Notices of Electronic Filing generated by the CM/ECF system to the following counsel of record:

Larry Elliot Klayman
7050 W. Palmetto Park Rd
Boca Raton, FL  33433
leklayman@gmail.com

Jeremy A. Chase
Jesse Feitel
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas, 21st FL
New York, NY 10020-1104
jeremychase@dwt.com
jessefeitel@dwt.com

Laura Handman
DAVIS WRIGHT TREMAINE LLP
1919 Pennsylvania Ave. NW, Ste. 800
Washington, D.C. 20006-3401
laurahandman@dwt.com

/s/ *Carol Jean LoCicero*
Attorney

28