**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**

PATRICK NATHANIEL REED,

                Plaintiff,

v.

SHANE RYAN, *et al*

                Defendants.

**Case No: 3:22-cv-01181-TJC-PDB**
**ORAL ARGUMENT REQUESTED**

**PLAINTIFF PATRICK NATHANIEL REED'S OPPOSITION TO DEFENDANT**
**BLOOMBERG L.P.'S MOTION TO DISMISS AMENDED COMPLAINT**

Plaintiff Patrick Nathaniel Reed ("Mr. Reed") hereby submits his opposition to Defendant Bloomberg L.P.'s ("Bloomberg") Motion to Dismiss Amended Complaint. ("Defendant's Motion").

**INTRODUCTION AND STATEMENT OF RELEVANT FACTS**

There is only one question present before the Court – whether the allegations in the Amended Complaint have satisfied the very minimal plausibility pleading standard set forth by the Supreme Court in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). The answer is clearly and unequivocally, **yes** and much more so! Mr. Reed's Amended Complaint is meticulously detailed and fact specific, and clearly sets forth not only false and defamatory statements made by the Defendant Bloomberg of and concerning Mr. Reed with actual malice. The Amended Complaint also explains  the motivation, that is also the constitutional malice, for the Defendants to have engaged in this pattern and practice of making these defamatory statements, mostly as a result of Mr. Reed having joined the LIV Golf Tour, which as a new entry into the world of professional golf. Defendant Bloomberg has set out to harm and stop in its nascent tracks by using Plaintiff Reed as a vehicle. This is of particular importance, as it is textbook black-letter law that both constitutional and actual malice can be discerned by circumstantial facts which

show the intent of the speaker, among the other many badges of actual malice. *See* Manual

Socias, *Showing Constitutional Malice in Media Defamation*, Fla. Bar. J. <u>Exhibit 1.</u>

In a case before a sister federal court in the U.S. District Court for the Southern District

of Florida, the Honorable Raag Singhal ("Judge Singhal"), presiding over a case on all fours with

this one, correctly shot down CNN's attempt to dismiss a defamation suit filed by public figure

Harvard Professor Alan Dershowitz based on similar claims that his allegations were not

plausible:

> To survive a motion to dismiss, factual allegations must (only) be enough to raise a
> right to relief above the speculative level" and must be sufficient to state a claim for
> relief that is plausible on its face….. A claim has facial plausibility when the plaintiff
> pleads factual content that allows the court to draw the reasonable inference that the
> defendant is liable for the misconduct alleged. (internal quotations omitted). <u>Exhibit 2</u>.

*See also Coastal Wellness Ctrs., Inc. v. Progressive Am. Ins. Co.,* 309 F. Supp. 3d 1216, 1219

(S.D. Fla. 2018).

In another defamation case, *U.S. Dominion, Inc. v. Guiliani, et al*, 1:21-cv-00213

(CJN)(D.D.C.) August 11, 2021 Mem. Op., the Honorable Carl Nichols of the U.S. District

Court for the District of Columbia allowed a similar high profile defamation complaint to

proceed based on the plaintiff having pled all that was needed to be pled at the motion to dismiss

stage of this very widely followed case. This is the correct interpretation and application of the

relevant pleading standard. Judge Nichols thus found that "[w]hen evaluating a motion to dismiss

under Federal Rule of Civil Procedure 12(b)(6), the Court must "treat the complaint's factual

allegations as true . . . and must grant plaintiff the benefit of all inferences that can be derived

from the facts alleged." *Dominion*, ECF No. 36 at 13.

These cases both stand for the universally accepted and well-settled principle as set forth

by the Supreme Court that at the Fed. R. Civ. P 12(b)(6) motion to dismiss stage, the only

question is whether what needed to be pled in the operative complaint was indeed pled and nothing else. And furthermore, the standard for dismissal at this stage is high. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007):

> Rule 12(b)(6) does not countenance … dismissals based on a judge's disbelief of a complaint's factual allegations"); *Scheuer* v. *Rhodes*, 416 U. S. 232, 236 (1974) (a well-pleaded complaint may proceed even if it appears "that a recovery is very remote and unlikely"). *Id*. at 556.

*Twombly*'s well-reasoned and clearly settled opinion is controlling given that the well-settled right to have one's claims heard by the jury, which is the bedrock of our entire legal system:

> I consider trial by jury as the only anchor ever yet imagined by man, by which government can be held to the principles of its constitution. - Thomas Jefferson, 1788.

> Representative government and trial by jury are the heart and lungs of liberty. Without them we have no other fortification against being ridden like horses, fleeced like sheep, worked like cattle and fed and clothed like swine and hounds. - John Adams, 1774.

> Trial by jury in civil cases is as essential to secure the liberty of the people as any one of the pre-existent rights of nature. James Madison, 1789.

> The civil jury trial is preferable to any other and ought to be held sacred. -Virginia Declaration of Rights, 1776.

> In civil suits the parties have a right to trial by jury and this method of procedure shall be held sacred. - Massachusetts Constitution, 1780.

> In suits at common law, trial by jury in civil cases is essential to secure the liberty of the people as any one of the pre-existent rights of nature. - James Madison, 1789.

This is especially true in defamation cases, as found by not only Florida's courts, but also courts all over the country:

> It is peculiarly the province of the jury to weigh and determine what effect is to be given to all such mitigating circumstances. The *quo animo* with which the words are spoken, or the written article published, should, in a case where no special damage is alleged and proven, regulate the amount of damages; but whatever is calculated to show that the defendant acted in good faith, and with reasonable belief of the truth of the charge, and with good motives, should be permitted to go to the jury, who will give it the effect it should have. *Jones, Varnum & Co. v. Townsend's Adm'x*, 21 Fla 431, 446-47 (Fla. 1885).

Therefore, a reasonable jury could conclude the statement was false. *See Southard v. Forbes, Inc.*, 588 F.2d 140, 143 (5th Cir. 1979) ("If the publication has no necessarily defamatory meaning, but can be understood in more than one way, one of which is defamatory, then it is for the jury to decide if . . . the publication in fact had that defamatory meaning."); *see also Smith v. Cuban Am. Nat'l Found.*, 731 So. 2d 702, 705 (Fla. 3d Dist. Ct. App. 199) ("If the statement is capable of more than one meaning, however, the trier of fact should determine whether the language used was actually understood in its defamatory sense."). *Johnston v. Borders*, 36 F.4th 1254 (11th Cir. 2022).

The law is well-settled that where a publication is susceptible of two reasonable interpretations, one of which is defamatory, the issue of whether the publication was defamatory becomes one of fact and must be submitted to a jury, as here, for a fact-finding determination. *Miami Herald Pub. Co. v. Ane*, 423 So. 2d 376 (Fla. Dist. Ct. App. 3rd Dist. 1983).

Where, however, a communication is ambiguous and is reasonably susceptible of a meaning which is defamatory, it is for the trier of fact to decide whether or not the communication was understood in the defamatory sense. *Wolfson v. Kirk*, 273 So. 2d 774 (Fla. Dist. Ct. App. 4th Dist. 1973).

When a plaintiff requests a jury trial, [i]t is only when the court can say that the publication is not reasonably capable of any defamatory meaning and cannot be reasonably understood in any defamatory sense that it can rule as a matter of law, that it was not libelous….[I]f the language is capable of two meanings, one actionable and the other not, it is for the jury to determine which of the two meaning would be attributed to it by persons of ordinary understanding under the circumstances…[A] jury must determine whether these impressions were actually conveyed, whether they were false, and whether the letters were motivated by actual malice." W*hite v. Fraternal Order of Police,* 909 F.2d 512, 525 (D.C. Cir. 1990) (internal citations and quotations omitted).

We must attempt to discharge our constitutional responsibility to protect First Amendment values without unduly treading on the fact- finding role of the jury and trial judge. We are mindful that in New York Times, Bose, and Harte-Hands, the Supreme Court was fashioning a process for reviewing the evidence which permits judicial protection of First Amendment values while still paying due deference to the fact-finding role of juries, and particularly the jury's opportunity to observe the demeanor of the witnesses. *Newton v. National Broadcasting Co*., 930 F.2d 662, 672 (9th Cir. 1990).

For the foregoing reasons, the Defendants' Motion must also fail, as pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure ("FRCP"), Mr. Reed's Amended Complaint copiously set forth allegations of defamation and tortious interference that more than satisfy the

minimal plausibility standard of *Twombl*y at this early pleading stage before discovery gets underway.

## I.   FACTS PERTAINING TO THE DEFENDANTS' MALICIOUS INTENT

Defendants are predictably driven by the thirst for clicks, views, attention, and therefore substantial profit. In the course of this unquenchable thirst, the Defendants have shown that they do not care about facts, accuracy, or any type of professional journalistic standard as they have clearly discovered that media-created narratives of fake news scandals are the easiest way to drive sales, clicks, viewership, and profit. This is set forth in the Amended Complaint:

> Certain golf media is notorious for its penchant of manufacturing and creating scandal where none truly exists, as it is a quick and easy way to gain attention and viewership, and therefore profit. Regrettably, Mr. Reed has become golf media's preferred target due to Defendant Ryan and the other Defendants' continued, sustained attacks. Am. Comp. ¶ 35.

And, as part of the Defendants' quest and thirst for views, clicks, and thus profits, they have cozied up to the PGA Tour and DP World Tour in order to earn "preferred" status in exchange for carrying out and publicizing their agendas. "In return for serving and carrying-out the PGA Tour's, the DP World Tour's, and Golf Channel's agenda, the Defendants, on information and belief, receive direct financial benefit and perks such as free tickets to PGA Tour events and special access to its officials and players, as well the indirect benefit of having a boosted profile and fame due to their association with the PGA Tour, the DP World Tour and Golf Channel." Am. Comp. ¶ 32. Now, this agenda has become focused on maliciously defaming Mr. Reed.

Mr. Reed, a world class professional golfer, decided in June of 2022 to sign with LIV Golf ("LIV"), an upstart professional golf league, after being constructively terminated as a member of the PGA Tour as a result of threats and actions by the PGA Tour and its

Commissioner Jay Monahan ("Monahan"). Am. Comp. ¶¶ 19 – 20. Mr. Reed was one of the original golfers who signed with LIV and remains one of its top stars and prominent golfers domestically and worldwide.

The PGA Tour and its European joint venture partner, DP World Tour, have seen many of their top golfers, including Mr. Reed, sign with LIV, and therefore came to view LIV as a strong threat to their monopolistic stranglehold on professional golf. Am. Comp. ¶ 25. Thus, they began a concerted scheme to defame, smear, and harm anyone associated with LIV—and in particular Mr. Reed, one of its most prominent athletes—in order to try to maintain their monopolistic stranglehold, and therefore continue to substantially profit, to the tune of an estimated $1.522 billion in revenue for the PGA Tour in 2021. Am. Comp. ¶ 25.

Now, answering the call of their benefactors if not overseers at the PGA Tour, Defendants AP and Ferguson chosen to republish these same malicious, false, and defamatory statements of and concerning Mr. Reed—right when the LIV controversy is taking center stage. By doing so, Defendants hope to drive sales, clicks, attention, viewership, and therefore profit at the injurious expense of knowingly and intentionally destroying Mr. Reed's reputation. Am. Comp. ¶ 35.

## II.    DEFENDANT BLOOMBERG'S DEFAMATION

On or about January 4, 2023, Defendant Erik Larson ("Larson"), who has been evading service of process, published on Defendant Bloomberg's website an article titled "*Saudi-Backed LIV Golf is Using PGA Suit to Get Data on 9/11 Families Court Told*" (the "Larson Article"). Am. Comp. ¶ 113. The Larson Article was purportedly about the ongoing litigation between LIV and the PGA Tour, *Jones v. PGA Tour et al*, 5:22-cv-04486 (N.D. CA.), but of crucial importance is the fact that Mr. Reed is not, and never has been a party to that lawsuit. Am.

Comp. ¶ 114. This is a matter of public record. However, despite Mr. Reed having absolutely no connection to the lawsuit between LIV and the PGA Tour, the Larson Article gratuitously and prominently features Mr. Reed's picture. Thus, there is absolutely no debate that Defendant Bloomberg, at a bare minimum, intended to and did in fact create the implication and impression that Mr. Reed was somehow part the litigation between LIV and the PGA Tour, and even more, a part of a scheme to "get data on 9/11 families."

Even more, the Larson Article also published that "**It's (meaning the issue of 9/11 family victims) has taken a more sinister turn**." Am. Comp. ¶ 118. Once again, given that Defendant Bloomberg made the choice to use Mr. Reed's photograph prominently along with the Larson Article, there is no doubt that Defendant Bloomberg, at a bare minimum, intended to and did in fact create the strong implication and impression  that Mr. Reed was personally involved in "sinister" activities to harm 9/11 families.  The definition of "sinister" in Webster's Dictionary at https://websterdictionary1828.com, is "evil, bad, corrupt, perverse, dishonest"! This is clearly defamatory by any stretch of the imagination!

## **LEGAL STANDARD**

A motion to dismiss is designed to test the legal sufficiency of a complaint and not to determine any factual issues. *Dorleus v. Bank of New York*, No. 14-80124-CIV, 2014 WL 1621941, at *2 (S.D. Fla. Apr. 23, 2014). All allegations of the complaint must be taken as true and all reasonable inferences drawn therefrom must be construed in favor the non-moving party. *AXA Equitable Life Ins. Co. v. Infinity Fin. Grp., LLC,* 608 F. Supp. 2d 1349, 1353 (S.D. Fla. 2009). A motion to dismiss a complaint is not a motion for summary judgment in which the court may rely on facts adduced in other proofs. *Urquilla–Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1053

n. 12 (11th Cir.2015). Instead, a motion to dismiss tests the legal sufficiency of the complaint. *Dorleus*, No. 14-80124-CIV, 2014 WL 1621941, at *2 (S.D. Fla. Apr. 23, 2014).

A complaint "does not require detailed factual allegations." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (U.S. 2009) (internal quotations omitted). To survive a motion to dismiss, a complaint need only "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* (internal quotations omitted). All that is required at this stage is the pleading of "enough facts to state a claim to relief that is plausible on its face." "A claim has facial plausibility when the plaintiff pleads factual  content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

Defendants cite a few irrelevant outlier cases that are not  on point,  but what controls here is   the applicable and well-established  pleading standard; that is at the motion to dismiss stage judges must confined their  analysis at the four corners of the complaint under Fed. R. Civ. P. 12(b)(6), as Judge Singhal and Judge Nichols did, and which the Court must do here as well.

Finally, when considering an FRCP 12(b)(6) motion, trial courts are limited to the four corners of the complaint and may only consider documents incorporated in the complaint—i.e., either documents attached to the complaint or documents which do not allege acts extrinsic to the pleadings. *Dershowitz v. Cable News Network, Inc.* 541 F. Supp. 3d 1354, 1360  (S.D. Fla. 2021). A court may consider only the complaint itself and any documents referred to in the complaint which are central to the claims. *Id.* "A court's review on a motion to dismiss is 'limited to the four corners of the complaint." *Coastal Wellness Ctrs., Inc. v. Progressive Am. Ins. Co.,* 309 F. Supp. 3d 1216, 1219 (S.D. Fla. 2018)

## LEGAL ARGUMENT

## I.    MR. REED HAS MORE THAN SUFFICIENTLY ALLEGED DEFAMATION

Under Florida law, the elements of defamation are "(1) publication; (2) falsity; (3) and the actor must act with knowledge or reckless disregard as to the falsity on a matter concerning a public official, or at least negligently on a matter concerning a private person; (4) actual damages[1]; and (5) statement must be defamatory." *Peerenboom v. Perlmutter*, 2017 Fla. Cir. LEXIS 14957, *24. To determine whether a statement is defamatory, it must be considered **in the context of the publication**. *Smith v. Cuban Am. Nat'l Found.*, 731 So.2d 702, 705 (Fla. 3d DCA 1999). "A publication must be considered **in its totality**. 'The court must consider all the words used, not merely a particular phrase or sentence.'" *Byrd v. Hustler Magazine*, 433 So. 2d 593, 595 (Fla. Dist. Ct. App. 1983) (emphasis added).

Of particular importance to this case is *Byrd*, *id*, which holds:

First, a publication must be considered in its totality. "The court must consider all the words used, not merely a particular phrase or sentence." *Information Control Corp. v. Genesis One Computer Corp.,* 611 F.2d 781, 784 (9th Cir. 1980). **When words and pictures are presented together, each is an important element of what, *in toto,* constitutes the publication. Articles are to be considered with their illustrations; pictures are to be viewed with their captions; stories are to be read with their headlines**. (emphasis added).

It is well settled that at the motion to dismiss stage, the pleading threshold is not high for defamation counts. A jury issue is present whenever a communication is "ambiguous and reasonably susceptible of a defamatory meaning." *Perry v. Cosgrove*, 464 So. 2d 664, 666 (Fla. Dist. Ct. App. 1985). A complaint cannot be dismissed if there is any possibility that the common mind could construe the publication as defamatory. *Abrams v. Gen. Ins. Co.*, 460 So. 2d 572 (Fla. Dist. Ct. App. 1984).

---

[1] Defendants' Motion makes the bogus argument in a footnote that Mr. Reed has not alleged damages, which is completely false. Mr. Reed has alleged severe reputational, financial and other damages in the Amended Complaint. *See generally* Am. Comp. ¶ 290

Florida courts have also found that a defendant may not escape liability for his defamatory conduct simply by attempting to couch his defamatory statement as an "opinion."

> However, a statement that although ostensibly in the form of an opinion "implies the allegation of undisclosed defamatory facts as the basis for the opinion," Restatement (Second) of Torts § 566 (1977), *is* actionable…. Mixed expression of opinion occurs when an opinion or comment is made which is based upon facts regarding the plaintiff or his conduct that have not been stated in the article or assumed to exist by the parties to the communication."

*Barnes v. Horan*, 841 So. 2d 472, 476-77 (Fla. Dist. Ct. App. 2002). "Mixed opinion is based upon facts regarding a person or his conduct that are neither stated in the publication nor assumed to exist by a party exposed to the communication. Rather, the communicator implies that a concealed or undisclosed set of defamatory facts would confirm his opinion." *Hay v. Indep. Newspapers, Inc.*, 450 So. 2d 293, 295 (Fla. Dist. Ct. App. 1984).

### a.      The Larson Article is Of and Concerning Mr. Reed

First and foremost, it is frankly dishonest that Bloomberg even raises the argument that the Larson Article is not "of and concerning" Mr. Reed when Mr. Reed's picture is prominently featured therein. As set forth above in *Byrd*, a publication must be considered in its totality. This, of course, includes photographs included as part of the article:

> **When words and pictures are presented together, each is an important element of what, in toto, constitutes the publication. Articles are to be considered with their illustrations; pictures are to be viewed with their captions; stories are to be read with their headlines**. *Id.* (emphasis added).

Thus, taking into account to holding of *Byrd*, the only possible conclusion where Mr. Reed's photo is prominently featured on the Larson Article is that the Larson Article is "of and concerning" Mr. Reed, thus ending the need for any further analysis.

Even in the unlikely event that the Court does not concur and requires further analysis, the same ultimate conclusion must be reached. This is because in Florida, even if a person is not

"named" - which again, Mr. Reed is "named" due to his picture being prominently featured – the article can still be "of and concerning" that person so long as "the communication as a whole [must] contain[] sufficient facts or references from which the injured person may be determined by the persons receiving the communication." *Isaac v. Twitter, Inc.*, 557 F. Supp. 3d 1251, 1258 (S.D. Fla. 2021). "The relevant inquiry is whether 'the average person upon reading [the] statements could reasonably have concluded that the plaintiff…was implicated." *Id*. at 1259.

Here, the context of the Larson Article is especially important, as it comes on the heels of Mr. Reed having already been maliciously defamed by the other Defendants in this case and in the companion case *Reed v. Chamblee et al*, 3:22-cv-01059-TJC-PDB ("*Chamblee*") as (1) a murderer, (2) working directly for a murderous regime, (3) having aligned with a tyrannical, murderous leader, (4) playing for blood money, (5) being complicit in sportswashing, and (6) being complicit in hiding human rights atrocities. *Chamblee*, Am. Comp. ¶ 135.  And, as set forth in the Amended Complaint here:

> Mr. Reed has become, not by choice but due to media-driven narrative, a "whipping boy" and therefore a frequent target of the Defendants and others in the media in order to defame, disparage and harm LIV's other golfers and LIV as a whole. Am. Comp. ¶ 53.
>
> **The Defendants know that if they can destroy the reputation of Mr. Reed, which they themselves have inserted as the face of the "controversy"** surrounding LIV, they can destroy the reputations and financial and other well-being of each and every golfer signed with LIV, just as they have for Mr. Reed for years and therefore LIV itself. This will allow them to achieve their goal of removing LIV as a competitor so that they can continue to profit obscenely. Am. Comp. ¶ 54 (emphasis added).

Thus, the importance of the context in which the Larson Article was published is two-fold. *First*, as alleged the SAC, Mr. Reed has become the "whipping boy" of the Defendants' and other's continued defamatory attacks as a result of his decision to join LIV, which has in fact made him the public "face" of the controversy surrounding LIV. This means that in the public's mind, Mr.

Reed is inextricably intertwined with LIV—something that Bloomberg is surely aware of and the entire reason that they chose to feature Mr. Reed's photo prominently in the Larson Article. *Second*, as a direct and proximate result of the very public defamation already perpetrated by the Defendants here and in *Chamblee*, most crucially that Mr. Reed "works directly for a murderous regime," the average person clearly would have believed that Mr. Reed was implicated in the Larson Article when it published that "Saudi-Backed LIV Golf is Using PGA Suit to Get Data on 9/11 Families Court Told" and "[i]t's (meaning the issue of 9/11 family victims) has taken a more sinister turn." In sum, the context surrounding the Larson Article makes it "ring true" as directly implicating Mr. Reed. And, at a very bare minimum, creates the entirely false implication that Mr. Reed, through his alleged "work for a murderous regime," is complicit in trying to get data on 9/11 families and thus harm them – an utterly despicable and disgusting charge.

Bloomberg's arguments to the contrary are unavailing and unconvincing. Bloomberg appears to be making the unbelievable argument first that Mr. Reed is not really identifiable in the photo, or that the focal point of the photo is Mr. Reed's LIV hat, and not Mr. Reed himself. These arguments are not only completely untrue, as it is patently obvious that Mr. Reed is in the photo, but also, they raise factual question outside the scope of the Amended Complaint, which cannot be considered at this stage. Moreover, as a Masters champion, two time Olympian and the winner of multiple professional golf tournaments, including his being nicknamed "Captain America, " for his successful exploits in the prestigious Ryder Cup, Mr. Reed's likeness and being is well recognized here and throughout the golfing world.

Bloomberg's reliance on *Parekh v. CBS Corp.*, 820 F. App'x 827 (11th Cir. 2020) is equally unavailing. In *Parekh*, the Plaintiff was the ex-boyfriend of non-party Ms. Deokaran,

who pretended to have terminal cancer in a money raising scam. *Id*. at 830. This became the subject of a CBS report, which Mr. Parekh sued over for defamation. *Id*. As part of his suit, Mr. Parekh alleged that the inclusion of a picture of him and his ex-girlfriend was defamatory because it "created a false, defamatory implication that he was still affiliated with Ms. Deokaran." *Id*. at 835. This argument was rejected by the Court because the text of the article made it clear that Mr. Parekh and Ms. Deokaran had already broken up, and stated that "their relationship is over." Of course, this is not applicable to the facts here, as the Larson Article does not state that Mr. Reed is no longer affiliated with the false branding of the "murderous" LIV regime, nor could they because this is not true. Thus, *Parekh* does not remotely apply.

Bloomberg's reliance on *Rubin v. United States News & World Report Inc.*, 271 F.3d 1305 (11th Cir. 2001) similarly fails. In *Rubin*, the Plaintiff, Mr. Rubin, was the owner of a gold refining business in Miami. *Id*. at 1306. Mr. Rubin willingly participated in an interview and photograph with U.S. News for an article titled "The Golden Age of Crime: Why International drug traffickers are invading the global gold trade." This article "pointed out that much of the international gold trade was legitimate, but that much of it was not, and detailed schemes that drug traffickers used to launder their money by trading in gold." *Id*. The article featured a photograph of Mr. Rubin, *Id*. at 1307, which Mr. Rubin contends was defamatory. The Court rejected Mr. Rubin's arguments because the photograph was placed above a quote from Mr. Rubin. *Id*. at fn. 10. This caused the Court to reason that "it is a common practice of magazines to show photographs of those they quote merely for visual interest. The inclusion of the quote beneath the caption indicates why Rubin's photograph was included: to put a face to the quote. And nothing else in the article can reasonably be read to falsely defame Rubin; rather, it presents him as an individual knowledgeable of the issues he is quoted on." *Id*. at fn. 10. Of course, this

reasoning again does not apply here. There was no quote from Mr. Reed. The Larson Article does not present Mr. Reed as an expert on golf who willingly participated in the preparation of the Larson Article. Thus, the reasoning of *Rubin* is also completely irrelevant to this instant case.

In sum, contrary to Bloomberg's contrived and frivolous arguments and non-relevant case law, the truth is that no reasonable person would plausibly conclude that the Larson Article was not "of and concerning" Mr. Reed. Mr. Reed's photo is prominently featured in the Larson Article with no exculpatory context or facts presented by the author, contrary to *Rubin* and *Parekh*. Mr. Reed had also been very publicly defamed by the Defendants herein and in *Chamblee* as someone who works directly for a murderous regime, is a murderer, a terrorist collaborator and someone who takes "blood money," and thus, the Larson Article rings true as to implicate Mr. Reed in the alleged scheme to collect data on and harm 9/11 families. Bloomberg's argument therefore must be rejected in its entirety.

     **b.**     **The Larson Article Contains False Statements of Fact**

Bloomberg argues that the Larson Article does not contain false statements of fact and constitute protected opinion regarding the details of the LIV/PGA litigation, but these arguments sidestep the real issue, which is the indisputable fact that Mr. Reed is completely uninvolved in the LIV/PGA litigation or the allegedly "sinister" conduct of using discovery to obtain personal information about and harm the victims of 9/11, and that the inclusion of his photograph creates the entirely false implication that he is. Thus, regardless of whether the Larson Article accurately depicts the details of the LIV/PGA litigation, it is still defamatory and contains false statements of fact <u>as to Mr. Reed</u> due to the fact that Mr. Reed is not a party to that litigation, and is completely uninvolved in any aspect of that litigation.

Put another way, even if it was true that LIV was using the PGA Tour litigation to obtain personal data on and harm 9/11 families – which it is not – the Larson Article would still be defamatory <u>as to Mr. Reed</u> because the gratuitous inclusion of Mr. Reed's photograph creates the false implication that Mr. Reed was personally involved in an alleged scheme to use the PGA Tour litigation to obtain personal data on and harm 9/11 families. This is where Bloomberg's arguments necessarily fail, as Mr. Reed is completely uninvolved in the LIV/PGA litigation. SAC. ¶ 114.

### c.   Mr. Reed Has More Than Sufficiently Pled Actual Malice

Actual malice is shown when the Plaintiff pleads "facts giving rise to a reasonable inference that the defendant published the story knowing that it was false or with reckless disregard for whether it was false or not." *Dershowitz v. Cable News Network, Inc*. 541 F. Supp. 3d 1354, 1367  (S.D. Fla. 2021) (internal quotation omitted). "[M]ost authorities suggest that a failure to retract, in conjunction with other circumstances, may be used to establish the requisite level of [constitutional] malice." John C. Martin, Comment, The Role of Retraction in Defamation Suits, 1993 U. Chi. Legal F. 293, 295 (1993). This is further shown in a practice guide published in The Florida Bar Journal by Manual Socias titled "*Showing Constitutional Malice in Media Defamation*.[2]" This article lays out twenty-four (24) "badges" or indicators of actual malice in media publications, many of which apply here. Indeed, a "refusal to publish a retraction upon learning of errors in a story" is one such "badge." <u>Exhibit 1</u>. There is no disputing the fact that the Defendants have received notice of the defamatory statements in question, Am. Comp. ¶ 133, and have failed to retract these statements, evidencing actual malice.

---

[2] https://www.floridabar.org/the-florida-bar-journal/showing-constitutional-malice-in-media-defamation/#:~:text=Constitutional%20malice%2C%20also%20called%20actual,for%20its%20truth%20or%20falsity.

Awareness of facts prior to the defamatory statements being made which strongly suggested innocence of plaintiff from the published accusations shows actual malice. *Cape Publ'ns v. Adams*, 336 So. 2d 1197 (Fla. 4th DCA 1976). As set forth by the Supreme Court in *Harte-Hanks Communications v. Connaughton*, 491 U.S. 657, 692 (1989), the "purposeful avoidance of truth" can show actual malice. This is certainly the case here.

Lastly, whether in the context of the facts of this case the statements were published with actual malice is a question for the jury in the context of the facts of this case. *Southern Air Transport, Inc. v. Post-Newsweek Stations, Florida, Inc.*, 568 So.2d 927, 929 (Fla. App. 3 Dist. 1990). For instance, where statements are capable of multiple meanings, statements must be presented to the trier of fact, notwithstanding the fact here that the defamatory statements at issue here are not vague and instead clearly defamatory. *Wolfson v. Kirk*, 273 So. 2d 774 (Fla. Dist. Ct. App. 1973).

Here, the relevant question, as set forth above, is not whether Defendants Bloomberg acted with actual malice in reporting on the details of the litigation between LIV and the PGA Tour. Instead, it is whether they acted with actual malice with regard to Mr. Reed, a non-party to the LIV/PGA litigation, which they clearly had a duty to discern as reporters. The question is completely, and unequivocally, yes.

This is because the litigation between LIV and the PGA Tour is all a matter of public record. In order to report on the litigation between LIV and the PGA Tour, Defendant Bloomberg, and its writer Defendant Larson, necessarily had to access the court records in the LIV/PGA Tour litigation in order to obtain the factual basis for the Larson Article. This would have necessarily been part of even the most basic due diligence. SAC ¶ 115. In the course of looking through the court record on the LIV/PGA Tour litigation, Defendant Bloomberg and its

writer Defendant Larson necessarily would have seen that Mr. Reed's name was nowhere to be found. It does not show up as one of the parties. SAC ¶ 114. Thus, it is impossible for Defendant Bloomberg and Defendant Larson to now assert that they did not know, or at least have very good reason to know, that Mr. Reed was and is completely uninvolved in the LIV/PGA Tour lawsuit. Then, as set forth above, they still went ahead and gratuitously and prominently featured Mr. Reed's photo in the Larson Article. The only possible reason for this is to intentionally create the false and misleading implication that Mr. Reed is somehow involved. SAC ¶ 115. This is the textbook definition of actual malice.

Defendant Bloomberg's attempted arguments to the contrary range from completely unavailing to nonsensical. For instance, Defendant Bloomberg asserts that in order to show actual malice, "Mr. Reed would have to plead facts showing Bloomberg specifically intended the Article to create the false implication that he was somehow personally and directly involved in LIV's litigation strategy and tactics in the PGA suit."  This is a bizarre argument. Defendant Bloomberg appears to be arguing there is no way for anyone to be merely "involved" in a lawsuit without having to become the lead counsel on that lawsuit. What about the layperson parties to a lawsuit? Are they not "involved?"

Defendant Bloomberg also appears to assert that the decision to include a photograph of Mr. Reed was merely "incidental," which is patently unbelievable and contrary to the allegations of the SAC that "Mr. Reed has become, not by choice but due to media-driven narrative, a 'whipping boy' and therefore a frequent target of the Defendants and others in the media in order to defame, disparage and harm LIV's other golfers and LIV as a whole." SAC ¶ 53.

The Court needs to ask itself the simple question – why include Mr. Reed's photo? If the article was about the lawsuit between LIV and the PGA Tour, why not include a photo of one of

the LIV golfers who <u>actually are a party</u> to the lawsuit, or had previously been? Defendant Bloomberg had no shortage of options, ranging from Phil Mickelson to Bryson DeChambeau to Taylor Gooch. Could it really be simply because, despite hours of scouring the internet, they could not find a picture of any golfer other than Mr. Reed wearing a LIV logo ? This cannot be true because in just a few minutes of looking, the undersigned counsel found numerous photographs of Phil Mickelson, who was actually a party to the LIV/PGA lawsuit, wearing hats and shirts adorned with his LIV HyFlyers logo. Thus, the only explanation here is that Bloomberg made a conscious decision, far from "incidental" to feature Mr. Reed in the Larson Article, despite knowing that he had nothing to do with the LIV/PGA litigation. This is as malicious as actual malice gets. Again, this is a question for the jury.

Lastly, the Amended Complaint does also set forth instances of common law, "ill will" malice exhibited by Defendant Bloomberg, but the allegation of actual malice is not premised entirely on this. This "ill will" malice is included and pled in the Amended Complaint because it is one of the "badges" of constitutional malice, <u>Exhibit 1</u>, which taken together can form a showing of actual, constitutional malice. Other "badges" include (1) failure to conduct a thorough investigation before publishing serious and damaging allegations that are not "hot news," (2) failure to report exculpatory facts, (3) omitting pertinent information to create a false impression, (4) a reporter's knowledge of facts conflicting with the report, (5) repetitive media attacks on the plaintiff, (6) failure to contact key witnesses, (7) a reporter's ill will toward the plaintiff, (8) a reporter's departure from professional standards, (9) refusal to publish a retraction upon learning of errors in a story, and (10) prior and subsequent defamatory statements. <u>Exhibit 1</u>. Thus, Mr. Reed has much more than sufficiently alleged actual malice, particularly at the FRCP 12 (b)(6) motion to dismiss stage, where, with regard to actual malice, the Court must

"accept as true…well-pleaded facts and construe them in the light most favorable to the plaintiff." *Dershowitz*, 541 F. Supp. 3d 1367.

> d.    **Mr. Reed Has More Than Sufficiently Pled Defamation Per Se**

Defendant Bloomberg makes no real attempt to argue that Mr. Reed did not properly plead defamation *per se*, instead simply reincorporating its arguments as to defamation and defamation by implication. This is because the Larson Article is clearly defamatory *per se*. A publication is *per se* defamatory if it (1) it charges that a person has committed an infamous crime; (2) it charges a person with having an infectious disease; (3) it tends to subject one to hatred, distrust, ridicule, contempt, or disgrace; or (4) it tends to injure one in his trade or profession." *Blake v. Ann-Marie Giustibelli, P.A.*, 182 So. 3d 881, 884 (Fla. Dist. Ct. App. 2016). It is clear that falsely accusing Mr. Reed of having participated and been involved in using the PGA/LIV lawsuit to get personal data 9/11 victims' families is exactly the type of publication to subject him to "hatred, distrust, ridicule, contempt, or disgrace" and also one that "tends to injure one in his trade or profession" as a professional golfer. This former point is self-explanatory, and the latter is due to the fact that professional golfers are supported by sponsors and fans, and an individual that engages in such heinous conduct would, of course, be rightfully shunned by both.

Lastly, Defendant Bloomberg argues that damages are not presumed against it even in a defamation *per se* context because they are a media defendant. Assuming this is true, which is not a given due to the fact that the Defendants merely cite *Edelstein v. WFTV, Inc.*, 798 So. 2d 797 (Fla. Dist. Ct. App. 2001), a Florida state court case and not an Eleventh Circuit one, Mr. Reed has more than pled special damages and at this stage.

## II.    MR. REED HAS PLED VIABLE CAUSES OF ACTION FOR TORTIOUS INTERFERENCE

Lastly, with regard to Mr. Reed's claim for tortious interference, Defendant Bloomberg disingenuously argues that the "single-action" rule must be applied to Mr. Reed's count for tortious interference. This is not true. Nowhere in the Amended Complaint does Mr. Reed plead that his tortious interference claims are premised on the exact same defamatory statements published by the Defendants that are at issue in the defamation counts. The fact of the matter is that Mr. Reed's counts for tortious interference do not directly reference the defamatory publications set forth in the Amended Complaint, and instead premised on the Defendants "spreading lies of and concerning Mr. Reed in order to destroy his reputation, and to induce sponsors to break their contractual relationships with Mr. Reed." *See generally* Am. Comp. ¶ 251. There is nothing in the Amended Complaint limiting these "lies" to the defamatory publications set forth the Amended Complaint. And Mr. Reed has more than pled damages as a result:

> As a result of…intentional and unjustified interference, Mr. Reed experienced the loss of multiple multi-million dollar sponsorship deals that were not or have not been renewed including, but not limited to Titleist, Nike, Ultimate Software, cbdMD, Callaway, Tax Slayer, Perry Ellis, NetJets, and ETS as well as numerous promising prospective sponsorship and business opportunities that did not come to fruition as a direct and proximate result including, but not limited to companies such as Quicken Loans, Draft Kings, Travelers, DOW, ARAMCO, CISCO, Porsche, Wells-Fargo, ROUSH, Zurich, Perry Ellis, Waste Management, Citi Bank, Houston Tourism, Taylormade, Bettinardi, and SRIXON. Am. Comp. ¶ 299.

Thus, at the motion to dismiss stage, before any discovery, Mr. Reed has pled all he needs to for his tortious interference counts under *Iqbal*.

## **CONCLUSION**

Based on the foregoing, the Defendant Bloomberg's Motion to Dismiss the Amended Complaint must be denied in its entirety. Mr. Reed, his colleagues, and hardly least his family, have been severely damaged by the defamatory campaign of the Defendant Bloomberg, who is

predictably driven by the intentional if not reckless thirst for clicks, views, attention, and therefore substantial profit. In the course of this unquenchable thirst and greed, Defendant Bloomberg has shown that it does not care about facts, accuracy, or any type of professional journalistic standard as they have clearly discovered that media-created narratives of fabricated scandals are the easiest way to drive sales, clicks, viewership, and profit.

In furtherance of this quest for clicks, viewership and profit,  Defendant Bloomberg has intentionally with actual malice effectively become the partner and surrogate of the monopolistic PGA Tour and its European joint venture partner the DP World Tour, by seeking to destroy Mr. Reed and fellow LIV players – the engine of LIV Golf.  Mr. Reed, as demonstrated by his prominent photograph wearing a LIV golf hat in the defamatory publication, is the preferred "sinister"  vehicle to severely damage not just LIV, but also Mr. Reed as a recognizable top player on this tour, given his highly acclaimed  professional golf career as a Masters Champion, two-time Olympian and Ryder Cup hero, having earned the nickname "Captain America," all of which are only a few of his successes.

**Finally, Mr. Reed and his counsel look forward to appearing before  this honorable Court at the upcoming omnibus hearing and oral argument.**

Dated: May 31, 2023                          Respectfully submitted,

By: */s/ Larry Klayman*
Larry Klayman, Esq.
Florida Bar No.: 246220
Klayman Law Group P.A.
7050 W. Palmetto Park Rd
Boca Raton, FL, 33433
Tel: 561-558-5536
leklayman@gmail.com

*Counsel for Patrick Nathaniel Reed*

21

**<u>CERTIFICATE OF SERVICE</u>**

I, Larry Klayman, hereby certify that on this day, May 31, 2023 I electronically filed the foregoing with the Clerk of Court using the Court's ECF procedures. I also certify that the foregoing document is being served this day on all counsel of record through the Court's eservice procedures.

<em>/s/ Larry Klayman</em>_____

EXHIBIT 1

# SHOWING CONSTITUTIONAL MALICE IN MEDIA DEFAMATION

📅 **Vol. 92, No. 8   September/October 2018   Pg 38**   👤 **Manual Socias**

📁 **Featured Article**



Illustration by Barbara Kelley

There is a myth that it is virtually impossible for a public figure to successfully sue the media for defamation. This myth is based on a perceived insurmountability of the requirement imposed on public figures to prove "actual" or "constitutional" malice by clear and convincing evidence when suing for defamation. In reality, the courts have provided an almost step-by-step guide for finding and proving constitutional malice. The guide is the badges of malice. The phrase "badges of malice" is adapted from the badges of fraud used in tax evasion and fraudulent conveyance cases to categorize types of circumstantial evidence that may support an inference of a subjective intent to defraud.

No doubt showing constitutional malice is an obstacle. Public figures must show constitutional malice to maintain their claim. The requirement of proving constitutional malice is not limited to public figures. Plaintiffs that are not public figures still must show constitutional malice to recover punitive damages.

Constitutional malice, also called actual malice, is the publishing of a defamatory statement either knowing it is false or with reckless disregard for its truth or falsity.[1] Requiring a showing of constitutional malice for a public figure to sue for defamation, or to impose greater than actual damages ( *i.e.* , presumed and punitive damages) on the media, is intended to prevent a chilling effect on news reporting and protect First Amendment rights.[2] The concept of "knowledge of falsity" is familiar to all attorneys in multiple contexts. Recklessness as to falsity, however, has evolved definitions and inferences unique to defamation law.

### Twenty-Four Badges of Constitutional Malice: A Guide

The Supreme Court articulated the parameters of "reckless disregard" in *St. Amant v. Thompson* , 390 U.S. 727, 731 (1965): "Reckless conduct is not measured by whether a reasonably prudent man would have published or would have investigated before publishing. There must be evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication."

Accordingly, *St . Amant* reasoned that recklessness may be inferred when "there are obvious reasons" to doubt the veracity of the defamatory statement.[3]

In *Mason v. New Yorker Magazine* , 501 U.S. 496 (1991), the Supreme Court summarized that, for proof of constitutional malice, "mere negligence does not suffice," and that the plaintiff must demonstrate that the author "in fact entertained serious doubts as to the truth of his publication...or acted with a high degree of awareness of probable falsity."[4]

Knowledge of falsity or reckless disregard for falsity is a subjective mental state of the person responsible for publishing the defamatory statement. Consequently, absent an admission by the media, showing constitutional malice is based on circumstantial evidence. The courts have recognized certain fact patterns of circumstantial evidence as probative of constitutional malice. These "badges of malice," some alone and some in combination with others, have been held sufficient to support a jury inference of constitutional malice. There are 24 badges of malice.[5]

· failure to conduct a thorough investigation before publishing serious and damaging allegations that are not "hot news";

· failure to give the plaintiff a fair opportunity to reply to defamatory allegations;

· failure to report exculpatory facts;

· omitting pertinent information to create a false impression;

· destruction, loss, or unavailability of a reporter's notes or research;

· the reporter's knowledge of a quoted source's animosity toward the plaintiff;

· the alteration of quotes to maximize a story's impact;

· a reporter's knowledge of facts conflicting with the report;

· emphasizing unimportant events to support a defamatory statement;

· continued reliance on a source that had proven unreliable in other respects;

· a preconceived determination to disparage a plaintiff or a preconceived slant or view;

· repetitive media attacks on the plaintiff;

· failure to contact key witnesses;

· a reporter's ill will toward the plaintiff;

· competitive pressure for "hot news" story;

· discrepancies, inconsistencies, and equivocation in the testimony of media witnesses;

· a reporter's departure from professional standards;

· failure to supervise the reporter's preparation of the story;

· refusal to publish a retraction upon learning of errors in a story;

· the use of deception to obtain a defamatory story;

· a reporter's lack of credibility;

· prior and subsequent defamatory statements;

· that an investigative agency with the same information as a reporter declined to prosecute or take any action against the plaintiff; and

· making threats in connection with a story.

These badges of malice are a guide and nothing more. The possible scope of evidence that may support an inference of malice is unlimited. The badges are useful because they summarize actual events that tend to repeat themselves in media defamation cases. Evidence of the badges in discovery will support a strong and well-precedented argument for constitutional malice. For each badge developed in discovery, the media will have an explanation. Developing multiple badges of malice can expose the media's serial excuses as pretextual and increase the chances of successfully arguing constitutional malice.

## Malice Typically Is Evaluated from the Accumulation of Circumstantial Evidence

The badges of malice are consistent with the extremely broad scope of evidence that the Supreme Court held must be discoverable by plaintiffs to prove malice. In *Herbert v. Lando* , 441 U.S. 153 (1979), the Supreme Court observed that the First Amendment protections given to the media were balanced by the corollary that the fact finder could consider an extremely broad scope of evidence in determining malice. "[A]ny competent evidence either direct or circumstantial, can be resorted to, and all the relevant circumstances surrounding the transaction may be shown..." to show malice.[6] The specific items of relevant evidence favorably itemized in *Herbert* include 1) all information known to the defamer showing the falsity of defamatory statements; 2) the defamer's thought process and reasons for crediting or discrediting information; 3) the defamer's thought processes and reasons for incorporating only certain information into a press statement; 4) threats made by the defendant; 5) prior defamations by the defendant; 6) subsequent defamations made by the defendant; 7) subsequent statements made by the defendant; and 8) circumstances indicating rivalry, ill will, or hostility.[7]

In *Harte-Hanks Communications, Inc. v. Connaughton* , 491 U.S. 657 (1989), the Supreme Court emphasized that a jury may infer malice from a series of factors none of which alone would have been sufficient. In that case, a newspaper published witness' allegations that a judicial candidate had been bribed. The candidate sued for defamation, and the newspaper argued that it had no knowledge that the bribery allegations were false. The jury found malice, and the newspaper appealed.

*Harte-Hanks* emphasized numerous factors in evaluating the entire record. The newspaper was involved in heated competition with another local paper and was under pressure to "scoop it" on local news ( *i.e* ., profit motive for the defamation). After hearing the obviously damaging bribery allegations, the newspaper conducted an investigation, but it failed to contact key witnesses.

Numerous taped witness interviews were available to the newspaper, but the editorial director did not listen to them. There were discrepancies in the testimony of the newspaper's witnesses. Though no single factor was dispositive, *Harte-Hanks* stressed that the jury may have found that "failure to conduct a complete investigation involved a deliberate effort to avoid the truth."[8]

In *Curtis Publishing Co. v. Butts* , 388 U.S. 130 (1967), a football coach sued a magazine for publishing an article accusing him of fixing games. The evidence showed that this was not "hot news," that the charges were serious, that the editors recognized "the need for a thorough investigation," that the reporter's superiors did not look at the reporter's notes prior to the publication, that a key witness was not interviewed, and that "no attempt was made to screen the films of the game."[9] The Supreme Court held that a jury may infer from this that the magazine "had been anxious to publish an expose and had, thus, wantonly and recklessly seized on a questionable affidavit."[10]

*Hunt v. Liberty Lobby* , 720 F.2d 631 (11th Cir. 1983), affirmed a jury finding of malice in a Florida defamation case. *Hunt* ruled that two factors present in that case independently supported the jury's determination. First, "when an article is not in the category of 'hot news,' that is, information that must be printed immediately or it will lose its newsworthy value, 'actual malice may be inferred when the investigation for a story...was grossly inadequate in the circumstances.'"[11] Second, "an inference of actual malice can be drawn when a defendant publishes a defamatory statement that contradicts information known to him, even when the defendant testifies that he believed that the statement was not defamatory and was consistent with the facts within his knowledge."[12]

A defendant's "inconsistent" and "equivocating" testimony supported a finding of malice in *Texas Disposal Systems Landfill, Inc. v. Waste Management Holdings, Inc.* , 219 S.W.3d 563 (Tex. App. 2007). The court cited a combination of

circumstantial evidence from which the jury may have inferred malice. These factors included 1) omitting pertinent information that would have prevented a "false impression" from the information included in the defamatory communication; 2) a failure to attempt verification of the defamatory information; and 3) "inconsistent" and "equivocating" testimony from the defendant.[13]

The frequency and duration of the media's attack on a plaintiff also may help establish malice. In *Bentley v. Bunton* , 94 S.W.3d 561 (Tex. 2002), the court affirmed a jury finding of malice. *Bentley* cited factors that included the fact that the talk show host had "relentlessly" repeated allegations against a particular judge for months while ignoring people that had knowledge of the allegations.[14]

Emphasizing unimportant events to support serious defamatory statements will also support a finding of malice. In *Bolling v. Baker* , 671 S.W. 2d 559 (Tex. App. 1984), a physician accused a nurse of dishonesty. When the nurse sued for defamation, the physician testified that one reason he doubted the nurse's honesty was an incident in which some lab slips "had been changed."[15] *Bolling* concluded that the physician's "obsession with such an insignificant event warrants the inference that he was using the incident to get even with [the nurse]."[16] Accordingly, the court concluded that there was sufficient evidence to support the jury's finding that the statements were made with knowledge of their falsity or with reckless disregard for the truth. Emphasizing unimportant events also fits within the more general badge of a reporter knowing that the facts do not support a defamatory story.

Finally, the context of a defamatory statement and the media's use of deception to obtain images for a defamatory story may support a jury inference of malice. In *Braun v. Flynt* , 726 F.2d 245 (5th Cir. 1984), a novelty entertainer who performed an act with a swimming pig at a family-oriented amusement park sued a sexually oriented men's magazine for defamation for publishing her

photo in its "Chic Thrills" section. The magazine obtained authority to use the photograph by misrepresenting the nature of the magazine. *Braun* affirmed a jury finding of malice, holding that the jury may infer malice from the magazine's use of deception to obtain the photograph and then inserting the photograph of what the editors knew was a family tourist attraction "in the context of" a lewd magazine.[17]

The media cannot avoid an inference of malice when it publishes a defamatory headline by showing that it published the full truth in the text of the story. In *Kaelin v. Globe Communications Corp.* , 162 F.3d 1036 (9th Cir. 1998), Kato Kaelin sued a newspaper for publishing a headline stating, "COPS THINK KATO DID IT!" after O.J. Simpson was acquitted of murder. The newspaper argued that there was no malice because the body of the story made clear that the "IT" referred to perjury and not the murders. The trial court entered summary judgment for the newspaper. The appellate court reversed *Kaelin* , holding that a jury may infer that the newspaper intended to convey a false impression from the scandalous headlines for the pecuniary motive of selling more newspapers. The truthful disclosure in the body of the article did not guarantee the newspaper immunity from defamatory headlines. "The editors' statements of their subjective intention," *Kaelin* stressed, "are matters of credibility for a jury."[18]

## Some Badges Alone May Establish Malice

There are instances in which courts have approved an inference of malice from a single item of circumstantial evidence. This occurs in two scenarios. One is when there is evidence of the reporter's lack of credibility regarding the story. This evidence includes the mysterious disappearance of the reporter's research notes, the alteration of quotes for defamatory impact, and the reporter's possession of materials showing that the defamatory story was false. The second scenario focuses on the reporter's conduct after the defamatory publication. When the media refuses to retract a defamatory statement after learning of its falsity, courts have allowed an inference that the defamation was published with

malice. Though neither scenario guarantees a finding of constitutional malice, both scenarios may support such a finding if the evidence is material to the defamation.

The destruction or unavailability of a reporter's notes and research supported a finding of malice in *Murphy v. Boston Herald, Inc.* , 449 Mass. 42 (Mass. 2007). There, a newspaper reporter, relying on the statement of a district attorney with animosity toward a judge, published an article accusing the judge of belittling a juvenile rape victim. *Murphy* found that a number of factors combined to furnish clear and convincing evidence of malice.[19] *Murphy* stressed 1) the reporter's knowledge that his source had animosity toward the judge; 2) the reporter's failure to verify the accuracy of the statements attributable to the judge with others who were present; and 3) the reporter's incredible claim that he discarded his notebook where he wrote the information told to him by the district attorney.[20] *Murphy* stressed that the strongest evidence of malice was the mysterious unavailability of the notebook: "The jury were entitled to draw the negative inference that [the reporter] discarded his notebook in a deliberate effort to conceal what he knew were inaccuracies in his reporting. This inference, in turn, *provides a strong basis for a finding of actual malice*."[21]

Consistent with *Murphy* , numerous courts have held that the destruction or unavailability of a reporter's notes or research may support a jury verdict of malice.[22]

A reporter's alteration of quotes to maximize the impact of the story also supports a verdict of malice. In *Masson v. New Yorker Magazine, Inc* ., 501 U.S. 496 (1991) , the Supreme Court held that a reporter's alteration of quoted words may equate with knowledge of falsity when the alteration results in a material change of the meaning conveyed by the quoted statement.[23] That a reporter in *Masson* might have misunderstood his or her sources is insufficient to overturn a jury's evaluation of the circumstances.[24]

The court in *Southern Air Transport, Inc. v. Post Newsweek Stations Florida, Inc* ., 568 So. 2d 927 (Fla. 3d DCA 1990), upheld a finding of malice when the media aired an uncorroborated claim by an individual of questionable credibility that the plaintiff was a drug trafficker. The court held publishing this serious and uncorroborated allegation without giving the plaintiff a fair opportunity to reply supported the inference of malice. The court also noted that the defamatory broadcast made the informant appear credible and failed to report information that would negatively impact his credibility.[25]

A reporter's possession of documents conflicting with his report supported a finding of malice in *Mitchell v. Griffin Television, LLC*, 60 P.3d 1058 (Okl. App. 2002). There, a veterinarian sued a TV station for falsely reporting that a lawsuit accused him of medicating a champion race horse to hide injuries so the horse could be sold. The TV station claimed there was no showing of malice because the complaint filed in federal court alleged the veterinarian had medicated the horse prior to the sale. That complaint accused the trainer of trying to mask the horse's unsoundness but made no such accusation as to the veterinarian. Since the TV station had a copy of the complaint, *Mitchell* held that the jury properly found that the false report was made with "reckless disregard."[26]

In *Herbert* , the court held that a defamer's post-publication conduct may be relevant to establishing malice at the time of publication.[27] The key post-publication conduct developed in the caselaw is the media's refusal to retract a defamatory statement after learning that it is false. *Restatement Second of Torts* 580A (1977), Comment D, concludes that a defamer's refusal to retract a defamatory statement after learning it is false "might be relevant in showing recklessness at the time the statement was published." In *Mahnke v. Northwest Publications, Inc.* , 160 N.W. 2d 1 (Minn. 1968), the Minnesota Supreme Court held that a jury may properly consider a defendant's failure to retract defamatory statements as evidence of recklessness. "We think that the failure to retract the

defamatory statements," *Mahnke* stressed, "underscored defendant's reckless attitude as to the consequences of what had been published and that the jury was entitled to take that fact into consideration."[28]

## Use of the Badges in Discovery

The focus of discovery on constitutional malice is obtaining evidence that the reporter either knew the truth refuting the defamation or the truth was so readily available that failure to inquire amounts to a deliberate avoidance of truth. The badges suggest where to look for this evidence. The first step is obtaining all investigative research materials, notes, drafts of articles, edits, article or script changes, outtakes communications, tweets, web postings (including both the defamatory article and any guest comments or posts), Facebook posts, and other social media materials concerning the defamatory story. The reporter's familiarity with the subject matter of the story, as well as the identities of his or her sources also warrant discovery. The goal of this phase of discovery is to learn everything the reporter said, wrote, knew, or had access to concerning the defamatory story.

A next step is to identify every item of information known or available to the reporter that is inconsistent with the defamatory sting of the story. This aspect of discovery then focuses on tracing how and why the reporter made editorial decisions to omit, downplay, or not pursue what was inconsistent with the defamation. This should be done at deposition, but it is helpful to initially obtain copies of all drafts or outtakes of the defamatory publication to see what was deleted.

The reporter should be deposed on every step of the investigation conducted on the story. Particular emphasis is on the reasons for a reporter's decision not to pursue research areas that would have exposed the defamatory story as false. The credibility issue surrounding a reporter's explanation of this process is often

the lynchpin that decides constitutional malice. Inconsistencies between the reporter's research and the defamatory string of the story may rise to a level where this alone allows an inference of malice.

The next aspect of discovery deals with external influences on the defamatory story. External influences discussed in the caselaw include 1) animosity toward the subject of the defamation; 2) competitive pressure to scoop other media outlets; 3) a pattern of defamatory coverage; and 4) an editorial slant. Also, failure to retract after learning of a defamatory falsity, though not an influence on the story, is an external factor that may support an inference of malice. Accordingly, discovery into the editorial decision not to retract should be as thorough as discovery into the decision to initially publish the defamation. In cases in which the media issues an inadequate retraction, the retraction can often be pled as an additional defamatory publication requiring discovery in its own right.

Discovery into animosity toward the subject of the defamation can be far ranging or a quick dead end. In cases in which a news outlet had an established relationship with the plaintiff, there is often a falling out predating the defamatory publication — and evidence of animosity. The entire history of the relationship, including all statements made by news outlet representatives about the plaintiff, are in play.

Competitive pressure for attention-grabbing stories is always present but must be shown in the record. There are often emails or other communications discussing a news outlet's market position (circulation or viewers). Media executives normally must acknowledge that their company's source of income (advertising), and often their income depends on their circulation or number of viewers. Editors sometimes direct reporters to pursue certain stories, either orally or in writing, to maximize viewers during ratings periods.

Television stations typically feature their most inflammatory stories during national ratings periods knowns as "sweeps." During this time, there can be increased pressure on reporters to generate high-profile stories or to exaggerate

to the point of defaming. Sweeps periods occur four times each year and are usually acknowledged in internal communications. It is important in the industry because the viewership established during sweeps determines advertising revenue. Questioning the reporter regarding his or her basis for publishing multiple defamatory statements will often yield testimony helpful to establish a credibility dispute.

A pattern of defamatory statements about the plaintiff can be key to showing malice. Identifying every defamatory statement about the plaintiff made by a news outlet is the first step. This includes defamatory statements that were made before and after the defamatory publication. In some cases, the sheer number of false statements made may support an inference of malice. In others, credibility issues are raised by a reporter's attempts to explain this pattern.

### Defending Summary Judgment

The first test of a plaintiff's evidence of constitutional malice is usually the media's motion for summary judgement. It is here that a plaintiff first feels the weight of being required to prove malice by clear and convincing evidence. In *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986), the Supreme Court held that, in ruling on a media motion for summary judgment or a directed verdict on constitutional malice, a court must evaluate the evidence of malice to determine whether a jury reasonably could infer malice under this heavier evidentiary burden. Media defendants, quoting isolated language from *Anderson* and similar cases, exaggerate that a plaintiff's burden is virtually insurmountable.

In reality, *Anderson* also stresses that courts should be cautious in granting summary judgment on constitutional malice:

> [I]t is clear enough from our recent cases that at the summary judgment stage, the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.[29]

Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or a directed verdict. The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor. Neither do we suggest that the trial courts should act other than with caution in granting summary judgment or that the court may not deny summary judgment in a case where there is reason to believe that the better course would be to proceed to a full trial.[30]

*Anderson* has been inconsistently applied. Some courts invoke *Anderson* as a license to act as jury in weighing the evidence. Others look at whether there are factual issues that may be presented to a jury. This was predicted by the dissent in *Anderson* .[31]

The dissenting justices argued that *Anderson* gave conflicting instructions to trial courts. Specifically, courts were simultaneously instructed to weigh the evidence under the "prism" of the clear and convincing standard and cautioned against weighing the evidence when ruling on a motion for summary judgment or directed verdict. The dissents predicated that *Anderson* would prove devoid of practical application.[32]

In *Hutchinson v. Proxmire*, 443 U.S. 111, n.9 (1979), the U.S. Supreme Court noted in a libel case "the proof of actual malice calls a defendant's state of mind into question [ *citations omitted* ] and does not readily lend itself to summary disposition."[33]

Summary judgment in a Florida defamation case arising from "investigative television news" was addressed in *Southern Air Transport* . There, the plaintiff sued a TV station for broadcasting an investigative story accusing the plaintiff of drug trafficking while engaged in covert arms shipments to the Nicaraguan Contras. The trial court granted summary judgment for the TV station on the issue of malice. The district court reversed, holding that these factors precluded

summary judgment: 1) A source's information had proven unreliable in other respects; 2) "the defendants *did not give plaintiff a fair opportunity to reply* to this drug trafficking accusation..."[34]; and 3) the government declined to prosecute anyone based on the source's information.[35] The court noted that other evidence in the record supported contrary inferences but stressed that weighting them was for the jury.[36]

Media defendants always assert that they believed the truth of the defamation. Constitutional malice pivots on creating a triable issue concerning credibility. The badges of malice help create this issue, but the courts have stressed that it is in the jury's purview to evaluate the credibility of media witnesses and reject their claim that they believed the defamation was true.

In *Harrison v. Williams* , 430 So. 2d 585 (Fla. 4th DCA 1983), a father sent defamatory communications to officials accusing a police officer of beating up his son. The police officer brought a defamation action, and the father's defense was that "he made a good faith mistake about the identity" of the police officer. The trial evidence showed that the son "informed his father" that it was the plaintiff who had attacked him. The assistant state attorney, however, had told the father that the attacker was another officer who looked like the plaintiff. The fact finder resolved the credibility issue in favor of the plaintiff and found that the father had made his accusations with malice. On appeal, the court affirmed, finding substantial competent evidence to support the inference of malice.[37]

*Dibella v. Hopkins* , 403 F.3d 102 (2d Cir. 2005), affirmed a jury's finding of malice and held that it was within the jury's purview to discredit the defamer's account of his mental state in making a defamatory statement.[38] Evidence that creates an issue concerning the reporter's credibility requires a jury determination.

The thrust of the focus on the credibility of the media witnesses is that anything normally impacting a witness' credibility is in play. In particular situations, these factors may be unique. For instance, a witness' hesitations, tone, and demeanor

are properly considered by a jury deciding whether to believe the witness. In the context of a motion for directed verdict, the matter must be put on the record because the transcript will not reflect them. In defending a summary judgment, an argument that the record prevents an issue on the media witnesses' credibility can be supported by videotaped deposition testimony.[39]

## Conclusion

The caselaw developed over the last half century shows that proving constitutional malice is feasible. It takes the discipline of developing every item of circumstantial evidence that may furnish a motive to defame or shows that the reporter knew or should have known the truth. The "should have known" standard applies to negligence, but negligence is a step toward recklessness. The 24 badges of constitutional malice reflect combinations of evidence that can defeat the media's First Amendment defense.

[1] *Gertz v. Welch* , 94 S. Ct. 2997 (1974).

[2] *Id.*

[3] *St. Amant*, 390 U.S. at 732, fn. 3 (citations omitted).

[4] *Mason*, 501 U.S. 496 at 510 (citations omitted).

[5]The badges are summarized here and the cases utilizing the various badges are discussed below.

[6] *Herbert*, 441 U.S. at 177, fn. 12 (citations omitted).

[7] *Id.* Courts typically reject various journalist privileges which normally protect journalists' sources from discovery on the ground that the media waives the privilege when it asserts its First Amendment defenses.

[8] *Harte-Hanks Communications*, 491 U.S. at 685. *See also Celle v. Filipino Reporter Enterprises, Inc* ., 209 F.3d 163 (2d Cir. 2000) (malice finding affirmed based on evidence of reporter's ill will, reporter's conflicting testimony, and reliance on questionable source without conducting investigation).

[9] *Curtis Publishing Co.*, 388 U.S. at 157.

[10] *Id.* at fn.20. *See also Healey v. New England Newspapers, Inc* ., 555 A.2d 321 (R.I. 1989) (newspaper report of angry relative blaming doctor for death creates jury issue of malice where newspaper failed to report known facts tending to exculpate the doctor); *Buratt v. Capital City Press* , 459 So. 2d 1268 (La. 1 Cir. 1984) (reckless disregard for truth shown when reporter omits reporting available information because it refuted defamatory point reporter trying to make).

[11] *Hunt*, 720 F.2d at 643.

[12] *Id.* at 645 (citations omitted).

[13] *Texas Disposal Systems Landfill*, 219 S.W.3d at 578-579.

[14] *Bentley,* 94 S.W.3d at 584-585, 600. *See also Kentucky Kingdom Amusement Co. v. Belo Kentucky, Inc.* , 179 S.W.3d 785 (Ky. 2005) (affirming jury finding of malice based on television station's failure to correct inaccuracies in prior reports, continuing commitment to running the same false story line, failure to significantly investigate, and because the general make up and presentation of the story exhibited hostility).

[15] *Bolling,* 671 S.W.2d at 563.

[16] *Id.* at 565.

[17] *Braun*, 726 F. 2d at 257.

[18] *Kaelin,* 162 F. 3d at 1042.

[19] *Murphy* , 449 Mass. at 58.

[20] *Id*. at 58-61.

[21] *Id.* at 61 (emphasis added).

[22] *See Moore v. Vislosky* , 240 F. App'x 457, 469 (3d Cir. 2007) (defamer's claim that she "lost" documentary evidence that supported her defamatory statements was implausible and supports jury finding that she acted with reckless disregard for truth); *Torgerson v. Journal/Sentinel, Inc.* , 563 N.W. 2d 472, 483 (Wis. 1997) (destruction of reporter's notes is sufficient evidence to support a jury verdict of actual malice); *Chang v. Michiana Telecasting Corp.* , 900 F.2d 1085, 1090 (7th Cir. 1990) ("destruction could imply that the notes would have revealed the reporter did not believe what he wrote or said") (citations omitted).

[23] *Masson,* 501 U.S. at 516.

[24] *Id* . at 520-521.

[25] *Southern Air Transport* , 568 So. 2d at 928.

[26] *Mitchell*, 60 P.3d at 1063.

[27] *Herbert,* 441 U.S. at 170-171.

[28] *Mahnke,* 160 N.W.2d at 344. *See also Zerangue v. TSP Newspapers, Inc.* , 814 F.2d 1066 (5th Cir. 1987) (refusal to retract an exposed error supports a finding of malice just as a readiness to retract tends to negate malice); *Golden Bear Distributing Systems of Texas, Inc. v. Chase Revel, Inc.* , 708 F.2d 944 (5th Cir. 1983) (refusal to retract supports jury finding that defamatory article published with reckless disregard of the truth).

[29] *Anderson*, 477 U.S. at 249.

[30] *Id.* at 255 (citations omitted).

[31] *Id.* at 265-268.

[32] *Id* . at 267-269.

[33] *See also Shiavone Const. Co. v. Time, Inc.* , 847 F.2d 1069 (3d Cir. 1988) (reversing summary judgment in media defamation case where media had internal inconsistencies in its research and information contradicting libelous assertions but nevertheless published libelous statements).

[34] *Southern Air Transport* , 568 So. 2d at 928 (emphasis added).

[35] *Id.*

[36] *Id.* at 929.

[37] *Harrison*, 430 So. 2d at 586. *See also Durso v. Lyle Stuart, Inc* ., 337 N.E. 2d. 443, 447 (Ill. App. 1975) (citations omitted) (jury may find malice and disregard defendant's claim that defamatory statement in investigative publication was caused by unintentional "error" where evidence creates issue of author's credibility because (citations omitted) it showed "muckraking intent, the absence of hot news, and an inadequate investigation…").

[38] *See also Newton v. NBC, Inc* ., 930 F.2d 662, 671 (9th Cir. 1990) (malice may be based on jury's negative assessment of reporter's credibility at trial).

[39] The normal rule is that the court should leave credibility issues for the jury. To the extent that the court weighs evidence to see if a credibility issue satisfies the "clear and convincing" standard, witness demeanor should be in play. The dissent in *Anderson* pointed out that applying the "clear and convincing" standard at the summary judgment stage and telling the courts not to weigh evidence was inherently contradictory. The dissent predicted that *Anderson* would be inapplicable in practice.

 **MANUEL SOCIAS** *is a solo practitioner who has represented clients in business litigation for 35 years. He also handles and consults on defamation cases.*

EXHIBIT 2

CASE NO. 20-61872-CIV-SINGHAL
United States District Court, S.D. Florida.

# Dershowitz v. Cable News Network, Inc.

541 F. Supp. 3d 1354 (S.D. Fla. 2021)
Decided May 24, 2021

CASE NO. 20-61872-CIV-SINGHAL

2021-05-24

Alan DERSHOWITZ, Plaintiff, v. CABLE NEWS NETWORK, INC., Defendant.

Brian Mitchell Rodier, Rodier & Rodier, Hallandale, FL, for Plaintiff. George S. LeMieux, Eric Corey Edison, Gunster, Yoakley and Stewart, P.A., Fort Lauderdale, FL, Amanda Levine, Pro Hac Vice, Katherine M. Bolger, Pro Hac Vice, Davis Wright Tremaine LLP, New York, NY, for Defendant.

RAAG SINGHAL, UNITED STATES DISTRICT JUDGE

1358*1358

Brian Mitchell Rodier, Rodier & Rodier, Hallandale, FL, for Plaintiff.

George S. LeMieux, Eric Corey Edison, Gunster, Yoakley and Stewart, P.A., Fort Lauderdale, FL, Amanda Levine, Pro Hac Vice, Katherine M. Bolger, Pro Hac Vice, Davis Wright Tremaine LLP, New York, NY, for Defendant.

## ORDER

RAAG SINGHAL, UNITED STATES DISTRICT JUDGE

**THIS CAUSE** is before the Court upon Defendant Cable News Network's Motion to Dismiss (DE [17]). The parties have fully briefed the Motion to Dismiss and the Court heard argument of counsel. For the reasons set forth below, the Motion to Dismiss is denied.

I. <u>INTRODUCTION</u>

Plaintiff Alan Dershowitz ("Dershowitz") has filed a Complaint (DE [1]) against Cable News Network, Inc. ("CNN") seeking damages for defamation. The Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332.

In January 2020, Dershowitz represented the President of the United States in an impeachment trial before the United States Senate. (*Id.* ¶ 6). This dispute concerns CNN's coverage of an argument Dershowitz made to the Senate about whether a president can be impeached and removed from office if he takes any action that is 1359motivated by a desire to be reelected. *1359 According to the Complaint, Dershowitz gave the following answer to a question by Senator Ted Cruz:



*Dershowitz v. Cable News Network, Inc.*    541 F. Supp. 3d 1354 (S.D. Fla. 2021)

The only thing that would make a quid pro quo unlawful is if the quo were somehow illegal. Now we talk about motive. There are three possible motives that a political figure could have. One, a motive in the public interest and the Israel argument would be in the public interest. The second is in his own political interest and the third, which hasn't been mentioned, would be his own financial interest, his own pure financial interest, just putting money in the bank. I want to focus on the second one just for one moment. Every public official that I know believes that his election is in the public interest and, mostly you are right, your election is in the public interest, and if a president does something which he believes will help him get elected in the public interest, that cannot be the kind of quid pro quo that results in impeachment. (*Id.* ¶ 7).[1]

[1]    The Complaint sets forth only an excerpt of Dershowitz' response. CNN has submitted the Congressional Record (DE [17-1] with the full transcript of Dershowitz' argument found at S650 and asks the Court to take judicial notice of the entirety of Dershowitz' comments.

Following the day's impeachment proceedings, CNN aired a clip of this argument that featured only the last sentence and omitted Dershowitz' words that a quid pro quo would be unlawful if the quo were somehow illegal.[2] (*Id.* , ¶ 8). Dershowitz alleges that several CNN commentators responded to the truncated clip and "exploded into a one-sided and false narrative that Professor Dershowitz believes and argued that as long as the President believes his reelection is in the public interest, that he could do anything at all – including illegal acts – and be immune from impeachment." (*Id.* ). Dershowitz alleges CNN commentators made the following defamatory statements[3] (DE [1], ¶ 13):

[2]    The Complaint acknowledges that CNN aired the entire statement several times earlier in the day on shows hosted by CNN employees Wolf Blitzer and Jake Tapper. (DE [1] ¶ 9).

[3]    In his Memorandum in Opposition (DE [21]), Dershowitz identified the underlined portions of these statements as those he alleges are defamatory.

Having worked on about a dozen campaigns, there is always the sense that, boy, if we win, it's better for the country. But that doesn't give you license to commit crimes or to do things that are unethical. So, it was absurd. What I thought when I was watching it was this is un-American. This is what you hear from Stalin. This is what you hear from Mussolini, what you hear from authoritarians, from Hitler, from all the authoritarian people who rationalized, in some cases genocide, based on what was in the public interest." -- Joe Lockhart @ 7:11 p.m., January 29, 2020.

The president's defense team [Dershowitz] seems to be redefining the powers of the president, redefining them towards infinity." ... [truncated clip played] ... "If you look at what he says there it blows your mind. He says if a president is running for re-election because he thinks getting elected will help America, he can do anything, anything, And that redefines the presidency and America." -- John Berman @ 6:17 a.m., January 30, 2020.

I did not go to Harvard Law, but I did go to the University of Texas School of Law, where I studied criminal law and constitutional law, but never dreamed a legendary legal mind would set them both ablaze on the Senate floor. The Dershowitz Doctrine would make presidents immune from

1360*1360



every criminal act, so long as they could plausibly claim they did it to boost their re-election effort. Campaign finance laws: out the window. Bribery statutes: gone. Extortion: no more. This is Donald Trump's fondest figurative dream: to be able to shoot someone on Fifth Avenue and get away with it." -- Paul Begala on CNN.com, January 29, 2020 @ 9:11 p.m.

This narrative, claims Dershowitz, damaged his reputation as a legal scholar and subjected him to ridicule on news outlets, talk shows, and social media. (*Id.* ¶¶ 12, 13).

Dershowitz alleges that CNN knew or had serious doubts that its commentators' statements were false at the time they were made but nonetheless made and/or published the statements with an intent to indulge ill will, hostility, and an intent to harm. (*Id.* ¶ 20). Dershowitz asserts that CNN's airing of only a portion of his answer was done to falsely paint him "as a constitutional scholar and intellectual who had lost his mind" and that "[w]ith that branding, [his] sound and meritorious arguments would then be drowned under a sea of repeated lies." (*Id.* ¶ 8). The result of omitting the words "[t]he only thing that would make a quid pro quo unlawful is if the quo were somehow illegal," says Dershowitz, is that CNN could "fool" its viewers into thinking "that the respected Alan Dershowitz believed that the President of the United States could commit <u>illegal</u> acts as long as he thought it would help his reelection and that his reelection was in the public interest, even though it was the opposite of what he said." (*Id.* ). Dershowitz alleges he has suffered and continues to suffer damage, including but not limited to damage to his reputation, embarrassment, pain, humiliation, and mental anguish and has sustained past and future loss of earnings. (*Id.* ¶ 19). He seeks $50 million in compensatory damages and $250 million in punitive damages from CNN.

CNN moves to dismiss the Complaint for failure to state a claim upon which relief can be granted. (DE [17]). Fed. R. Civ. P. 12(b)(6). First, CNN contends its broadcasts are protected by the fair report privilege, which shields the press from liability for reporting information on official government proceedings. Second, CNN argues that the statements made by its commentators were non-actionable opinions based upon Dershowitz' public testimony. Finally, CNN asserts that Dershowitz has not and cannot plead that CNN acted with the actual malice required for a public figure to sustain a defamation claim. CNN asks the Court to dismiss Dershowitz' Complaint with prejudice.

II. <u>LEGAL STANDARDS</u>

A. Motion to Dismiss

To survive a motion to dismiss, "factual allegations must be enough to raise a right to relief above the speculative level" and must be sufficient "to state a claim for relief that is plausible on its face." *Bell Atl. Corp. v. Twombly* , 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal* , 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). "The mere possibility the defendant acted unlawfully is insufficient to survive a motion to dismiss." *Sinaltrainal v. Coca-Cola Co.* , 578 F.3d 1252, 1261 (11th Cir. 2009), *abrogated on other grounds by Mohamad v. Palestinian Authority* , 566 U.S. 449, 132 S.Ct. 1702, 182 L.Ed.2d 720 (2012).

In considering a Rule 12(b)(6) motion to dismiss, the court's review is generally "limited to the four corners of 1361 the complaint." *1361 *Wilchombe v. TeeVee Toons, Inc.* , 555 F.3d 949, 959 (11th Cir. 2009) (quoting *St. George v. Pinellas Cty.* , 285 F.3d 1334, 1337 (11th Cir. 2002) ). The court must review the complaint in the light most favorable to the plaintiff, and it must generally accept the plaintiff's well-pleaded facts as true. *See Hishon v. King & Spalding* , 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984). But "[c]onclusory allegations,

unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal." *Jackson v. BellSouth Telecommunications* , 372 F.3d 1250, 1262 (11th Cir. 2004) (citation omitted); *see also Iqbal* , 129 S. Ct. at 1949 ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions").

<u>B. Defamation</u>

The parties agree that Florida law applies to this dispute. In Florida, a defamation claim has "five elements: (1) publication; (2) falsity; (3) actor must act with knowledge or reckless disregard as to the falsity on a matter concerning a public official, or at least negligently on a matter concerning a private person; (4) actual damages; and (5) statement must be defamatory." *Jews For Jesus, Inc. v. Rapp* , 997 So. 2d 1098, 1106 (Fla. 2008).

CNN argues that its broadcasts concerning Dershowitz' statements are protected from liability by the fair report privilege. The fair report privilege is a qualified privilege given to news media "to accurately report on the information they receive from government officials." *Woodard v. Sunbeam Television Corp.* , 616 So. 2d 501, 502 (Fla. 3d DCA 1993). "If the report of a public official proceeding is accurate or a fair abridgment, an action cannot be constitutionally maintained, either for defamation or for invasion of the right of privacy." *Id.* (quoting Restatement (Second) of Torts § 611, cmt. b (1977)). "The privilege extends to the publication of the contents of official documents, as long as the account is reasonably accurate and fair." *Rasmussen v. Collier County Publ. Co.* , 946 So. 2d 567, 571 (Fla. 2nd DCA 2006).

Next, CNN argues that its commentators offered opinions and, therefore, it cannot be liable for defamation. In Florida, a claim of defamation requires a false statement of fact. *Id.* Statements of pure opinion are not actionable. *Zambrano v. Devanesan* , 484 So. 2d 603, 606 (Fla. 4th DCA 1986). "The distinction between fact and opinion is not always easy to perceive." *Id.* "Thus, the law recognizes that some comments may be pure expressions of opinion whereas others may be mixed expressions of opinion." *Id.*

A mixed opinion is one "based upon facts regarding a person or his conduct that are neither stated in the publication nor assumed to exist by a party exposed to the communication." *LRX, Inc. v. Horizon Assocs. Joint Venture ex rel. Horizon-ANF, Inc.* , 842 So. 2d 881, 885 (Fla. 4th DCA 2003). "Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact. Simply couching such statements in terms of opinion does not dispel these implications." *Milkovich v. Lorain Journal Co.* , 497 U.S. 1, 18-19, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990).

Whether a challenged statement is one of fact or opinion is a question of law to be decided by the court. *Turner v. Wells* , 879 F.3d 1254, 1262 (11th Cir. 2018). "In assessing whether an allegedly libelous statement is opinion, the court must construe the statement in its totality, examining not merely a particular phrase *1362 or sentence, but all of the words used in the publication." *Rasmussen* , 946 So. 2d at 571 (citing *Hay v. Indep. Newspapers, Inc.* , 450 So. 2d 293, 295 (Fla. 2d DCA 1984) ).

Finally, CNN challenges the sufficiency of Dershowitz' pleading of actual malice. *See New York Times Co. v. Sullivan* , 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) (public figure must prove actual malice to succeed in defamation case). Actual malice "should not be confused with the concept of malice as an evil intent or a motive arising from spite or ill will." *Masson v. New Yorker Mag., Inc.* , 501 U.S. 496, 500, 111 S.Ct. 2419, 115 L.Ed.2d 447 (1991). Rather, actual malice refers to "publication of a statement with knowledge of falsity or reckless disregard as to truth or falsity." *Id.* at 511, 111 S.Ct. 2419. To avoid dismissal of a defamation claim, a

public figure must plead facts sufficient to give rise to a plausible inference of actual malice. *Michel v. NY Post Holdings, Inc.* , 816 F.3d 686, 702 (11th Cir. 2016). The pleading standards of *Iqbal* and *Twombly* apply to a public figure's allegations of actual malice. *Id.*

III. <u>ANALYSIS</u>

The Court must first address those items that it considered in resolving this Motion. CNN included numerous exhibits with its Motion to Dismiss and argues the Court may properly consider all of them when deciding the Motion. The Court disagrees. At the 12(b)(6) stage, the court may consider the allegations in the complaint as well as documents incorporated into the complaint by reference and matters of which it may take judicial notice. *Lozman v. City of Riviera Beach* , 713 F.3d 1066, 1075 n.9 (11th Cir. 2013) (citations omitted). These items are incorporated by reference in the Complaint and are properly considered at the motion to dismiss stage:

  • CNN footage of the impeachment trial aired on January 29, 2020 (DE [17-6], ex. A);

  • Transcript and footage of the January 29, 2020, episode of the program Erin Burnett Outfront (DE [17-6], ex. B);

  • Transcript and footage of the January 20, 2020, episode of the program New Day (DE [17-6], ex. C); and

  • Paul Begala article "Presenting the Ludicrous 'Dershowitz Doctrine' " published January 29, 2020 on cnn.com (DE [17-6], ex. D)

In addition, the court may take judicial notice of Congressional Record of January 29, 2020 (DE [17-1]). *See Coastal Wellness Centers, Inc. v. Progressive American Ins. Co.* , 309 F. Supp. 3d 1216, n.4 (S.D. Fla. 2018) ("The Court may take judicial notice of government publications and website materials."). The remaining items[4] – transcripts of shows broadcast by other media outlets, transcripts of interviews given by Dershowitz on January 30 and 31, 2020, and a copy of Dershowitz' book *Defending the Constitution* – fall outside the pleadings. "The clear rule in this Circuit is that consideration of material falling outside the pleadings converts a motion to dismiss into one for summary judgment. And in doing so, the judge must give notice to the parties and allow them 10 days in which to supplement the record." *Michel* , 816 F.3d at 701. The Court declines to 1363 make that conversion and, therefore, has only considered those items referenced in the Complaint.*1363  A. <u>Fair Report Privilege</u>

    4  These items are attached to CNN's Motion to Dismiss (DE [17]) at DE [17-2]; [17-3]; [17-4]; [17-5]; [17-6], ex. E; and [17-6], ex. D.

CNN argues that its airing of verbatim statements that Dershowitz made on the floor of the United States Senate is unquestionably protected by the fair report privilege. *See Woodard* , 616 So. 2d at 502 ("The news media has been given a qualified privilege to accurately report on the information they receive from government officials."). "The fair report privilege is news media's qualified privilege 'to report accurately on information received from government officials.' " *Folta v. New York Times Co.* , 2019 WL 1486776, at *2 (N.D. Fla. 2019) (quoting *Rasmussen* , 946 So. 2d at 570-71 ). Clearly, a public broadcast concerning the impeachment trial of the President of the United States triggers the fair report privilege.

*Dershowitz v. Cable News Network, Inc.*    541 F. Supp. 3d 1354 (S.D. Fla. 2021)

The next issue is whether the fair report privilege applies to CNN's broadcasts. The fair report privilege applies "[i]f the report of a public official proceeding is an accurate or a fair abridgment." *Folta* , 2019 WL 1486776, at *2 (quoting *Woodard* , 616 So. 2d at 502 ). CNN argues that it played a verbatim clip of Dershowitz' actual words spoken during a high-level government proceeding and, therefore, the fair report privilege applies. *See Jamason v. Palm Beach Newspapers, Inc.* , 450 So. 2d 1130, 1132 (Fla. 4th DCA 1984) ("accurate report of judicial proceeding" entitled to fair report privilege). Dershowitz does not dispute that the privilege would probably apply if CNN had merely played the truncated clip without further comment. But that is not Dershowitz' claim. The one-count Complaint alleges that the truncated clip was part of "a deliberate scheme to defraud" CNN's audience (DE [1], ¶ 11) that enabled Lockhart, Berman, and Begala to present Dershowitz's comments in a defamatory manner. Thus, for purposes of applying the fair report privilege the Court must consider the broadcasts and the clip as a whole and not as separate claims. And the question is whether CNN's broadcasts presented an accurate or fair abridgment of Dershowitz' comments to the Senate. To answer this, we must look to the source documents. *Folta* , 2019 WL 1486776, at *4 ("Determining whether a report is fair and accurate requires a close comparison of the report and the documents and information from which it is drawn."); *Stewart v. Sun Sentinel Co.* , 695 So. 2d 360, 362 (Fla. 4th DCA 1997) (comparing defamatory information with official documents for "material differences" that would defeat the fair report privilege).

During the impeachment trial, Senator Ted Cruz submitted a question for Dershowitz to answer: "As a matter of law, does it matter if there was a quid pro quo? Is it true that quid pro quos are often used in foreign policy?" *Congressional Record* , 166:19 (Jan. 29, 2020), p. S650. (DE [17-1], p. 7). Dershowitz answered at length and gave several hypotheticals of quid pro quo that he considered would be lawful. At several points in his response, Dershowitz stated that a quid pro quo that is unlawful would be one based on an illegal motive. These points are highlighted below:

> I offered you a hypothetical the other day: What if a Democratic President were to be elected and Congress were to authorize much money to either Israel or the Palestinians and the Democratic President were to say to Israel "No; I am going to withhold this money unless you stop all settlement growth" or to the Palestinians "I will withhold the money Congress authorized to you unless you stop paying terrorists, and the President said "Quid pro quo. If you don't do it, you don't get the money. If you do it, you get the money"? There is no one in this Chamber who would regard that as in any way unlawful. *The only thing that would make a quid pro quo unlawful is that if the quo were in some way illegal.*

1364*1364

Now, we talked about motive. There are three possible motives that a political figure can have: One, a motive in the public interest, and the Israel argument would be in the public interest; the second is in his own political interest; and the third, which hasn't been mentioned, *would be in his own financial interest, just putting money in the bank.* I just want to focus on the second one for just one moment.

Every public official whom I know believes that his election is in the public interest. Mostly, you are right. Your election is in the public interest. If a President does something which he believes will help him get elected – in the public interest – that cannot be the kind of quid pro quo that results in impeachment....

Everybody has mixed motives, and for there to be a constitutional impeachment based upon mixed motives would permit almost any President to be impeached.

How many Presidents have made foreign policy decisions after checking with their political advisers and their pollsters? If you are just acting in the national interest, why do you need pollsters? Why do you need political advisers? Just do what is best for the country. But if you want to balance what is in the public interest with what is in your party's electoral interest and in your own electoral interest, it is impossible to discern how much weight is given to one or the other.

Now, we may argue that it is not in the national interest for a particular President to get reelected or for a particular Senator or Member of Congress – and maybe we are right; it is not in the national interest for everybody who is running to be elected – but for it to be impeachable, you would have to discern that he or she made a decision solely on the basis of, as the House managers put it, corrupt motives, and *it cannot be a corrupt motive if you have a mixed motive that partially involves the national interest, partially involves electoral, and does not involve personal pecuniary interest.*

The House managers do not allege that this decision, this quid pro quo, as they call it – and the question is based on the hypothesis that there was a quid pro quo. I am not attacking the facts. *They never allege that it was based on pure financial reasons. It would be a much harder case.*

If a hypothetical President of the United States said to a hypothetical leader of a foreign country: Unless you build a hotel with my name on it and unless you give me a million-dollar kickback, I will withhold the funds. *That is an easy case. That is purely corrupt and in the purely private interest.*

But a complex middle case is: I want to be elected. I think I am the greatest President there ever was, and if I am not elected the national interest will suffer greatly. That cannot be.

*Congressional Record* 166:19 (Jan. 29, 2020) pp. S650-51 (emphasis added). (DE [17-1], pp. 7-8).[5]

[5] CNN argues that the paragraph breaks in the Congressional Record signify that Dershowitz is "manipulat[ing] his Senate arguments by merging together *three* separate paragraphs from the Congressional Record to make it appear as one thought." (DE [24], p. 5). The Court must consider the entirety of Dershowitz' remarks, and the editorial judgment of the Government Printing Office staff is not binding on this Court.

To compare Dershowitz' answer with the comments made by CNN's commentators, those comments are set forth again, below:

Having worked on about a dozen campaigns, there is always the sense that, boy, if we win, it's better for the country.

1365*1365

But that doesn't give you license to commit crimes or to do things that are unethical. So, it was absurd. What I thought when I was watching it was this is un-American. This is what you hear from Stalin. This is what you hear from Mussolini, what you hear from authoritarians, from Hitler, from all the authoritarian people who rationalized, in some cases genocide, based what was in the public interest." -- Joe Lockhart @ 7:11 p.m., January 29, 2020.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

The president's defense team [Dershowitz] seems to be redefining the powers of the president, redefining them towards infinity." ... [truncated clip played] ... "If you look at what he says there it blows your mind. He says if a president is running for re-election because he thinks getting elected will help America, he can do anything, anything. And that redefines the presidency and America." -- John Berman @ 6:17 a.m., January 30, 2020.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

I did not go to Harvard Law, but I did go to the University of Texas School of Law, where I studied criminal law and constitutional law, but never dreamed a legendary legal mind would set them both ablaze on the Senate floor. The Dershowitz Doctrine would make presidents immune from every criminal act, so long as they could plausibly claim they did it to boost their re-election effort. Campaign finance laws: out the window. Bribery statutes: gone. Extortion: no more. This is Donald Trump's fondest figurative dream: to be able to shoot someone on Fifth Avenue and get away with it." -- Paul Begala on CNN.com, January 29, 2020 @ 9:11 p.m.

Dershowitz alleges he never said a president could commit illegal acts if he thought it would help his reelection and his reelection was in the public interest. (DE [1], ¶ 8). And he alleges that CNN, through its employee commentators, distorted the meaning of what he said to the Senate in the coverage on CNN.com and the two broadcasts. (DE [1], ¶ 10, 11). Dershowitz contends that by omitting the phrase, "the only thing that would make a quid pro quo unlawful is if the quo were somehow illegal," CNN presented Dershowitz' comments in a misleading context, which enabled the commentators to (falsely) assert that Dershowitz believed a president could extract a quid pro quo for any reason, including an illegal reason, if he believed it would help his re-election. Dershowitz alleges that if the entire clip had been played, no panel guest would have been able to credibly make that statement. (DE [1], ¶ 9). Thus, Dershowitz argues, CNN presented an official proceeding in a misleading manner and the fair report privilege does not apply.

The Court agrees. CNN presented an abridgment of Dershowitz' answer to Senator Cruz' question. The abridgment is not accurate, to the extent that it omitted a crucial qualification: that an illegal motive for a quid pro quo would be corrupt. As a result, the commentators' statements – that Dershowitz believes a President can do anything, even commit crimes if it would help his re-election – are not based upon a fair and accurate summary of Dershowitz' statement to the Senate.

CNN argues that editors and publishers have great discretion to determine what information to publish. This is correct. But the qualified fair report privilege "merely means that the report of [official] proceedings must be correct." *Jamason* , 450 So. 2d at 1132 (quoting *Walsh v. Miami Herald Publishing Co.* , 80 So. 2d 669, 671

1366(Fla. 1955) ).*1366  CNN argues that Dershowitz' response to Senator Cruz' statement was ambiguous and that CNN was reasonable in its belief that Dershowitz argued "that presidents cannot be impeached for actions taken to win an election if the President believes his own victory would be in the public interest, regardless of the legality of those actions." (DE [17], p. 14). That is an argument that CNN may present to a jury. But because the broadcasts did not present a fair and accurate abridgment of Dershowitz' remarks, CNN cannot avail itself of the fair report privilege.

Finally, CNN argues that the media has no obligation to present additional information that would present a subject in a better light. This too is correct. *See Folta* , 2019 WL 1486776, at *5 (media has "the right to focus and color their report to capture and hold the readers' attention" provided the report is "substantially accurate"). Thus, in *Larreal v. Telemundo of Florida, LLC* , 489 F. Supp. 3d 1309 (S.D. Fla. 2020), the fair report privilege applied to a report that the plaintiff was arrested during a raid conducted as part of a long-term undercover narcotics investigation. The Telemundo report was one about the undercover raid and arrests. *Id.* The plaintiff sued Telemundo for defamation and alleged it omitted information that would have clarified that he was arrested on a traffic-related warrant. The court stated that "regardless of the charges against the other individuals, the fact that Larreal was arrested on a bench warrant alone does not rebut or undermine Telemundo's accurate reporting about the operation's arrests or change the gist of the story." *Id.* at *1322.

By contrast, the CNN broadcast segments set forth in Dershowitz' Complaint were focused specifically on Dershowitz' comments to the Senate and, as presented on air, changed the gist of what Dershowitz said. For the fair report privilege to apply a defendant must have "presented a fair and accurate report of the source documents." *Folta* , 2019 WL 1486776, at *6. The CNN broadcasts do not meet that standard.

B. Fact v. Opinion

CNN's next ground for dismissal is that the allegedly defamatory statements were non-actionable opinion. CNN argues that the statements at issue were made during commentary shows about the impeachment proceedings and were "rhetorical hyperbole" protected by the First Amendment. *See Horsley v. Rivera* , 292 F.3d 695, 701 (11th Cir. 2002) (holding non-literal, figurative language not defamatory). Thus, CNN argues that statements referring to Dershowitz' arguments as "un-American," that he was "redefining the powers of the President," that his position "blows your mind," and that his argument "is what you hear from Stalin ... what you hear from Mussolini, what you hear from authoritarians" are hyperbole for which there can be no liability.

Dershowitz agrees with CNN on the hyperbolic nature of the commentary and that no liability would attach to those kinds of statements. But he argues that the commentaries also contained untrue, defamatory factual comments – that Dershowitz said a President could do anything without liability (even commit crimes) if he thought it would help his reelection and was in the national public interest – that were contradicted by the full context of Dershowitz' answer to Senator Cruz' question. The Court concludes that the commentators' statements set forth in the Complaint were not pure opinion but instead were mixed expressions of opinion that could reasonably be construed as defamatory. *See Barnes v. Horan* , 841 So. 2d 472, 477 (Fla. 3rd DCA 2002)

1367(the court must determine whether an expression of opinion can also contain a defamatory *1367  meaning due to assertion of undisclosed acts).

A mixed expression of opinion is not constitutionally protected. *Madsen v. Buie* , 454 So. 2d 727, 729 (Fla. 1st DCA 1984). "[A] statement that although ostensibly in the form of an opinion 'implies the allegation of undisclosed defamatory facts as the basis for the opinion' *is* actionable." *Eastern Air Lines, Inc. v. Gellert* , 438 So. 2d 923, 927 (Fla. 3rd DCA 1983) *disapproved on other grounds* , *Ter Keurst v. Miami Elevator Co.* , 486 So. 2d 547 (Fla. 1986) (quoting Restatement (Second) of Torts § 566 (1977) ) (emphasis in original). Further, "where the speaker or writer neglects to provide the audience with an adequate factual foundation prior to engaging in the offending discourse, liability may arise." *Zambrano* , 484 So. 2d at 607. The Complaint alleges that CNN's broadcasts lacked the "adequate factual foundation" that would have prevented the commentators from mischaracterizing Dershowitz' argument. The Court concludes that the Complaint plausibly alleges that the comments made on CNN and CNN.com were defamatory statements of mixed opinion.

CNN argues that because the impeachment trial was widely covered by it and other media outlets, the underlying facts were "known to the audience" and, therefore, a finding of pure opinion may still be made. *Id.* at 606-07 ; *Rasmussen* , 946 So. 2d at 571. The court must consider numerous factors in determining whether a comment or editorial is based upon publicly disclosed facts. *Rasmussen* , 946 So.2d at 571. These include construing "the statement in its totality," considering "the context in which the statement was published," and accounting for "all of the circumstances surrounding the publication, including the medium by which it was disseminated and the audience to which it was published." *Id.* Although some of these factors are alleged in the Complaint or are available to the Court at the motion to dismiss stage, other factors relating to the context of the broadcasts and its audience are not before the Court. This requires a more fully developed record. At this stage, the Court concludes that Dershowitz' Complaint meets the plausibility standard for alleging a false statement of fact.

C. <u>Actual Malice</u>

CNN next moves to dismiss the Complaint for failure to plausibly allege the "actual malice" standard of fault applicable to public figures as required by *New York Times Co.* , 376 U.S. 254, 84 S.Ct. 710. The plausibility standard of *Iqbal* and *Twombly* applies to the actual malice standard in defamation proceedings. *See Michel* , 816 F.3d at 702. A public figure must, therefore, plead "facts giving rise to a reasonable inference that the defendant[ ] published the story knowing that it was false or with reckless disregard for whether it was false or not." *Id.* at 703. There must be some showing that the defendant intended "to avoid the truth." *Id.*

CNN argues that Dershowitz pleads only conclusory statements of actual malice and fails to "home to" the person(s) responsible for the alleged defamation. *New York Times Co.* , 376 U.S. at 287, 84 S.Ct. 710 (The state of mind required for actual malice must be "brought home" to the persons having responsibility for publishing the offending material). CNN also argues that it aired live Dershowitz' complete argument earlier in the day and, therefore, it is impossible for Dershowitz to plead actual malice with connection to the later showing of the 1368 truncated clip.[6] *1368 Finally, CNN argues that Dershowitz' statement to the Senate was so ambiguous that any misinterpretation by CNN cannot be attributed to actual malice.

[6] The Court will not (at this time) entertain CNN's arguments concerning Dershowitz' subsequent appearances on shows with Wolf Blitzer and Chris Cuomo as those matters are outside the four corners of the Complaint.

In deciding a motion to dismiss, the court must accept as true the plaintiff's well-pleaded facts and construe them in the light most favorable to the plaintiff. *Crawford's Auto Center, Inc. v. State Farm Mut. Auto. Ins. Co.* , 945 F.3d 1150 (11th Cir. 2019). Dershowitz alleges that, after the live broadcast, "CNN then went to work by assembling panels for programming throughout the day in which the hosts shared" only the truncated clip. (DE [1], ¶ 8). He alleges that CNN intentionally omitted the statement that a quid pro quo would be unlawful if the

quo were illegal in order to "fool its viewers" into believing that Dershowitz actually said that a President could commit illegal acts so long as he thought it would help his reelection and that his reelection was in the public interest. (*Id.* ). This was done, he alleges, "to falsely paint Professor Dershowitz as a constitutional scholar and intellectual who had lost his mind." (*Id.* ). He alleges that CNN knew for certain that he had prefaced his remarks with the qualifier that a quid pro quo could not include an illegal act because it aired the entire statement earlier in the day, but that CNN knowingly omitted that portion when it played the truncated clip "time and again." (*Id.* , ¶¶ 9, 10). He alleges that the truncated clip was created "intentionally and deliberately with knowledge and malice to facilitate its ability to falsely claim that plaintiff said the opposite of what he actually said." (*Id.* , ¶ 18). And, finally, Dershowitz alleges that commentators made their statements with knowledge or reckless disregard that they were false. (*Id.* , ¶ 17).

These allegations, for purposes of surviving the Motion to Dismiss, plausibly plead a factual basis from which "actual malice" can be inferred. The Complaint alleges that CNN knew its reports were false, it explains the reasons CNN and its employees knew the reports were false, it explains the nature of the alleged falsehoods, and it alleges who made the false statements.

To the extent that the Complaint does not identify with specificity the persons (other than the commentators) within the CNN organization who were responsible for the broadcast decisions, that is a matter for discovery. The Court does not accept CNN's argument that a public figure defamation plaintiff must identify and plead (before discovery) each responsible decision maker within a news organization. The claims in *New York Times Co.* , 376 U.S. 254, 84 S.Ct. 710, went to a jury trial but the plaintiff ultimately failed to establish that the persons responsible for publication of the offending advertisement acted with actual malice. *Id.* at 287, 84 S.Ct. 710. In a case involving a large news organization where the responsible decision makers may not be otherwise known, a plaintiff must be permitted to plead the facts that would plausibly establish actual malice without identifying a specific person. It is then the plaintiff's burden to conduct the discovery necessary to identify and, to be successful, present record evidence that those individuals acted with actual malice. *See, id.* ("[T]he evidence against the Times supports at most a finding of negligence ... and is constitutionally insufficient to show the recklessness that is required for a finding of actual malice.")

CNN cites the district court's dismissal in *Mejia v. Telemundo Mid-Atl., LLC* , 440 F. Supp. 3d 495, 497 (D. Md. 2020), for support of its argument that Dershowitz was required to plead that a specific individual acted with actual malice. But *Mejia* is inapposite. That case involved a private figure whose punitive damages claim required *1369 allegations that the defamer acted with actual malice. *Id.* at 499. The case was dismissed because the plaintiff failed to allege any facts that would establish the requisite fault (negligence). *Id.* at 501-502. The court's reference to actual malice, that the complaint contained "no factual allegations referring to the state of mind of the individual in charge of Defendant's banners," referred to the punitive damages claim.[7] *Id.* at 499, 502. *Mejia* has no bearing on the present case.

[7] In a later decision, the *Mejia* court granted leave to file a third amended complaint where the proposed pleading raised additional factual allegations sufficient to raise a plausible claim that the defendant acted negligently in allowing the false banner to be broadcast. The third amended complaint did not specify a particular individual. *Mejia v. Telemundo Mid-Atlantic LLC* , 2021 WL 594215, at *3 (D. Md. Feb. 16, 2021).

Next, the fact that CNN played Dershowitz' entire statement earlier in the day does not preclude Dershowitz from alleging that later broadcasts of the truncated clip (and the related commentary) were done with actual malice. Viewers who watched the earlier broadcasts may well have been able to put the truncated clip and the commentators' statements into context. But for those viewers who did not see the earlier broadcasts,

Dershowitz' Complaint about the later broadcasts at least reaches the required level of plausibility to sustain his defamation claim. The earlier broadcasts and their effect on the issue of actual malice may be an issue for a jury to consider, but they have no bearing on the sufficiency of the pleadings.

Finally, CNN argues that Dershowitz' answer to the Senator Cruz' question was so "extravagantly ambiguous" that Dershowitz cannot establish that CNN acted with actual malice in airing the clip or discussing his arguments. Citing *Time, Inc. v. Pape* , 401 U.S. 279, 91 S.Ct. 633, 28 L.Ed.2d 45 (1971), CNN contends that its commentators' analysis of Dershowitz' argument, even if incorrect, cannot create an issue of actual malice.

In *Pape* , the newsmagazine Time published an article about a report issued by the federal Civil Rights Commission. The report detailed numerous incidents of police brutality, including an incident in Chicago that gave rise to a federal lawsuit. But the Time article did not specify that the facts about the Chicago incident were taken from a civil complaint, rather than from an independent finding of the Commission. A police officer named in the report sued Time for defamation, and the issue was whether omission of the word "allegedly" from the Time account was enough to establish actual malice. The trial court entered a directed verdict in favor of the defendant, but the court of appeals reversed. The author of the Time article testified at trial that the context of the report indicated to him that the Commission believed that the incident occurred as described. After reviewing the totality of the underlying report *and the testimony of the Time writer* , the Supreme Court concluded that "[t]o permit the malice issue to go to the jury because of the omission of a word like 'alleged,' despite the context of that word in the Commission Report and the external evidence of the Report's overall meaning, would be to impose a much stricter standard of liability on errors of interpretation or judgment than on error of fact." *Id.* at 290, 91 S.Ct. 633.

In the present case, the Court has before it only the allegations of the Complaint, which must be taken as true, and the substance of the broadcasts. Dershowitz has adequately pleaded actual malice to survive the Motion to Dismiss. Whether the evidence adduced will ultimately satisfy Dershowitz' burden of proving actual malice by 1370 clear and convincing evidence *1370 remains to be seen. But he has alleged enough to go forward.

## IV. POLITICAL MALEVOLENCE

In a footnote, CNN argues that Dershowitz' "claims of disinterested political malevolence are insufficient" to establish actual malice. The Court agrees and, further, concludes that these allegations should be stricken as immaterial and impertinent. Fed. R. Civ. P. 12(f). In paragraph 14 of the Complaint, Dershowitz alleges:

> Professor Dershowitz was one of the most revered and celebrated legal minds of the past half century. His reputation relating to his expertise in criminal and constitutional matters was one that lawyers would only dream about attaining in their lifetimes. However, Professor Dershowitz appears to have made one mistake. He chose to defend the President of the United States and defend the U.S. Constitution at a moment in time where CNN has decided that doing so is not permitted. For this, CNN set out to punish him and destroy his credibility and reputation, and unfortunately, succeeded.

The Supreme Court has stated that "[a defendant's] motive in publishing a story ... cannot provide a sufficient basis for finding actual malice." *Harte-Hanks Communications., Inc. v. Connaughton* , 491 U.S. 657, 665, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989). Indeed, a defamation claim cannot rest on the argument that "erroneous communications were motivated by differences in political opinions. Doing so would run afoul of the Supreme Court's landmark ruling in *New York Times Co. v. Sullivan* . *See* 376 U.S. at 271–72, 84 S.Ct. 710 (noting that errors are inevitable when there is free debate and that they too must be protected to give breathing room to those exercising their freedom of expression)." *Arpaio v. Robillard* , 459 F. Supp. 3d 62, 66 (D.D.C. 2020).

Paragraph 14 of Dershowitz' Complaint alleges that CNN was motivated by political animus. As Judge Lamberth noted in *Arpaio* , "Allegations of 'leftist enmity' cannot trump the guarantees of the First Amendment." *Id.* "Striking a pleading or a portion thereof is a drastic remedy to be resorted to only when required for the purposes of justice." *Sanchez v. Selective Ins. Co. of the Southeast* , 2019 WL 79282, at *2 (S.D. Fla. Jan. 2, 2019) (quotation omitted). Nevertheless, the allegations in paragraph 14 are immaterial to the claim and are an impertinent salvo that do not belong in this case. Rule 12(f)(1), Fed. R. Civ. P., gives the Court the power to strike such matters "on its own." *Sanchez* , at *3 (*sua sponte* striking plaintiff's request for interest). The Court will exercise that power and strike paragraph 14 from the Complaint.

V. CONCLUSION

For the reasons set forth above, the Court finds that Dershowitz has plausibly alleged facts sufficient to withstand CNN's Motion to Dismiss. The Court is in no way ruling on the merits of the case but concludes merely that Dershowitz has satisfied the pleading requirements of Rule 8(a)(2), Federal Rules of Civil Procedure. Accordingly, it is hereby

**ORDERED AND ADJUDGED** that Defendant's Motion to Dismiss (DE [17]) is **DENIED** . It is further **ORDERED** that paragraph 14 of Plaintiff's Complaint is **STRICKEN** pursuant to Fed. R. Civ. P. 12(f)(1).

**DONE AND ORDERED** in Chambers, Fort Lauderdale, Florida, this 24th day of May 2021.

 casetext