## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

PATRICK NATHANIEL REED,

                Plaintiff,

v.

SHANE RYAN, *et al*

                Defendants.

**Case No: 3:22-cv-01181-TJC-PDB**

PATRICK NATHANIEL REED,

                Plaintiff

          v.

BRANDEL EUGENE CHAMBLEE, et al

                Defendants.

**Case Number: 3-22-CV-01059-TJC-PDB**

### NOTICE OF APPEAL

Plaintiff Patrick Nathaniel Reed ("Mr. Reed") hereby appeals to the U.S. Court of Appeals for the Eleventh Circuit the District Court's (1) September 27, 2023 Order dismissing all of Mr. Reed's counts, Exhibit 1,  (2) January 5, 2024 Order denying Mr. Reed's Motions for Recusal, denying Mr. Reed's Motions for Reconsideration, and granting Motion for Anti-SLAPP fees, Exhibit 2, and all

other opinions and orders adverse to Mr. Reed in both of the captioned cases above.

Dated: January 8, 2024

Respectfully submitted,

By: */s/ Larry Klayman* _____
Larry Klayman, Esq.
Florida Bar No.: 246220
Klayman Law Group P.A.
7050 W. Palmetto Park Rd
Boca Raton, FL, 33433
Tel: 561-558-5536
leklayman@gmail.com

*Counsel for Patrick Nathaniel Reed*

## CERTIFICATE OF SERVICE

I, Larry Klayman, hereby certify that on this day, January 8, 2024, I electronically filed the foregoing with the Clerk of Court using the Court's ECF procedures. I also certify that the foregoing document is being served this day on all counsel of record through the Court's eservice procedures.

*/s/ Larry Klayman* _____

# EXHIBIT 1

# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# JACKSONVILLE DIVISION

PATRICK NATHANIEL REED,

      Plaintiff,

v.

BRANDEL EUGENE CHAMBLEE,
TGC, LLC, DAMON HACK,
BENJAMIN SHANE BACON,
EAMON LYNCH, GANNETT CO.,
INC., GANNETT SATELLITE
INFORMATION NETWORK, LLC,
CONDE NAST INTERNATIONAL,
INC., and ZACH HELFAND,

      Defendants.

Case No. 3:22-cv-1059-TJC-PDB

_____

PATRICK NATHANIEL REED,

      Plaintiff,

v.

SHANE RYAN, HACHETTE BOOK
GROUP, INC., DOUG FERGUSON,
THE ASSOCIATED PRESS, FOX
SPORTS, INC., NYP HOLDINGS,
INC., GAVIN NEWSHAM,
BLOOMBERG L.P., and ERIK
LARSON,

      Defendants.

Case No. 3:22-cv-1181-TJC-PDB

_____

# O R D E R

These cases involve professional golfer Patrick Reed's attempt to bring defamation claims against numerous publishers, writers, golf commentators, and media outlets. His Amended Complaints reference over 50 different allegedly defamatory statements. However, many of the statements are not about Reed. Some statements are about LIV Golf, of which Reed is a member, but not specifically about Reed. Others are matters of opinion or permissible rhetorical hyperbole. Still others are statements of fact, the truth of which are not challenged. And Reed does not meet the required pleading of actual malice to hold the press liable for defamation. While Reed may be frustrated at the negative media coverage he receives (some of which seems over the top), under Florida law and the First Amendment, Reed fails to bring actionable defamation claims and his cases therefore must be dismissed.[1]

---

[1] Before the Court are seven motions to dismiss attacking Reed's Amended Complaints filed in each lawsuit: <u>Reed v. Chamblee, et al.</u> (3:22-cv-1059) ("Reed I") and <u>Reed v. Ryan, et al.</u> (3:22-cv-1181) ("Reed II"). (Docs. 35, 38, 62 in 3:22-cv-1059; 33, 36, 50, 65 in 3:22-cv-1181). Reed responded to each motion. (Docs. 45, 46, 81 in 3:22-cv-1059; 42, 43, 67, 74 in 3:22-cv-1181). Several replies followed. (Docs. 51, 59 in 3:22-cv-1181). The Court held an omnibus hearing in Reed I and II on July 31, 2023, the record of which is incorporated by reference. (Docs. 87 in 3:22-cv-1059; 80 in 3:22-cv-1181). Several parties filed post-hearing briefing too. (Docs. 89, 90 in 3:22-cv-1059; 83 in 3:22-cv-1181).

## I.   ALLEGED FACTS

Reed is an accomplished professional golfer. (Docs. 28 ¶ 14 in 3:22-cv-1059; 27 ¶ 19 in 3:22-cv-1181). With a career consisting of nine PGA Tour Tournament wins, including the 2018 Masters, and a ranking of sixth in the Official World Golf Ranking as late as 2020—Reed has been and remains at the forefront of the professional golf world. Id. After almost ten years with the PGA Tour, in June 2022, Reed and the PGA Tour parted ways. (Docs. 28 ¶¶ 15, 37 in 3:22-cv-1059; 27 ¶¶ 20, 21 in 3:22-cv-1181). Reed then signed with LIV Golf. Id.

The allegations in Reed I emerge from media coverage of the tension between the PGA Tour and LIV Golf, which were "primary competitors" when Reed joined LIV. (See Docs. 28 ¶ 20 in 3:22-cv-1059; 27 ¶ 25 in 3:22-cv-1181). Reed sues several sports analysts and commentators who cover golf events, including Brandel Chamblee, Damon Hack, Benjamin Shane Bacon, and Eamon Lynch. (Doc. 28 ¶ 49 in 3:22-cv-1059). He similarly sues publishers and media companies who published articles regarding LIV or Reed's relationship with LIV, including TGC, LLC ("Golf Channel"), Gannett Satellite Information Network, LLC ("Golfweek"), Gannett Co., Inc. ("Gannett"), Conde Nast International, Inc. ("New Yorker"). See id. ¶ 50. Reed also tags Zach Helfand as a Defendant, who wrote one article in the New Yorker. (See Doc. 28 ¶ 116 in 3:22-cv-1059). Reed alleges these Defendants each conspired with the PGA Tour to jointly engage in "anti-competitive actions against golfers who participated

in LIV tournaments" around the time "the Commissioner Jay Monahan and the PGA Tour" "constructively terminated" him from the Tour.[2] (Docs. 28 ¶¶ 15, 16, 28–37 in 3:22-cv-1059; 27 ¶¶ 21, 24–50 in 3:22-cv-1181). In this effort against Reed after he signed with LIV Golf, each Defendant allegedly defamed him. (Docs. 28 ¶ 38 in 3:22-cv-1059; 27 ¶ 51 in 3:22-cv-1181).

In Reed II, Reed pleads the same alleged conspiracy between Defendants and the PGA Tour, but the allegations largely arise from publications about Reed's career before he played for LIV. (See Doc. 27 in 3:22-cv-1181). For example, the Reed II Amended Complaint identifies numerous statements made in a book, The Cup They Couldn't Lose: America, the Ryder Cup, and the Long Road to Whistling Straits, wherein the author described several accusations regarding Reed's gamesmanship throughout different moments in Reed's career. Id. ¶¶ 67–86. However, Reed also pleads defamation published by others regarding his career, including a few statements about LIV. See id. ¶¶ 113–122. He sues writers Shane Ryan, Doug Ferguson, Gavin Newsham, and Erik Larson, along with publishers Hachette, Associated Press, Fox Sports, NYP Holdings, Inc. ("the New York Post"), and Bloomberg L.P. See id. ¶¶ 67–122.

---

[2] For clarity, the PGA Tour is not a party in Reed I or II, and Reed brings no employment or conspiracy claims.

Across both suits, Reed identifies at least fifty defamatory statements in the Amended Complaints. The statements range from reporting on golf events that Reed participated in, commentary on his affiliation with LIV, and criticism of LIV generally, including its financial support from the Public Investment Fund of Saudi Arabia. Before filing suit, Reed requested a correction or retraction of statements from all of the Defendants, none of whom did so. (Docs. 28 ¶ 133 in 3:22-cv-1059; 27 ¶ 122 in 3:22-cv-1181).

As a result of these statements, Reed alleges he suffers personal attacks by unnamed individuals and a hostile workplace. (Doc. 28 ¶¶ 130–31 in 3:22-cv-1059; 27 ¶¶ 120–21 in 3:22-cv-1181). Reed retains security guards for himself and his family when in public and at LIV Golf tournaments. (Doc. 28 ¶ 132 in 3:22-cv-1059). He also alleges this conduct has caused him the loss of numerous prospective sponsorships and business opportunities with various companies, including sponsorships from corporate partners of the PGA Tour. (Docs. 28 ¶¶ 17, 18 in 3:22-cv-1059; 27 ¶¶ 22, 23 in 3:22-cv-1181).

## II.   PROCEDURAL MATTERS

### a.  Fed. R. Civ. P. 8 – Short and Plain Statement

Reed filed both suits in the latter half of 2022. (See Docs. 1 in 3:22-cv-1059; 1 in 3:22-cv-1181). After initially curing jurisdictional issues in Reed I (Docs. 14, 24 in 3:22-cv-1059), the Court sua sponte dismissed the complaints in each suit as shotgun pleadings and for deficiencies under Federal Rule of

Civil Procedure 8(a). (See Docs. 27 in 3:22-cv-1059; 25 in 3:22-cv-1181). In both Orders, the Court noted that each complaint was "neither short nor plain," and instructed Reed to bring claims only supported in law. Id. However, Reed declined to heed these instructions. Although he trimmed six counts from each of his forty-two-count complaints, the Amended Complaints are longer and span over ninety pages apiece against numerous defendants with few substantive changes. (Compare Doc. 1 with Doc. 28 in 3:22-cv-1059; compare Doc. 1 with Doc. 27 in 3:22-cv-1181). Reed's disregard of the Court's Orders—and FED. R. CIV. P. 8's requirements—notwithstanding, the Court has determined to address the substance of Reed's claims.

### b. FED. R. CIV. P. 4 – Service of Process

Reed has faced challenges serving certain Defendants in both suits. In Reed I, Reed attempted to serve Helfand five times, but remains unsuccessful and claims Helfand evades service. (See Docs. 59, 60 in 3:22-cv-1059). In Reed II, Reed still has not served Defendant Newsham who resides in the United Kingdom. (Doc. 52 in 3:22-cv-1181). On April 24, 2023, Reed requested additional time to serve Helfand and Newsham, which the Court granted, but Reed never reported back about his efforts.[3] (See Docs. 61 in 3:22-cv-1059; 54 in 3:22-cv-1181).

---

[3] Reed also served Fox Sports on November 14, 2022, but no counsel for Fox Sports appeared. (Doc. 52 in 3:22-cv-1181). Reed moved for clerk's default

If a plaintiff fails to properly serve a defendant within 90 days of the complaint's filing, "the court—on motion or on its own after notice to the plaintiff—must dismiss the action without prejudice . . . or order that service be made within a specified time." FED. R. CIV. P. 4(m). "But if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period." Id. Reed's action against Helfand is well past the 90 days provided and subject to dismissal. "Under Rule 4(m), a plaintiff has two avenues to expand the time for service: a mandatory extension based on 'good cause,' and a discretionary extension based on the factors outlined in Rule 4(m)'s advisory committee notes." Vu v. Ho, 756 F. App'x 881, 882–83 (11th Cir. 2018)[4] (citing Horenkamp v. Van Winkle & Co., 402 F.3d 1129, 1132–33 (11th Cir. 2005)). "Good cause exists only when some outside factor[,] such as reliance on faulty advice, rather than inadvertence or negligence, prevented service." Lepone-Dempsey v. Carroll Cnty. Com'rs, 476 F.3d 1277, 1281 (11th Cir. 2007) (quotation marks and citation omitted). Evasion of service is a factor for the Court's consideration in whether to exercise its discretion, but not a

---

against Fox Sports on August 29, 2023. (Doc. 82). Magistrate Judge Patricia D. Barksdale denied the motion without prejudice for failure to comply with Local Rule 1.08. (Doc. 84). He since filed a corrected motion. (Doc. 85).

[4] The Court does not rely on unpublished opinions as binding precedent; however, they may be cited when the Court finds them persuasive on a particular point. See McNamara v. GEICO, 30 F.4th 1055, 1060–61 (11th Cir. 2022).

consideration of whether good cause exists. <u>See Vu</u>, 756 F. App'x at 882–83; <u>Joe Hand Promotion, Inc. v. Koda</u>, No. 2:14cv623-MHT, 2014 WL 7408215, at *2 (M.D. Ala. Dec. 31, 2014).

Reed's counsel stated at the July 31, 2023 hearing that Helfand continues evading service despite Reed's repeated efforts and expense in attempting to serve him. (Doc. 87 at 91:17–92:10 in 3:22-cv-1059). The Court does not doubt Reed's service efforts, but he has proffered no reasons establishing good cause for extending the service deadline. After almost a year of litigation in Reed I and repeated extensions of the service deadline (<u>See</u> Docs. 54, 58), any further extension would unreasonably delay the suit's progress. Therefore, the Court declines to exercise its discretion to extend the service period and dismisses without prejudice Reed's claims against Defendant Helfand.

As for Newsham, Reed's counsel also claims he evades service in the United Kingdom. (Doc. 80 at 91:17–92:10 in 3:22-cv-1181). Because Newsham resides in a foreign country, FED. R. CIV. P. 4(m) does not apply to him. <u>See</u> FED. R. CIV. P. 4(m) ("This subdivision (m) does not apply to service in a foreign country under Rule 4(f), 4(h)(2), or 4(j)(1), or to service of a notice under Rule 71.1(d)(3)(A)."). The Eleventh Circuit has "not held in a published decision whether or what time constraints apply to service on foreign defendants" and circuits courts disagree "regarding what—if any—time limits apply[.]" <u>Harris v. Orange S.A.</u>, 636 F. App'x 476, 485 (11th Cir. 2015). The Eleventh Circuit

noted that most courts apply a "flexible due diligence" standard for determining when delay should be excused and held that a plaintiff's complaint may be dismissed upon a showing he failed to exercise diligence in attempting to effectuate service on a foreign defendant. Id. at 485–86.

The Court imposed the service deadline for Newsham and extended it twice. (See Docs. 48, 54, 69 in 3:22-cv-1181). After the Court's first deadline, Reed reported that because Newsham lived in the United Kingdom "service is not assured and if necessary he will be voluntarily dismissed out with the case continuing against his employer the New York Post if necessary." (Doc. 52 in 3:22-cv-1181). The Court then extended the deadline, and Reed again reported that service upon Newsham was "especially challenging because he lives in the United Kingdom" and requested twenty additional days for service. (Docs. 54, 66 in 3:22-cv-1181). The Court extended the deadline again and Reed did not report on his service efforts until the July 31, 2023 hearing when the Court inquired. (Doc. 69 in 3:22-cv-1181). Reed's counsel only noted that Newsham "evaded service." (Doc. 80 at 91:23–92:9 in 3:22-cv-1181). Having provided Reed several extensions and receiving little information about his service efforts, Reed has not exercised due diligence in serving Newsham and no more delay is necessary. Therefore, the Court dismisses without prejudice Reed's claims against Defendant Newsham.

On one last service issue: in Reed I, the New Yorker contends Reed served the wrong entity. (Doc. 62 at 8–9 in 3:22-cv-1059). Reed served Conde Nast International, Inc., but the New Yorker contends this entity has not existed since 2021. Id. Reed having failed to complete proper service on the entity that published the subject article, the New Yorker argues this Court lacks personal jurisdiction over it. Id. Reed does not meaningfully respond to this argument. (Doc. 81 at 2 n.1 in 3:22-cv-1059). He therefore concedes it. See Guzman v. City of Hialeah, No. 15-23985-CIV-GAYLES, 2016 WL 3763055, at *3 (S.D. Fla. July 14, 2016) ("A plaintiff who, in her responsive brief, fails to address her obligation to object to a point raised by the defendant implicitly concedes that point."); see also Chapman v. Abbott Lab'ys., 930 F. Supp. 2d 1321, 1325 (M.D. Fla. Mar. 14, 2013); Covington v. Arizona Beverage Co., LLC, No. 08-21894-CIV-SEITZ/O'SULLIVAN, 2009 WL 10668916, at *6 (S.D. Fla. Sept. 11, 2009). The claims against the New Yorker are dismissed.[5]

---

[5] With Helfand and the New Yorker dismissed, the Court need not analyze the one alleged defamatory statement in the article written by Helfand and published by the New Yorker. (See Doc. 28 ¶¶ 116–17 in 3:22-cv-1059). Assuming arguendo either Defendant should remain in the lawsuit, the Court notes that the purported statement, which involves a quotation from a Tweet reading "LIV needs a public investment fund to sportswash its association with Patrick Reed," likely is non-actionable. Id. On its face, the statement—though harsh—reflects a negative opinion of Reed. As discussed further below, pure opinions cannot provide the basis for a defamation claim. See Fortson v. Colangelo, 434 F. Supp. 2d 1369, 1378 (S.D. Fla. 2006).

## c. Personal Jurisdiction – Larson

In Reed II, Defendant Larson challenges the Court's personal jurisdiction over him. (Doc. 65 in 3:22-cv-1181). "A plaintiff seeking to establish personal jurisdiction over a nonresident defendant 'bears the initial burden of alleging in the complaint sufficient facts to make out a prima facie case of jurisdiction.'" Louis Vuitton Malletier, S.A. v. Mosseri, 736 F.3d 1339, 1350 (11th Cir. 2013) (quoting United Techs. Corp. v. Mazer, 556 F.3d 1260, 1274 (11th Cir. 2009)). "A federal court sitting in diversity jurisdiction undertakes a two-step inquiry in determining whether personal jurisdiction exists: the exercise of jurisdiction must (1) be appropriate under the state long-arm statute and (2) not violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution." United Techs. Corp., 556 F.3d at 1274 (citations omitted).

"A defendant can be subject to personal jurisdiction under the Florida long-arm statute in two ways[.]" Schulman v. Inst. for Shipboard Educ., 624 F. App'x 1002, 1004 (11th Cir. 2015).

> [F]irst, section 48.193(1)(a) lists acts that subject a defendant to specific personal jurisdiction—that is, jurisdiction over suits that arise out of or relate to a defendant's contacts with Florida, Fla. Stat. § 48.193(1)(a); and second, section 48.193(2) provides that Florida courts may exercise general personal jurisdiction—that is, jurisdiction over any claims against a defendant, whether or not they involve the defendant's activities in Florida—if the defendant engages in 'substantial and not isolated activity' in Florida, id. § 48.193(2).

Id. at 1004–05 (citing United Techs. Corp., 556 F.3d at 1274).

11

Reed alleges the Court possesses specific personal jurisdiction over all Defendants, including Larson, pursuant to § 48.193(1)(a)(2), which extends jurisdiction over any individual "[c]ommitting a tortious act within this state." FLA. STAT. § 48.193(1)(a)(2); (Doc. 27 ¶ 3 in 3:22-cv-1181). The Eleventh Circuit has "consistently held that, under Florida law, a nonresident defendant commits a tortious act in Florida by performing an act outside the state that causes injury within Florida," which can include alleged defamation. Del Valle v. Trivago GMBH, 56 F.4th 1265, 1272–73 (11th Cir. 2022) (citing Internet Sols. Corp. v. Marshall, 39 So. 3d 1201, 1216 (Fla. 2010)). As stated in the Florida Supreme Court's decision in Internet Solutions, a plaintiff satisfies this requirement when alleging that the defendant "post[ed] [allegedly defamatory] statements on a website, provide[d] that the website posts containing the statements are accessible in Florida and accessed in Florida." 39 So. 3d at 1216 (emphasis added). However, subsequent case law makes clear that a plaintiff must allege facts about the statements being accessed in Florida, not merely that the statements were published or accessible in Florida. Catalyst Pharms., Inc. v. Fullerton, 748 F. App'x 944, 947 (11th Cir. 2018) (citing Internet Sols., 39 So. 3d at 1203–04, 1215).

Reed alleges in the Amended Complaint that "[e]ach and every one of the defamatory publications . . . were intentionally published and perpetrated by the Defendants in the state of Florida," where the publications "were

accessed, read, opened, and viewed by numerous third-party Florida residents and citizens." (Doc. 27 ¶ 55 in 3:22-cv-1181). He further pleads that Florida is the "prime target" for Defendants' alleged defamation because it is the capital of professional golf. Id. These allegations barely surpass the threshold of establishing specific personal jurisdiction under Florida's Long-Arm Statute. Reed avoids "naming names" of any third-parties who accessed Larson's publication, but the Court must take his general allegations that Florida residents read his publication as true, and so he pleads enough. See Internet Sols., 39 So. 3d at 1203–04, 1215 (holding that allegedly defamatory content posted on a website was accessed in Florida where, through exhibits attached to the complaint, the plaintiff showed that a number of those who commented on the posts "appeared to be from Florida"); Rubinstein v. Ourian, No. 20-21948-CIV-MORENO, 2020 WL 6591559, at *2 (S.D. Fla. Nov. 10, 2020) (finding specific personal jurisdiction when the plaintiff alleged more than a conclusory allegation of third-party access but not access by a specific third-party); Paris v. Levinson, No: 8:19-cv-00423-T-02SPF, 2019 WL 2995957, at *3 (M.D. Fla. July 9, 2019) (finding specific personal jurisdiction when the plaintiff alleged at least one of the defamatory statements was accessed by clients in Florida); cf. Zimmerman v. Buttigieg, 521 F. Supp. 3d 1197, 1210–11 (M.D. Fla. 2021) (determining no long-arm jurisdiction over the defendants because there was

no allegation that the allegedly defamatory "tweet was directed to a specific person in Florida or accessed by a person in this forum.").

However, the exercise of personal jurisdiction over Larson offends due process. See Melgarejo v. Pycsa Panama, S.A., 537 F. App'x 852, 859 (11th Cir. 2013). "[M]ere proof of any one of the several circumstances enumerated in [Florida's Long-Arm Statute] as the basis for obtaining jurisdiction of nonresidents does not automatically satisfy the due process requirement of minimum contacts." Venetian Salami Co. v. Parthenais, 554 So. 2d 499, 502 (Fla. 1989). Rather, the due process inquiry "focuses on the relationship among the defendant, the forum, and the litigation." Walden v. Fiore, 571 U.S. 277, 283–84 (2014) (quotation marks and citation omitted). Courts apply a three-part test: "(1) whether the plaintiff's claims 'arise out of or relate to' at least one of the defendant's contacts with the forum; (2) whether the nonresident 'purposefully availed' himself of the privilege of conducting activities within the forum state, thus invoking the benefit of the forum state's law; and (3) whether the exercise of personal jurisdiction comports with 'traditional notions of fair play and substantial justice.'" Louis Vuitton, 736 F.3d at 1355.

The Amended Complaint addresses due process by alleging that "Defendants all conduct substantial business and reap substantial profit regularly in Florida," and "they are all members of golf media," with Florida serving as the "golf capital of the United States." (Doc. 27 ¶¶ 3, 56 in 3:22-cv-

1181). But the Amended Complaint also alleges that Larson is "a citizen and resident of New York," and otherwise makes no allegations about Larson's contacts with Florida. (Doc. 27 ¶ 17 in 3:22-cv-1181). Larson's allegedly defamatory article reported on litigation between LIV and the PGA Tour occurring in the District of Columbia and Northern District of California. <u>Id.</u> ¶ 113 n.8; <u>see also</u> Doc. 50-1. Though it included a picture of Reed wearing a "LIV Golf" hat, the article does not mention Reed by name nor anything about Florida. <u>Id.</u>

To circumvent this dearth of factual allegations connecting Larson to Florida, Reed argues in his response that his general allegation about all Defendants conducting business in Florida suffices. (Doc. 74 at 11–14 in 3:22-cv-1181). He adds that Bloomberg, the publisher of Larson's article, is registered to do business in Florida, and Larson acted in concert with Bloomberg and the PGA Tour on the article. <u>Id.</u> He contends that Larson and Reed's relationship centers in Florida because Reed is a professional golfer with a residence in Florida; Larson is a member of the golf media; and the PGA Tour is headquartered in Florida. <u>Id.</u> Finally, Reed tacks on that Larson has written at least ten articles "directly related" to "the PGA Tour or Florida" and that he was listed as a speaker at the Southwest Florida reading festival that took place on March 7, 2020. <u>Id.</u>

15

Unfortunately, this argument largely identifies contacts between other parties and Florida, including Bloomberg, the PGA Tour, and Reed—not Larson. Even assuming Larson wrote ten articles about "the PGA Tour or Florida" and that he visited Florida once three years ago for an unrelated event, the claims in this lawsuit do not arise from those contacts and do not indicate Larson availed himself "of the privilege of conducting activities" in Florida. Louis Vuitton, 736 F.3d at 1355. Simply put, merely publishing an article about a lawsuit involving golf entities, without more, does not automatically subject the author to the jurisdiction of this Court. See Alt. Energy Corp. v. Redstone, 328 F. Supp. 2d 1379, 1383 (S.D. Fla. 2004). Therefore, Larson is dismissed without prejudice from Reed II.[6]

### d. Statute of Limitations

#### 1. Reed I: Chamblee, Hack, Bacon, Lynch, and Golf Channel[7]

In the first-filed Motion to Dismiss in Reed I (Doc. 35), Defendants Chamblee, Hack, Bacon, Lynch, and Golf Channel argue that the alleged

---

[6] Even assuming personal jurisdiction extended over Larson, the statements allegedly made by him in an article published by Bloomberg are not actionable. See infra III.a.2. The statements include "Saudi-Backed LIV Golf is Using PGA Suit to Get Data on 9/11 Families, Court Told" and "It's [meaning the issue of 9/11 family victims] has [sic] taken a more sinister turn." (See Doc. 27 ¶¶ 113, 118).

[7] Within this Order, to the extent the Court separates analyses by sections titled "Reed I" or "Reed II," all document citations within each section refer to the applicable case's docket unless otherwise stated.

statements in paragraphs 76 through 88 of the Amended Complaint are controlled by Texas law. Id. at 3, 7–12. The seven alleged statements in January and February 2021 concern Reed's gamesmanship at the Farmers Insurance Open. (Doc. 28 ¶¶ 76–88). Defendants argue Texas's statute of limitations bars Reed's claims based on those statements because defamation suits must be brought within one year of publication. (Doc. 35 at 7–8; TX CIV. PRAC. & REM. § 16.002(a)). Reed counters that Florida law applies and does not bar these claims, as Florida law imposes a two-year statute of limitation for defamation claims. (See Doc. 45 at 12–15; FLA. STAT. § 95.11(4)(h)).

Section 95.10, Florida Statutes, states: "When the cause of action arose in another state or territory of the United States, or in a foreign country, and its laws forbid the maintenance of the action because of lapse of time, no action shall be maintained in this state." "The purpose of the statute is to discourage 'forum shopping' and the filing of lawsuits in Florida that have already been barred in the jurisdiction where the cause of action arose." Celotex Corp. v. Meehan, 523 So. 2d 141, 143 (Fla. 1988). Under Florida choice of law rules, the "most significant relationship" test applies to tort claims. Green Leaf Nursery v. E.I. DuPont De Nemours & Co., 341 F.3d 1292, 1301 (11th Cir. 2003). In applying this test, courts consider "(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicile, residence, nationality, place of incorporation and place of business of the

17

parties, and (d) the place where the relationship, if any, between the parties is centered." <u>Id.</u> (citations and quotation marks omitted). No single factor controls. Instead, the Court weighs the totality of the circumstances. <u>See</u> <u>e.g.</u>, <u>Nix v. ESPN, Inc.</u>, 772 F. App'x 807, 812 (11th Cir. 2019).

In support of Texas law's application, Defendants advance: (1) Reed lived in Texas at the time of publication of the statements; (2) none of the allegedly defamatory conduct as to the statements occurred in Florida, as they were published from or available in other states or countries; (3) none of the parties are located in Florida; (4) Reed is a citizen of Texas and only owns a house in Florida; (5) the parties' relationship for these statements occurred in San Diego, California—not Florida; and (6) Reed originally filed Reed I in the Southern District of Texas and alleged that venue was proper there because "a substantial part of the events or omissions giving rise to" his claims occurred there. (Doc. 35 at 7–12). In support of Florida law's application, Reed argues: (1) the PGA Tour is headquartered in Ponte Vedra Beach, Florida and the Defendants are the "media arm" of the PGA Tour; (2) Reed's golf community is in the Middle District of Florida and he resides in Kissimmee, Florida; (3) the defamatory conduct occurred in Connecticut where Golf Channel is headquartered, which also has a two-year statute of limitations; (4) the parties are located in multiple states, but primarily in Florida, as Reed resides and Defendants have principal places of business in Florida. (Doc. 45 at 12–15).

18

The first factor, location of the injury, weighs slightly in favor of Florida. Reed alleges he is a citizen of Texas, does not dispute that he resided in Texas when the alleged statements were published, and originally filed suit there. (See Docs. 28 ¶ 3; 35 at 2, 9). However, Reed also alleges he owns a home in Florida, resides in Florida, and "Florida and this district are in effect the capitol [sic] of professional golf and golf in general for the United States." (Doc. 28 ¶¶ 3, 47). Reed's former and current employers who are competitors in Florida, PGA Tour and LIV, both operate in Florida. Id. ¶¶ 28, 48. And this lawsuit pertains in part to Reed's change from the PGA Tour to LIV. See id. ¶ 38. Simply put, Reed is a citizen of Texas, but his golf career is more connected to Florida. "There are situations . . . in which the state of most significant relationship is not where the plaintiff was domiciled or had its principal place of business, but rather the state where the plaintiff suffered greater injury." Nix, 772 F. App'x at 810. "For example, a plaintiff may suffer greater injury in another state if the defamatory matter 'related to an activity of the plaintiff that is principally located in [that] state,' or 'the plaintiff suffered greater special damages in [that] state than in the state of his domicil[e].'" Id. (quoting Michel v. NYP Holdings, Inc., 816 F.3d 686, 694 (11th Cir. 2016)). Reed's activity as a professional golfer is largely based in Florida; so, the location of his alleged injury favors here.

The second factor, the place where the alleged tortious conduct occurred, is neutral. The event that gave rise to the alleged statement occurred in San Diego, California and appeared in an online publication available in any state, and one statement occurred in broadcast from Connecticut. (See Doc. 35 at 9, 11). None of the alleged conduct occurred in Florida, but it also did not occur in Texas. The third factor—the domicile, residency, incorporation of the parties—weighs slightly in favor of Florida. Reed owns a home in Florida and Defendant Golf Channel is headquartered in Florida and Connecticut. (Doc. 28 ¶¶ 3, 8). The other Defendants are citizens of or headquartered elsewhere. Id. ¶¶ 4–7, 9–12. Finally, the fourth factor—the place where the relationship between the parties is centered—leans slightly towards Florida. Although the statements concerned an event in California and were published in fora other than Florida and Texas, the claims are generally centered around Reed's career as a professional golfer based in Florida. See e.g., Frey v. Minter, 829 F. App'x 432, 435–36 (11th Cir. 2020) (finding Georgia law applied though the plaintiff was a Florida resident, as other factors weighed in favor of Georgia, including that the parties' relationship "centered around the litigation that took place in Georgia."). Therefore, Florida law applies, and these claims are not time-barred.

### 2.  Reed II: Defendants AP and Ferguson

Defendants AP and Ferguson similarly invoke Texas's and New York's one-year statute of limitations for claims brought against them. (Doc. 36 at 9–

14). Reed maintains Florida law controls. (Doc. 43 at 12–14). The claims Defendants argue are barred arise from a column published in February 2021. (See Doc. 27 ¶¶ 105–112). Applying the most significant relationship test, Florida dominates the parties' relationship with Reed. See Green Leaf Nursery, 341 F.3d at 1301. Reed resides in and his golf career is based in Florida.[8] (See Doc. 27 ¶¶ 8, 55). Defendant Ferguson, who wrote the column, is a citizen of Florida. Id. ¶ 11. Although Defendant AP is incorporated and headquartered in New York (id. ¶ 12), two of the three parties bear a relationship to Florida. The column concerned Reed's golf career, his purported reputation in golf, and golf events in the Bahamas and San Diego, California. (See Doc. 36-1). The column mentioned neither Texas nor New York, nor for that matter, Florida. Id. Yet, as concluded above, because Reed resides in Florida, his golf career is based in Florida, the purported statements concern Reed's golf career, and Defendant Ferguson is domiciled in Florida, Florida law applies, and the claims are not time-barred. With these threshold matters resolved, the Court turns to the sufficiency of the remaining claims.

---

[8] For the purpose of subject matter jurisdiction, Reed is a citizen of Texas, so diversity jurisdiction exists. (See e.g., Doc. 27 ¶ 8).

## III.   DEFAMATION

Reed brings three types of defamation claims against each Defendant in both suits: Defamation, Defamation by Implication, and Defamation Per Se.[9] Under Florida law, defamation is defined as "the unprivileged publication of false statements which naturally and proximately result in injury to another." Wolfson v. Kirk, 273 So. 2d 774, 776 (Fla. 4th DCA 1973) (citation omitted). Defamation has "five elements: (1) publication; (2) falsity; (3) the statement was made with knowledge or reckless disregard as to the falsity on a matter concerning a public official, or at least negligently on a matter concerning a

---

[9] In his Amended Complaints, Reed does not distinguish what statements constitute each type of defamation; instead, he incorporates every alleged statement by a Defendant into each Count against that Defendant. (See e.g., Docs. 28 ¶¶ 134–58 in 3:22-cv-1059; 27 ¶¶ 123–47 in 3:22-cv1181). As a general rule, this manner of pleading contains the same deficiencies identified in the Court's Orders dismissing Reed's original complaints. (See Docs. 27 in 3:22-cv-1059; 25 in 3:22-cv-1181). Further, the forms of defamation alleged by Reed require proof of different elements so his identical factual allegations for each type of defamation and inclusion of numerous statements in each Count constitutes improper pleading. See e.g., Zimmerman v. Buttigieg, 576 F. Supp. 3d 1082, 1091–92 (M.D. Fla. 2021) (dismissing amended complaint as a shotgun pleading because the plaintiff alleged three types of defamation under Florida law, yet each count contained allegations with respect to both tweets at issue and incorporated all preceding allegations, including an element specific to general defamation in the plaintiff's defamation by implication and per se counts). Though the Court would be well within its right to dismiss both Amended Complaints as shotgun pleadings, because Defendants have met Reed on the sufficiency of his defamation claims and because ordering another repleader would not change the substance of the claims, the Court will engage on the substantive issues.

private person; (4) actual damages; and (5) the statement must be defamatory." Turner v. Wells, 879 F.3d 1254, 1262 (11th Cir. 2018) (citing Jews For Jesus, Inc. v. Rapp, 997 So. 2d 1098, 1106 (Fla. 2008)).

Defamation per se, a variation on general defamation, occurs when a false statement "suggest[s] that someone has committed a dishonest or illegal act." Shaw v. R.J. Reynolds Tobacco Co., 818 F. Supp. 1539, 1541–42 (M.D. Fla. 1993) (citation omitted). "An otherwise false and defamatory statement is considered defamatory per se, obviating the need to prove special damages, if 'it charges that a person has committed an infamous crime . . . [or] it tends to injure one in his trade or profession." Berisha v. Lawson, 378 F. Supp. 3d 1145, 1155 (S.D. Fla. 2018) (quoting Klayman v. Judicial Watch, Inc., 22 F. Supp. 3d 1240, 1247 (S.D. Fla. 2014) (internal quotation omitted)); see also Richard v. Gray, 62 So. 2d 597, 598 (Fla. 1953). "In other words, when a statement is 'so obviously defamatory' and 'damaging to [one's] reputation,' it generally 'gives rise to an absolute presumption both of malice and damage.' Corsi v. Newsmax Media, Inc., 519 F. Supp. 3d 1110, 1119 (S.D. Fla. 2021) (quoting Wolfson, 273 So. 2d at 776; citing Carroll v. TheStreet.com, Inc., No. 11-CV-81173, 2012 WL 13134547, at *3 (S.D. Fla. May 25, 2012)).

By contrast, defamation by implication springs from "the concept that literally true statements can be defamatory where they create a false impression." Jews For Jesus, 997 So. 2d at 1106–08. "Defamation by implication

arises, not from what is stated, but from what is implied when a defendant (1) juxtaposes a series of facts so as to imply a defamatory connection between them, or (2) creates a defamatory implication by omitting facts . . . ." <u>Klayman</u>, 22 F. Supp. 3d at 1254 (quoting <u>Jews for Jesus</u>, 997 So. 2d at 1106) (internal quotation marks omitted). In other words, "[d]efamation by implication is premised not on direct statements but on false suggestions, impressions and implications arising from otherwise truthful statements." <u>Jews for Jesus</u>, 997 So. 2d at 1107 (citation and quotation omitted). The Florida Third District Court of Appeal in <u>Readon v. WPLG, LLC</u> describes "a classic example of defamation by implication" that was before the Second District Court of Appeal in <u>Heekin v. CBS Broadcasting, Inc.</u>, 789 So. 2d 355, 358 (Fla. 2d DCA 2001), compared to an insufficiently alleged defamation by implication claim:

> In <u>Heekin</u>, the plaintiff alleged that a broadcast falsely portrayed him as a spouse abuser by juxtaposing an interview with his former spouse along with stories and pictures of women who had been abused and killed by their partners. 789 So. 2d at 357. Even though the reporting did not literally claim that the plaintiff was a spouse abuser, by overplaying his former wife's story with stories of spouse abuse, the reporting created the defamatory implication that the plaintiff had abused his spouse. Conversely, Readon has alleged no such defamatory implication. The negative statements about Readon, that he was engaged in potentially underhanded business dealings, were not implied but rather stated explicitly. The reporting of Readon's profession did not make these stories about Readon any more or less negative, but rather gave the public a context for why the stories were relevant.

317 So. 3d 1229, 1237–38 (Fla. 3d DCA 2021).

All three types of defamation also require a plaintiff to plead and prove actual malice if he is a public figure. See New York Times Co. v. Sullivan, 376 U.S. 254, 279–80 (1964); Jews for Jesus, 997 So. 2d at 1105–07 (listing elements for both general defamation and defamation by implication claims); Levan v. Capital Cities/ABC, Inc., 190 F.3d 1230, 1239 (11th Cir. 1999); Corsi, 519 F. Supp. 3d at 1123 (dismissing defamation and defamation per se claims for failure to plead actual malice element). "Whether the defendant's statements constitute defamation . . . is a question of law for the court to determine." Turner, 879 F.3d at 1269 (citing Brown v. Tallahassee Democrat, Inc., 440 So. 2d 588, 590 (Fla. 1st DCA 1983)); see Skupin v. Hemisphere Media Grp., Inc., 314 So. 3d 353, 356 (Fla. 3d DCA 2020) (affirming dismissal of defamation claims and holding "whether a statement is one of fact or opinion is a question of law for the court and not a jury"). When making this determination, the Court "must construe the statement in its totality, examining not merely a particular phrase or sentence, but all the words used in the publication." Hay v. Indep. Newspapers, Inc., 450 So. 2d 293, 295 (Fla. 2d DCA 1984). Defendants in both suits attack multiple elements of Reed's defamation claims against them. The Court addresses each challenge in turn.

### a. Of and Concerning Reed

Florida law requires that any alleged defamation be must "of and concerning" the plaintiff. See Thomas v. Jacksonville Television, Inc., 699 So.

2d 800, 805 (Fla. 1st DCA 1997) (collecting cases); <u>see also</u> <u>Zimmerman</u>, 521 F. Supp. 3d at 1212 (noting that of and concerning element "[c]ertainly . . . applies to all forms of the tort."). In other words, a statement must be "specifically directed at the plaintiff" to be actionable. <u>Rosenblatt v. Baer</u>, 383 U.S. 75, 81 (1966); <u>see also</u> <u>McIver v. Tallahassee Democrat, Inc.</u>, 489 So. 2d 793, 794 (Fla. 1st DCA 1986) (quoting <u>Sullivan</u>, 376 U.S. at 288). Although a Plaintiff need not be named in a publication, "Florida courts have long held that if a defamed person is not named in the defamatory publication, 'the communication as a whole [must] contain[ ] sufficient facts or references from which the injured person may be determined by the persons receiving the communication.'" <u>Isaac v. Twitter</u>, 557 F. Supp. 3d 1251, 1258–59 (S.D. Fla. 2021) (quoting <u>Wolfson</u>, 273 So. 2d at 779). "The relevant inquiry is whether 'the average person upon reading [the] statements could reasonably have concluded that the plaintiff [ ] was implicated[.]'" <u>Id.</u> at 1259 (quoting <u>Miami Herald Pub. Co. v. Ane</u>, 423 So. 2d 376, 389 (Fla. 3d DCA 1982), <u>aff'd</u>, 458 So. 2d 239 (Fla. 1984)).

For example, in <u>Sloan v. Shatner</u>, No. 8:17-cv-332-T-27AAS, 2018 WL 3769968, at *6 (M.D. Fla. June 22, 2018), the court dismissed a complaint alleging a defamation by implication claim because the plaintiff failed to plead that a radio interview was "of and concerning" him when the transcript did "not mention [p]laintiff, his business, or identifying characteristics." Similarly, in <u>Isaac</u>, 557 F. Supp. 3d at 1258–59, the court dismissed a complaint alleging

26

defamation per se because the publication did not identify the plaintiff's name, business, nor otherwise provide any descriptive information identifying the plaintiff, even though the publication referenced an article that did identify the plaintiff's business. However, in <u>Zimmerman</u>, 521 F. Supp. 3d at 1203, 1213, the court found the plaintiff pled an implied or indirect reference to the plaintiff, though his name was not stated, when the defendant tweeted "Trayvon Martin would have been 25 today. How many 25th birthdays have been stolen from us by white supremacy, gun violence, prejudice, and fear?" Though Zimmerman was not mentioned in the tweet, "[a] tortfeasor [can] juxtapose a series of facts in such a way that a specific person is identifiable even though that person's name has not been used." <u>Id.</u>

### 1. Reed I

Off the bat in Reed I, two alleged statements plainly concern another person and are non-actionable. In paragraphs 65 through 69 of the Amended Complaint, Reed identifies the statements allegedly published in an article published by Golf Channel entitled "Mickelson's statements inaccurate and ironic: Obnoxious greed? Et tu, Phil?" (Doc. 28 ¶¶ 65–69).[10] The article focuses

---

[10] Although the Court's review on a motion to dismiss generally is limited to the complaint, a court may consider documents integral to the complaint's allegations that are referenced or cited within the complaint without the motion being converted into one for summary judgment. <u>See</u> <u>Horsley v. Feldt</u>, 304 F. 3d 1225, 1134 (11th Cir. 2002) (holding that Rule 12(b)(6) decisions have adopted the "incorporation by reference" doctrine where a document attached

on professional golfer Phil Mickelson and his relationships with LIV and the PGA Tour. (See Doc. 36-3). The article never identifies Reed nor references him. Id. In fact, it solely concerns Phil Mickelson. Id. Notably, the statement Reed alleges is defamatory specifically refers to Mickelson: "Now he [Mickelson] has continued his subterfuge by saying the PGA Tour could end any threat, presumably from the Saudi blood money funding a proposed Super Golf League, by just handing back the media rights to the players." Id.; Doc. 28 ¶ 65. Golf Channel published this article on February 5, 2022—about four months before Reed joined LIV in June 2022. (Doc. 28 ¶¶ 15, 65).[11] The article's complete

---

to a motion to dismiss may be considered by the district court if the document is central to the plaintiff's claim and undisputed) (collecting cases). This especially makes sense in a defamation case. See Smith v. Cuban Am. Nat'l Found., 731 So. 2d 702, 705 (Fla. 3d DCA 1999) ("To determine whether a statement is defamatory, it must be considered in the context of the publication.") (collecting cases); Martinez v. Netflix, Inc., No. 20-cv-24328-WPD, 2023 WL 2630337, at *3 (S.D. Fla. Feb. 23, 2023) (court noted it watched entire film containing alleged defamatory statements to adjudicate the motion to dismiss). Here, the Amended Complaint cites all of the publications containing the defamatory statements, and provides links for almost all of them (and when Reed does not, Defendants filed copies of the publications). Therefore, the Court reviews those publications as part of the Amended Complaints.

[11] In paragraph 68 of the Amended Complaint, Reed alleges Chamblee states in the article that money is "coming from the wrong place" and that it is "good [PGA Tour] versus evil [Mr. Reed and LIV] . . . evil usually fails. So, it will fail." (Doc. 28). Even without Reed's self-serving bracketed modifications, these statements are not in this article and therefore no publication containing these statements has been alleged. (Doc. 36-3). Therefore, the statements are non-actionable.

dearth of identification of Reed renders his defamation claims based on the article deficient as a matter of law.

Similarly, Reed alleges Chamblee states on the Horace Langley podcast: "I think there's a reason for that . . . <u>they're</u> destroying the professional game <u>they</u> were they been put [sic] in the Hall of Fame because of <u>their</u> accomplishments and because of <u>their</u> legacy[,] well <u>they've</u> tainted their legacy in an irreparable way so I think both of them should be kicked out of the Hall of Fame I really do . . . ." <u>Id.</u> ¶ 61 (emphasis added). But when viewing the statement in context on the podcast that is linked in Reed's Amended Complaint, Chamblee plainly refers to golfers Phil Mickelson and Greg Norman in the statement. (Doc. 28 ¶ 57 n.5; Travis Fulton, <u>Brandel Chamblee Thoughts of the LIV Golf Tour</u>, at 6:25–6:55, YOUTUBE (June 14, 2022), https://www.youtube.com/watch?v=xXxnqWJdWhI&t=339s). Directly before Chamblee makes the statement quoted in Reed's Amended Complaint, Chamblee lists numerous professional golfers whom he says "left the game in a better place," and then says "[s]o when you look at what Phil Mickelson and Greg Norman are doing, it's never been done as far as I can tell in any Hall of Fame, but both of them should be kicked out of the Hall of Fame." <u>Id.</u> at 5:40–6:37. He then immediately makes the statement alleged in Reed I. <u>See id.</u> at 6:35–6:55. This context precludes any finding that this statement concerns Reed. Thus, his defamation claims based on this statement are dismissed.

29

Reed also alleges a number of statements are defamatory that concern LIV or LIV players as a group, but do not identify Reed. He argues that given the public figure status of every professional golfer who plays for LIV, all publications that refer to LIV golfers are directed towards him. (See Doc. 45 at 15–16). Defendants disagree. They contend that Reed's professional identity is not synonymous with LIV because many professional golfers play for LIV. (See Doc. 35 at 12–15). Further, they argue Reed invokes the group libel doctrine but he alleges insufficient facts under the doctrine that the alleged statements about LIV and LIV players are "of and concerning" him. Id.

The "group libel" doctrine applies "only if, (a) the group or class is so small that the matter can reasonably be understood to refer to the member [of the group], or (b) the circumstances of publication reasonably give rise to the conclusion that there is particular reference to the member." Thomas, 699 So. 2d at 804 (affirming trial court's conclusion that appellants were unable to amend their complaint to satisfy the "of and concerning" requirement in group defamation context) (quoting Restatement of Torts 2d § 564 (1977)). Indeed, "[p]laintiffs face a difficult task when the statements concern groups; when a group is large, that is, composed of twenty-five or more members, courts consistently hold that plaintiffs cannot show the statements were 'of and concerning' them." Id. at 805.

30

In <u>Thomas</u>, the First District Court of Appeal held that a group of commercial net fishermen fell short of alleging the "of and concerning" requirement when they challenged a "deceptive and misleading" advertisement showing purported negative consequences of commercial net fishing, including a dolphin caught in a fishing net, dead fish dumped over the side of a boat, and a turtle about to die from commercial net fishing. <u>Id.</u> at 802–03. Although the court felt "troubled by the alleged indifference of the named television stations to their obligation to truth" when the stations aired the advertisement, the court held the group libel doctrine barred the fishermen's defamation claims because the advertisement did not identify nor describe them individually. <u>Id.</u> at 804–05; <u>see also</u> <u>Adams v. WFTV, Inc.</u>, 691 So. 2d 557, 557–58 (Fla. 5th DCA 1997) (applying <u>Thomas</u> holding in similar lawsuit brought by 637 commercial net fisherman and dismissing their complaint under group libel doctrine) (collecting cases).

The actual number of LIV golfers at the time of each publication is not alleged explicitly in the Amended Complaint; but Reed neither alleges nor argues in his briefing that LIV consists of fewer than twenty-five players. (Docs. 28; 45 at 15–18). Reed does contend that Chamblee said he looked at a list of the 48 players participating in the LIV Gold Invitational Series, but only

31

fourteen players were recognizable. (Doc. 45 at 17).[12]  By extension, Reed argues LIV—though it includes 48 players—actually only consists of the smaller group of prominent players for the purpose of the group libel doctrine. Id. Somewhat contradicting this argument though, the Amended Complaint alleges that there are "many top professional golfers, including but not limited to, Phil Mickelson, Brooks Koepka, Dustin Johnson, Bryson DeChambeau, Patrick Reed, Cameron Smith, Kevin Na, Charles Schwartzel, Ian Poulter, Lee Westwood, and Sergio Garcia, to name just a few world class golfers, [who] have decided to join LIV." (Doc. 28 ¶ 37) (emphasis added).

Thus, Reed's allegations and arguments belie that LIV is a group "so small" that any statement about LIV or LIV players generally "can reasonably be understood to refer" to Reed. Thomas, 699 So. 2d at 804. Put differently, the LIV group of golfers at 48 players is too large for Reed to claim that any alleged defamation to LIV equates to defamation against him personally. Further, he neglects to plead "the circumstances" of each alleged defamatory statement that "reasonably give rise to the conclusion that there is particular reference" to him. Id. Although Reed pleads in the Amended Complaint that he has "become, not by choice but due to media-driven narrative, a 'lightning rod' and therefore a

---

[12]  This purported statement by Chamblee is not stated in the article cited in paragraph 70 of the Amended Complaint in Reed I; however, for the purpose of Reed's argument, the Court construes Reed's acknowledgement of the purported statement as his recognition that LIV consists of 48 players.

frequent target of the Defendants . . . to defame, disparage, and harm LIV's other golfers and LIV as a whole," this allegation lacks the factual allegations required to state a claim that each Defendant through the relevant publication wrote about Reed specifically when referring to LIV or LIV players a whole. (Doc. 28 ¶ 40 in 3:22-cv-1059; <u>see also</u> Doc. 27 ¶¶ 33–34 in 3:22-cv-1181). The Amended Complaint paints with too broad of a brush when alleging how certain statements about LIV equate to statements concerning Reed specifically.

In Reed I, the following statements refer to LIV or LIV players, but never identify Reed or refer to him individually even without naming him:

- "This is one of the saddest days in the history of golf. Watching these players come together for money and show to the world . . . <u>they are showing us that they are the greediest, most self-serving, self-interesting [sic], willfully blind players in the world of golf today</u>." (Doc. 28 ¶ 71).[13]

- "So when I hear these players say that they are 'growing the game' . . . it makes me want to puke. <u>They're destroying the game. And they are destroying their reputations</u>." <u>Id.</u> ¶ 74.

- LIV being the "<u>evil empire's . . . Death Star</u>," and players "<u>opt[ing] to cut and run for Saudi money</u>," and publishing that LIV golfers had endured "<u>reputational harm that comes with taking guaranteed cash to sportswash Saudi atrocities</u>." <u>Id.</u> ¶ 101.[14]

---

[13] For both suits, the underlined portions of statements are the portions Reed alleges are defamatory. If a statement is quoted and contains no underlining, then Reed alleges the entire statement is defamatory. (<u>See</u> Docs. 28 ¶ 52 in 3:22-cv-1059; 27 ¶ 61 in 3:22-cv-1181).

[14] Reed's quote of the second statement belies the context of the article, which reads: "In the case of Cameron Smith, much depends on whether the

33

- "Team golf is a tough sell, but moreso when the product is lousy and <u>the association with a merciless regime too toxic for commercial sponsors</u>," and "Whatever divisions need to be bridged in golf, whatever personal relationships must be healed, <u>doing so cannot involve offering the sport wholesale as a life raft for sportswashing ambitions in Riyadh. No amount of investment by the Saudi Arabian regime can be rendered respectable or accepted without dire reputational consequences for the entire sport. Golf cannot choose to host a cancer and expect to remain healthy</u>." <u>Id.</u> ¶ 103.

- "They [the Official World Golf Ranking] would not like to see a tour funded by a government with such a discriminatory practice by that government. This would be at least in my view akin to allowing – at the time it was called the South African tour under apartheid – tournaments played there to accumulate world ranking points." <u>Id.</u> ¶ 108.

- LIV Golfers are "<u>bought</u>." <u>Id.</u> ¶ 110.

The context of these statements within each publication does not reveal any specific reference to Reed. For Chamblee's statements in paragraphs 71 and 74, in the article cited in the Amended Complaint, Chamblee discusses players joining LIV generally and Phil Mickelson specifically, but never mentions or implicates Reed. <u>Id.</u> ¶ 70 n.8; Jason Daniels, <u>It makes me want to puke' – Chamblee rips LIV Golf stars in scathing attack</u>, GOLF WRX (Jun. 10, 2022), https://www.golfwrx.com/678264/it-makes-me-want-to-puke-chamblee-rips-liv-

_____

choice has already been made. Rumors suggest the world No. 2 will soon decamp to LIV. Today's announcement makes his reported price—$100 million—seem a poor return given what a player of his caliber could earn on the PGA Tour in the coming years, and without the reputational harm that comes with taking guaranteed cash to sportswash Saudi atrocities." (Doc. 28 ¶ 99 n.11). Thus, this statement concerns Cameron Smith, not Reed.

golf-stars-in-scathing-attack/. Similarly, the columns authored by Lynch and published by Gannett only discuss LIV players as a group or reference other specific LIV figures who are not Reed. (See Doc. 28 ¶¶ 99 n.11, 100–01, 102 n.12 103–06); Eamon Lynch, PGA Tour's war with LIV Golf enters 'Return of the Jedi' phase, GOLFWEEK (Aug. 24, 2022), https://golfweek.usatoday.com/2022/0 8/24/lynch-pga-tour-news-liv-golf-leverage/; Eamon Lynch, LIV Golf's problems aren't limited to Greg Norman's Incompetence. Replacing him won't solve them.", GOLFWEEK (Nov. 10, 2022), https://golfweek.usatoday.com/2022/11/10/ eamon-lynch-problems-liv-golf-greater-greg-norman-incompetence/. The first column concerns the PGA Tour's efforts to keep players from leaving for LIV and the Tour's future business model in light of LIV's competition. (Docs. 28 ¶ 99 n.11; 38-1). The second article largely concerns criticism of LIV CEO Greg Norman and LIV's future business generally due, in part, to its affiliation with Saudi Arabia. Id. ¶ 102 n.12; see also Doc. 38-2. These columns relate—not to Reed or his status within LIV—but rather the golf world at large and the competitors within it, including the PGA Tour and LIV generally.

Chamblee's alleged tweets similarly do not concern Reed and are therefore non-actionable. Chamblee's tweets criticize Saudi Arabia, its funding of the LIV tour, and LIV golfers generally due to LIV's ties with Saudi Arabia. (See Doc. 28 ¶¶ 89–98). Chamblee's tweets challenged by Reed include:

- "Golf won today. Murderers lost." Id. ¶ 89.

- "[E]ither way, whether the money is against or in addition to guarantees <u>its [sic] still blood money and you're still complicit in sportswashing</u>." <u>Id.</u> ¶ 90.

- "<u>These thugs are directed by the people who fund LIV golf</u> . . . but LIV will pretend this video and so many others depicting human rights atrocities don't exist, but will happily post video of a golf event in Boston meant <u>to sportswash these atrocities</u>." <u>Id.</u> ¶ 91.

- "By defectors I mean those who have turned their backs on the meritocracy of professional golf. <u>I mean those who have sold their independence to a murderous dictator and those who have sued their fellow professionals so they can benefit from the tours they are trying to ruin</u>." <u>Id.</u> ¶ 92.

- "No. Wrong. But when they murdered, butchered and dismembered a dissenting journalists [sic] they began to care. <u>Those same people behind that murder run this tour</u>." <u>Id.</u> ¶ 93.

- "The IOC decides where the Olympics go . . . and there is a big difference between doing business in a country and <u>directly for a murderous regime as LIV golfers are</u>." <u>Id.</u> ¶ 94.

- "I can understand [Mohammed bin Salman's] regime wanting to become more than a petro[l] country & corporate interest to serve that part of the world. <u>I can't understand an individual working for him</u>." <u>Id.</u> ¶ 95.

- "LIV golf is about hiding [the Saudi Arabian regime's] human atrocities." <u>Id.</u> ¶ 96.

- "The criticism of LIV defectors is not that they are doing it for the money, that is easily understood, what is not so easily understood is why they would directly work for a regime that has such a reprehensible record on human rights." <u>Id.</u> ¶ 97.

- "<u>The sportwashing paid to turn a blind eye to atrocities</u>, the blight of LIV." <u>Id.</u> ¶ 98.

Defendants attach copies of each of these tweets to their Motion to Dismiss. (See Docs. 36-8–36-17). As Reed unsuccessfully alleges a group libel theory and alleges no facts regarding the circumstances surrounding each of these tweets to support his contention that Chamblee made them regarding Reed, the tweets do not concern Reed. Accordingly, the claims arising from the statements contained in the following allegations in Reed I are dismissed: Paragraphs 71, 74, 89–98, 101, 103, 110.

### 2. *Reed II*

Two alleged statements in Reed II raise a similar issue, though present a unique circumstance. Reed pleads that an article published by Bloomberg titled "Saudi-Backed LIV Golf is Using PGA Suit to Get Data on 9/11 Families, Court Told" constitutes defamation because the article contained a picture of Reed's face partially covered wearing a hat with the words "LIV Golf" on it. (Docs. 27 ¶ 113 n.8; 50-1). The article itself never mentions Reed. Id. Rather, the article reports on a lawsuit filed by LIV against the PGA Tour, and how LIV "was accused on Tuesday of using its US lawsuit against PGA to 'build an intelligence file' on families of 9/11 victims who have been critical of the kingdom and its new professional golf circuit. The upstart has countered that the PGA is secretly running a 'smear campaign' to take it down." Id. In describing the relationship between LIV and the PGA Tour, the article states "When PGA began suspending players who left for LIV, the Saudi tour sued, calling the PGA an

37

'entrenched monopolist' that was trying to choke off its supply of star golfers."
Id. The article makes clear the lawsuit involves an "antitrust case" between the
two competitors and does not insinuate the lawsuit was brought by LIV players
or otherwise involves LIV players individually. Id. The only statement within
the article Reed claims constitutes defamation is: "It's [meaning the issue of
9/11 family victims] has [sic] taken a more sinister turn." (Doc. 27 ¶ 118).

But merely including a picture of Reed without any other identification
or reference to him in the article, especially when the article concerns a lawsuit
between other parties, LIV and the PGA Tour, falls short of alleging defamation
of and concerning Reed. "The relevant inquiry is 'whether an average person,
upon reading [the] statements, could reasonably have concluded that the
plaintiff [] was implicated[.]'" Isaac, 557 F. Supp. 3d at 1259 (quoting Miami
Herald Pub. Co., 423 So. 2d at 389. The article is not about Reed and his
photograph is incidental to its content. As a matter of law, no reasonable person
would understand the article as implicating Reed. See e.g., Rubin v. U.S. News
& World Rep., 271 F.3d 1305, 1308 n.10 (11th Cir. 2001) (use of the plaintiff's
photograph accompanied by quotes from him did not create defamatory
implication); Fogel v. Forbes, Inc., 500 F. Supp. 1081, 1085 (E.D. Pa. 1980)
(picture and article not capable of defaming plaintiffs, as they were not
mentioned or identified in article, and their appearance in photo was "incidental
and [did] not in any manner imply that they [were] participating in the activity

38

discussed in the article"); <u>Houseman v. Publicaciones Paso del Norte, S.A. DE C.V.</u>, 242 S.W.3d 518, 526 (Tex. App. 2007) (reasonable reader would not be misled by plaintiff's photo accompanying article, which did not otherwise identify plaintiff). Therefore, the claims arising from the statements alleged in paragraphs 113 and 118 in Reed II are dismissed.

### b. Non-Defamatory Statements

"Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas." <u>Gertz v. Robert Welch, Inc.</u>, 418 U.S. 323, 339–40 (1974). In line with this principle, "[t]rue statements, statements that are not readily capable of being proven false, and statements of pure opinion are protected from defamation actions by the First Amendment." <u>Turner</u>, 879 F.3d at 1262 (collecting cases); <u>Keller v. Mia. Herald Publ'g Co.</u>, 778 F.2d 711, 714–15, 717 (11th Cir. 1985) (applying Florida law) (citations omitted). In determining whether a statement constitutes one of these three categories of protected speech, "the words used are not to be construed or taken in their mildest or most grievous sense, but . . . should be construed as the common mind would understand it." <u>Loeb v. Geronemus</u>, 66 So. 2d 241, 245 (Fla 1953) (internal quotation marks omitted).

Similarly, statements may constitute rhetorical hyperbole, which sometimes overlaps with pure opinion. <u>Fortson v. Colangelo</u>, 434 F. Supp. 2d

1369, 1378 (S.D. Fla. 2006) ("Pure opinion is sometimes characterized as rhetorical hyperbole." (internal quotation marks and citation omitted)). "The Supreme Court has used various phrases to describe 'rhetorical hyperbole,' including 'imaginative expression' and 'loose, figurative, or hyperbolic language.'" Id. (collecting cases in footnote). "Although rhetorically hyperbolic statements may 'at first blush appear to be factual[,] . . . they cannot reasonably be interpreted as stating actual facts about their target.'" Id. at 1378–79 (quoted authority omitted). "The distinction between fact and pure opinion/rhetorical hyperbole is a critical one; to be actionable, a defamatory publication must convey to a reasonable reader the impression that it describes actual facts about the plaintiff or the activities in which he participated." Id. at 1379 (citing Ford v. Rowland, 562 So. 2d 731, 735 (Fla. 5th DCA 1990)).

Whether a statement is one of opinion, rhetorical hyperbole, or of fact that is susceptible to defamatory interpretation are questions of law for the court. Keller, 778 F.2d at 715; Fortson, 434 F. Supp. 2d at 1379; From v. Tallahassee Democrat, Inc., 400 So. 2d 52, 56–57 (Fla. 1st DCA 1981). And "[a]fter making this determination, the Court can dismiss a claim if it finds that an allegedly defamatory statement is nonactionable." Markle v. Markle, No. 8:22-cv-511-CEH-TGW, 2023 WL 2711341, *8 (M.D. Fla. Mar. 30, 2023) (citing Turner, 198 F. Supp. 3d at 1370 (finding a statement that was not "subject to empirical proof" or an "objectively verifiable event" to be a protected opinion)); Wolfson,

273 So. 2d at 778 ("Where the court finds that a communication could not possibly have a defamatory or harmful effect, the court is justified in either dismissing the complaint for failure to state a cause of action or in granting a directed verdict at the proof stage.").

A defamatory statement must be objectively falsifiable. See Markle, 2023 WL 2711341, *9 (dismissing defamation claim because statements regarding speaker growing up "as an only child" and wishing she had siblings were opinions, not facts, because read in context they were the speaker's opinions about her own childhood); Santilli v. Van Erp, No. 8:17-CV-1797, 2018 WL 2172554, at *5–6 (M.D. Fla. Apr. 20, 2018) (calling an academic a "fringe scientist," "mad professor," and "cunning scam artist" constituted opinion because such statements are not objective or falsifiable), report and recommendation adopted, 2018 WL 2152095 (M.D. Fla. May 10, 2018); Hamze v. Cummings, 652 F. App'x 876, 881 (11th Cir. 2016) (finding that sheriff's expression that the defendant's crime was a "brutal, senseless, roadrage [sic] killing" that showed a "disregard for human life" was an opinion and therefore non-actionable as a defamation claim).

The Eleventh Circuit in Turner elaborates on this standard:

Under Florida law, a defendant publishes a "pure opinion" when the defendant makes a comment or opinion based on facts which are set forth in the publication or which are otherwise known or available to the reader or listener as a member of the public. [From, 400 So. 2d at 57.] Mixed expression of opinion occurs when

41

an opinion or comment is made which is based upon facts regarding the plaintiff or his conduct that have not been stated in the publication or assumed to exist by the parties to the communication. Id.; Stembridge v. Mintz, 652 So. 2d 444, 446 (Fla. Dist. Ct. App. 1995). . . . When making this assessment, a court should construe statements in their totality, with attention given to any cautionary terms used by the publisher in qualifying the statement. Keller, 778 F. 2d at 717.

879 F.3d at 1262–63. Further, "[c]ommentary or opinion based on facts that are set forth in the article or which are otherwise known or available to the reader or listener are not the stuff of libel." Rasmussen v. Collier Cnty. Publ'g Co., 946 So. 2d 567, 571 (Fla. 2d DCA 2006).

### 1. Reed I

Reed alleges many statements are defamatory that constitute non-actionable rhetorical hyperbole or opinion (or both). Beginning with one statement made on the Horace Langley's Podcast, Reed zeroes in on a segment where Chamblee criticizes LIV golf players' choice to join LIV as follows:

So if they're aligning themselves with a tyrannical, murderous leader . . . look if you if you [sic] look at who MBS is . . . centralizing power, committing all these atrocities, you look at what he's doing to the citizens of his . . . of his country ask yourself I mean would you have played for Stalin[,] would you have played for Hitler[,] would you have played for Mao[,] would you play for Pol Pot," [Froggy] "would you have played for Putin?" [Chamblee in agreement] "would you have played for Putin . . . which . . . and this [is] who this guy is. He settles disputes with bonesaws.

(Doc. 28 Lo¶ 58) (alterations in original).

42

Reviewing these statements in their totality, <u>see</u> <u>Keller</u>, 778 F.2d at 717, though Chamblee criticizes LIV golfers as a group and LIV for its association with Mohammed bin Salman (the Crown Prince and Prime Minister of Saudi Arabia), the statements nevertheless qualify as non-literal, hyperbolic commentary that the First Amendment allows. The Eleventh Circuit, courts within this Circuit, and Florida courts have found similar statements non-defamatory. <u>See</u> <u>e.g.</u>, <u>Horsley</u>, 292 F.3d at 701 (the defendant's statement that the plaintiff was "an accomplice to homicide" was protected under the First Amendment "as an imaginative and figurative expression that could not have been taken by a reasonable viewer of the Program as a literal assertion of facts.");[15] <u>Fortson</u>, 434 F. Supp. 2d at 1373–85 (calling a member of rival basketball team a "thug," "thugged out," "a vacant lot," a "meaningless mass," and "gangstas or wankstas" constituted non-actionable rhetorical hyperbole, as no reasonable reader could interpret them as facts about the plaintiff); <u>Pullum v. Johnson</u>, 647 So. 2d 254, 257 (Fla. 1st DCA 1994) (calling the plaintiff a "drug pusher" could not reasonably be understood as stating an actual fact about the

---

[15] The Eleventh Circuit applied the First Amendment and Georgia law in this case. However, the standard regarding permissive "rhetorical hyperbole" that "cannot reasonably be interpreted as stating actual facts about an individual" arises from the United States Supreme Court's holding under the First Amendment. <u>Horsley</u>, 292 F.3d at 701 (citing <u>Milkovich v. Lorain Journal Co.</u>, 497 U.S. 1, 20 (1990) (citing <u>Hustler Magazine v. Falwell</u>, 485 U.S. 46, 50, 53–55 (1987))).

43

plaintiff's illegal association with drugs). A reasonable listener of the statements at issue would not understand Chamblee's commentary as stating an actual fact about Reed[16] or any other LIV golfer's association with bin Salman. Rather, the commentary reflects Chamblee's hyperbolic opinion about LIV golfers choosing to play for LIV given its financial support from Saudi Arabia.

Notably, a case Reed heavily relies on supports this conclusion. In Dershowitz v Cable News Network, 541 F. Supp. 3d 1354, 1366 (S.D. Fla. 2021), the parties agreed that a commentator's statements were non-actionable rhetorical hyperbole, when the commentor called the plaintiff's arguments at an impeachment trial "un-American" and stated that he was "redefining the powers of the President," that his position "blows your mind," and that his argument "is what you hear from Stalin . . . what you hear from Mussolini, what you hear from authoritarians." The Dershowitz parties agreed no liability attached to those statements, and instead, the parties and the court focused on alleged defamatory factual comments—such as CNN reporting that the plaintiff "said a President could do anything without liability" contrary to the context of the plaintiff's statement. Id. Chamblee's statements about bin Salman mimic

---

[16] This statement also does not concern Reed and therefore does not satisfy the "of and concerning" requirement. However, given the nature of the opinion and its direction towards LIV golfers, the Court chooses to analyze it under this element of defamation.

the same type of non-actionable commentary in <u>Dershowitz</u>. <u>See</u> <u>also</u> <u>Trump v.</u> <u>Cable News Network, Inc.</u>, -- F. Supp. 3d --, 2023 WL 4845589, at *5 (S.D. Fla. July 29, 2023) (finding statements calling former President Donald Trump "Hitler-like" "not a verifiable statement of fact that would support a defamation claim" (citation omitted)).

Further, Chamblee's statement is not capable of being proven false. Although Reed alleges the statement accuses him "of aligning himself with a 'tyrannical, murderous (sportswashing) leader,'" (Doc. 28 ¶ 59), whether a person "aligns" himself with another is an amorphous expression that cannot be proven or disproven. The context of the statement supports that Chamblee expresses a hyperbolic opinion about the LIV players' affiliation with the leadership of Saudi Arabia, as immediately after the alleged statement, Chamblee states that bin Salman "runs this league, who runs that fund, which runs and funds this tour." (<u>See</u> Doc. 28 ¶ 57 n.5; Travis Fulton, <u>Brandel</u> <u>Chamblee Thoughts of the LIV Golf Tour</u>, at 19:37–19:45, YOUTUBE (June 14, 2022), https://www.youtube.com/watch?v=xXxnqWJdWhI&t=339s). This clarification of his opinion supports a reasonable understanding that Chamblee disapproves of players joining LIV because of LIV's financial support and relationship with bin Salman. Notably, Reed does not dispute that bin Salman is associated with LIV and Reed alleges that LIV "is financially backed by the Public Investment Fund of Saudi Arabia," thereby acknowledging the

relationship about which Chamblee opines. (Doc. 28 ¶ 28). In the same podcast, the alleged statement by Chamblee that LIV players were "over there purely playing for blood money" also constitutes opinion,[17] as it is Chamblee's subjective assessment of LIV players' conduct and is not readily capable of being true or false. See Turner, 879 F.3d at 1264 (finding statement that the plaintiff participated in "homophobic taunting" of someone else a non-actionable opinion) (citing Michel, 816 F.3d at 697). Therefore, all claims based on these statements must be dismissed.

Reed also asserts that Chamblee, Bacon, and Hack each made defamatory statements about Reed's performance at the Farmer's Insurance Open ("FIO") in early 2021. (Doc. 28 ¶¶ 76–88). The statements concern an incident at the FIO where Reed "claimed embedded ball relief," which resulted in PGA Tour officials "clear[ing] [Reed] to take a free drop" and "absolv[ing]" him of any wrongdoing. Id. ¶¶ 76, 78, 85. As reported in one of the articles containing allegedly defamatory statements and cited in the Amended Complaint, Reed won the FIO but the embedded ball incident occurred at the tenth hole when he sought "relief after pulling his approach shot from a fairway bunker into the

---

[17] Reed alleges that Chamblee says "Mr. Reed is 'over there purely playing for blood money.'" (Doc. 28 ¶ 142). This allegation suggests Chamblee directly identifies Reed in this statement, but he does not; instead, he refers to LIV "players" playing for "blood money." (See Doc. 28 ¶ 57 n.5; Travis Fulton, Brandel Chamblee Thoughts of the LIV Golf Tour, at 11:55–12:01, YOUTUBE (June 14, 2022), https://www.youtube.com/watch?v=xXxnqWJdWhI&t=339s).

46

left rough" despite television coverage showing the ball bounced. <u>See</u> <u>id.</u> ¶ 78 n.9; Ryan Crombie, <u>Brandel Chamblee slaughters Patrick Reed over rules row</u>, Bᴜɴᴋᴇʀᴇᴅ (Feb. 1, 2021), https://www.bunkered.co.uk/golf-news/brandel-chamblee-slaughters-patrick-reed-over-rules-row. The article notes Reed "was adamant neither he nor anyone in his group saw the ball bounce" and then he "marked his ball and picked it up before a rules official could inspect the lie." <u>Id.</u> The article notes the PGA Tour officials "cleared" Reed, but the incident "sparked fury" across golfers. <u>Id.</u>

Reed contests none of those statements describing what happened; rather, he claims defamation in several quotes from Chamblee within the article about Reed's conduct. Chamblee is quoted saying that what Reed "<u>appeared</u> to be doing" was unethical because it "violated" "an unwritten code which players adhere to around the golf ball." <u>See</u> <u>id.</u> ¶¶ 78–82 & 78 n.9; Crombie, <u>supra</u> (emphasis added).[18] Chamblee then states, "I either messaged or talked to 15

---

[18] The full section of the article states:

"In the same way that there is a distinction between law and morality, there is a mark distinction, in this case, between what he was legally allowed to do and what he ethically appeared to be doing," said Chamblee, speaking on the Golf Channel.

"There is an unwritten code which players adhere to around the golf ball. He violated that code in so many ways that even the rules officials themselves were stammering as to how to address it."

Crombie, <u>supra</u>. Reed challenges the first statement in the quotation too. (Doc. 28 ¶ 80).

to 20 current and past tour players, some of them Hall of Fame members, over the past 24 hours and not a single player is in defense of what Patrick Reed did," which Reed alleges constitutes defamation. (Doc. 28 ¶ 78). Finally, Chamblee says:

> Ask yourself this: if everybody in the field were to conduct themselves around a golf ball in this manner, would it be good for the game of golf? It would not be. It would call into question every single movement or drop that every single player would be making. It would cause an uproar on the PGA Tour.

Id. Reed pleads these statements defame him because they accuse him of "cheating and violating the code that golfers adhere to," and "falsely state that [Reed] lacks ethics or morals." Id. ¶¶ 79, 82. He also claims Chamblee did not disclose "material exculpatory information" as he "refused to talk about [Reed's] great performance." Id. ¶¶ 81, 82.

Contrary to Reed's allegations, the publication that quotes Chamblee plainly discloses the relevant facts regarding the incident at the FIO, including that PGA Tour officials cleared Reed after the incident and that Reed won the event. See Crombie, supra. In context with the factual background, Chamblee's statements regarding Reed's conduct at the FIO qualify as non-actionable opinion. See Skupin, 314 So. 3d at 356 (holding that "[c]ommentary or opinion based on facts that are set forth in the subject publication or which are otherwise known or available to the reader or listener do not constitute libel" and affirming dismissal of defamation claim because in viewing the broadcasts,

48

the trial court determined the four reports at issue amounted to no more than expression of opinion and commentary gleaned from an investigation and stated facts).

Commentary about whether a player's conduct violates an alleged unwritten ethical code cannot be disproven. See Turner, 879 F.3d at 1264 ("This statement is the Defendants' subjective assessment of Turner's conduct and is not readily capable of being proven true or false." (citation omitted)). And commentary based on facts documented in the article constitutes pure opinion and is thus protected speech. See Ozyesilpinar v. Reach PLC, 365 So. 3d 453, 460 (Fla. 3d DCA 2023). Finally, as to the statement where Chamblee claims he spoke with fifteen to twenty current and past tour players, none of whom defended Reed's conduct—though it is a provable statement whether he spoke to fifteen to twenty individuals, the statement expresses rhetorical hyperbole, not a literal statement of fact. Reed relies on Saadi v. Maroun, but the facts are distinguishable. In Saadi v. Maroun, No. 8:07-cv-1976-T-24-MAP, 2008 WL 4194824, at *3 (M.D. Fla. Sept. 9, 2008), the court found that the plaintiff sufficiently alleged defamatory statements when the defendants labeled the plaintiff as "a mentally unstable stalker, a criminal," stated "he has received gifts paid for with money stolen from the Lebanese government," and asserted he falsely claimed to have a law degree and committed statutory rape, which the defendants claim they knew based on an "investigation." The court held that

49

such statements imply factual knowledge and are "not merely subjective characterizations of publically-available [sic] information." Id. In other words, the statements were capable of being proven false. The statement here regarding whether other tour players "defended" Reed's conduct at a golf event when speaking with Chamblee is based on Chamblee's subjective interpretation of the conversations, and reading the statement in context reflects Chamblee's opinion that he and other players disapproved of Reed's conduct.[19]

Reed's other allegations against Hack and Bacon's commentary on a broadcast about the same incident at the FIO similarly fall short. (See Doc. 28 ¶¶ 83–88). Hack and Bacon start their broadcast showing the USGA's definition of an embedded ball, USGA Rule 16.4 regarding embedded balls, video footage of Reed with the ball, Reed's interview about the incident, an interview with the Senior Tour Director, and then Hack and Bacon providing their commentary on how they viewed the incident. See id. ¶ 83 n.10; GOLF CHANNEL, Patrick Reed has lost the benefit of the doubt after another controversy, YOUTUBE (Jan. 31, 2021), https://www.youtube.com/watch?v=aIKObXgWpRY. He alleges the following statements are made in the broadcast:

- "I'm just not comfortable with Patrick's behavior around the ball. You know, I always thought that the golf ball -- you treat it like the Hope Diamond. You treat it like a Fabergé

---

[19] This statement presents a closer question. But even if it could be defamatory, Reed pleads no facts demonstrating actual malice, and thus, no defamation claim may proceed based on this statement. See infra III.c.

egg, especially when it comes to an unclear situation. <u>So right here we're seeing Patrick kind of hovering over where he says the ball was embedded and it's just hard to know what he's doing</u>. Like where is the official at this point? You know, we're supposed to take him at his word, but there's -- <u>there just seems to be smoke</u>." (Doc. 28 ¶ 84).

- "To me, this looks bad for Patrick Reed, a guy that has history of doing these things." <u>Id.</u> ¶ 86.

- "So now we have to lean on the fact that Patrick Reed does have a history. I go back to 2019 in the Bahamas, the Par 5, 11th hole where he, you know, has the brushing away of the sand; and then later says, "Well, it's my word against their word." And he says that "When I get in the sand" -- he says, "I'm afraid of getting close to the cup hole." That's his direct quote. "I'm afraid." "Every time I get in the bunker, I'm scared to even get my club close to it." He's close to it, Shane Bacon. He's not just close to it. He's sweeping it away. When you tell me that high-level players can tell me the difference between two clubs that weigh a .01 ounce difference. He's not feeling that? So we already have this situation. And we have the smoking mirrors [sic] about his time in Georgia where he was kicked off of the team and had to transfer to Augusta State. So he does have a history and now we have another situation." <u>Id.</u> ¶ 87.

This type of commentary is pure opinion based on the facts and video footage played before and during the publication of the statements. <u>See</u> <u>Town of Sewall's Point v. Rhodes</u>, 852 So. 2d 949, 951 (Fla. 4th DCA 2003) (reversing and directing entry of judgment for appellants because no defamation occurred when statements on a framed photograph amounted to "pure opinion" as "[t]here [was] no implication that [the defendant's] opinion [was] based on a concealed or undisclosed set of defamatory facts" and "anyone viewing the photograph" could draw his own conclusions as to the photograph). To the

51

extent that Hack and Bacon referenced Reed's "history of doing these things," this too constitutes non-actionable opinion, as within these statements, Hack references the facts he relies on, including an incident at a tournament in the Bahamas and when Reed transferred from Georgia to Augusta State. (See Doc. 28 ¶ 87). Accordingly, Reed's allegations premised on Bacon and Hack's commentary fails to state a claim for defamation. See id. ¶¶ 84–87.

Finally, to the extent Reed claims defamation concerning statements in the article reporting on the previous dismissal of the complaint in Reed I,[20] his allegations fail. See id. ¶¶ 111–15. The article propounds no opinions; instead, it reports that this Court previously dismissed the complaint in Reed I. (See Docs. 27 in 3:22-cv-1059; 25 in 3:22-cv-1181). The Court can take judicial notice of its own files. The Court did dismiss the original complaint (with leave to amend, which the article references). (See Doc. 27 in 3:22-cv-1059; Cameron Jourdan, LIV Golf: Patrick Reed's $750 million defamation lawsuit dismissed in Florida court, GOLFWEEK (Nov. 18, 2022), https://golfweek.usatoday.com/20 22/11/18/liv-golf-news-patrick-reed-defamation-lawsuit-dismissed-750-million-

---

[20] Reed alleges the defamatory statements are the title of the article, "LIV Golf: Patrick Reed's $750 million defamation lawsuit dismissed in Florida court" and the statement "Patrick Reed's $750 million defamation lawsuit, which was originally filed Aug. 16 in Texas and eventually refiled in Florida the next month, has been dismissed." (Doc. 28 ¶¶ 112, 113; see also Jourdan, infra).

florida-court/). True statements are not actionable. <u>Turner</u>, 879 F.3d at 1262. So, the claims premised on this article warrant dismissal.

### 2.   *Reed II*

Numerous alleged defamatory statements in Reed II also constitute non-actionable statements of facts or opinions. See <u>Johnson v. Clark</u>, 484 F. Supp. 2d 1242, 1247 (M.D. Fla. 2007) ("Whether a statement is one of fact or one of opinion is a question of law."). Reed II's allegations largely focus on statements in a book authored by Defendant Ryan and published by Defendant Hachette: <u>The Cup They Couldn't Lose: America, the Ryder Cup, and the Long Road to Whistling Straits</u> (the "Book"). (Doc. 27 ¶ 67). Many of the alleged statements in the book were republished from an earlier book authored by Ryan and published by Hachette titled <u>Slaying the Tiger: a Year Inside the Ropes on the New PGA Tour</u>. <u>Id.</u> The statements concern different moments in Reed's career when third parties accused Reed of cheating in golf events or otherwise expressed dislike for Reed. See <u>id.</u> ¶¶ 70–84. Reed calls the following statements defamatory:

- First Chapter titled: "December 2019, Melbourne, Australia, Fires Down Under . . . <u>The Greatest Escape</u> . . . <u>The End of the Legend of Patrick Reed</u>." <u>Id.</u> ¶ 70.

- "[Reed had] been kicked out of Georgia after a year for two alcohol violations, the second of which he tried to hide from his coach, and before that he'd been accused by his teammates of cheating during a qualifying event. Then he went to Augusta State, where he turned the entire team

against him almost immediately, and once again he was accused of cheating, this time by shaving strikes in two straight qualifying events. His teammates held a meeting and voted to kick him off the team, but Augusta State coach Josh Gregory reduced it to a two-match suspension." Id. ¶ 72.

- "When the ugly details came out, Reed set to work blundering his way into deeper trouble, which was the start of a PR strategy that he's doggedly stuck to ever since. He went on Golf Channel, produced a couple of vague statements from his coaches, and generally took the path of full denial. The end result was that Reed's teammates, who had previously been silent came out of the woodwork to crucify him further, confirming old details and adding new ones." Id. ¶ 74.

- "Reed found himself in a waste area that looked indistinguishable from a sand trap. The rules, though, are different: in the waste area, a player is allowed to ground his club. Which is exactly what Reed did, but then he proceeded to drag the club backward, sweeping away the sand in front of his ball. Then he resettled the club and did it again. This is blatantly illegal, and nothing about it was ambiguous. Reed had improved his lie by clearing the path to his ball, and when the first effort wasn't satisfactory, he did it again. The TV camera caught him red-handed, and Golf.com's Dylan Dethier, on the scene, heard Rickie Fowler say, I don't even know what you have to review." Id. ¶ 77.

- "Reed was assessed a two-stroke penalty when the round was over, but the bigger problem was the hit to his reputation. Before long, someone dug up a clip of him doing the same exact thing at a 2015 tournament, and for a guy whose credibility was already in the mud, who had been accused of cheating in the past, it was like throwing gas on the flames. He was skewered." Id. ¶ 80.

- "Chamblee went so far as to say that when Tiger added Reed to the team, he 'made a deal with the devil.' By forcing the Americans to defend him[,] Reed put them in an impossible situation and forced them to greet an obvious violation – one

that would have horrified most of them to commit, in a sport where players frequently call penalties on themselves even when the camera aren't running – with silence, putting their own integrity on the line." Id. ¶ 82.

- "It figured that the first time anyone on Reed's team had been honest and open with the media, it would be a caddie admitting he'd shoved a fan." Id. ¶ 84.

With regard to paragraphs 72 and 74, which concern accusations of cheating, Reed does not sufficiently allege these statements contain false statements of fact. In the subsequent paragraphs following both allegations, Reed claims each statement is "false, malicious, and defamatory on its face" because it falsely states that he "cheated during his NCAA playing career." See id. ¶¶ 73, 75. But herein lies the problem: Ryan never says that Reed cheated in the qualifying events, and a person of common mind would not believe he does. See Loeb, 66 So. 2d at 245 ("The publication made should be construed as the common mind would understand it," and not "in their mildest or most grievous sense."). Rather, these statements describe Reed's teammates accusing him of cheating and speaking out against him. Reed does not allege his teammates never made the accusations. See id. ¶¶ 73, 75. Notably, Reed even affirmatively pleads that his teammates "had every reason to get rid of [him] on the team, and that is what they did," id. ¶ 76, which only supports Ryan's assertions that Reed's teammates accused Reed and attempted to remove him from the team. At most, Reed alleges he provided "public statements by his

55

coaches—who would have been privy to any cheating accusations—that they were unaware of any cheating accusations against" Reed. Id. ¶ 73. But Reed never alleges that his teammates never accused him of cheating, as required to state a defamation claim. See e.g., Jones v. BuzzFeed, Inc., 591 F. Supp. 3d 1127, 1142 (N.D. Ala. 2022) (applying Alabama law and concluding that the article titled "How Accusing a Powerful Man of Rape Drove A College Student To Suicide" was not defamatory because the facts of the headline were true, as a person accused the plaintiff of rape and later committed suicide); cf. Johnston v. Borders, 36 F.4th 1254, 1275–76 (11th Cir. 2022) (alleged statement by animal shelter employee that she was directed to euthanize animals "that had been [at the shelter] over a certain amount of time" constituted defamation because a reasonable jury could find that statement was false when the director did not direct employee to euthanize animals "that had been [at the shelter] over a certain amount of time," but rather told her to euthanize animals documented as having behavioral or medical issues that made them unadoptable).

The remaining statements by Ryan and Hachette constitute pure opinion. Reed alleges the title of the first chapter, "The Greatest Escape . . . The End of the Legend of Patrick Reed," "is telling and of great legal significance" and defamatory in itself. (Doc. 27 ¶ 70–71). But the title alone propounds no facts, let alone false statements of fact. See e.g., Trump, 2023 WL 4845589, at *5

56

(finding former President Donald Trump's complaint "that CNN described his election challenges as 'the Big Lie'" dismissible because it contained no false statement of fact).

Similarly, Ryan's commentary and reporting about Reed's conduct at the 2019 Hero World Classic Tournament as "blatantly illegal," and not "ambiguous," and "an obvious violation" constitutes protected opinion. (See Doc. 27 ¶¶ 77, 82). Ryan provides the necessary factual background on which he bases his opinions within the Book by describing Reed's situation that caused the two-stroke penalty and reactions by other spectators as context for his opinions. Id. Critically, Reed does not allege the facts contained in Ryan's statements are false, including the penalty he received and the reaction by Rickie Fowler. Id. ¶¶ 77–80. Rather, he alleges the statements are defamatory because they "accuse[] [Reed] of intentionally cheating" during the event, when the video of the matter "at worst" showed "an unintentional error" by Reed. Id. ¶ 78.[21] But Ryan simply expresses his perception of a factual event that Reed admits occurred. Speakers, writers, and publishers have leeway in stating their impression of disclosed facts. See Greenbelt Coop. Publ'g Ass'n v. Bresler, 398 U.S. 6, 13–14 (1970) (use of the term "blackmail" during a heated debate to

---

[21] Although Reed alleges the broadcast of the event was "doctored," Reed does not allege Ryan intentionally relied on "doctored" footage in making his statement. (Doc. 27 ¶ 78).

characterize the negotiating position of a public figure was not "slander," and a news report describing the characterization in full context was not "libel," as it was impossible to believe that a listener or reader of the comments would think that a crime had been charged); <u>Donnelly v. McConnell</u>, No. 6:12–cv–670–Orl–22KRS, 2012 WL 2402803, at *4 (M.D. Fla. June 26, 2012) (dismissing with prejudice defamation claim because alleged statements were the writer's "own assessments, opinions, and characterizations," which drew upon his experiences and facts stated in the letter or "otherwise assumed"); <u>Readon</u>, 317 So. 2d at 1237–38 (holding the complaint failed to allege any defamatory implication about the plaintiff's "potentially underhanded business dealings" because merely reporting on negative statements about the plaintiff's profession did not imply anything beyond what was specifically stated). Ryan's expression is protected and thus non-actionable.

The next two alleged statements fare the same. (<u>See</u> Doc. 27 ¶¶ 82, 84). Ryan's commentary about "forcing the Americans to defend" Reed and putting "them in an impossible situation" after the harsh response to Reed's penalty echoes of hyperbolic opinion. <u>Id.</u> ¶ 82; <u>see</u> <u>Fortson</u>, 434 F. Supp. 2d at 1378–79. Although Reed alleges the statement is a "false exaggeration" and that he "never forced his teammates to say anything, nor could he," (Doc. 27 ¶ 83), such reading prescribes a hyper-literal meaning to the comment rather than a common understanding. <u>See</u> <u>Horsley</u>, 292 F.3d at 701 ("[B]oth the Supreme

Court and this Court of Appeals have long recognized that a defamation claim may not be actionable when the alleged defamatory statement is based on non-literal assertions of 'fact.'" (citations omitted)).

Ryan's final statement concerns an incident where a caddie on Reed's team shoved someone who shouted an expletive-laden insult at Reed during a golf event. (Doc. 27 ¶ 84; Shane Ryan, <u>The Cup They Couldn't Lose: America, the Ryder Cup, and the Long Road to Whistling Straits</u>, 11 (2022)). After describing the incident, Ryan writes, "It figured that the first time anyone on Reed's team had been honest and open with the media, it would be a caddie admitting he'd shoved a fan." <u>Id.</u> Reed alleges this falsely indicates he lied before. <u>Id.</u> ¶¶ 84, 85. This statement in context, though perhaps strongly worded, expresses an opinion about the first time someone from Reed's team spoke after the backlash Reed received following the Hero World Challenge. The statement is not objectively falsifiable. <u>See</u> <u>Markle</u>, 2023 WL 2711341, *9. Therefore, though such a statement may be snarky, when considering it in the totality of the publication, it constitutes opinion. <u>See</u> <u>Hay</u>, 450 So. 2d at 295.

As all of Ryan and Hachette's statements are non-actionable, to the extent any of those same statements are repeated in other publications, those statements are also non-actionable. Further, the article authored by Newsham, published by Fox Sports and the New York Post, and the article authored by Ferguson and published by the Associated Press, each contain statements and

information either derived from the Book or substantially similar statements to those in the Book that are non-actionable. Those statements include:

- "'Don't know they'd p*** on him if he was on fire': The scandalous truth of golf's biggest villain." (Doc. 27 ¶ 87).

- "The scandalous truth about Patrick Reed, the bad boy of golf" Id.

- "Detailing the long history of the Ryder Cup, Ryan explains how 2020 US captain Steve Stricker managed to galvanise [sic] a team so often incapable of beating their European counterparts — and how he solved the perennial problem of Patrick Reed." Id. ¶ 91.

- "During one qualifying round, Reed hit his ball into the rough but when they found it, it was, miraculously, closer to the fairway. Convinced he was cheating, Reed was challenged by his teammates but denied any wrongdoing. It was a similar story when Reed attended Augusta State. This time, he stood accused of shaving strokes off his scorecards and while his teammates voted to kick him off the team, his coach reduced the sanction to a two-match suspension." Id. ¶ 95.

- "Golf analyst Brandel Chamblee, meanwhile, suggested that in picking Reed, Woods had 'made a deal with the devil.' He was right." Id. ¶ 98.

- "At the Hero World Classic in the Bahamas prior to the Presidents Cup, Reed was spotted trying to improve the lie of his ball, not once but twice. Reed blamed it on the angle of the TV cameras making it look worse than it was but he was still penalised [sic] two strokes. As Ryan writes: 'Making a deal with the devil is useful only if the devil can give you something important in exchange . . . .'" Id. ¶ 100.

- "Free from the trouble that followed Reed around like a puppy, the US team jelled like never before, coasting to a record win over Europe, winning 19-9. Petty feuds were forgotten, egos left at the locker room door and any chance

60

of disruption had been eradicated. Finally, the US players were a team, not just a dozen millionaire golfers thrown together. And, as Ryan writes, it showed 'what happens when American power is no longer stifled by mismanagement, but elevated and ultimately unleashed by a superb captaincy.'" Id. ¶ 102.

- "The violation was so egregious that Rickie Fowler, glancing at the replay on television, quickly raised his eyebrows and said: "Whoa! What was THAT?"

  It was Patrick Reed.

  This was just over a year ago in the Bahamas, the day Reed infamously used the back of his wedge to scoop away sand — twice — from behind his golf ball in a waste bunker, improving his line of play. Only when he was shown video evidence did Reed accept the two-shot penalty, but not before suggesting the camera angle made it look worse than it was.

  The penalty, as it turns out, was worth more than two shots.

  There is no greater punishment in golf than being stuck with a reputation for cheating." Id. ¶ 107.

- "Moving past this one will be almost impossible." Id. ¶ 109.

- "He pulled his approach from a fairway bunker into thick grass left of the 10th green. Approaching where a volunteer had marked the spot with a tiny flag, Reed asked if the ball bounced. 'No, I didn't see it bounce,' the volunteered replied.

  He turned to his playing partners, PGA Tour rookie Will Gordon and second-year player Robby Shelton, and told them, 'They said it didn't bounce,' and that he would check for an embedded lie. Crouching over, he marked the spot with a tee, put the ball in the palm of his hand and kept probing the turf for about 5 seconds when he called for an official. And then he poked around for another five seconds.

'I believe it broke ground, but I'm going to let you make that call,' Reed told Brad Fabel, the rules official.

Fabel didn't immediately know what he was talking about because Reed had placed the ball about 8 feet away.

Reed showed him where the ball was, Fabel poked around and agreed there was a 'lip,' meaning the ball had broken the plane of the soil.

Free drop." <u>Id.</u> ¶ 111.

<u>Id.</u> ¶¶ 87 n.5–6, 105 n.7; <u>see also</u> Gavin Newsham, <u>'Don't know they'd p\*\*\* on him if he was on fire': The scandalous truth of golf's biggest villain</u>, Fox Sports, (Sept. 18, 2022), https://www.foxsports.com.au/golf/dont-know-they-p-on-him-if-he-was-on-fire-the-scandalous-truth-of-golfs-biggest-villain/news-story/e7c3b7dd1a5b3d0bbdb0758ccc3960f9; Gavin Newsham, <u>The scandalous truth about Patrick Reed, the bad boy of golf</u>, New York Post (Sept. 17, 2022), https://nypost.com/2022/09/17/the-scandalous-truth-about-patrick-reed-the-bad-boy-of-golf/; Doug Ferguson, <u>Column: Reed's reputation from Bahamas the ultimate penalty</u>, Associated Press (Feb. 2, 2021), https://apnews.com/article/sports-bahamas-patrick-reed-golf-rickie-fowler-8d0fa7ed6f764ddf3195e23e005c53a4.

These statements likewise report on commentary about instances of penalties or accusations of cheating in golf events or other misdeeds against Reed (Doc. 27 ¶¶ 95, 100, 107, 109, 111) and statements about Reed's professional reputation (<u>Id.</u> ¶¶ 87, 91, 98, 102). The Court declines to walk

through each statement in as much detail as others because the analysis remains the same. For Newsham's articles, Reed alleges Newsham "republish[ed]" content from the Book and that the statements regarding accusations of cheating publish "the falsity" that Reed cheated in his career. See id. ¶¶ 88, 96, 97, 101. As discussed before, Reed fails to allege that the facts in the articles are false, as required to state a defamation claim. Therefore, the statements in Paragraphs 95 and 100 constitute non-actionable statements of fact. All other statements in paragraphs 87, 91, 98 and 102 qualify as pure opinion about Reed.

As to Ferguson's article, Reed alleges much of the same, pleading that Ferguson's statements about Reed's penalty at the Hero World Challenge accused him "of being a cheater" and that Ferguson's statements about Reed's performance at another golf event falsely implied that Reed "had somehow gotten away with cheating." Id. ¶¶ 107, 108, 109, 111, 112. Again, Reed does not contest the truth of the facts contained in the statements. Rather, he contests the opinions based on those statements of fact, like "[t]here is no greater punishment in golf than being stuck with a reputation for cheating" when Ferguson described Reed's two-shot penalty at the Hero World Challenge and Reed's abusive treatment by spectators thereafter. Id. ¶ 107; Doug Ferguson, Column: Reed's reputation from Bahamas the ultimate penalty, ASSOCIATED PRESS (Feb. 2, 2021), https://apnews.com/article/sports-bahamas-

patrick-reed-golf-rickie-fowler-8d0fa7ed6f764ddf3195e23e005c53a4. But like those that came before, Ferguson discloses true statements of facts and bases his opinions on those statements—a form of permissible speech. See Turner, 879 F.3d at 1262–63. Therefore, Reed states no viable claims premised on the statements in Ferguson's article and published by the Associated Press.

Only one statement remains, and it gives the Court pause. In Newsham's article where he describes an instance between Reed and his college team, he writes: "When items including a watch, a putter and $400 went missing from the locker room, teammates suspected it was Reed who had taken them, especially as he turned up the following day with a large wad of cash." (Doc. 27 ¶ 93). As to this statement, Reed alleges "[t]his statement is false, malicious and defamatory because it falsely accuses [Reed] and/or implies that [Reed] stole from his teammates. This has never been any accusation [sic] that this occurred and [Reed] never stole from his teammates." Id. ¶ 94 (emphasis added). In its motion, the New York Post argues this anecdote originated in Ryan's 2015 and 2022 books, along with an article titled The Villain: Patrick Reed that predated the 2015 book, and Newsham's article merely republished the information. (Doc. 33 at 7, 9). Reed concedes the anecdote about allegedly "stealing from his teammates" in college appeared in the 2015 article. (Doc. 42 at 6–7, 14). Regardless of the republication, the statement nevertheless remains potentially defamatory on its face because Reed asserts it contains false

64

statements of fact, i.e. the accusations by his teammates never happened. Therefore, the statements contained in paragraph 94 are potentially actionable, so the Court proceeds to assess Reed's allegations of actual malice. Wolfson, 273 So. 2d at 776.

Thus, only one statement alleged in Reed II may be defamatory, but none of the other alleged statements survive the motions to dismiss.

### c. Actual Malice

Although only one of the alleged statements in Reed II potentially is actionable, even assuming arguendo all statements in both cases were, the Court assesses whether the actual malice standard is met. "Determining whether an individual is a public figure—and thus subject to the actual malice analysis—is a question of law for the court to decide." Michel, 816 F.3d at 702. "An individual may qualify as a public figure either generally—that is one with such fame and notoriety that he will be a public figure in any case—or for only limited purposes, where the individual has thrust himself into a particular public controversy and thus must prove actual malice in regard to certain issues." Berisha v. Lawson, 973 F.3d 1304, 1310 (11th Cir. 2020) (internal quotation marks and citation omitted).

Reed's status as a professional golfer, who has won nine PGA Tour Tournaments, and has "remained a top player in the world," makes him a public figure. (See Docs. 28 ¶ 14 in 3:22-cv-1059; 27 ¶ 19 in 3:22-cv-1181). Sports

figures generally are public figures, and Reed does not refute this in his briefing. See Curtis Publ'g Co. v. Butts, 388 U.S. 130, 154–55 (1967) (college football coach and athletic director); Marcone v. Penthouse Int'l Mag. for Men, 754 F.2d 1072, 1083 (3d Cir. 1985) ("[S]ports figures are generally considered public figures because of their position as athletes or coaches."); Brewer v. Memphis Publ'g Co., 626 F.2d 1238, 1254–55 (5th Cir. 1980) (former college and professional football player); Time, Inc. v. Johnston, 448 F.2d 378, 380 (4th Cir. 1971) (former professional basketball player and current college assistant coach); Vandenburg v. Newsweek, Inc., 441 F.2d 378, 379 (5th Cir. 1971) (college track coach). Because Reed is a public figure, he must sufficiently allege facts showing actual malice by the defendants to maintain his claims. Nodar v. Galbreath, 462 So. 2d 803, 806 (Fla. 1984) (citing Sullivan, 376 U.S. at 280).[22]

---

[22] The parties dispute whether Reed must allege actual malice for his defamation per se claims. Indeed, courts disagree about the appropriate standard. Compare e.g., Lawnwood Med. Center Inc. v. Sadow, 43 So. 3d 710, 727 (Fla. 4th DCA 2010) ("Jones v. Greeley, 25 Fla. 629, 6 So. 448, 450 (1889), held that malice is an intrinsic part of actions for defamation per se in order that the jury may consider punitive damages."), with Saulsberry v. Elder, No. 21-CV-62362-SMITH/VALLE, 2022 WL 17830489, at *2 (S.D. Fla. Dec. 20, 2022) (holding that even when a plaintiff alleges a per se defamatory statement, "[n]evertheless, if the plaintiff is a public figure, plaintiff must also allege that defendant published the defamatory statement with actual malice." (citing Wallis v. Cueto, No. 17-CV-21014, 2017 WL 6388914, at *3 (S.D. Fla. Aug. 9, 2017))). The court in Corsi v. Newsmax Media, Inc. provides a thoughtful analysis:

> [W]hen a statement is "so obviously defamatory" and "damaging to [one's] reputation," it generally "gives rise to an absolute presumption both of malice and damage." Wolfson v. Kirk, 273 So.

To satisfy this standard, Reed "must allege facts sufficient to give rise to a reasonable inference that the false statement was made 'with knowledge that it was false or with reckless disregard of whether it was false or not.'" Michel, 816 F.3d at 702 (quoting Sullivan, 376 U.S. at 280). This is a subjective test, focusing on whether the defendant "actually entertained serious doubts as to the veracity of the published account, or was highly aware that the account was probably false." Id. at 703. Notably, "[e]ven an 'extreme departure from professional [publishing] standards' does not necessarily rise to the level of actual malice." Berisha, 973 F.3d at 1312 (quoting Harte-Hanks Commc'ns, Inc. v. Connaughton, 491 U.S. 657, 665 (1989)) (alteration in Berisha); see also Michel, 816 F.3d at 703 ("[A] failure to investigate, standing on its own, does not indicate the presence of actual malice." (citation omitted)); Klayman v. City Pages, No. 5:13-cv-143-Oc-22PRL, 2015 WL 1546173, at *16 (M.D. Fla. Apr. 3,

---

2d 774, 776 (Fla. 4th DCA 1973) . . . . However, Florida law applies the Supreme Court's ruling from the well-known First Amendment defamation case of Gertz v. Robert Welch Inc., 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), which eliminates presumed damages for defamation per se actions against media defendants. See Mid-Florida Television Corp. v. Boyles, 467 So. 2d 282 (Fla. 1985). Thus, the Florida Supreme Court's decision in Mid-Florida Television Corp. makes clear that a plaintiff suing a media defendant must nevertheless plead malice and damages. Edelstein v. WFTV, Inc., 798 So. 2d 797 (Fla. 4th DCA 2001).

519 F. Supp. 3d at 1119 (some alterations in original) (internal footnote omitted). The Court finds the Corsi analysis persuasive, and thus, Reed must plead actual malice for his defamation per se claims.

67

2015) (rejecting the argument that defendants' failure to contact plaintiff prior to publication established actual malice).

Looking past Reed's conclusory allegations of actual malice in both Amended Complaints, he attempts to satisfy actual malice in only a few ways. In Reed I, he alleges that "material exculpatory information was not disclosed" or was "omitted" or "belittled" by Defendants. (Doc. 28 ¶¶ 82, 85, 86, 88 in 3:22-cv-1059). He also alleges Defendants' refusal to print a retraction constitutes actual malice. Id. ¶ 133. In Reed II, he suggests a failure to investigate by Defendants Ryan and Hachette for "choos[ing] not to speak with" certain college coaches, teammates, and PGA Tour officials. (Doc. 27 ¶ 69 in 3:22-cv-1181). None pass muster.

A publisher's failure to include allegedly exculpatory information has no bearing on actual malice because a publisher is "not required to balance its reporting with potentially mitigating factors so long as the reporting [does] not purposely make false statements." Readon, 317 So. 3d at 1236 (cleaned up); see also Jacoby v. Cable News Network, Inc., No. 21-12030, 2021 WL 5858569, at *5 (11th Cir. Dec. 10, 2021) ("[The plaintiff] is not entitled to having Defendants credit his preferred sources of information or structure its articles in the manner that he desires."). A publisher's refusal to retract a statement also does not qualify as actual malice. See e.g., Dockery v. Fla. Democratic Party, 799 So. 2d 291, 296 (Fla. 2d DCA 2001) (holding that a publisher's failure to print

denials did not constitute actual malice); <u>Klayman v. City Pages</u>, 2015 WL 1546173, *15 (holding that the failure to retract or print a correction did not help establish actual malice). And a publisher's deficient due diligence must go beyond a failure to investigate, and must actually rise to extreme departure of publishing standards, which is not alleged factually here. <u>See</u> <u>Michel</u>, 816 F.3d at 703 ("[A] failure to investigate, standing on its own, does not indicate the presence of actual malice." (citation omitted)); <u>Klayman</u>, 2015 WL 1546173, at *16 (rejecting the argument that defendants' failure to contact plaintiff prior to publication established actual malice). Finally, contrary to Reed's assertions, actual malice is not satisfied "merely through a showing of ill will or 'malice' in the ordinary sense of the term." <u>Harte-Hanks</u>, 491 U.S. at 666.

Accordingly, Reed's Amended Complaints in both lawsuits fall short of alleging sufficient facts showing that any Defendant had actual malice. This deficiency is fatal to each defamation claim.[23]

---

[23] New York Post also raises the wire service defense. (Doc. 33 at 27 in 3:22-cv-1181). The wire service defense provides "a special protection for those who re-publish news reports from reliable news sources." <u>Nix v. ESPN, Inc.</u>, No. 1;18-cv-22208, 2018 WL 8802885, at *3 (S.D. Fla. Aug. 30, 2018) (citing <u>Layne v. Tribune Co.</u>, 146 So. 234, 238 (Fla. 1933)). Florida law provides that when one news source "republishes the content of a news story that was originally published by another reputable news agency or source, the republisher will not be liable if they relied on the research of the original publisher, absent a showing that the republisher had, or should have had, substantial reasons to question the accuracy of the articles or the <u>bona</u> <u>fides</u> of the reporter." <u>Nix v. ESPN, Inc.</u>, 772 F. App'x 807, 813 (11th Cir. 2019). The Court need not reach this issue here because none of the statements are actionable.

## IV.   TORTIOUS INTERFERENCE

Reed's only other type of claim against any Defendant in both suits is tortious interference. All of his tortious interference claims are barred under Florida's single action rule. Florida's "single publication/single action rule does not permit multiple actions to be maintained when they arise from the same publication upon which a failed defamation claim is based." <u>Ozyesilpinar</u>, 365 So. 3d at 461 (citations omitted). "Florida courts have held that a single wrongful act gives rise to a single cause of action, and that the various injuries resulting from it are merely items of damage arising from the same wrong." <u>Orlando Sports Stadium, Inc. v. Sentinel Star Co.</u>, 316 So. 2d 607, 609 (Fla. 4th DCA 1975) (quoted authority omitted). "Thus, if the defamation count fails, the other counts based on the same publication must fail as well because the same privileges and defenses apply." <u>Callaway Land & Cattle Co. v. Banyon Lakes C. Corp.</u>, 831 So. 2d 204, 208 (Fla. 4th DCA 2002) (citing <u>Fridovich v. Fridovich</u>, 598 So. 2d 65, 70 (Fla. 1992)). Courts also routinely dismiss duplicative tort causes of action under the single action rule. <u>See</u> <u>e.g.</u>, <u>Markle</u>, 2023 WL 2711341, *13 (dismissing injurious falsehood claim because it was based on the plaintiff's same statements as her failed defamation claims); <u>Tymar Distrib. LLC v. Mitchell Grp. USA, LLC</u>, 558 F. Supp. 3d 1275, 1286–88 (S.D. Fla. 2021) (dismissing tortious interference claim because it was premised on defamatory statements); <u>Ortega Trujillo v. Banco Cent. Del Ecuador</u>, 17 F. Supp. 2d 1334,

1339–40 (S.D. Fla. 1998) (dismissing false light privacy claim arising from same allegedly defamatory publication).

Reed argues his tortious interference claims are not premised on the defamatory statements; instead, they are based on Defendants "spreading lies of and concerning [Reed] in order to destroy his reputation, and to induce sponsors to break their contractual relationships with" Reed. (See e.g., Doc. 42 at 24–25 in 3:22-cv-1181). He further states "[t]here is nothing limiting these 'lies,' to the defamatory publications set forth [in] the Amended Complaint." Id. at 25. This response misses the mark. Although Reed does not plead explicitly in his Amended Complaints that the purported "lies" spread by each Defendant are the same as the alleged defamatory statements, he pleads no other factual allegations about how each Defendant spread lies. Therefore, the Amended Complaints premise the tortious interference claims on the defamation claims.[24] Because Reed's defamation claims are facially deficient, so are his tortious interference claims.

---

[24] Reed's argument that his tortious interference claims can be based on statements not alleged in the Amended Complaints fails too. To state a tortious interference claim, Reed must allege how each Defendant unjustifiably interfered with his business relationships. See Bortell v. White Mountains Ins. Grp., 2 So. 3d 1041, 1049 (Fla. 4th DCA 2009) (affirming dismissal of tortious interference claim in part because the plaintiff failed to allege how each defendant interfered with his relationships); Haney v. PGA Tour, Inc., No. 19-CIV-63108-RAR, 2020 WL 6470157, at *2–3 (S.D. Fla. March 30, 2020) (finding tortious interference claim sufficiently pleaded because the plaintiffs alleged "concrete examples" of the interference). Vague allegations as to how

71

## V.   LEAVE TO AMEND

District courts "should freely give leave [to amend] when justice so requires." FED. R. CIV. P. 15(a)(2). Whether "justice so requires" resides within the Court's discretion. Blackburn v. Shire US Inc., 18 F.4th 1310, 1317 (citing Burger King Corp. v. Weaver, 169 F.3d 1310, 1319 (11th Cir. 1999)). The Court considers five factors in deciding whether to provide an opportunity to amend: "(1) undue delay, (2) bad faith or dilatory motive, (3) repeated failure to cure deficiencies by amendment, (4) undue prejudice to the opposing party by virtue of allowance of the amendment, and (5) futility." Id. at 1317–18 (citing Foman v. Davis, 371 U.S. 178, 182 (1962); Burger King Corp., 169 F.3d at 1319); see also Bryant v. Dupree, 252 F.3d 1161, 1163 (11th Cir. 2001). An amendment is futile if the cause of action asserted could not withstand a motion to dismiss. See Fla. Power & Light Co. v. Allis Chalmers Corp., 85 F.3d 1514, 1520 (11th Cir. 1996). Here, dismissal with prejudice is appropriate for two reasons. First, the Court provided Reed an opportunity to amend in both suits, but his amendments were sparse and he continued to assert the same alleged defamatory statements, while not curing the deficiencies identified in the Orders dismissing the original complaints. (See Docs. 27 in 3:22-cv-1059; 25 in

---

Defendants allegedly interfered are insufficient. So even assuming the single action rule does not bar Reed's tortious interference claims, he nevertheless fails to state them sufficiently.

3:22-cv-1181). Second, permitting amendment would be fruitless. In over fifty alleged defamatory statements, only one may be potentially defamatory, but even with regard to that statement, Reed alleged no facts supporting actual malice. There is no reason to think that a third amended complaint would be different. These overwhelming deficiencies, coupled with his previous failed attempt at pleading both complaints, demonstrates that further amendment would be futile.[25]

## VI. ANTI-SLAPP

Defendants in Reed I argue they are entitled to fees and costs under Florida's anti-SLAPP statute. Florida's anti-SLAPP statute provides a right to recover attorney fees from a plaintiff who "file[s] . . . any lawsuit . . . against another person or entity without merit and primarily because such person or entity has exercised the constitutional right of free speech in connection with a public issue . . . as protected by the First Amendment to the United States

---

[25] Defendant Fox Sports has yet to appear in Reed II and Reed filed a motion for clerk's default. (Doc. 85 in 3:22-cv-1181). However, none of the claims against Fox Sports will succeed because the statements published by Fox Sports were also published by the New York Post and were determined to be non-actionable. See supra III.b.2. There is no reason to keep the case open for Reed to pursue default judgment against Fox Sports, as Reed states no plausible claims against it. As such, the motion for clerk's default is granted, but the claims against Fox Sports are dismissed. See Hall v. Chase Home Fin., LLC, No. 111CV00092TCBAJB, 2011 WL 13318765, at *12 (N.D. Ga. Mar. 22, 2011) (recommending dismissal of defendant who had not yet appeared because the claims against it were subject to dismissal), report and recommendation adopted, No. 1:11-CV-92-TCB, 2011 WL 13318866 (N.D. Ga. Apr. 12, 2011).

Constitution and s. 5, Art. I of the State Constitution." FLA. STAT. § 768.295(3) and (4). Federal courts sitting in diversity and applying Florida law routinely award fees under Florida's anti-SLAPP statute. See e.g., Corsi, 519 F. Supp. 3d at 1128 (awarding media defendants attorney's fees and costs under Florida's anti-SLAPP statute); Bongino v. Daily Beast Co., 477 F. Supp. 3d 1310, 1322–24 (S.D. Fla. 2020) (same and noting Florida's statute does not conflict with Federal Rules of Civil Procedure); Vibe Ener v. Duckenfield, No. 20-cv-22886, 2020 WL 6373419, *5 (S.D. Fla. Sep. 28, 2020) (same). Reed argues that courts applying other states' anti-SLAPP laws have held such statutes conflict with the Federal Rules of Civil Procedure.[26]

The parties present a significant issue regarding whether this Court can and should apply Florida's anti-SLAPP statute in this case. The Court requires further briefing before it can rule on this issue. Therefore, the Court defers ruling on whether fees should be awarded on this ground.

---

[26] Reed cites an oral argument of the appeal proceedings in the Corsi case wherein the Honorable William Pryor questioned whether Florida's anti-SLAPP statute applied in federal court. (See e.g., Doc. 46 at 18–19 in 3:22-cv-1059). However, the Eleventh Circuit never ruled on the appeal because the parties settled the case. See Corsi v. Newsmax Media Inc., No. 21-10480 and 22-10758, 2022 WL 3353776, at *1 (11th Cir. July 1, 2022).

## VII.   CONCLUSION

The Court has no role in determining whether some of the coverage of Reed is unfair or excessive. Rather, the Court bases its ruling on Florida defamation law and the First Amendment. This means the cases must end here.

Accordingly, it is hereby

**ORDERED:**

1.     In Reed I (3:22-cv-1059), Defendants Brandel Chamblee, Damon Hack, Benjamin Bacon, Eamon Lynch, and TGC, LLC's Motion to Dismiss the Amended Complaint (Doc. 35) is **GRANTED**.

2.     In Reed I (3:22-cv-1059), Defendants' Gannett Satellite Information Network, LLC and Gannett Co., Inc.'s Motion to Dismiss Amended Complaint (Doc. 38) is **GRANTED**.

3.     In Reed I (3:22-cv-1059), Defendant Conde Nast International, Inc. d/b/a The New Yorker's Motion to Dismiss Amended Complaint (Doc. 62) is **GRANTED**.

4.     In Reed I (3:22-cv-1059), the Affidavit of Larry Klayman (Doc. 82) is **STRICKEN**.[27]

---

[27] A few days before the July 31, 2023 hearing on the motions to dismiss, Reed filed an Affidavit with 538 pages of attachments containing cases and a Motion for Leave to Supplement the Oppositions to Motions to Dismiss. (Docs. 82, 83 in 3:22-cv-1059; 75, 76 in 3:22-cv-1181). In the motion, Reed disingenuously said the Court indicated it "would review materials outside of the four corners of the Amended Complaints" and attached 215 pages of

5.      In Reed I (3:22-cv-1059), Plaintiff Patrick Reed's Motion for Leave to Supplement His Oppositions to Motions to Dismiss (Doc. 83) is **DENIED**.

6.      In Reed I (3:22-cv-1059), the Amended Complaint (Doc. 28) is **DISMISSED WITH PREJUDICE**.

7.      In Reed II (3:22-cv-1181), Defendants Hachette Book Group Inc., Shane Ryan, and NYP Holdings, Inc.'s Motion to Dismiss the First Amended Complaint (Doc. 33) is **GRANTED**.

8.      In Reed II (3:22-cv-1181), Defendants The Associated Press and Doug Ferguson's Corrected Motion to Dismiss Amended Complaint (Doc. 36) is **GRANTED**.

9.      In Reed II (3:22-cv-1181), Bloomberg L.P.'s Motion to Dismiss Amended Complaint (Doc. 50) is **GRANTED**.

---

documents containing information about Reed's purported "financial, reputational and emotional damage," and "condemnation by even PGA Tour players of the defamatory tactics" of certain Defendants, along with other outside sources. (Docs. 83 in 3:22-cv-1059; 76 in 3:22-cv-1181). These voluminous filings made only days before the hearing were both untimely and improper. The Court never indicated it would consider materials outside of the four corners of the Amended Complaints; rather, the Court said it would receive courtesy copies of electronically filed pleadings and exhibits, as is routinely done. (Docs. 54 in 3:22-cv-1059; 41 in 3:22-cv-1181). (This also means Reed's counsel's attacks on opposing counsel who filed courtesy copies were unwarranted.) Accordingly, the Court denies the motion for leave to supplement and strikes the affidavit. To the extent Reed cited case law in his briefing elsewhere, the Court considered those cases.

10.  In Reed II (3:22-cv-1181), Defendant Erik Larson's Motion to Dismiss First Amended Complaint (Doc. 65) is **GRANTED**.

11.  In Reed II (3:22-cv-1181), the Amended Complaint (Doc. 27) is **DISMISSED WITH PREJUDICE**.

12.  In Reed II (3:22-cv-1181), the Affidavit of Larry Klayman (Doc. 75) is **STRICKEN**.

13.  In Reed II (3:22-cv-1181), Plaintiff Patrick Reed's Motion for Leave to Supplement His Oppositions to Motions to Dismiss (Doc. 76) is **DENIED**.

14.  In Reed II (3:22-cv-1181), Plaintiff Patrick Reed's Corrected Motion to Enter Default against Fox Sports (Doc. 85) is **GRANTED**. The Clerk must enter default, but the case against Fox Sports is nevertheless dismissed. See supra note 25, at 73.

15.  No later than **October 20, 2023**, any Defendant who previously requested fees under the Florida anti-SLAPP statute, may file a motion for entitlement. If any motions are filed, Reed shall respond to those motions no later than **November 17, 2023**.

16.  This Order is not final. The Court shall withhold entry of final judgment until after resolution of any fee claims.

**DONE AND ORDERED** in Jacksonville, Florida the 27th day of September, 2023.



TIMOTHY J. CORRIGAN
United States District Judge

ksm
Copies:

Counsel of Record

# EXHIBIT 2

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

PATRICK NATHANIEL REED,

     Plaintiff,

v.                                                       Case No. 3:22-cv-1059-TJC-PDB

BRANDEL EUGENE CHAMBLEE,
TGC, LLC, DAMON HACK,
BENJAMIN SHANE BACON,
EAMON LYNCH, GANNETT CO.,
INC., GANNETT SATELLITE
INFORMATION NETWORK, LLC,
CONDE NAST INTERNATIONAL,
INC., and ZACH HELFAND,

     Defendants.

---

PATRICK NATHANIEL REED,

     Plaintiff,

v.                                                       Case No. 3:22-cv-1181-TJC-PDB

SHANE RYAN, HACHETTE BOOK
GROUP, INC., DOUG FERGUSON,
THE ASSOCIATED PRESS, FOX
SPORTS, INC., NYP HOLDINGS,
INC., GAVIN NEWSHAM,
BLOOMBERG L.P., and ERIK
LARSON,

     Defendants.

---

# O R D E R

These cases are before the Court on several motions. First, in both cases, Plaintiff seeks recusal of the undersigned. (Docs. 93 in 3:22-cv-1059; 88 in 3:22-cv-1181). Second, in both cases, Plaintiff seeks reconsideration of the Court's Order dismissing the Amended Complaints with prejudice ("the dispositive Order"). (Docs. 94 in 3:22-cv-1059; 89 in 3:22-cv-1181). Third, in Reed I,[1] Defendants seek attorneys' fees and costs under Florida's anti-SLAPP Statute. (Doc. 92 in 3:22-cv-1059). Each motion is ripe. (Docs. 95, 96, 99 in 3:22-cv-1059; 90, 91 in 3:22-cv-1181). The Court denies the first two motions and grants the third motion.

## I.    REED'S MOTIONS FOR RECUSAL

In Reed I and II, Plaintiff filed identical motions seeking recusal of the undersigned. (Docs. 93 in 3:22-cv-1059; 88 in 3:22-cv-1181). Reed's counsel attaches an affidavit to both motions, which the Court reviewed. He requests recusal on several bases. First, he disagrees with the dispositive Order. He raises several arguments challenging portions of the Court's Order that he also brings in his motions for reconsideration. Relatedly, he contends that at least one of the fifty-five defamatory statements he alleged should have gone through to discovery, so the dismissal of all statements indicates the undersigned's bias.

---

[1] "Reed I" refers to <u>Reed v. Chamblee, et al.</u> (3:22-cv-1059) and "Reed II" refers to <u>Reed v. Ryan, et al.</u> (3:22-cv-1181).

(See e.g., Docs. 93 at 6 in 3:22-cv-1059 ("It is simply an impossibility that all fifty-five (55) defamatory statements would be dismissed with prejudice, particularly before any discovery had taken place."); 88 at 6 in 3:22-cv-1181 (same)). Second, Reed contends the Court should have denied Defendants' request for fees under Florida's anti-SLAPP statute in Reed I without further consideration, and the Court's failure to do so indicates bias. Third, Reed argues the undersigned "us[ed] a harsh, mocking, and condescending tone" in the dispositive Order when admonishing Reed's counsel about repeated attacks on opposing counsel for providing courtesy copies to the Court. Id. at 4. In essence, Reed challenges the dispositive Order and argues the reasoning and result suggests extrajudicial bias. Id.

Judges must recuse themselves when they are personally biased or prejudiced against a party or in favor of an adverse party. 28 U.S.C. § 144. "To warrant recusal under § 144, the moving party must allege facts that would convince a reasonable person that bias actually exists." Williams v. Geo Grp., Inc., No. 22-11266, 2023 WL 1957496 at *1 (11th Cir. Feb. 13, 2023) (citing United States v. Serrano, 607 F.2d 1145, 1150 (5th Cir. 1979)). Section 455 also requires recusal "when there is an appearance of impropriety" and "when any of the specific circumstances set forth in [§ 455(b)] exist, which show the fact of partiality." United States v. Patti, 337 F.3d 1317, 1321 (11th Cir. 2003) (citing 28 U.S.C. § 455(b)). This inquiry applies an objective standard asking whether

a "fully informed lay observer would entertain significant doubt about the judge's impartiality." Christo v. Padgett, 223 F.3d 1324, 1333 (11th Cir. 2000) (citing United States v. Kelly, 888 F.2d 732, 744-45 (11th Cir. 1989)).

Bias generally must arise from extrajudicial sources for judicial disqualification. See In re Walker, 532 F.3d 1304, 1310–11 (11th Cir. 2008) (citing Thomas v. Tenneco Packaging Co., 293 F.3d 1306, 1329 (11th Cir. 2002)). Remarks or opinions made in judicial proceedings and not from extrajudicial sources generally fall short of establishing bias "unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." Liteky v. United States, 510 U.S. 540, 555 (1994). But "[m]ere 'friction between the court and counsel' . . . is not enough to demonstrate 'pervasive bias.'" In re Walker, 532 F.3d at 1311 (internal citations omitted).

Reed identifies one extrajudicial source in his counsel's affidavit; however, he never mentions it in his motions. Mr. Klayman testifies the undersigned "had been and perhaps still is a member of an exclusive club in Ponte Vedra, Florida, where high level officials of the PGA Tour are also members, likely even the commissioner of the PGA Tour, Jay Monahan and his staff." (Docs. 93 at 34 ¶ 1 in 3:22-cv-1059; 88 at 34 ¶ 1 in 3:22-cv-1181). Such purported reason, stated only in the affidavit, is legally insufficient to establish bias. It relies on speculation that membership in a club would mean the undersigned affiliated with other potential members of the Club who may be

4

part of the PGA Tour (a non-party to this suit). As said by the Eleventh Circuit, "it is well established in our case law that recusal based 'on unsupported, irrational, or highly tenuous speculation' is not warranted." <u>Conroy on behalf of Aflac, Inc. v. Amos</u>, 785 F. App'x 751, 755 (11th Cir. 2019) (citing <u>United States v. Greenough</u>, 782 F.2d 1556, 1559 (11th Cir. 1986)). And the case law is clear that a judge's past or present membership with a group alone does not create a basis for recusal.[2] <u>See e.g.</u>, <u>In re Moody</u>, 755 F.3d 891, 899 (11th Cir. 2014) (denying petition for writ of habeas corpus because "the mere fact that Judge Coogler [the district judge] teaches at a university that has chosen to memorialize Judge Vance [a judge the petitioner was convicted of murdering] does not mandate recusal."); <u>Conroy</u>, 785 F. App'x at 755 (finding the plaintiff presented "no concrete reason" why the judge's participation in a group "would make a reasonable observer question his impartiality"); <u>Wu v. Thomas</u>, 996 F.2d 271, 275 (11th Cir. 1993) (finding judge needed not recuse himself because his status as an adjunct professor and past contributions to the defendant, a university, were insufficient for recusal); <u>Parrish v. Bd. of Comm'r of Ala. State Bar</u>, 524 F.2d 98, 101, 104 (5th Cir. 1975) (holding judge's "acquaint[ance] with" some of the defendants in the suit and their counsel did "not exceed what might

---

[2] Though unnecessary for this analysis, which is based on an objective standard that assumes the truth of the assertion, the allegation is incorrect: the undersigned is not and has not been a member of the Ponte Vedra Club during anytime pertinent to this suit.

be expected as background or associational activities with respect to the usual district judge").[3]

Otherwise, Reed's arguments for recusal concern the Court's dispositive Order and judicial proceedings in Reed I and II. As stated in Liteky, "judicial rulings alone almost never constitute a valid basis for a bias or partiality recusal motion." 510 U.S. at 541. Having reviewed Reed's arguments and the affidavit, no reasonable observer would question this Court's impartiality in the dispositive Order or based on the judicial proceedings. The Court's 78-page ruling on the pending motions—which the Court issued after a nearly three-hour hearing and supplemental briefing—substantively addressed the arguments raised in each motion and Reed's responses. The Court considered the cases cited within the parties' briefs and addressed the controlling or most persuasive precedent in the dispositive Order. Reed largely relitigates arguments made that the Court considered before and critiques the Court's resolution of those arguments. Nevertheless, neither the Affidavit nor Reed's arguments establish that the dispositive Order displayed a "deep-seated favoritism or antagonism as would make fair judgment impossible." Id.[4]

---

[3] In Bonner v. City of Prichard, the Eleventh Circuit adopted as binding precedent all decisions the Fifth Circuit rendered before October 1, 1981. 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

[4] To the extent Reed's counsel also suggests that the undersigned displayed favoritism to one of the defendants' attorneys, Minch Minchin, because he served as an intern for the undersigned over five years ago, this

Moreover, the Court's footnote in the dispositive Order regarding Reed's counsel's repeated attacks on opposing counsel does not indicate bias. (See Docs. 91 at 75 n.27 in 3:22-cv-1059; 86 at 75 n.27 in 3:22-cv-1181). The footnote addressed voluminous filings Reed made a few days before the July 31, 2023, hearing; the Court rejected Reed's contention that the Court indicated it would consider materials outside the Amended Complaints because it had done so for opposing counsel. In the underlying briefing, Reed argued that the Court "set a precedent" for "review[ing] materials outside of the four corners of the Amended Complaints," when the Court said it would consider courtesy copies of pleadings and exhibits submitted on a zip drive by opposing counsel. (Docs. 83 at 2 in 3:22-cv-1059; 76 at 2 in 3:22-cv-1181). As stated in the footnote, which bears repeating, "The Court never indicated it would consider materials outside of the four corners of the Amended Complaints; rather, the Court said it would receive

---

argument carries no force. See Brown v. Brock, 169 F. App'x 579, 581, 583 (11th Cir. 2006) (holding that district judge did not abuse his discretion in declining to recuse himself on the ground that a former law clerk represented the defendant; the court noted that "an ethical danger exists only if the law clerk knows the judge's thoughts about a specific matter and the law clerk subsequently represents one of the parties to the matter before the judge"); see also Scopelliti v. City of Tampa, No: 8:14–cv–949–MSS–TGW, 2015 WL 13427797, at *2 (M.D. Fla. Nov. 20, 2015) (denying motion for recusal on ground that counsel served as an intern for the judge previously, stating "[s]tanding alone, the fact that Defendant was represented by a lawyer who served as an intern to the court while he was attending law school is not evidence of partiality."). Reed alleges no facts demonstrating an "ethical danger" regarding Mr. Minchin's representation in this case. See Brown, 169 F. App'x at 583.

courtesy copies of electronically filed pleadings and exhibits, as is routinely done." Id. The Court's statement was appropriate because Mr. Reed's counsel repeatedly argued or insinuated that opposing counsel engaged in improper ex parte communications when opposing counsel had only submitted courtesy copies of materials already filed. (See Docs. 41, 83 in 3:22-cv-1059). Nevertheless, "judicial remarks . . . that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge." Liteky, 510 U.S. at 555.

Reed's challenge is thus insufficient and the motions for recusal in Reed I and II are due to be denied.

## II. REED'S MOTIONS FOR RECONSIDERATION

In Reed I and II, Reed filed motions seeking reconsideration of the dispositive Order under Federal Rules of Civil Procedure 59 and 60. (Docs. 94 in 3:22-cv-1059; 89 in 3:22-cv-1181). Rule 59 permits motions "to alter or amend judgment" within twenty-eight days after the entry of judgment. FED. R. CIV. P. 59(e). Rule 60 allows relief from judgment for listed specific reasons (none of which Reed claims here) or "any other reason that justifies relief." FED. R. CIV. P. 60(b). "[R]econsideration of a previous order [is] an extraordinary remedy." Ludwig v. Liberty Mut. Fire Ins.. Co., 8:03-cv-2378-EAK-MAP, 2005 WL 1053691, at *3 (M.D. Fla. March 30, 2005). "As a result, '[a] Court will not alter a prior decision absent a showing of clear and obvious error where the 'interests

8

of justice' demand correction.'" <u>Gaffney v. Rives</u>, No: 8:22-cv-1613-CEH-SPF, 2023 WL 7928093, at \*2 (M.D. Fla. Nov. 16, 2023) (quoting <u>Prudential Sec., Inc. v. Emerson</u>, 919 F. Supp. 415, 417 (M.D. Fla. 1996)). "[A] motion to reconsider must demonstrate why the court should reconsider its decision and set forth facts or law of a strongly convincing nature to induce the court to reverse its prior decision." <u>Id.</u> (quoting <u>McGuire v. Ryland Grp., Inc.</u>, 497 F. Supp. 2d 1356, 1358 (M.D. Fla. 2007)).

"Courts recognize three grounds to support a motion under Rule 59(e): (1) an intervening change in controlling law; (2) newly discovered evidence, and (3) manifest errors of law or fact." <u>Scoma Chiropractic, P.A. v. Dental Equities, LLC</u>, No. 2:16-cv-41-JLB-MRM, 2022 WL 738559, at \*2 (M.D. Fla. Feb. 9, 2022) (citing <u>Banister v. Davis</u>, 140 S. Ct. 1698, 1703 n.2 (2020)). Reed only asserts the third ground. "A manifest error 'amounts to a wholesale disregard, misapplication, or failure to recognize controlling precedent.'" <u>Id.</u> (quoting <u>Shuler v. Garrison</u>, 718 F. App'x 825, 828 (11th Cir. 2017). But the Court should not reconsider a ruling based on arguments "which could, and should, have been made earlier." <u>Prudential</u>, 919 F. Supp. at 417 (cleaned up). "Moreover, this Court will not reconsider a previous ruling when a 'party's motion fails to raise new issues and, instead, only relitigates what has already been found lacking.'" <u>McGuire</u>, 497 F. Supp. 2d at 1358 (quoting <u>Lamar Adver. of Mobile, Inc. v. City of Lakeland</u>, 189 F.R.D. 480, 489 (M.D. Fla. 1999) (citation omitted)).

Reed seeks solely to relitigate past arguments, old matters, and case law previously considered by the Court. He argues the Court ignored case law he cited and misstated the law. This is incorrect. The Court carefully reviewed and heard the briefs and arguments presented before issuing the dispositive Order. The Court also has considered the case law cited in Reed's reconsideration motions, none of which changes the Court's reasoning. Notably, Reed seemingly disregards the law cited by the Court in the dispositive Order. For example, Reed quotes the Order stating "[w]hether the defendant's statements constitute defamation . . . is a question of law for the court to determine," and argues this represents the Court "admit[ing] that [it] was taking this matter totally out of the hands of the trier of fact." (Docs. 94 at 3 in 3:22-cv-1059; 89 at 3 in 3:22-cv-1181). However, Reed never identifies that this statement is a quote from an Eleventh Circuit case, <u>Turner v. Wells</u>, 879 F.3d 1254, 1269 (11th Cir. 2018). (<u>See</u> Docs. 91 at 25 in 3:22-cv-1059; 86 at 25 in 3:22-cv-1181). Reed neglects to address <u>Turner</u>, the related case law cited in the Order, or how this law is incorrect. Contrary to Reed's assertions, the Court did not disregard, misapply, or fail to recognize controlling precedent. <u>See generally</u> <u>Scoma</u>, 2022 WL 738559, at *2.

Further, Reed's claim that the Court did not give individual analysis to each of the fifty-five alleged defamatory statements falls short. The Court identified the basis for dismissal of each statement in the Order and analyzed

10

each basis with the relevant law. Reed may disagree with the Order or wish for more. But Reed's position does not establish manifest error. Id. Finally, Reed's argument that the Court should have summarily denied Defendants' request for attorneys' fees carries no weight because the Court held the issue in abeyance pending further briefing, so there is no prior decision to reconsider.[5] Accordingly, Reed has failed to identify any cognizable basis for reconsideration.

## III.   DEFENDANTS' MOTION FOR ANTI-SLAPP FEES

In Reed I, Defendants move for attorneys' fees and costs under Florida's anti-SLAPP statute. § 768.295, Fla. Stat. (2023). Previously, the Court considered this issue and ordered additional briefing on Defendants' entitlement to those fees and costs. (Doc. 91 at 73–77).[6] The briefing is now complete. (Docs. 92; 99).

---

[5] In his reconsideration motions, Reed again claims the Court reviewed documents from Defendants outside the scope of the Amended Complaints but refused to do so for him. This is wrong. As stated before, opposing counsel submitted courtesy copies of pleadings and exhibits that had been filed with the Court. (See Docs. 91 at 75 n.27 in 3:22-cv-1059; 86 at 75 n.27 in 3:22-cv-1181). The Court considered those courtesy copies. The Court also considered the materials submitted with Reed's filings and presented at the hearing, except for the untimely filings made prior to the hearing. Id. Reed identifies no materials submitted by the parties that the Court cited to or analyzed in the dispositive Order that were improper.

[6] All document citations in this section refer to Reed I unless otherwise stated.

Florida's anti-SLAPP statute provides a right to recover attorney fees from a plaintiff who "file[s] . . . any lawsuit . . . against another person or entity without merit and primarily because such person or entity has exercised the constitutional right of free speech in connection with a public issue . . . as protected by the First Amendment to the United States Constitution and s. 5, Art. I of the State Constitution." § 768.295(3) and (4), Fla. Stat. (2023). "'Free speech in connection with public issues' means any written or oral statement that is protected under applicable law and . . . is made in or in connection with a play, movie, television program, radio broadcast, audiovisual work, book, magazine article, musical work, news report, or other similar work." § 768.295(2)(a).

The Eleventh Circuit has not ruled on whether Florida's anti-SLAPP statute applies in federal court cases invoking diversity jurisdiction. See e.g., Condo. Assoc. of Parker Plaza Ests., Inc. v. Moreff, No. 22-61638-CIV, 2023 WL 3600495, at *1 (S.D. Fla. March 2, 2023) ("The Eleventh Circuit has not yet addressed whether Florida's anti-SLAPP statute can be applied to actions in federal court.") (citing Parekh v. CBS Corp., 820 F. App'x 827, 836 (11th Cir. 2020).[7] Absent such precedent, other district courts within the Eleventh Circuit

---

[7] Reed cites an oral argument of the appeal proceedings in the Corsi case wherein the Honorable William Pryor questioned whether Florida's anti-SLAPP statute applied in federal court. (See e.g., Doc. 46 at 18–19 in 3:22-cv-1059). However, the Eleventh Circuit never ruled on the appeal because the

have considered this issue. In <u>Government Employees Insurance Co. v. Glassco Inc.</u>, my colleague, Judge Kathryn Kimball Mizelle, analyzed in great depth whether Florida's anti-SLAPP statute applies in federal court. No. 8:19-cv-1950-KKM-JSS, 2021 WL 4391717, at *3–5 (M.D. Fla. Sept. 24, 2021). Applying the <u>Erie</u> doctrine—which requires "[a] federal court sitting in diversity [to] apply state substantive law and federal procedural law"—Judge Mizelle held that Florida's anti-SLAPP statute creates a substantive right and thus must be applied in federal court. <u>Id.</u> at *3–5 (citing <u>Hanna v. Plumer</u>, 380 U.S. 460, 465 (1965) (citing <u>Erie R.R. Co. v. Tompkins</u>, 304 U.S. 64 (1938)). In so doing, Judge Mizelle stated that a plain reading of the statute suggested that it "is strictly a procedural mechanism for litigants to have anti-SLAPP motions decided more expeditiously," instead of a substantive right. <u>Id.</u> at *5. But she reasoned that a Florida appellate court found a substantive right.

> In <u>Gundel v. AV Homes, Inc.</u>, Florida's Second District Court of Appeal concluded that Florida's anti-SLAPP statute "creates a right not to be subject to meritless suits filed 'primarily because [the defendant] has exercised the constitutional right of free speech in connection with a public issue, or right to peacefully assemble, to instruct representatives of government, or to petition for redress of grievances before the various governmental entities of the states.'" 264 So. 3d 304, 310–11 (Fla. 2d DCA 2019) (alteration in original) (quotation omitted) (referring to the right created by the anti-SLAPP statute as a "substantive right"). Although it recognized that the statute puts forth "procedural mechanisms," that court also read into the statute a burden-

---

parties settled the case. <u>See</u> <u>Corsi v. Newsmax Media Inc.</u>, No. 21-10480 and 22-10758, 2022 WL 3353776, at *1 (11th Cir. July 1, 2022).

shifting test. Id. at 312–14. Under this test, the SLAPP defendant bears the initial burden of establishing a prima facie case that the anti-SLAPP statute applies. Id. at 314. Then the party that filed the lawsuit must show that its claims are not without merit and not primarily based on retaliating against the exercise of First Amendment rights in connection with a public issue. Id. The court found that this unwritten burden-shifting approach "serves the purpose of the statute." Id. But see Ingraham v. Wright, 430 U.S. 651, 670 n.39 (1977) ("There is no support whatever for this [purposive analysis] in the decisions of this Court.").

The Court is left with a state statute, the text of which is procedural and creates no substantive right but which has been interpreted by a state appellate court as creating a substantive right that includes a burden-shifting approach to deciding a motion. Whatever misgivings the Court might have, its obligation is clear: "**State law is what the state appellate courts say it is, and we are bound to apply a decision of a state appellate court about state law even if we think that decision is wrong**." Winn-Dixie Stores, Inc. v. Dolgencorp, LLC, 881 F.3d 835, 848 (11th Cir. 2018) (Ed Carnes, C.J.). So here we are: **the Court must read Florida's anti-SLAPP statute as creating a substantive right and apply its burden-shifting procedure per Gundel if no conflicts exist with the Federal Rules of Civil Procedure**. See [Makaeff v. Trump University, LLC, 715 F.3d 254, 273 (9th Cir. 2013)] (Kozinski, J., concurring). **None do.**

Id. at *5 (emphasis added) (internal footnote omitted).[8] As described by Judge Mizelle, the Gundel court held that Florida's anti-SLAPP statute created a "substantive right," and noted that it "bears some similarity to statutes providing for immunity from suit where the statutory protection cannot be

---

[8] While agreeing with the result reached by Judge Mizelle that the anti-SLAPP statute applies in federal court, the undersigned takes no position on Judge Mizelle's "plain reading" stance.

adequately restored once it is lost through litigation and trial." <u>Gundel</u>, 264 So. 3d at 311 (citations omitted).[9]

Other federal courts within the Eleventh Circuit have awarded fees and costs under Florida's anti-SLAPP statute. <u>See</u> <u>e.g.</u>, <u>Corsi v. Newsmax Media, Inc.</u>, 519 F. Supp. 3d 1110, 1128 (S.D. Fla. 2021) (awarding media defendants attorney's fees and costs under Florida's anti-SLAPP statute); <u>Mac Isaac v. Twitter, Inc.</u>, 557 F. Supp. 3d 1251, 1261 (S.D. Fla. 2021) (after dismissing the amended complaint with prejudice for failing to state a claim, the court awarded fees and costs under Florida's anti-SLAPP statute because the defamation claim was meritless); <u>Bongino v. Daily Beast Co.</u>, 477 F. Supp. 3d 1310, 1322–24 (S.D. Fla. 2020) (same and noting Florida's statute does not conflict with Federal Rules of Civil Procedure: "This conclusion is in line with decades of Eleventh Circuit precedent, which find that state-law statutes and claims for attorneys' fees and costs 'unequivocally' apply in a federal court exercising diversity jurisdiction." (citations omitted)); <u>Vibe Ener v. Duckenfield</u>, No. 20-cv-22886,

---

[9] Several Florida District Courts of Appeal have certified conflict with <u>Gundel</u> regarding whether the substantive right created by Florida's anti-SLAPP statute provides certiorari jurisdiction to the Florida appellate courts. <u>See</u> <u>Vericker v. Powell</u>, 343 So. 3d 1278, 1281 (Fla. 3d DCA 2022); <u>WPB Residents for Integrity in Gov., Inc. v. Materio</u>, 284 So. 3d 555, 561 (Fla. 4th DCA 2019); <u>Johnston v. Fischer</u>, 369 So. 3d 354, 356 (Fla. 5th DCA 2023). Though this conflict concerns the anti-SLAPP statute, it does not impact the issue here—whether the fee provision in Florida's anti-SLAPP statute is procedural or substantive.

2020 WL 6373419, *5 (S.D. Fla. Sept. 28, 2020) (applying the fee provision of Florida's anti-SLAPP statute); <u>Anderson v. Best Buy Stores L.P.</u>, No. 5:20-cv-41-JSM-PRL, 2020 WL 5122781, at *4 (M.D. Fla. July 28, 2020) (same), <u>adopted in full by sub nom. Anderson v. Coupons in the News</u>, No. 5:20-cv-41-JSM-PRL, 2020 WL 5106676 (M.D. Fla. Aug. 31, 2020).

But Reed rejects this line of cases. Instead, he asks the Court to follow Judge Paul G. Byron's lead in <u>Sterling v. Doe</u>, No: 6:21-cv-723-PGB-EJK, 2022 WL 2112091, at *4–5 (M.D. Fla. Feb. 2, 2022). <u>Sterling</u> involved a defamation suit. <u>Id.</u> There, the Magistrate Judge denied the defendant's motion to quash third-party subpoenas issued by the plaintiff for the purpose of naming and serving the defendant. <u>Id.</u> at *2. The defendant argued Florida and California's anti-SLAPP statutes provided him standing to challenge the subpoenas. <u>Id.</u> at *4. Magistrate Judge Kidd rejected that argument and found both anti-SLAPP statutes inapplicable because the plaintiff alleged a prima facie defamation case. <u>See id.</u> In denying the objection to this order, Judge Byron reasoned Judge Kidd need not have followed the line of federal court cases applying the fee provision in Florida's anti-SLAPP statute because "the fee-shifting provision of anti-SLAPP laws is obviously different than the pretrial dismissal anti-SLAPP provisions which conflict with and 'answer the same question' as the Federal Rules." <u>Id.</u> at *5 (quoting <u>Bongino</u>, 477 F. Supp. 3d at 1323 (internal quotation

16

marks and citation omitted)). <u>Sterling</u> does not conflict with other federal courts that have held and applied Florida's anti-SLAPP fee provision under <u>Erie</u>.

Although Reed cites cases based on anti-SLAPP statutes from other states, those decisions are unpersuasive. The specific requirements and language in each state's anti-SLAPP statute must be analyzed individually under <u>Erie</u>, which leads to different results depending on the statute. <u>See Carbone v. CNN, Inc.</u>, 910 F.3d 1345, 1347-57 (11th Cir. 2018) (finding Georgia's anti-SLAPP statute's "motion-to-strike" provision inapplicable in federal court because it conflicted with Federal Rules of Civil Procedure 8, 12, and 56); <u>Klocke v. Watson</u>, 936 F.3d 240, 245–49 (5th Cir. 2019) (holding Texas's anti-SLAPP statute imposed additional requirements beyond those in Federal Rules of Civil Procedure 12 and 56, and thus the statute did not apply in federal court); <u>La Liberte v. Reid</u>, 966 F.3d 79, 87–88 (2d Cir. 2020) (holding California's motion to strike procedure in anti-SLAPP statute conflicted with Federal Rules of Civil Procedure and was therefore inapplicable in federal court); <u>Abbas v. Foreign Pol'y Grp., LLC</u>, 783 F.3d 1328, 1333–36 (D.C. Cir. 2015) (holding that special motion to dismiss provision in D.C.'s anti-SLAPP statute conflicted with Federal Rule of Civil Procedure 12 and was thus inapplicable in federal court); <u>but see</u> <u>Godin v. Schencks</u>, 629 F.3d 79, 85–86 (1st Cir. 2010) (holding Maine's anti-SLAPP statute applied in federal court, because "neither Fed.R.Civ.P. 12(b)(6) nor Fed.R.Civ.P. 56 . . . was meant to control the particular issues

under" the statute); <u>Adelson v. Harris</u>, 774 F.3d 803, 809 (2d Cir. 2014) (holding Nevada's anti-SLAPP law applied in federal court in part because fee-shifting statutes are substantive under <u>Erie</u>).

None of these cases, nor any others cited by the parties or located by the Court, controls whether the <u>fee provision</u> in <u>Florida's</u> anti-SLAPP statute applies in federal court cases. And thus far, the tide of courts within this Circuit have applied the Florida fee provision. <u>See, e.g.</u>, <u>Corsi</u>, 519 F. Supp. 3d at 1128; <u>Mac Isaac</u>, 557 F. Supp. 3d at 1261; <u>Bongino</u>, 477 F. Supp. 3d at 1322–24; <u>Vibe Ener</u>, 2020 WL 6373419, at *5; <u>Anderson</u>, 2020 WL 5122781, at *4. The Court follows those cases and finds the fee provision in Florida's anti-SLAPP statute applies.

The statute states "[t]he court shall award the prevailing party reasonable attorney fees and costs incurred in connection with a claim that an action was filed in violation of this section." § 768.295(4), Fla. Stat. (2023). Defendants satisfy both requirements for attorneys' fees and costs under the statute. <u>See Vibe Ener</u>, 2020 WL 6373419, at *4–5 (describing the Court must find the claims to be "without merit" under § 768.295(3) and primarily because the defendant exercised "free speech in connection with a public issue"). First, given that Reed brought no viable defamation claims in his original and Amended Complaint, his claims are "without merit." § 768.295(3), Fla. Stat. (2023). Second, the lawsuits were brought "primarily" because Defendants

"exercised the constitutional right of free speech" in their publications about Reed as a public figure. See Parekh, 820 F. App'x at 836 (affirming award of fees under Florida anti-SLAPP statute where lower court determined that the suit lacked merit and arose out of protected First Amendment activity). Accordingly, Defendants are entitled to an award of attorney's fees and costs under Florida's anti-SLAPP Statute, § 768.295(4), Fla. Stat. (2023).

Accordingly, it is hereby

**ORDERED:**

1.    In Reed I (3:22-cv-1059), Defendants' Motion for Anti-SLAPP Fees (Doc. 92) is **GRANTED**.

2.    No later than **January 24, 2024**, Defendants shall file a motion (jointly or separately) regarding the fee amounts and costs under Local Rule 7.01(c). Reed shall respond no later than **February 23, 2024**.

3.    In Reed I (3:22-cv-1059), Plaintiff's Motion for Recusal (Doc. 93) is **DENIED**.

4.    In Reed I (3:22-cv-1059), Plaintiff's Motion for Reconsideration, to Alter or Amend Judgment, and for Relief from Judgment or Order Pursuant to Federal Rules of Civil Procedure 59 and 60 (Doc. 94) is **DENIED**.

5.    In Reed II (3:22-cv-1181), Plaintiff's Motion for Recusal (Doc. 88) is **DENIED**.

6.    In Reed II (3:22-cv-1181), Plaintiff's Motion for Reconsideration, to Alter or Amend Judgment, and for Relief from Judgment or Order Pursuant to Federal Rules of Civil Procedure 59 and 60 (Doc. 89) is **DENIED**.

7.    The Court will direct entry of Final Judgment in Reed I (3:22-cv-1059) after ruling on the forthcoming fee motion(s).

8.    The Court will delay entry of Final Judgment in Reed II (3:22-cv-1181) until it enters judgment in Reed I.

**DONE AND ORDERED** in Jacksonville, Florida the 5th day of January, 2024.

Timothy J. Corrigan

TIMOTHY J. CORRIGAN
United States District Judge

ksm
Copies:

Counsel of Record

20